**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Future Claimants' Representative,<br>Tort Claimants' Committee, and<br>Coalition of Abused Scouts for Justice, | ) ) ) ) | |
| Petitioners, | ) | Civil Action No. 21-392-RGA |
| v. | ) ) | Bankruptcy Case No. 20-10343 (LSS) |
| Boy Scouts of America and Delaware BSA, LLC, | ) ) | |
| Respondents. | ) ) ) | |

**APPENDIX TO DEBTORS' ANSWERING BRIEF IN OPPOSITION TO THE FUTURE
CLAIMANTS' REPRESENTATIVE, THE OFFICIAL COMMITTEE OF TORT
CLAIMANTS, AND THE COALITION OF ABUSED SCOUTS FOR JUSTICE'S
MOTION FOR ENTRY OF AN ORDER, PURSUANT TO 28 U.S.C. § 157(d) AND
BANKRUPTCY RULE 5011(a), WITHDRAWING THE REFERENCE OF
PROCEEDINGS INVOLVING THE ESTIMATION OF PERSONAL INJURY CLAIMS**

# TABLE OF CONTENTS

**Description**                                                                                                                                          **Pages**

Transcript of Hearing, February 17, 2021 [Bankr. D.I. 2240]................................. A001-A0271

Transcript of Telephonic Omnibus Hearing, March 17, 2021

    [Bankr. D.I. 2407] ............................................................................... A0272-A0335

Transcript of Status Conference, April 12, 2021 [Bankr. D.I. 2589] ..................... A0336-A0372

```
 1                 UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3                                    .    Chapter 11
     IN RE:                           .
 4                                    .    Case No. 20-10343 (LSS)
     BOY SCOUTS OF AMERICA and        .
 5   DELAWARE BSA, LLC,               .
                                      .    Courtroom No. 2
 6                                    .    824 North Market Street
                                      .    Wilmington, Delaware 19801
 7
                 Debtors.            .    February 17, 2021
 8   . . . . . . . . . . . . . . . .    10:00 A.M.

 9                       TRANSCRIPT OF HEARING
         BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10               UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Debtor:          Derek C. Abbott, Esquire
13                            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                              1201 North Market Street, 16th Floor
14                            Wilmington, Delaware 19899

15                            - and -

16                            Jessica Lauria, Esquire
                              WHITE & CASE
17                            1221 Avenue of the Americas
                              New York, New York 10020
18
     For First State Insurance
19     Company and Hartford
       Accident and Indemnity
20     Company:               James Ruggeri, Esquire
                              SHIPMAN & GOODWIN LLP
21                            1875 K Street, NW, Suite 600
                              Washington, DC 20003
22

23   Audio Operator:          Brandon McCarthy

24

25
```

1  Transcription Company:    Reliable
                             1007 N. Orange Street
2                            Wilmington, Delaware 19801
                             (302)654-8080
3                            Email:  gmatthews@reliable-co.com

4  Proceedings recorded by electronic sound recording;
5  transcript produced by transcription service.

6

7  <u>TELEPHONIC APPEARANCES</u> (Continued):

8

9  For Century Indemnity:    Tancred Schiavoni, Esquire
                             Brad Elias, Esquire
10                           O'MELVENY
                             7 Times Square
11                           New York, New York 10036

12 For Tort Claimants:       James Stang, Esquire
                             PACHULSKI STANG ZIEHL JONES LLP
13                           919 North Market Street, 17th Floor
                             Wilmington, Delaware 19801
14

15
   For Coalition of the      Eric Goodman, Esquire
16   Abused Scouts for       D. Cameron Moxley, Esquire
     Justice:                BROWN RUDNICK
17                           601 Thirteenth Street, NW
                             Washington, DC 20005
18
   For Andrew Vanarsdale
19   & Timothy Kosnoff:      David Wilks, Esquire
                             WILKS LAW, LLC
20                           Wilmington, Delaware

21 For Napoli Shkolnik:      Brett Bustamante, Esquire
22                           NAPOLI SHKOLNIK PLLC
                             360 Lexington Avenue
23                           New York, New York 10017

24

25

1    TELEPHONIC APPEARANCES (Continued):

2

3    For Hartford Financial:    Philip Anker, Esquire
                                WILMERHALE
4                               250 Greenwich Street
                                New York, New York 10007

5
     For The Church of Jesus    Adam J. Goldberg, Esquire
6       Christ of Latter-Day-   LATHAM & WATKINS LLP
        Saints:                 885 Third Avenue
7                               New York, New York 10022

     For Bailey Cowan
8       Heckaman PLLC:          Connor Bifferato, Esquire
                                THE BIFFERATO FIRM
9                               800 N. King Street
                                Wilmington, Delaware 19801
10

     For James Harris Law:      James Harris, Esquire
11                              JAMES HARRIS LAW, PLLC

12
     For 55101:                 Melanie Muhlstock, Esquire
13                              PARKER WAICHMAN LLP
                                59 Maiden Lane, 6th Floor
14                              New York, New York 10038

15   For Slater Slater
        Schulman LLP:           Scott Cousins, Esquire
16                              COUSINS LAW LLC
                                1521 Concord Pike
17                              Wilmington, Delaware

18                              - and -

19
                                Joel Taylor, Esquire
20                              KAGEN CASPERSEN
                                757 3rd Avenue, 20th Floor
21                              New York, New York 10017

22   For Eisenberg Rothweiler
        Winkler, Eisenberg &
23      Jeck, P.C.:             Daniel Hogan, Esquire
                                HOGAN MCDANIEL
24                              1311 Delaware Avenue
                                Wilmington, Delaware 19806
25

TELEPHONIC APPEARANCES (Continued):

```
For Mark Bern/Partners:    William Sullivan, Esquire
                           SULLIVAN HAZELTINE ALLINSON LLC
                           919 North Market Street
                           Wilmington, Delaware 19801

For Michael O'Malley:      Walter Gouldsbury, Esquire
                           CIARDI Gouldsboro ASTIN
                           52 Haddonfield-Berlin Road
                           Cherry Hill, New Jersey 08034

For John Doe 59969:        Carmen Durso, Esquire
                           LAW OFFICE OF CARMEN DURSO
                           175 Federal Street
                           Boston, Massachusetts 02110

For AIG:                   Susan Gummow, Esquire
                           FORAN GLENNON PALANDECH PONZI RUDLOFF
                           222 North LaSalle Street
                           Chicago, Illinois 60601

For Andrews Thornton,
  ASK LLP:                 Lawrence Robbins, Esquire
                           ROBBINS RUSSELL ENGLERT ORSECK
                             UNTEREINER SAUBER LLP
                           2000 K Street NW, 4th Floor
                           Washington, DC 20006

For Junell & Assoc.:       John Thomas, Esquire
                           HICKS THOMAS LLP
                           700 Louisiana Street
                           Houston, Texas 77002

For D Miller & Assoc.:     Stephanie Levick, Esquire
                           WALDEN MACHT HARAN
                           250 Vesey Street, 27th Floor
                           New York, New York 10281
```

```
1   TELEPHONIC APPEARANCES (Continued):

2

3   For Claimants 18867,
      43995, 50263:           Ryan Hicks, Esquire
4                             SCHNEIDER WALLACE COTTRELL KONECKY
                              2000 Powell Street, Suite 1400
5                             Emeryville, California 94608

6   For Babin Law:            Joseph Pickens, Esquire
                              TAFT STETTINIUS HOLLISTER
7                             94 N. Sandusky Street, Suite 101
                              Delaware, Ohio 43015
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

<u>INDEX</u>

2  #3) [SEALED] Hartford and Century's Motion for an Order (I)
3  Authorizing Certain Rule 2004 Discovery and (II) Granting
   Leave from Local Rule 3007-1(f) to Permit the Filing of
4  Substantive Omnibus Objections (D.I. 1971, Filed 1/22/21).

5  #4) [SEALED] Insurers' Motion for an Order Authorizing Rule
   2004 Discovery of Certain Proofs of Claims (D.I. 1974, Filed
6  1/22/21).

7  #5) Insurers' Motion for Entry of an Order Authorizing Filing
   Under Seal Portions of Certain Documents Relating to
8  Insurers' Motion for an Order Authorizing Rule 2004 Discovery
   of Certain Proofs of Claim (D.I. 1976, Filed 1/22/21).
9

10  #6) Hartford Accident and Indemnity Company, First State
    Insurance Company and Twin City Fire Insurance Company's
11  Motion to Compel Abused in Scouting and Kosnoff Law PLLC to
    Submit Rule 2019 Disclosures (D.I. 2028, Filed 2/3/21).

12  #7) Century's Motion to Compel Ichor Consulting, LLC to
13  Submit the Disclosures Required by Federal Rule of Bankruptcy
    Procedure 2019 (D.I. 2029, Filed 2/3/21)
14

15  #8) Century's Motion to Compel Abused In Scouting, Kosnoff
    Law PLLC, and the Coalition to Submit the Disclosures
16  Required by Federal Rule of Bankruptcy Procedure 2019 (D.I.
    2030, Filed 2/3/21).

17  #9) Motion of Andrews & Thornton, Attorneys at Law and ASK
18  LLP for Entry of an Order Authorizing Filing under Seal of
    their Objection to Insurers' Rule 2004 Motion (D.I. 2083,
19  Filed 2/5/21).

20  #10) Motion of the Coalition of Abused Scouts for Justice to
    File Sur-Reply to Insurers' Reply Brief in Support of Motion
21  for an Order Authorizing Rule 2004 Discovery of Certain
    Proofs of Claim (D.I. 2196, Filed 2/15/21).
22

23  #11) Timothy D. Kosnoff, Esquire's Motion to Strike Insurers'
    Reply Brief in Support of Motion for an Order Authorizing
24  Rule 2004 Discovery of Certain Proofs of Claim [D.I. 2180]
    (D.I. 2204, Filed 2/16/21).

25

#12) Insurers' Motion for Entry of an Order Authorizing Filing Under Seal Certain Documents Relating to Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim [D.I. 1974, Revised Public Version D.I. 2022] (D.I. 2211, Filed 2/16/21).

**Ruling: Matters taken under advisement**

#13) Third Interim Fee Application Hearing. [Exhibit A]

    <u>Debtors' Professionals</u>
    Alvarez & Marsal North America, LLC
    Bates White, LLC
    Haynes and Boone, LLP
    KCIC, LLC
    Morris, Nichols, Arsht & Tunnell LLC
    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
    PricewaterhouseCoopers LLP
    Quinn Emanuel Urquhart & Sullivan, LLP
    Sidley Austin LLP
    White & Case LLP

    <u>Tort Committee's Counsel</u>
    Pachulski Stang Ziehl & Jones LLP
    Pasich LLP
    Berkeley Research Group, LLC

    <u>Official Committee of Unsecured Creditors</u>
    AlixPartners, LLP
    Kramer Levin Naftalis & Frankel LLP

    <u>Future Claimant's Representatives</u>
    Ankura Consulting Group, LL
    Gilbert, LLP
    James L. Patton, Jr. and Young Conaway Stargatt & Taylor

HARTFORD'S WITNESS(s)

**DENISE NEUMANN MARTIN**

    Direct Examination by Mr. Ruggeri     22

    Cross Examination by Mr. Moxley     29

1     Redirect Examination by Mr. Ruggeri     58

2

3  CENTURY'S WITNESS(s)

4  **PAUL HINTON**

5     Direct Examination by Mr. Elias     150

6     Cross Examination by Mr. Robbins     162

7     Cross Examination by Mr. Sullivan     170

8     Cross Examination by Mr. Taylor     172

9     Cross Examination by Mr. Goodman     180

10     Redirect Examination by Mr. Elias     182

11

12  EXHIBITS     I.D.     REC'D

13  Declaration of Joshua Weinberg     18

14  Declaration of Todd Mercier     19

15  Declaration of Dr. Denise Neumann Martin     21

16  Declaration of Andrew Kirschenbaum     141

17  Declaration of Sergei Zaslavsky     142

18  Declaration of Paul Hinton     148

19  Declaration of Erich Speckin     149

20

21

22

23

24

25

1       (Proceedings commenced at 10:13 a.m.)

2              THE COURT:  Good morning, counsel, this is Judge

3    Silverstein.  We're here in the Boy Scouts of America case;

4    case number 20-10343.

5              Brandon, can you please remind everyone of the

6    protocol for the hearing.

7              THE CLERK:  Yes, good morning.

8              It is very important that you put your phones on

9    mute when you are not speaking.  When speaking, please do not

10   have your phones on speaker as it creates feedback and

11   background noise which makes it very difficult to hear you

12   clearly.

13             Also, it is important that you state your name

14   each time you speak for an accurate record.  Your cooperation

15   in this matter is appreciated.  Thank you.

16             THE COURT:  Thank you.

17             I'm going to turn this over to debtors' counsel

18   and I'm assuming that I'm going to get an update on where we

19   are and I would like to have that, please.

20             MR. ABBOTT:  Yes, Your Honor.  Thank you.  Derek

21   Abbott from Morris Nichols here with my colleagues from White

22   & Case, counsel for the debtors.

23             Your Honor, before we jump into that, may I make

24   one suggestion regarding the agenda, Your Honor?

25             THE COURT:  Yes.

1          MR. ABBOTT:  The last item on the agenda is

2     interim fee apps.  Your Honor, we have a lot on the court's

3     plate today.  And I know there may be a number of

4     professionals who were on the phone for that.  My hunch, Your

5     Honor, was that you might not get to that today.  But if

6     that's accurate, I wonder if we might just announce that and

7     let those folks be excused so we're not, you know, burning

8     their time and our money.

9          THE COURT:  Yes, thank you, Mr. Abbott.  Your

10    hunch is correct. We are not going to get to that today.

11         So if that's the matter that you are on for, then

12    you are excused.

13         MR. ABBOTT:  Thanks very much, Your Honor.  I will

14    now turn it over to Ms. Boelter for a quick update on status,

15    and then we'll return to the agenda after that.

16         THE COURT:  Thank you.

17         Ms. Boelter.

18         MS. LAURIA:  Thank you, Your Honor and I now --

19    Jessica Lauria, formerly Boelter, with White & Case for the

20    debtors.  I will be brief, Your Honor, because I am cognizant

21    of the fact that you do have a very full agenda this morning.

22         We have not appeared in front of the court since

23    November, that was shortly after our bar date.  And that, I

24    think, is good news in the sense that we've managed to

25    resolve contested issues without the need to appear before

1 the court. And, frankly, it saved the estate quite a bit of
2 money not pulling us altogether.

3      What have we been doing since November?  We have
4 been, Your Honor, engaged in very intense mediations. We now
5 have twenty-two mediation parties which are keeping our three
6 mediators extremely busy.  The mediation sessions at this
7 point are dailies, sometimes several times a day, involving
8 one-on-one with a singular mediation party and the mediator,
9 sometimes a collection of mediation parties and the mediator.

10      We are making very good progress in the
11 mediations.  But we do have a lot of work in front of us
12 still.  That said, Your Honor, as I reported in November, it
13 is still the debtor's intention to emerge from Chapter 11 by
14 the end of summer 2021, so by the end of this upcoming
15 summer.

16      In order to do that, we need to have a disclosure
17 statement hearing late spring.  We're targeting the April
18 timeframe, and I believe Mr. Abbott and his colleagues have
19 been in touch with chambers in terms of understanding Your
20 Honor's schedule and securing those dates.

21      To make that happen, the debtors will need to file
22 an amended plan and disclosure statement, as well as a
23 solicitation procedures motion in the next few weeks. And we
24 look forward to discussing those documents with you in April.

25      So that's where we're at today, Your Honor.  If

1   you have any questions, I'm happy to answer them, but,

2   otherwise, I think we can hand things back over to Mr. Abbott

3   to kick off today's agenda.

4          THE COURT:  Okay.  Thank you.  No, I don't have

5   any questions.  That was helpful.

6          Let me remind everyone who is not speaking to mute

7   your phones.  I am hearing some paper rustling and some

8   background noise.

9          Mr. Abbott.

10         MR. ABBOTT:  Thanks, Your Honor.  My apologies to

11  Ms. Lauria for failing to keep up with the times.

12         Your Honor, items 1 and 2 on the agenda --

13         THE COURT:  And congratulations.

14         MR. ABBOTT:  Indeed, Your Honor.

15         Items 1 and 2 on the agenda, Your Honor, have been

16  submitted under certificate of no objection which brings us

17  to number 3 which is the first matter that I think is going

18  forward, unless the court has questions about 1 or 2?

19         THE COURT:  No, I don't think I have questions

20  about 1 or 2.  I'll take a look at them after the hearing.

21         MR. ABBOTT:  Thank you very much, Your Honor.

22         Number 3 is Century's motion, Your Honor, so I

23  will cede the microphone to Century's counsel.

24         THE COURT:  Thank you.

25         MR. SCHIAVONI:  Your Honor, I believe we have two

1  2004 motion before the court.  They're kind of bookends to

2  each other.  One of them seeks discovery which with respect

3  to the claimants and the other one seeks -- and it also seeks

4  very importantly limited relief from the local rule allowing

5  omnibus objections to be heard.

6          The other motion seeks some very targeted

7  discovery of specific plaintiff's lawyers who signed large

8  numbers of proofs of claim.  This is sort of two ends of the

9  pipe, sort of what on the one end of the process on how the

10 claims were prepared, and on the other end issues about the

11 kinds of claims that came out on the backend.

12         And I would just suggest, Your Honor, that we

13 address, first, the motion for claimant discovery and the

14 corresponding relief from the omnibus to allow omnibus

15 objections to be addressed.  And I would turn that over to

16 Hartford to give the main presentation.

17         I would ask to be heard at the end of that briefly

18 on the omnibus objection issue because it's so important to

19 just address one of the Supreme Court cases that deal with

20 that issue.

21         THE COURT:  Okay.  Now who is going to be taking

22 the lead on this?

23         MR. RUGGERI:  Good morning, Your Honor, James

24 Ruggeri for Hartford.  I will grab the one end of the pipe

25 that Mr. Schiavoni has extended to me.

1          Your Honor, I'd like to start with what we believe

2     is some good news.

3          Through our meet and confer effort in regard to

4     our motion, 2004 motion for leave to serve discovery, we met

5     and conferred with claimants and counsel over the past few

6     weeks. We actually have been able to resolve our differences

7     with ninety-four of the claimants, so those ninety-four

8     claimants have been removed from the list of claimants as to

9     which we've asked the court to grant us relief or permission

10    to serve discovery.

11         And last night, we filed at Docket Number 2224 of

12    filings that shows the amended Exhibit C to our motion which

13    shows 1,304 claimants as to which we have current discovery

14    disputes.

15         Your Honor, now I'd like to turn to the

16    declaration --

17         THE COURT:  Let me ask, Mr. Ruggeri, let me ask

18    what was the general nature of the resolutions that have been

19    reached?

20         MR. RUGGERI:  There was a wide range, Your Honor.

21    Some of the claimants agreed to meet our discovery request.

22    A lot of them did actually and to respond in full to the

23    eleven interrogatories and eight document requests we served.

24         Others, Your Honor, we went through the proof of

25    claim form and they told us they had nothing further to add.

1  And they were in those few open window states, if you will,

2  with regard to the statute of limitation.  And so we said, so

3  long as you're affirming that this is the information that

4  this is the information that you have to support your claim,

5  we will accept that representation.

6          And, again, so long as they weren't in a discovery

7  rule statute of limitation state, which is different than the

8  open window states as the court knows, we were satisfied that

9  the proofs of claim forms and the information support

10  supplied met the obligation that we thought we needed them to

11  meet.  So we were able to resolve those.

12          So it was as bit of a mix bag, Your Honor.  But it

13  did take place over a period of weeks and, as I said, we're

14  pleased that we were able to resolve with regard to ninety-

15  four of the claimants.  None of the claimants, whom we

16  resolved, said this discovery is crazy and you shouldn't have

17  the right to propound it or anything like that. We were able

18  to work through the substance, if you will, of the discovery

19  dispute.

20          And, again, they either said yes, we will

21  supplement what we provided or this is all that we have and

22  we don't have anything more to add and we're not in a

23  discovery rule state.  So that was the nature of the

24  resolution, Judge.

25          THE COURT:  Thank you.

1    MR. RUGGERI:  Your Honor, we submitted three

2    declarations in support of our motion.  I would like to admit

3    them into evidence or move to have them admitted into

4    evidence at this time.

5    The first one was a declaration of Joshua Weinberg

6    and that's found at the docket at Number 1972-5.  Mr.

7    Weinberg offered a declaration that attached to it a number

8    of emails that we received from debtor's counsel. Those

9    exhibits, Your Honor, were filed under seal because they

10   contained claimant specific information.  And we would move

11   the court to admit Mr. Weinberg's declaration into evidence.

12   THE COURT:  Is there any objection?

13     (No verbal response)

14   MR. MOXLEY:  Your Honor, this is Cameron Moxley on

15   behalf of the Coalition of Abused Scouts for Justice from the

16   law firm of Brown Rudnick.

17   Your Honor, it may be appropriate now for us to

18   make this objection, Your Honor, generally.

19   We would ask the court to actually give no weight

20   and to strike the declarations that were filed with the

21   insurer's reply submission.

22   There were no declarations filed, Judge, in

23   connection with the objection, so those declarations were

24   submitted in response to nothing.  And some of them were

25   filed less than twenty-four hours before this hearing began.

1       Judge, we believe the approach that's been taken

2 with respect to these declarations, particularly the late

3 filed ones to the reply submission is a tactic that was

4 designed to not allow for meaningful consideration of

5 testimony and of examination of those witnesses.

6       And we would note that debtor's counsel

7 highlighted for the court at the beginning there is

8 tremendous ongoing constructive work in connection with the

9 mediation that the hope of which (indiscernible) plan.  And

10 (indiscernible) tactics are a distraction.

11       So, Judge, I want to (indiscernible) outset as Mr.

12 Ruggeri noted going to go through the declaration but that's

13 our objection to the declarations that are submitted late in

14 connection with the reply.

15       Thank you, Your Honor.

16       THE COURT:  Okay.  Well, I'll deal with those when

17 I get to those declarations.  But my question is, is there

18 any objection to the entry into evidence of the declaration

19 of Joshua Weinberg that was executed on January 21st of 2021?

20    (No verbal response)

21       THE COURT:  Okay.  I hear none.  It's admitted

22 without objection.

23    (Declaration of Joshua Weinberg, received into

24 evidence)

25       MR. RUGGERI:  Your Honor, the second declaration

1  I'd like to address is the declaration of Todd Mercier.  Mr.

2  Mercier is a vice president of investigations at HUB

3  Engineering or HUB Enterprises, Inc.  That's an investigation

4  firm that we have retained to help us review the proofs of

5  claims themselves.  As I said, he is an assistant vice

6  president there.

7         This declaration also was filed timely and Mr.

8  Mercier, in connection with his deposition, provided the

9  results of his firm's investigation into twenty-one of the

10 claimants, as with the Weinberg exhibits, Your Honor.

11        We filed Mr. Mercier's exhibit under seal because

12 they also disclose and dealt with claimant specific

13 information.

14        We would move the court to admit the Mercier

15 declaration into evidence.

16        THE COURT:  Is there any objection to the entry

17 into evidence of Mr. Mercier's declaration that was executed

18 on January 21st, 2021?

19     (No verbal response)

20        THE COURT:  I hear none.

21        It's admitted without objection.

22     (Declaration of Todd Mercier, received into evidence)

23        THE COURT:  And I didn't ask this question with

24 respect to Mr. Weinberg but I should have, and I'll ask it

25 for both Weinberg and Mercier.  Is there going to be any

**A0018**

1  cross-examination of these witnesses?

2        (No verbal response)

3              THE COURT:  I do not hear a request.  Okay.

4              MR. RUGGERI:  Thank you, Your Honor.

5              Your Honor, that brings us to the declaration of

6  Denise Neumann-Martin which also was timely submitted and can

7  be found at docket at Number 2007-1.  Dr. Martin has a Ph.D.

8  from Harvard University and is a managing director with NERA

9  Economic Consulting which is a firm specializing in the

10 application of economics and statistics.

11             Your Honor, I think there's no doubt that Dr.

12 Martin is an expert.  She is, but that's not why we submitted

13 her declaration in connection with our 2004 motion.

14             We did that to show the court how we identify the

15 1400 claimants on whom we seek to serve discovery.  We're not

16 offering expert opinion testimony from Dr. Martin today on

17 any inferences or extrapolation from that group of 1400

18 claimants.  She doesn't have the data.  We don't have the

19 discovery yet from which she could do that.

20             The Coalition did ask us to make Dr. Martin

21 available for cross-examination. She is on the line but my

22 point today is this really isn't about Dr. Martin today.

23 Today is about our right as creditors and parties in interest

24 to take discovery, Rule 2004 discovery into the debtor's

25 principal liabilities which are the, obviously, the

1  underlying sex abuse claims.

2          I would proceed by, again, offering the

3  declaration of Dr. Martin into evidence and making her

4  available for cross-examination, if there is any.

5          THE COURT:  Is there any objection to the entry

6  into evidence of the declaration of Dr. Martin which was

7  executed on January 22nd, 2021?

8          MR. MOXLEY:  Your Honor, again, it's Cameron

9  Moxley from Brown Rudnick for the Coalition.

10          We have no objection to the admission into

11  evidence. We do request the opportunity today, Judge, to

12  question Dr. Martin.

13          THE COURT:  Very good.  You will have that

14  opportunity.

15          Is there anyone else who is going to want to

16  question Dr. Martin?

17      (No verbal response)

18          THE COURT:  Okay.  I hear no one else.

19          Mr. Ruggeri, in terms of your affirmative case,

20  other than the three declarations, is there any other

21  evidence that you're going to be presenting in support of the

22  motion?

23          MR. RUGGERI:  There's not, Your Honor.

24          THE COURT:  Okay.  Then let's proceed with Dr.

25  Martin's testimony.

1    Mr. Ruggeri, do you have any opening questions or

2 are we right into cross?

3    MR. RUGGERI:  Your Honor, I think that we could

4 ask a couple of questions to acquaint the court with Dr.

5 Martin.  It seems appropriate.  We could start there, Your

6 Honor.

7    THE COURT:  Okay.  Then, Dr. Martin, I need to

8 swear you in.  Can you please raise your right hand?

9    DENISE NEUMANN-MARTIN, WITNESS, SWORN

10    THE WITNESS:  I will.

11    THE COURT:  Please state your full name and spell

12 your last name for the record?

13    THE WITNESS:  Denise Neumann-Martin; M-A-R-T-I-N.

14    THE COURT:  Thank you.

15    Mr. Ruggeri.

16    MR. RUGGERI:  Thank you, Your Honor.

17                    DIRECT EXAMINATION

18 BY MR. RUGGERI:

19 Q    Good morning, Dr. Martin.

20 A    Good morning.

21 Q    I think I found you on the screen.  It's hard to do

22 this by Zoom.  There are lots of faces there.

23    Dr. Martin, where are you currently employed?

24 A    I work for NERA Economic Consulting.  I've been

25 managing director and I've been with the firm for about

1  thirty years now.

2  Q    And would you tell the court a little bit about what

3  NERA does and what you do there as a managing director?

4  A    Sure. We're a firm of about 500 consulting economists

5  in offices around the world.  We apply the tools of

6  statistics and microeconomics to problems that arise in

7  litigation in a bankruptcy.

8  Q    Would you tell the court a little bit about your

9  education background, Dr. Martin?

10  A    Yes, I have a Bachelors Degree in Economics from

11  Wellesley College and a Master's and a Ph.D. in Economics

12  from Harvard University.

13  Q    And how about your education in the area of statistics,

14  specifically.  Can you tell the court a little bit about

15  that?

16  A    Sure.  I followed a number of courses in statistics,

17  both undergraduate and graduate level.  They include topics

18  (indiscernible) speaking such as probability theory and

19  hypothesis testing.  Probability theory tells us likelihood

20  that events are going to occur by chance alone where, you

21  know, (indiscernible) of the coin flip.  If I took a

22  (indiscernible) coin probability theory helps with

23  understanding what's the likelihood I'm going to get exactly

24  five heads.

25        And then hypothesis testing lets us go further than

1 that. It says, you know, how unlikely I'll receive certain

2 events. So if I had a no hypothesis, for example, that a

3 coin is fair so it's going to give sustain probability of

4 guessing ahead as in the tail. It's about the test. I can

5 slip that coin ten times and if I find I get nine heads, the

6 probability theory and hypothesis testing let me conclude

7 that I can reject the (indiscernible). That's not a fair

8 coin. It's disproportionately likely to give (indiscernible)

9 a head rather than a tail.

10        That's just a very basic example but that's the kind of

11 statistics that I have been trained in, in a (indiscernible)

12 deep level.

13 Q    And, again, Dr. Martin, sticking with your background

14 have you ever taught any classes, coursework in the area of

15 statistics?

16 A    Yes, after I completed my statistic training at

17 Harvard, I was a teaching fellow. There will be a full

18 professor who's teaching the main course and then I taught

19 weekly sections of statistics in one circumstance to Harvard

20 Business School students.

21 Q    And the area of sample (indiscernible) is that an area

22 with which you're familiar, Dr. Martin?

23 A    Sure that's another area that I received training in at

24 both undergraduate and graduate level. And it's something

25 that I use, techniques that I use routinely in my work at

1  NERA.

2  Q    And in connection with your work in this case, we know

3  that you offered a declaration, correct?

4  A    That's right.

5  Q    And can you tell the court what was your assignment in

6  regard to the declaration?

7  A    Sure.  I had two assignments.  The first was to design

8  and pull a sample of the abused claims that would allow

9  statistical inferences to be made at it's called a

10 subpopulation level.  I was asked to look at six

11 subpopulations.  And then at the level of the population as a

12 whole, so that was one assignment.

13     And another was to generate using a full database of

14 the abuse claims to generate certain statistics that have

15 been requested by counsel.

16 Q    And with regard to the six populations, who provided

17 those subpopulations to you?

18 A    They were provided to me by counsel. They were

19 subpopulations of particular interest to them and they asked

20 me to design a sample that would allow inferences to be made

21 about those subpopulations.  And then they requested about

22 the population altogether.

23 Q    Does the fact that counsel identified those

24 subpopulations, Dr. Martin, effect the integrity of the

25 sample that you drew?

1  A    No, not at all.  It's what's called a stratified sample

2  and it's used in cases when you want to investigate

3  particular subgroups of interest.  Right, you have a

4  particular interest in understanding what the particular

5  characteristic would be in a subpopulation.  And so, you

6  stratify your sample.  You sample within these buckets for

7  strata to make sure you get enough, make sure you get enough

8  observations of each of the subsamples to be able to say

9  something statistically meaningful about those subsamples.

10  Q    Now you drew claims for not only the six subpopulations

11  but for a seventh population too, correct?

12  A    That's right.

13  Q    And what was the seventh subpopulation or population,

14  depending on how you refer to it?

15  A    I would call it all other.  You had the sixth

16  population that counsel asked me to sample from. And then my

17  assignment was to be able to say something also about a

18  population as a whole.  So I needed to sample from the

19  seventh subpopulation, those that are not any of the sixth,

20  to enable me to do that extrapolation.

21  Q    And how many claims did you draw for each of the seven

22  populations?

23  A    I drew two hundred claims within each of the

24  subpopulations.

25  Q    And who arrived at the number two hundred for those

1  subpopulations?

2  A    I did use those accepted statistical formulas. They let

3  us, that we conclude that pulling a sample of two hundred

4  claims from each of the subpopulations would allow me with 95

5  percent confidence to estimate proportion, for example, with

6  a margin of error of plus or minus 7 percent within the -- at

7  that most was my 7 percent was within the subpopulation.  And

8  then to extrapolate up to a population as a whole that would

9  yield a margin of error at most plus or minus 4 percent.

10            THE COURT:  I'm sorry, doctor, I didn't hear that

11  last part.  It would be for the population as a whole, it's

12  what?

13            THE WITNESS:  The margin of error would be plus or

14  minus 4 percent.  I have more observations in the 1400 than I

15  do in the 200, so I put all of it together, I can estimate

16  margin of error that's smaller, estimated an estimate with a

17  smaller margin of error around it.

18  BY MR. RUGGERI:

19  Q    Can you briefly tell the court how you went about

20  drawing the two hundred claims for each of the seven

21  subpopulations and the group that you considered to populate

22  those subpopulations?

23  A    Sure.  And, again, I don't know if they'll let you go

24  through each of the six subpopulations, but maybe that would

25  help the explanation.

1    The first subpopulation was claimants who alleged

2  abuse, at least, one year of abuse in the period from 1971 to

3  1975.  So we identified all those -- again, relying on the

4  omni database which is the database that comes from the proof

5  of claims.  And so, we identified all claims that identified,

6  at least, one year of abuse in that four-year, five-year

7  period.  We sorted them randomly and then we picked the first

8  two hundred, so that was our first subsample was from that,

9  that subpopulation.

10    Then we moved onto the next subpopulation which had no

11  scouting affiliation.  Again, that came right from the new

12  database.  There's a scout affiliation field.  But we looked

13  for cases with that with zero.

14    And we also, though, before pulling that sample, we

15  made sure those there was no scouting affiliation.  We're not

16  also in the first subpopulation.

17    One of the things that's important for extrapolation is

18  that the sample be mutually exclusive.  So I want to make

19  sure there's no overlap between the different subsamples.  So

20  my second subsample was two hundred claims from those who did

21  not indicate any scouting affiliation, that were not also in

22  the first group, and I've seen seventy-one to seventy-five.

23    And then I really just proceeded from there.  You know,

24  we also pulled two hundred in some claimants who provided no

25  indication of identifying their abuser from claimants who did

1  not allege any physical abuse and claimants who did allege

2  any impact associated with the alleged abuse.  And then,

3  finally, from claimants who had sought counseling.

4  Q     Dr. Martin, in your declaration you don't share any

5  inferences or extrapolations that you've made from the sample

6  you designed and drawn.  Why not?

7  A     We haven't gotten there yet, right?  All I've done so

8  far is draw sample, and I've drawn it so that it will enable

9  me to make (indiscernible) inferences at the subpopulation

10 level and the full population level.  But to do that, we have

11 to get the additional discovery data, get the assignment of

12 what we're trying to classify, characterize, and then we'll

13 get estimates.  And then we can extrapolate those estimates

14 to the populations.

15 Q     Thank you, Dr. Martin.

16           MR. RUGGERI:  Your Honor, that's all I have for

17 the direct.

18           THE COURT:  Thank you.

19           Mr. Moxley, cross.

20           MR. MOXLEY:  Thank you, Your Honor.

21                     CROSS-EXAMINATION

22 BY MR. MOXLEY:

23 Q     Good morning, Dr. Martin.

24 A     I'm trying to find you.  Okay.  I got you right here.

25 Q     Can you see me now, doctor?

1  A     I can.  Thank you.

2  Q     Terrific.  Great.

3        Dr. Martin, my name is Cameron Moxley.  I'm from the

4  law firm of Brown Rudnick on behalf of the Coalition of Abuse

5  Scouts for Justice.

6        Dr. Martin, you talked about your curriculum vitae as

7  well that you have a Ph.D. and a master's degree from Harvard

8  in economics and a Bachelors Degree in economics and

9  (indiscernible), correct?

10 A     That's right.

11 Q     Dr. Martin, are you a medical doctor?

12 A     I'm not.

13 Q     Are you a psychologist?

14 A     I'm not.

15 Q     Do you have any degrees in psychology, Dr. Martin?

16 A     I do not.

17 Q     In a professional capacity, have you ever treated a

18 victim of sexual abuse?

19 A     No.

20 Q     In a professional capacity, have you ever counseled a

21 victim of sexual abuse?

22 A     No.

23 Q     Dr. Martin, have you published any articles on sexual

24 abuse?

25 A     I have not.

1  Q    Has anyone assisting you at NERA on this engagement

2  published any articles on sexual abuse?

3  A    No, I don't believe so.

4  Q    Dr. Martin, do you know anyone has published articles

5  on sexual abuse?

6  A    I'm sorry; excuse me?

7  Q    Dr. Martin, the question was do you know anyone who has

8  published articles on sexual abuse?

9  A    I don't think so.

10  Q    Have you read any qualitative studies regarding

11  childhood sexual abuse?

12  A    Yeah, I worked on the case alleging abuse in the

13  Catholic Church and so I may have, at that time, read some

14  studies, although I'm not like following any particular ones

15  sitting here today.

16  Q    Is there any study that you could name that you've read

17  about childhood sexual abuse?

18  A    No.

19  Q    Dr. Martin, can you name any journals that frequently

20  publish articles involving childhood sexual abuse?

21  A    No, not offhand I can't.

22  Q    Dr. Martin, you're aware of the categories of sexual

23  abuse that are identified on the claim forms in this matter,

24  correct?

25  A    Of the physical abuse categories, yes.

**A0030**

1  Q    Okay.  Are you aware, Dr. Martin how the term sexual

2  abuse is defined in literature discussing sexual abuse

3  issues?

4  A    (indiscernible) differently than in the clinical claim

5  forms, no I don't have information about that.

6  Q    Are you familiar with an organization called Child USA?

7  A    I don't believe so, no.

8  Q    Are you familiar, Dr. Martin, with any think tank that

9  studied childhood sexual abuse?

10 A    Again, I may have seen articles from that kind of

11 organization in my work with abuse claims in the Catholic

12 Church but I don't remember a particular one sitting here.

13 Q    Dr. Martin, are you familiar with studies on delay

14 disclosure in the sexual abuse context?

15 A    Not in a professional capacity, no.

16 Q    Okay. Do you know what the -- strike that.

17      Do you know what delay disclosure means in the sexual

18 abuse context?

19 A    Again, my lay understanding would be that disclosures,

20 you know, sometime after the alleged abuse occurred.

21 Q    Do you know if the delayed disclosure is common among

22 sexual abuse survivors?

23 A    Again, I may have seen statistics on that but I'm not

24 surely not using them for the purposes of the affidavit that

25 I have prepared for the court and for purposes of drawing the

1  sample which relies on my expertise as a statistician solely.

2  Q    Are you familiar, Dr. Martin, any estimates of the

3  percentage of child sexual abuse victims is not

4  (indiscernible) that child sexual abuse that they experienced

5  before adulthood?

6  A    I missed a couple of words --

7          MR. RUGGERI:  Objection, Your Honor.

8          Your Honor, beyond the scope in relevance.

9          As I said, we're not talking about inferences and

10  extrapolation today.  We're actually talking about the

11  assignment that she performed.

12          THE COURT:  I'm going to permit the questions.  I

13  think, Mr. Moxley, you're making your point so I don't know

14  how many more questions along these lines you have, but I

15  think it's fair to explore her background relative to sexual

16  abuse, given that that's what the proofs of claim involve.

17          MR. MOXLEY:  And, Judge, I will keep these

18  questions as brief as possible.

19          THE COURT:  Okay.

20  BY MR. MOXLEY:

21  Q    Dr. Martin, the question, just to repeat again, was I

22  think you said you didn't hear me, so let me just ask the

23  question again, if I could.

24          Are you familiar with any estimate of the percentage of

25  child sexual abuse victims who purposely (indiscernible)

1  disclose the child sexual abuse they experienced before

2  adulthood?

3  A    Again, I may have seen those statistics, but I'm not --

4  I don't know them sitting here today and I'm not using that

5  for purposes of preparing the affidavit.  I don't need to use

6  them for purposes of preparing the affidavit.

7  Q    Do you know the average age of a victim of child sexual

8  abuse at the time that victim first reports the abuse?

9  A    I don't.

10  Q    Dr. Martin, do you know the percentage of child sexual

11  abuse that goes unreported altogether based on U.S.

12  Department of Justice data?

13  A    I'm not familiar with that statistic, no.

14  Q    Do you know, Dr. Martin, if most sexual abuse survivors

15  typically disclose the abuse they suffered all at once or

16  overtime?

17  A    Again, I'm not familiar with that.

18  Q    Dr. Martin, when child sexual abuse is detected during

19  the victim's childhood, what the study shows the most likely

20  manner of protection?

21  A    I don't know the answer to that. Again, it's not

22  necessary for the report that I'm submitting to the court

23  here.

24  Q    Dr. Martin, are you aware of whether child sexual abuse

25  experts generally believe that even when reports are delayed

1  or are inconsistent that we should not consider them to be

2  unreliable?

3  A    I'm sorry.  You're a little muffled.

4  Q    Dr. Martin, can you hear me better now?

5  A    Uh-huh.

6  Q    Okay.  Are you aware of whether child sexual abuse

7  experts generally believe that even when reports are delayed

8  or inconsistent, we should not consider them to be

9  unreliable?

10 A    Again, I'm not familiar with that one way or the other.

11 Q    Do you know, Dr. Martin, if child sexual abuse experts

12 generally expect new disclosures of child sexual abuse from

13 senior citizens in light of attitudinal shifts in society

14 over the last two generations?

15 A    I am not familiar with that one way or the other.

16 Q    And do you know, Dr. Martin, what empirical evidence

17 demonstrates with respect to the likelihood of people to

18 engage in harmful behavior such as criminal activity the

19 person that's sexually abused as a child?

20 A    No, I don't.  And, again, this is not -- that's not my

21 area of expertise.  It's not the area of expertise that I

22 have used to design and pull the sample of these claimants

23 which is a purely statistical exercise in my statistical

24 expertise.

25 Q    Do you consider yourself to be an expert in child

1　sexual abuse claims?

2　A　In the sense that I am able to and have draw a sample

3　of claims in each of these populations that will allow me to

4　make statistical inferences about the proportion of those

5　claimants that satisfy some criteria, for example, in

6　(indiscernible) with statistical precision.

7　Q　Dr. Martin, you recall that last week I had the

8　opportunity to take your deposition, do you recall that?

9　A　Yes.

10　Q　You recall, Dr. Martin, I asked you whether or not if

11　you were to replace on the claim form the different

12　categories of sexual abuse with what is the claimant's

13　favorite color.  And if you were asked to analyze that data

14　would you bring anything different to bear to your analysis.

15　Do you recall I asked you that question?

16　A　I do recall that, yes.

17　Q　And what was your response, if you recall?

18　A　That it's functionally equivalent.  It really doesn't

19　matter what the subject area is.  What the expertise I am

20　bringing is how to draw a sample such that whatever the

21　population that they're already studying it's large enough

22　that I can draw statistically significant inferences about

23　population characteristics.

24　Q　You're not bringing or purporting to bring any

25　expertise of your own with respect to sexual abuse claimants

1  to the statistical analysis by your undertaking, is that

2  right?

3  A     That's right.  Again, it's not necessary for me to, you

4  know, pull the sample and then analyze the information from

5  the sample when we get there and extrapolate up to the

6  population.  Those are really relying on the kinds of

7  statistical techniques that I was talking about when Mr.

8  Ruggeri was asking me questions.

9  Q     Dr. Martin, in your declaration you cited to two

10  specific sources, one of which was the reference manual on

11  scientific evidence.  And specifically, in that manual, the

12  chapter that was entitled, "Reference to (indiscernible)

13  Statistics," is that correct?

14  A     Yes.

15  Q     And we look at that reference guide at your deposition

16  and do you recall that when we looked at that guide at page

17  241 discuss the step of developing statistical model.  And

18  the reference guide discussed the need for the model to

19  "suit" the occasion in order to allow for inferences to be

20  drawn.  Do you recall that?

21  A     I don't recall that specifically, but I'll take your

22  word for it.

23  Q     Well, let's take a look at your deposition transcript

24  which I think you have in front of you.

25            MR. MOXLEY:  And for the record, Your Honor, the

1  transcript is Exhibit 10 to the supplement to objection.

2  BY MR. MOXLEY:

3  Q    Do you have your transcript in front of you from the

4  deposition?

5  A    I do, yes.

6  Q    Okay.  Let's look at page 71 of that transcript.  Are

7  you able to flip there with me?  We don't have the ability

8  today, Dr. Martin, to bring it on the screen.  If you can

9  look at the hard copy in front of you.

10  A    I (indiscernible).  I have a (indiscernible) from

11  (indiscernible).

12  Q    Okay. Great.  Great.

13       Dr. Martin, if you look at page 71 of your transcript,

14  line 17, you'll see there's a question that begins couple of

15  steps down, do you see that?

16  A    Yes.

17  Q    And I asked you a couple of stepdown, there's a bullet

18  for "Developing Statistical Model," and it describes the need

19  for statistical models that "suit the occasion and allow for

20  inferences actually to be drawn from the sample," is that

21  right?  And your answer was, "yes," correct?

22  A    Right, exactly.

23  Q    So you're bringing nothing different to bear here then

24  if you were analyzing the claimant's favorite colors, right?

25  A    The statistical model here is both allows me to

1  estimate a proportion, for example, of each subsample and to

2  estimate that such that I know what the margin of error is

3  around that.  And also, statistical model lets me know that I

4  can extrapolate that out to the population as a whole. And,

5  again, put a margin of error around that so that the model

6  that I'm proposing to use here or that I referenced is a

7  statistical model, right.  And that I aptly have expertise in

8  that area all the time.

9  Q    But areas so just to confront has any subject matter

10 expertise, subject matter expertise in child sexual abuse

11 conformed your work in the case so far?

12 A    No, again, that's not my area of expertise.  My area of

13 expertise is statistics and economics.

14 Q    Now in that reference guide, Dr. Martin, that we looked

15 at, at your deposition, we looked at that guide which stated

16 that cases involving statistical evidence frequently are or

17 should be two expert cases of interlocking testimony with one

18 of those two experts being an expert of the subject matter

19 expertise, correct?

20 A    I remember looking at that, yes.

21 Q    Dr. Martin, are you familiar with using benchmarks in

22 statistical analyses?

23 A    Again, I know we also talked about this at my

24 deposition; yes, I'm aware of that, that can occur.

25 Q    Do you recall that when I first asked you about that at

your deposition, your first response was I'm not sure what
you mean by that, right?

A     I just wanted to make sure we were talking about the
same thing, clarifying your question.

Q     And, Dr. Martin, after pointing you to the discussion
of the importance of using appropriate benchmarks in
presenting the results of statistical analyses from the
reference guide that you cited in your declaration, you
testified at the deposition that using benchmarks was a
technique that you had seen used when you compare results
generated.  Do you recall that?

A     Yes.

Q     And as of last week at your deposition, Dr. Martin, you
had not yet determined one way or the other whether you would
use benchmarks in your analyses here, correct?

A     I don't know what the questions are yet, right.  What I
was asked to do so far is draw a sample and draw a sample
that would allow me to make, again, statistical inferences,
draw statistical inference about the subpopulation and the
population as a whole with statistical precision.  Now I
can't possibly think about benchmarks or any other aspects of
the assignment until I know more detail about what that
assignment is.

     What I can do is draw a sample and tell you this sample
is big enough that I can reach conclusions about

1  subpopulations and the populations as a whole and do it with

2  a -- and tell the court the margin of error around my

3  estimates.  But until I know what, you know, counsel wants me

4  to estimate I can't possibly go further than that in my

5  explanation.

6  Q    Dr. Martin, counsel, as you testified, selected the

7  first six subcategories that are identified in your

8  declaration, correct?

9  A    Counsel selected those -- they asked me to investigate

10 those, yeah.

11 Q    And who asked you to draw the seven, the seventh

12 category that you drew?

13 A    They didn't ask me to draw that, but the assignment was

14 to be able to say something in a statistical sense about each

15 of those six subpopulations and then also about the

16 population as a whole.  And so, without that seventh subgroup

17 which I determined we should sample, we'd be missing a

18 portion of the population.  So it would not be possible to

19 extrapolate up to the full population.

20 Q    And the only reason, Dr. Martin, that you are analyzing

21 the sixth, the first six subpopulations is because counsel

22 asked you to do that, correct?

23 A    I'm not sure what the only reason -- the only means in

24 that sentence.  Yes, my assignment was to develop a sample

25 that would allow an investigation of those six subpopulations

1  and the population as a whole.

2  Q    Is there any reason other than that counsel asked you

3  to analyze those six subcategories that you picked those

4  subcategories?

5  A    No, again, I didn't pick them.  Counsel picked them.  I

6  was asked just to provide a sample doing that instruction.

7  Q    Dr. Martin, is it customary in your work for the

8  attorney to define the categories of statistical analysis?

9  A    Sure. It can be, right.  With (indiscernible) sampling

10  does is it lets you investigate subpopulations, right.  You

11  have to know what the subpopulation of interests are. And,

12  here, they indicated that the subpopulations were the six

13  that we went through before.

14  Q    Did Hartford counsel explain to you why those six

15  categories were chosen?

16  A    Not in any detail, no.

17  Q    What generally did they tell you?

18        MR. RUGGERI:  Your Honor, that goes beyond the

19  scope of permissible inquiry into conversations between a

20  witness and counsel.

21        MR. MOXLEY:  But, Your Honor -- I'm sorry, Judge.

22        THE COURT:  Go ahead.

23        MR. MOXLEY:  Thank you, Your Honor.

24        Your Honor, Rule 26 and I could point the court to

25  the subsection 26(b)(4)(c)(2) and (3) provide that

communications between the party's attorney and an expert

witness are only protected except when the communication

identifies facts or data the party's attorney provided and

that the expert consider in forming the opinions to be

expressed; or identify assumptions that the party's attorney

provided and the expert relied on in forming the opinion to

be expressed.

Dr. Martin has unequivocally testified both today

and at deposition that the only reason she is analyzing the

six subcategories identified in her declaration is because

counsel asked her to do that.

So I think, Judge, we're entitled to discover what

Dr. Martin was told by counsel in connection with the facts

or data to be considered in analyzing those six subcategories

or what assumptions they asked her to make.

MR. RUGGERI:  And, Your Honor, the rule is very

careful.  It allows counsel to ask about the assumptions that

the expert was requested to make.  It does not allow you to

get asked that issue.  That would throw the privilege out the

window, Your Honor.

Dr. Martin has said what assumptions that she was

asked to take into account and the assumptions that she

relied on and that's the scope in a permissible inquiry under

Rule 26, Your Honor.

MR. MOXLEY:  Your Honor, if I may, that is the

very question I just asked Dr. Martin there was an objection interposed.

My question and I'll rephrase it if counsel would like and if the court would like, but my question to Dr. Martin is simply what did counsel tell Dr. Martin as to assumptions she should make or facts or data she should consider in connection with those six subcategories. We want to understand what her understanding is from counsel as to why those six subcategories are the ones she should be analyzing.

MR. RUGGERI: Your Honor, I have no objection to the question as rephrased which is different than the one he asked.

THE COURT: Yes, let's go with the rephrased question and why don't you repeat it for Dr. Martin.

MR. MOXLEY: Of course. Thank you, Your Honor.

BY MR. MOXLEY:

Q    Dr. Martin, the question is -- strike that.

The question, Dr. Martin, is you've testified that the six subcategories are categories that were identified by counsel. My question is what assumption were you asked to make about those six subcategories and what facts or data did counsel tell you about why they were asking you to analyze those six subcategories?

MR. RUGGERI: The why question, Your Honor, he

1  tagged it onto the end again, that's the problem that he gets

2  invading the privilege, Your Honor.

3          THE COURT:  Let's not ask a compound question,

4  first of all.  Let's just ask her the pieces of it so that we

5  can make sure it's within the bound.

6  BY MR. MOXLEY:

7  Q    Dr. Martin, what assumptions were you asked to make by

8  counsel with respect to the six subcategories that are

9  identified in paragraph five of your declaration?

10 A    No assumption at all.

11 Q    Okay.  What facts were you told by counsel with respect

12 to those six subcategories?

13 A    The only fact I can think of is that 1971 to 1975 is

14 the period of the Hartford coverage insurance lock.

15 Q    Do you recall any other facts that you were told by

16 counsel?

17 A    I don't believe so, no.

18 Q    What data, if any, did counsel provide you with respect

19 to those subcategories that are identified in your

20 declaration?

21 A    I was provided with -- I guess we downloaded the omni

22 database which is, you know, the proof of claims information.

23 And I think I explained earlier about the -- mostly just took

24 -- mostly subcategories are only in that database.  I had a

25 couple of cases.  We had to do additional sort of filtering

1  or refining to parsing to populate to know which claimants

2  fell into each of the subcategories.

3  Q    Dr. Martin, how did you communicate with Hartford's

4  counsel regarding the identification of the six

5  subcategories?

6         MR. RUGGERI:  Objection to form.  I don't

7  understand the question, but to the extent it invades

8  privilege, I object on that ground.

9         MR. MOXLEY:  I'll clarify the question.

10 BY MR. MOXLEY:

11 Q    Dr. Martin, by what method, meaning telephone, email,

12 text messages, other methods, did you utilize in

13 communicating with Hartford's counsel about the six

14 subcategories you were asked to analyze?

15 A    It probably was in both emails at time and phone calls

16 at times.  I certainly, for example, submitted a draft of our

17 -- sample draft of my affidavit which talks about those six

18 subpopulations.  And I would invite (indiscernible) to talk

19 on the phone, yeah.

20 Q    And, Dr. Martin, I believe at your deposition we talked

21 a little bit about the fact that (indiscernible) or assisted

22 in making a document production in connection with this

23 matter, correct?

24 A    Yes.

25 Q    Did you produce any of the emails with counsel about

1  the facts or assumptions that you were provided by counsel

2  with respect to the sixth subcategories that are identified

3  in paragraph five of your declaration?

4  A    Again, there are no -- I was asked not make no

5  assumptions about those.  There wouldn't be any emails or

6  phone calls about assumptions I was asked to make.  The only

7  facts I can think of is the '71 to '75 coverage block.  And I

8  don't believe that would have been the subject of an email

9  either.

10  Q    Dr. Martin, if the insurers get the discovery they seek

11  in the motion, will you be able to tell the court if 96,000

12  sexual abuse claims are valid or not?

13         MR. RUGGERI:  Objection; calls for speculation,

14  Your Honor.  We're not there yet.

15         THE COURT:  Overruled.  Let her answer the

16  question.

17  BY MR. MOXLEY:

18  A    Again, my area of expertise is not in sexual abuse, not

19  particularly, and it would be up to the court to decide, you

20  know, at the end whether claims are valid or not.

21         What I will be able to tell the court is whether these

22  subpopulations or that they share certain characteristics,

23  and I can say that, I can measure that with statistical

24  precision.  I can measure that with, you know, margin of

25  error between 4 and 7 percent.

1    And then, you know, I leave it to counsel and the court

2    to decide whether that means they're valid or invalid.  I

3    don't have any opinion about that.  I have statistical

4    opinion.

5    Q    Dr. Martin, in your declaration at paragraph five, it's

6    for the court's benefit and for the record is, is at Docket

7    Number 1972-6.  Dr. Martin, you state at paragraph five the

8    sample you have drawn, "would be a sufficient size to allow

9    statistically significant inferences to be drawn about

10   population parameters," correct?

11   A    Yes.

12   Q    What is a statistically significant inference?

13   A    The one that's likely to be issued here is I can

14   estimate for each subpopulation what proportion of the

15   population has some characteristic.  And I don't know if

16   those characteristics are going to be yet.  But I can

17   estimate that using the two hundred claim sample.

18        And then suppose I find it 50 percent what statistics

19   lets me tell you is that that's my best estimate of what it

20   is for the population or the subpopulation that 50 percent

21   share that characteristic.  And there's a margin of error

22   around that in the subpopulation of plus or minus 7 percent.

23   So go from 43 percent up to 57 percent.

24        And then -- yeah, so I'm 95 percent confident that if I

25   pulled another two hundred claims, different two hundred, my

1  result would fall in that same band.  My result would fall

2  between 43 percent and 57 percent.  And then when I get to

3  the population as a whole, if I extrapolate up, and I'll

4  develop an estimate for the population as a whole, so that's

5  50 percent.  What I can tell the court is that that's my best

6  estimate.

7        And if I redid the whole exercise again, that would

8  range from 46 percent up to 54 percent.  So I can tell the

9  court what proportions are and how confident I am that I have

10  measured them accurately and what the margin of error is

11  around those.

12  Q    And with respect to what you'll be able to share with

13  the court as you just described it, will that allow the court

14  from reading your explanation of inferences you're able to

15  draw, will that allow the court to determine whether even a

16  single one of these proofs of claim is valid or not?

17  A    Again, I don't know what the --

18        MR. RUGGERI:  Objection to form.  He's asking the

19  witness what the court is going to do with the information

20  and I think that's not appropriate.

21        THE COURT:  Sustained.  The way the question was

22  phrased.

23  BY MR. MOXLEY:

24  A    Dr. Martin, in presenting your statistically

25  significant inferences at the end of your analysis, do you

1  intend to provide opinion as to whether or not any particular

2  proof of claim is valid or not?

3  A     No, first of all, it's not going to my opinion.

4  Generally, I'm not a determiner of validity.  What I am

5  determiner of is which claimant share -- what proportion of

6  claimants share a piece of that characteristic.

7  (indiscernible) looking at any individual claimant saying

8  that claimant has or doesn't have the characteristic.  But

9  it's saying in this population as a whole what proportion of

10 claimants do I expect statistically would share this

11 characteristic and how sure am I that that's the right

12 number.

13 Q    Dr. Martin, just to confirm you don't have, as you sit

14 here today, a statistical model yet, correct?

15 A    I know we spent a long time on this in the deposition

16 and I haven't generated for the court yet an estimate of

17 population parameters because I haven't been asked to do that

18 yet.  We haven't gotten the discovery information yet.  We

19 haven't done any additional analysis yet.

20      What I have done is design the sample so that when that

21 work is done (indiscernible) the kind of extrapolation that I

22 was referencing earlier.

23 Q    Dr. Martin, to try to be as efficient as possible, let

24 me just go through and list what your six subcategories are,

25 just so that we're all talking about the same thing.  These

1  are in paragraph five of your declaration.

2      The six subcategories are: allege abuse in 1971 to

3  1975; no scouting affiliation; no abuser identification; no

4  physical abuse alleged; sought counseling; no impact alleged;

5  is that correct?

6  A      Yeah.

7  Q      Okay.  Is it fair then to say, Dr. Martin, there are

8  potentially six subcategories that you're analyzing where the

9  proof of claim is perceived to be deficient in some way,

10  (indiscernible) identify information of any given category;

11  is that fair?

12  A      Again, I'm not making any assumptions about that.  I

13  don't have any opinion about that.  All I was asked to do is

14  sample from those subcategories.

15  Q      Your seventh category was pulled from a pool of proofs

16  of claim that didn't fall into any of the six subcategories,

17  correct?

18  A      That's right.

19  Q      In your deposition I asked you if you knew what the

20  size of that pool from which that seventh category was drawn.

21  And I can point you to your testimony, but you didn't know

22  specifically what the number was.  I asked you if you would

23  estimate it at tens of thousand and you said you thought it

24  was probably around there.  Do you recall that?

25  A      Yes.

1  Q    Is that still your view that it was probably around

2  tens of thousands of proofs of claim that the two hundred in

3  the seventh category were pulled from?

4  A    Actually, since you asked that question, I went back

5  and looked and it's about 30,000 claims in that seventh

6  category.

7  Q    Dr. Martin, in all of your conversations with counsel,

8  did you have any idea what you are actually going to be

9  analyzing or are you just right now looking at the sample and

10  pulling the sample?

11  A    Just right now looking at the sample and pulling the

12  sample.

13  Q    Dr. Martin, how does including the two hundred claims

14  from that seventh category that don't fall into the first

15  six, how will that effect the way you may develop your

16  statistical model?

17  A    Again, if I were asked to extrapolate up, we could

18  investigate the same population characteristics of

19  (indiscernible), each of the seven subpopulations and then

20  because I have that seventh one, I would be able to compare

21  it, compare with those who share none of this six to ones

22  that do and/or extrapolate up to the population as a whole.

23  But having that seventh bucket lets me say something about

24  those (indiscernible) populations; if I'm asked to do that.

25  Q    As you sit here today, do you know if you will be asked

1  to do that?

2  A    I don't know.

3  Q    Something about the (indiscernible)?

4  A    I don't know.  My assignment was to allow that to be

5  done, so I think may be asked to do that, but I haven't been

6  given any additional information about my assignment other

7  than to design a statistically valid sample.

8  Q    Dr. Martin, there's some overlap among six

9  subcategories meaning that some proofs of claim fall within

10 multiple subcategories, right?

11 A    Yes.

12 Q    And you acknowledged that in paragraph five and six of

13 your declaration, correct?

14 A    Yes.

15 Q    How much overlap is there?  Are you able to determine

16 that?

17 A    Sure.  You can filter the database and, you know, have

18 it see how often its one, for example, allege abuse in the

19 1971, '75 period and no scouting affiliations.

20 Q    You referenced earlier about how you may be able to use

21 that seventh subcategory to extrapolate up about and draw

22 inferences about the total population in the omni database.

23 How would you do that?  Can you explain that?

24 A    It's not may.  I mean if you wanted to extrapolate up

25 to the full population, you would need to use all of the

1   subpopulation.  That's what we're doing.  And (indiscernible)

2   talk you through the formula that is used.

3       First, we're going to get the estimate for each of the

4   subpopulations or whatever characteristic we're interested

5   in.  From that, we can calculate the variance for each of the

6   subpopulations, you know, how tightly we're measuring that,

7   that estimate in the subsample.

8       And then what extrapolation is, is taking those, you

9   know, different sample estimates and variances and putting

10  them together (indiscernible) the population as a whole.

11  That involves adjusting for the weak (ph) of each

12  subpopulation.  So the weak is the number of claims in the

13  subsample, divided by the total population of claims -- I'm

14  sorry; total population.  So the number of claims in the

15  population that's been sampled to have that characteristic

16  divided by the total amount of the claim.  That's the weak

17  and that's a factor that goes into extrapolation.

18      And then also the likelihood of the selection.  So the

19  two hundred, I'm selecting two hundred for each bucket, at

20  each of the strata.  And then you divide that by the total

21  number in the subpopulation as a whole.  So both of those get

22  -- multiplied by the variance and then that allows us to

23  estimate the -- sample estimate and the margin of error

24  around it for the population as a whole.

25  Q   Dr. Martin, do you have any understanding as to why

1  each of the six subcategories that you're analyzing are part

2  of your analysis?

3  A    I think we went through this earlier and I was not

4  given any explanation of the particular buckets.  And I can

5  (indiscernible) that the '71 to '75 wanted -- I know that's a

6  Hartford period so I could understand that being a

7  subcategory.  I don't know the reasons why they elected to --

8  I mean I can speculate, but I wasn't given any information

9  about the reason that they asked for the other five

10 categories.

11 Q    In connection with the analysis that you will undertake

12 and that you (indiscernible), Dr. Martin, have you ever

13 considered talking to a claimant in this case about the abuse

14 they suffered as a child?

15 A    Again, it's not for purposes of selecting statistically

16 representative sample.  I mean that's what I've been asked to

17 do so far.  I've been asked to generate sample that were

18 going to allow me to make inferences about population --

19 about quantitative metrics, right, about population

20 parameters.  But you don't need to talk to anybody,

21 (indiscernible) talk to a claimant to be able to do that.

22 That's just -- it's just statistics.

23 Q    And what about excess of drawing inferences about the

24 population from the sample in connection with that next step,

25 have you ever considered talking to a claimant in this case

1　about the abuse they suffered as a child?

2　A　Again, I haven't been asked to do anything else yet, so

3　I really don't know what the assignment would be and I have

4　to know what that is before I can talk about what I might do

5　or never did.

6　Q　I appreciate that, Dr. Martin.  My question is a little

7　bit different.  My question is have you ever considered --

8　you're the expert undertaking this analysis -- have you ever

9　considered talking to a claimant in this case about the abuse

10　they suffered as a child?

11　　　　　MR. RUGGERI:  Your Honor, I object.  Yeah, asked

12　and answered.  We're well beyond the scope.  She said she

13　hasn't been asked to take on any additional assignments.

14　　　　　THE COURT:  Sustained.

15　　　　　MR. MOXLEY:  If I might just be heard briefly.

16　　　　　Your Honor, Dr. Martin has -- Dr. Martin's

17　declaration submitted.  According to the brief that was

18　submitted by the insurers specifically for the purpose of

19　being able to draw statistical inferences from a sample of

20　claimants if they get the discovery they're seeking.

21　　　　　My question is to understand if Dr. Martin

22　actually would find it useful to hear from a claimant.  And I

23　think that goes to the heart of whether or not her analysis

24　will provide anything useful to the court.

25　　　　　I can rephrase the question if the court would

1  like.

2       THE COURT:  I think it's asked and answered.  She

3  hasn't gotten to the next step yet.

4       MR. MOXLEY:  Thank you, Your Honor.

5  BY MR. MOXLEY:

6  Q    Dr. Martin, in thinking about the statistical analysis

7  that you say in your declaration that you will be able to

8  undertake having drawn these samples, would anything that a

9  claimant in this case might have to say affect your analysis?

10      MR. RUGGERI:  Same objection, Your Honor.  Not

11  there yet.

12      MR. MOXLEY:  Judge, respectfully, the purpose of

13  the declaration, you can look at the brief, was saying that

14  this discovery will allow inferences to be drawn.  I'm asking

15  the expert will the discovery allow her to draw inferences.

16      THE COURT:  Isn't that an argument?  Isn't this

17  part of your argument?

18      MR. MOXLEY:  I apologize, Your Honor.  I was just

19  responding to Mr. Ruggeri's objection stating the basis for

20  the question.

21      THE COURT:  Well, no, I understand that.  But

22  isn't that part of your argument?  I mean I think you're

23  trying to make your argument through your questions but I'm

24  going to sustain the objection.  You can argue what you want

25  to argue with respect to that.

1          MR. MOXLEY:  Thank you, Your Honor.

2          Dr. Martin, thank you very much for your time

3    today.  I have no further questions.

4          THE COURT:  Thank you.

5          Any redirect?

6          MR. RUGGERI:  Your Honor, very briefly.

7                    REDIRECT EXAMINATION

8    BY MR. RUGGERI:

9    Q    Dr. Martin, as a statistician was expertise in the area

10   of sexual abuse claims needed for the assignment that you

11   performed for me?

12   A    No.  It's just purely statistical exercise.

13   Q    And can you elaborate what you mean by that and explain

14   to the court a little bit more why this subject matter

15   expertise was not necessary for the assignment that you

16   performed?

17   A    All I know from the perspective of statistics about a

18   sample to, you know, pull one effectively, one that will

19   allow me to make statistical inferences is information about

20   the size of -- the identity of the subcategories, the size of

21   the subcategories, the level of precision that I want to have

22   attend to the results, the margin of error that I'm willing

23   to tolerate essentially.

24        And then it's -- they're just statistical formulas,

25   right.  You plug the information into the formulas and it

1    spits out an end.  In this case, the end was like a 196.  We

2    rounded it out to two hundred.  It doesn't matter to the

3    formulas whether you're talking about, you know, sexual abuse

4    claims or asbestos claims.  I've done a (indiscernible) where

5    I've used a lot of statistical sampling is asbestos personal

6    injury claim, right.  And I'm not a subject matter expert in

7    asbestos.  You know, I'm not a medical doctor, but I can pull

8    a representative sample of asbestos personal injury claims

9    for additional investigation.

10        And I've done that, you know, throughout the last

11   probably fifteen years in my working there. So it's not about

12   the subject.  It's really about having the expertise in

13   statistics to design the sample properly.

14   Q    You anticipated my next question.

15            MR. RUGGERI:  And that's all I have, Your Honor,

16   for redirect.

17            THE COURT:  Thank you.

18            Thank you, Dr. Martin.  You're excused.

19        (Witness excused)

20            THE WITNESS:  Thank you.

21            THE COURT:  Thank you.

22            Mr. Ruggeri.

23            MR. RUGGERI:  Yes, Your Honor, that completes the

24   evidentiary portion of our presentation.  I think we're at

25   the point of counsel making arguments.

1    THE COURT:  Okay.

2    MR. RUGGERI:  May I proceed?

3    THE COURT:  You may.

4    MR. RUGGERI:  Your Honor, and thank you for the

5 time that you gave us this morning to present the evidentiary

6 record that we sought to present.

7    We have a problem in this case, and I think we all

8 know that there's a problem.  And I think the problem starts

9 with the numbers.

10    Prior to the date the petition was filed on

11 February 18th, 2020, Boy Scouts which was a long-time tort

12 defendant have been named in a grand total of 275 lawsuits,

13 and they told us it was aware of another 1400 claims.  And

14 that was after decades in the tort system.  And that was as

15 of February 18th, 2020.

16    Then, Boy Scouts filed a petition.  It asked the

17 court to set a bar date which the court did.  Now, we have

18 more than 95,000 claims that have been filed.  That, Your

19 Honor, is an unprecedented fifty-five (indiscernible)

20 explosion in claims.  I've never seen anything like it in the

21 context of mass tort bankruptcies, and my experience goes all

22 the way back to the Celotex bankruptcy in the 1990s.

23    Your Honor, bankruptcy is not supposed to be used

24 to increase the debtor's liabilities.  It's supposed to be

25 used to distribute the assets fairly for those liabilities.

1  We don't believe this court can or should ignore the

2  explosion in claims and we don't think this court can or

3  should ignore the circumstances surrounding the explosion of

4  claims.

5         This explosion of claims, Your Honor, and the

6  circumstances surrounding it including the unprecedented

7  attorney advertisements, we believe points squarely in favor

8  of Rule 2004 discovery.  We seek discovery regarding the

9  debtor's liabilities.  That is, no one can dispute, a

10 legitimate goal of Rule 2004 discovery.

11        But Your Honor's opinion in Millennium Lab, you

12 know, the analysis there, when Your Honor was deciding

13 whether to allow the trustee to pursue discovery from banks.

14 You talked about the legitimate purposes of 2004 discovery.

15        We cited Your Honor to In re Subpoena Duces Tecum.

16 This isn't the first time that a party in interest has sought

17 a 2004 discovery into the validity of proofs of claims that

18 have been filed.

19        If the proof of claim process is tainted, Your

20 Honor, it affects the integrity of this entire proceeding.

21 And we shouldn't have to just accept, at this stage, Your

22 Honor, what the claimants say or don't say in support of the

23 proofs of claim.  We should be able, allowed, given time, an

24 opportunity to drill down, drill down deeper for, at least,

25 all we're asking for is about 1.5 percent of the claimants to

1  find out what evidence do they have to support their claim.

2          And I don't know that the court has focused on

3  this issue.  But the majority of states in this country still

4  have discovery rules that apply to time bar issues.

5          The proof of claim form, my recollection, is we

6  ask the court to include some questions that would give us

7  answers to those questions.  That information isn't even

8  provided by the proof of claim form.  We don't have

9  information gleaned or elicited from the proof of claim form

10  that allows us to apply statute of limitations in the

11  majority of discovery rule statute of limitation states.

12  It's not in the proof of claim form.

13          THE COURT:  Let me ask you about that particular,

14  and I want to understand what information you think you're

15  going to get and how it's going to be used.  How it can be

16  used.

17          But on the statute of limitations, for example,

18  isn't that a very facts and circumstances determination based

19  on a particular state law and particular facts?

20          MR. RUGGERI:  You know, Your Honor, it is based on

21  particular facts but we could ask the facts to let us make

22  decisions, frankly, for example, on whether to object to the

23  claim.  If I know facts surrounding the claimant recovery of

24  a repressed memory.  If I have an opportunity to elicit that

25  information, either through document discovery or through the

1  depositions that we seek to take, or if I'm entitled to ask

2  the claimant, okay.  When did you connect your injuries to

3  the alleged sexual abuse?  Those are point question that

4  we're seeking to ask through this discovery and that we would

5  seek to ask through the depositions that seek to take that

6  will enable us to apply and make determinations on whether to

7  assert objections based on statute of limitations for those

8  claimants.  We're in the blind right now really where we're

9  having to make assumptions.

10          THE COURT:  I understand that but since you raised

11  that as the particular issue you want to explore, and you

12  raised it first in your argument, I guess I don't understand

13  that one consistent with how I read the motion which is you

14  want to be able to bring omnibus objections.

15          MR. RUGGERI:  We do.

16          THE COURT:  Explain to me how you would bring an

17  omnibus objection on a statute of limitation issues and how

18  any information you could get through whatever second step

19  Dr. Martin might take relates to that?

20          MR. RUGGERI:  I think we have a little bit of the

21  cart before the horse in terms of whatever step Dr. Martin

22  might take, right.  I have not asked her to analyze the time

23  bar issue.  That would be a legal determination that we could

24  make.

25          I haven't asked her to extrapolate for that issue.

1  The sixth categories you'll recall none of the subpopulations

2  is the time bar question.  Okay.

3              THE COURT:  Okay.

4              MR. RUGGERI:  So we aren't -- with regard to

5  making omnibus objection, it could very well be that we could

6  do it.  We offer, I think her declaration does offer the

7  court the number of states in Florida, in New Mexico, for

8  example, that claims that arise out of those.  That may be an

9  instance where it would have to be claimant by claimant or it

10  may be subject to an omnibus objection.

11             If there's no evidence in support of any discovery

12  rule exception to the applicability of the statute of

13  limitations, I just don't know what facts or information that

14  the claim can rely on.  If the court recalls that the proof

15  of claim forms invites people to make claims even if their

16  time barred.

17             We're trying to get some information for us to

18  distinguish the potentially time barred from the time barred

19  claim.  It may lead to objections that we may file.  I don't

20  know if we would do those objections one by one or through an

21  omnibus.  I don't have the information yet.  I haven't

22  categorized those claimants, Your Honor, to see if they are

23  susceptible to an omnibus objection.  I just don't know at

24  this point because we're still at the frontend of seeking the

25  discovery.

1          THE COURT:  Well isn't that important?  And I ask

2     it because I'd like to make sure I understand what you would

3     intend to use the Rule 2004 discovery for because -- and

4     maybe I've linked it incorrectly to the omnibus objections

5     but I think actually it's linked in the motion to the omnibus

6     objections.

7          And if one of the grounds -- if you can't use

8     information generated from a to be analyzed discovery

9     scenario for an omnibus objection then doesn't that undercut

10    the discovery you're seeking?  Because you're not sitting

11    here saying I'm going to take a deposition of every single

12    96,000 claimants. So there has to be a way to use this and

13    I'm trying to figure out exactly what you want to use it for.

14         MR. RUGGERI:  Your Honor, I think to the extent

15    that we're seeking to reserve the right to ask Dr. Martin to

16    extrapolate to allow us to draw inferences, it does go to the

17    sub-populations that we have asked her to draw the claims

18    for.  So I think that is the answer.

19         The fact is that with regard to a lot of the

20    claimants we believe there is no evidentiary support that

21    they have provided to take advantage of a discovery rule in

22    those states that still apply the statute of limitations.  So

23    we will be looking at that information.  Whether that

24    information is susceptible to extrapolation I don't know

25    sitting here today.  We don't have that information. It may

**A0064**

1  or may not be.

2        To the extent that we could object on the grounds

3  that these claims fall within discovery rule states and none

4  of them supports any evidence in support of a recovery of a

5  repressed memory, or the cause of connection, or, you know,

6  that sort of stuff.  I just don't know.  That is why we're

7  asking these folks to provide support, but the proof of claim

8  form did invite people to file claims even if they were time

9  barred.  So we are trying to wrestle with that issue.

10        Your Honor, I don't know.  The information,

11  depending on how we get it, it may or may not allow us to

12  extrapolate.  It may or may not, you know, invite us to ask

13  the court to allow us to take some additional discovery.  It

14  may or may not allow us to ask the court to make sure that it

15  imposes safeguards along the lines of what Judge Carey,

16  former Judge Carey, did in the Maremont case to protect the

17  recoveries of legitimate claims against the taking away by

18  illegitimate claims.

19        We're not at the point, right now, where we know

20  what we are going to do because we don't have the

21  information.  And it would be premature for me to sit here

22  today and tell you what I am going to be able to do, you

23  know, if we get the information.

24        We're not asking for a lot here.  I mean we are

25  trying to get to the bottom of the liabilities against the

1  debtors on the time table that has been imposed on us

2  pursuant to Rule 2004 which, again, is a legitimate 2004

3  interest that we have.  And I will say that the other point I

4  would make in regard to our discovery request is this isn't,

5  you know, a question of discovery that we're making without

6  any evidentiary support.  We know and the court now knows

7  from the record there are invalid and factually unsupported

8  claims.

9          The record is undisputed.  We attached emails from

10  mothers and brothers who have said the claimants were lying.

11  We attached the HUB Report that identified, you know,

12  claimants who are fraudsters, convicted of fraud crimes, and

13  --

14          THE COURT:  I'm not sure what to do with that, but

15  okay.

16          MR. RUGGERI:  We also had claimants who told us

17  they want to withdraw their claims now that we have

18  identified them as part of the (indiscernible).  Just

19  yesterday, Your Honor, we got an email from Boy Scouts

20  counsel about another claimant who said -- another person who

21  said claimant X is lying, he is trying to ruin the life of

22  the person he has identified as an abuser, and he is trying

23  to steal money from the real victims.

24          So that is the circumstance, the context in which

25  we are before the court asking for leave to take discovery on

1   1.5 percent of the claimants who have made --

2           THE COURT:  I understand that.  So explain to me -

3   - I want to make sure I understand why you think these fixed

4   categories of claims of subgroups that were identified, the

5   sub-populations, what do they tell me?

6           MR. RUGGERI:  At the end, you know -- Your Honor,

7   what I am trying to find out at the end of the day is are we

8   dealing with a lot of invalid claims.  So I am saying, in the

9   first instance, within the Hartford policy periods are we

10  dealing with a lot of invalid claims within that population.

11  Are we seeing something that causes concern?

12          The other categories, Your Honor, are categories

13  that we believe are indicia of needing more information.  We

14  have -- there are 81,000 claimants -- 85,000 claimants who

15  don't identify any affiliation with scouting, okay.  That is

16  the second category.  Well that looks to me like that is a

17  potential problem because, obviously, they need to state a

18  cognizable claim against the Boy Scouts or Local Councils,

19  right, but the Boy Scouts here, this is the debtors, the Boy

20  Scouts.

21          So I can't tell you.  From those, my presumption

22  is they are invalid because they haven't shown any connection

23  between their claim and Boy Scouts.  So that is an example

24  where let us dig a little deeper, let us look at the 200

25  claims, let us see if that is indicative of invalid filings.

That is what we are trying to find out.  No abuser
identification, okay.

There are 6,400 claimants who provide no
information about alleged abusers.  Another, that to me is
indicia of a presumptively invalid claim and, again, let me
take discovery.  Again, 1,400 -- the Coalition says you're
wrong, Jim, you're wrong Hartford, that your assumption is
incorrect that it is a very small, if any, percentage claims.
We don't know, but I think we're entitled to find out.  I
mean that is what we're trying to do is we're just trying to
get the information to find out.

I think, based on my looking at the numbers, a
significant percent of the claims are invalid; invalid either
because they can't show a connection to Boy Scouts, invalid
either because they have no support of their claims, invalid
because, as we've seen from the emails we received, people
are making it up and they're doing it because they sought as
a way to make quick money.

Yesterday, Your Honor, I think the court saw we
had a claimant submit a letter to the court complaining that
a plaintiff's lawyer hadn't shown up at his jail to do a town
hall with the inmates on the claimant.  He was complaining
because the plaintiff lawyer didn't show up to give him the
education on that.  I mean those cause alarms to go off in my
head and say, you know what, this is exactly what this 2004

1 discovery is when we're trying to get to the bottom of the

2 liabilities of the debtor.

3       This is the biggest liability that it has. These

4 are the abuse liabilities and you can't just turn a blind

5 eye, I don't believe we should, when we have, you know,

6 evidence that the proof of claim process in this case may be

7 tainted. I think we should be allowed to go a little deeper.

8       The other point, you know, the claimants, Your

9 Honor, right, these are folks who have interjected themselves

10 into this proceeding. They didn't have to make claims, but

11 they chose to put in proofs of claim here. I mean I think

12 legitimately the court said, you know, if you want perfection

13 why not seek discovery for all 95,000. Well that is not

14 practical, right. It's not practical to do that.

15       I think what we're trying to do here is ease the

16 burden on the claimants as a whole, on the court, on the

17 parties by saying let us look at 1,400. Let us see what we

18 see. Let's start there and figure out where it goes. I will

19 be able to tell from that population --

20       THE COURT: Okay. What -- tell me this, this is -

21 - what I am trying to figure out is if what you want is going

22 to get anywhere. So when I look at the interrogatories what

23 in the interrogatories wasn't in the proof of claim form?

24       MR. RUGGERI: Your Honor, one, whether -- even if

25 there is a statement in support of a proof of claim, if I ask

1    for additional information, if I can sit down and talk with

2    someone -- and I have had experience doing this in a

3    different arena in the (indiscernible) bankruptcy, this was

4    years ago, where the court let me sit down and talk with some

5    claimants and depose the claimants in connection with the

6    bankruptcy proceeding there. It was something else. I mean

7    it was in the context of abuse where I sat down and talked

8    with a claimant who said that she would support it with a

9    diagnosis of a doctor and the first thing I heard from her

10    mouth is I've never seen a doctor, and I was like really.

11    So, I've been through this exercise before. I

12    think the manner in which these claims were put together

13    these interrogatories are intended to illicit information

14    from people who didn't provide it in the first instance and

15    to give them an opportunity to substantiate the claims from

16    those who did. Then for a hundred I would have the

17    opportunity to sit down with them, under oath, and ask

18    pointed questions about the information we have about their

19    claims to allow us to make a determination on whether we

20    believe it, you know, valid or invalid. We submit that we

21    think we are going to see that a lot of these are patently

22    invalid.

23    So the categories are really broken down into

24    three that I am asking for.

25    The first category is the details of the alleged

1  abuse.  You know, tell me information about the acts of

2  abuse, tell me the details of the alleged abuser, tell me the

3  details about the alleged abuser's relationship to scouting.

4          I will tell you, Judge, that when we initially

5  drafted the discovery those questions had to the extent not

6  already provided by your proof of claim form give me all the

7  details about this.  The Coalition, in the course of our meet

8  and confer process, said that would be confusing to the

9  claimants and asked us to strike that preamble; so we did, so

10  we did.  We weren't trying to make make-work, but that was

11  being responsive to the process and the Coalition.

12          The second group of questions, Your Honor, relates

13  to the application of the discovery rule, the

14  interrogatories.  And those go into, you know, the repressed

15  memory beginning at interrogatories five, six, seven, eight

16  and nine; those go to when did you recover your memory, when

17  did you, you know, put your injuries together and realize

18  that those injuries were caused by the abuse.

19          The last two, Your Honor, go to prior claims that

20  the claimants have made against Boy Scouts or Local Councils

21  in prior recoveries which, obviously, goes to the validity of

22  claims that they could be making now.  It's not a small

23  number there, Your Honor.  Its thousands of claims that fall

24  into that bucket too based on our initial paths.

25          The one I missed, Your Honor, is three and four

1  goes to the relationship of the abuser to Scouting and the

2  relationship of the claimant to Scouting.  We talked about

3  that earlier.  Those would be interrogatories three and four.

4          So those are the categories of information.  It's

5  pretty pointed.  It's pretty focused, Your Honor, of the

6  information that we are seeking.  We talked about 100

7  depositions.  That is less then point one percent of all the

8  claimants who have made these claims.  We're just asking the

9  court's permission let us to the 1,400.  Let us identify, you

10  know, 100 of those, up to 100.

11         Mr. Anker, his firm, my firm, Mr. Schiavoni; we're

12  committed to working as fast and as efficiently as we can.  I

13  think with a little bit of cooperation we could complete

14  those depositions by the end of May or possibly early June.

15  It is consistent with a time table that the debtor is seeking

16  to impose on us, Your Honor.

17         Then, you know, I don't know, it probably bears

18  pointing that the court has seen a raft of objections filed

19  in response to the motion.  It didn't see objections from the

20  tort claimants' committee and it didn't see objections from

21  the Boy Scouts.  They said nothing in regard to these

22  motions, but neither one of them stood up and objected.

23         There was an argument about our absence of meet

24  and conferring.  We did meet and confer, Your Honor. I had a

25  team of people spend weeks meeting and conferring with

lawyers and claimants.  The TCC told us it couldn't speak for

the individual council and invited us to meet and confer with

individual council.  We did that.  We met and confer with the

pro se claimants with regard to the Coalition.  And I

appreciate it.

Mr. Goodman sort of cut us off at the path by

telling us that, you know, unless discovery were reciprocal

on some basis then we were sort of at our end.  So that did,

although we offered to meet and confer with anyone who wanted

to, that did, sort of, stunt the meet and confer process

there.

Your Honor, we talked a little bit about Local

Rule 3007-1.  I invite Mr. Anker if he has additional words

or Mr. Schiavoni to talk about that.  Again, given the nature

of the beast that we are wrestling with here I do think it

may be that omnibus objections are appropriate.  And we saw

in the local rule 150 two times a month, that really doesn't

get us to where I think the court wants to get us or where

debtor wants to get us on the schedule that it seems to

impose.

Judge, just wrapping up this case is unprecedented

sadly for Your Honor perhaps or maybe you find it fun, but we

need this discovery.  I think the court needs this discovery.

The legitimate claimants should welcome this discovery.  We

want to make sure dollars are paid to those who deserve it.

1 We know there are invalid claims. It is a purpose that falls

2 right in the sweet spot of Rule 2004 when we're talking about

3 the examination of the debtors' liabilities. And, you know,

4 for all the reasons we talked about today I would ask the

5 court to grant the motion and allow us to serve the

6 discovery.

7 I would say that with regard to the document

8 requests, Your Honor -- actually, the interrogatories, if you

9 look closely we did have typos in interrogatories nine and

10 eleven. They cross-reference the wrong numbers. Nine should

11 cross-reference interrogatory eight. And eleven should

12 cross-reference interrogatory ten, but we would clean those

13 up before they were served, Your Honor.

14 THE COURT: And so how am I supposed to use

15 information, and I recognize Dr. Martin hasn't done the

16 second step, but its -- and I guess can't yet. What I am

17 still having a hard time understanding and what I don't think

18 I got any testimony from Dr. Martin about, and I'm not

19 criticizing that because she hasn't been asked to do anything

20 further, is what -- is she going to be able to make

21 statistically significant inferences about something that's

22 relevant to whether or not a claim is valid --

23 MR. RUGGERI: Your Honor, I think --

24 THE COURT: -- and then if she -- okay. Go ahead.

25 MR. RUGGERI: I was going to say the answer is

1  yes, but their probably, I think, assuming that the expert

2  statistician is going to be making that qualitative

3  determination and she won't.

4       THE COURT:  That's right.  So I don't have anybody

5  who tells me that what she is going to be able to give me is

6  relevant to whether a particular claimant or group of

7  claimants has been abused.

8       MR. RUGGERI:  I think, Your Honor, what she will

9  be able to tell you is based on the sample, if I accept as

10 true, that 100 of the 200 claimants who fall into that sub-

11 population do not have invalid claims as told to me, my

12 counsel, as the statistician I can extrapolate from there to

13 the entire group of that sub-population; for example, those

14 who don't identify any affiliation with Scouting.

15      That is where the statistics comes into play, but

16 she would not be the one making that qualitative judgment on

17 the validity of that claim.  That may, indeed, be an

18 assumption that she would share with the court that she was

19 asked to assume and explain the specifics around that

20 assumption.  That is the nature of how this exercise would

21 work from a lay person (indiscernible) perspective, but what

22 she was saying is hers is formulaic; statistics is formulaic.

23      So I think there are two reasons:

24      One, I think we would have the right to depose 1.5

25

1  percent of the claimants in a circumstance where we have real

2  questions about the proof of claim process and the, you know,

3  gaining of these claims in support and given the evidentiary

4  record we put in there.  Frankly, I think that warrants

5  investigation by itself independent of any reliant and

6  extrapolation. I think we got to see where we are.

7        All we are asking for is 1.5 percent of the

8  claims.  Then let's figure out what the next steps are.  I

9  think that we're seeking to anticipate where this goes. I

10  don't know where this goes at this point.  All I am asking is

11  please give me the discovery that I believe I am entitled to

12  under the precedent in this jurisdiction.  And on this

13  court's analysis for 1,400, which is a small sub-population,

14  1.5 percent of claimant who elected to participate in this

15  proceeding.

16        We think it is entirely appropriate for this court

17  to make sure that this proceeding is not overrun by abuse of

18  the proof of claim process.  It is my duty to assist the

19  court, if you will, in trying to flesh out the facts.  So I

20  don't think it is right to bootstrap and anticipate where we

21  necessarily have to go to a statistician's testimony.  We are

22  not there yet.  It is just 1.5 percent and point one percent

23  of claimants for deposition; that's it.

24        THE COURT:  Well to make that argument I'm not

25  even sure you needed a statistician.

1       So I am trying to figure out -- I am trying to

2   figure out where we end up because if, in fact, we end up

3   measuring factors that have no correlation, and I'm using

4   that word not in a scientific way, if we end up analyzing

5   factors that don't correlate to presumptively invalid claims

6   then what have we accomplished.

7       MR. RUGGERI:  Your Honor, I think that what you

8   probably looked at, at a minimum, is based on the sample of -

9   - based on the 1,400.  The reason why I presented the

10  declaration of Denise Martin was just to tell Your Honor --

11  explain to Your Honor where this list of 1,400 claimants came

12  from; that was it.  I was -- I said (indiscernible) the sub-

13  populations and she told me what would be adequate numbers to

14  put in those sub-populations to extrapolate if we wanted to.

15  That is how she came up with 200 for each of the stratified

16  sub-populations.  That was the extent of why she was put on

17  the stand today.

18       I have offered to the court, there are thousands

19  and thousands of claims that fall into these different sub-

20  populations. I think it probably doesn't surprise the court

21  to know that I am suspicious where someone says there's not

22  Scouting affiliation.  My working presumption is that that is

23  a presumptively invalid claim and now we're in a situation

24  where, you know, 502 says unless objected to the proof of

25  claim is presumptively valid.  We have gone round and round

1 on that.

2          So I am trying to avoid a situation where I have

3 to object to every one of these claims.  Some of them may be

4 valid.

5          THE COURT:  But wouldn't you actually have to --

6 and maybe I don't need to decide that for today.  The

7 procedure -- the concept that you are using of extrapolating

8 to a group, isn't that more relevant to some kind of group

9 estimation, some sort of global estimation of claims because

10 that is how you would use these to extrapolate, right.  I

11 don't know where we are going in this case. I have nothing in

12 front of me in terms of a plan, or how we're going to vote,

13 or what we're going to do.  So, I don't know where we're

14 going.

15          Just because one person who wasn't or half of the

16 group who says they have no affiliation with Scouting does

17 that mean I get to disallow somebody's claim who also says

18 that where they said, I'm making it up, my brother was a

19 scout and I went to camp so and so with him.  I mean I can't

20 do that.  I don't think I can do that.

21          So that is what I am trying to figure out, what

22 can we accomplish here.

23          MR. RUGGERI:  Your Honor, I think your, sort of,

24 thoughts and statement about you don't know where we're going

25 I don't either.  I don't think an estimation would be proper

here. I don't know if that is in the cards for us here, but certainly if one were to ask the court to estimate the liabilities for some purpose then this information will be highly relevant to that, I would imagine.

Then the question is with regard to voting. I mean in many cases we see mass tort claims where each claimant gets a dollar vote. I don't think it's appropriate if our discovery in these 1,400 claims shows that the proofs of claims are ripe with invalid filings. I think that would be inappropriate.

I don't think, and you're aware, we provided the court with the public tweeting out there about who said what to whom about how they are going to control this. That is a real concern in this case. I mean the integrity of this case is at issue. We have got to get to the bottom of it. I don't think the court can have a working assumption that every one of these claimants presents a claim eligible to vote in light of the circumstances of this case which are well-known not only in this courtroom, but not outside the courtroom.

So I think that this case cries out for this discovery and I know the court would like all the questions answered about where it leads us. I don't think we have all the questions that -- the information or the ability to answer those questions because you and I, you more then I, don't control where this case is going. All I know is it's a

1  possibility that I'm going to ask the court to estimate.

2  Well there is going to be some sort of vote and do we allow

3  this proceeding to be overtaken, and voted on, and controlled

4  by claimants who I think, if we're entitled to some

5  discovery, may show, you know what, they don't have valid

6  claims.

7          So from the perspective of being able to

8  extrapolate, you heard Dr. Martin, you can extrapolate based

9  on the subgroups.  For what purpose you want to extrapolate,

10  what is the assignment at the end of the day, for what

11  purpose is she being asked that is information that I would

12  have to provide her and an assumption to make, right, to

13  allow that to happen, but I don't think we're there yet, Your

14  Honor.  I don't think we need to be there yet.

15          I think that the request here is, frankly, a

16  pretty small one as to complete it in a matter of a few

17  months.  I mean our meet and confers were successful, you

18  know, when people -- this is not information that is

19  impossible to provide particularly claimants who are

20  participating in this proceeding made the decision to

21  participate in this proceeding.

22          1.5 percent doesn't seem to be a lot to ask from,

23  Your Honor.  I mean that is -- like I said, we probably could

24  have said all 95,000. You probably would have said, okay,

25  this is a short hearing, Mr. Ruggeri.  We are trying to do it

1    more efficiently.

2           THE COURT:  Thank you.

3           Okay.  Let me hear a response.

4           MR. RUGGERI:  Your Honor, I don't know if Mr.

5    Schiavoni -- he asked to be heard on this motion too.

6           THE COURT:  Mr. Schiavoni?

7           MR. SCHIAVONI:  Your Honor, there is a second

8    component to this motion; it's the omnibus objection that I

9    think Mr. Ruggeri was going to have Mr. Anker address that

10   for him.  I wanted to just address the Supreme Court decision

11   on that.  So if Mr. Anker wants to be heard I would ask to

12   pass to him and then just let me address the Supreme Court

13   decision.

14          THE COURT:  Okay.  We will pass the ball.

15          Mr. Anker, do you have anything to add?

16          MR. ABBOTT:  Your Honor, Derek Abbott.  May I just

17   interrupt for a moment?

18          Your Honor, I apologize.  I have received several

19   requests from folks in the audience about a potential break

20   for just a few minutes if that is possible.

21          THE COURT:  Yes.  If we have a request that's

22   fine.  Let's take ten minutes.

23          MR. ABBOTT:  Thank you, Your Honor.

24          THE COURT:  Thank you.  12:10.

25        (Recess taken at 12:00 p.m.)

1    (Proceedings resumed at 12:10 p.m.)

2    MR. ANKER:  I was about to say good morning, Your

3  Honor, but I think its good afternoon.  For the record Philip

4  Anker, Wilmer Cutler Pickering Hale & Dorr.  We are co-

5  counsel with Mr. Ruggeri's firm for Hartford.

6    I am going to do my darn best to be brief.  I

7  often say that and don't fulfill my promise, but I will do my

8  very, very best. I want to make two points.

9    One is just to try to answer the question you were

10  asking.  And I appreciate that question.  How can one take

11  discovery of a sample of claimants and draw then inferences

12  about others.  And I think the question, Your Honor, may come

13  down to, with respect to claim objections, what one means by

14  an influx.

15    Let me just give a concrete example.  Imagine that

16  we were to take this discovery and conclude that all of those

17  claimants within the sample who did not show any affiliation

18  on their proof of claim form with Scouting they, in fact,

19  didn't have any affiliation with Scouting.  I certainly think

20  that would give us a good faith basis to file an omnibus

21  objection.

22    I am not suggesting, Your Honor, it would give you

23  a basis on an *ex parte* to deny those claims.  The claimants

24  would get notice, the other claimants would object to, and

25  they would have an opportunity to say, well, that might have

been true about everyone else in the sample, but it wasn't true about me.

As Your Honor knows from business bankruptcy cases omnibus objections are routinely filed without any discovery at all. A debtor says all the following claimants and asserted claims in our books and records show nothing. The claimant can come in and say, well, actually you do owe me money. We could have done that here. Frankly, we thought the responsible thing to do was to do some discovery first. We thought it was better to ask questions and shoot later, not shoot first and ask questions thereafter.

The only other point I would make on that is I don't think the only end game here is mass claim objections all done before confirmation. As Mr. Ruggeri noted in other cases, including in this district, Judge Carey in Maremont where there have been, on a sample, some showing of invalid claims that has informed the court's judgement when it came to trust distribution procedures, confirmation, what they need to provide.

I am about to give an alternative to (indiscernible), Your Honor, but maybe the answer at the end of the day -- imagine we take the sample and it turns out the overwhelming majority of the claims are invalid, maybe there will then be an argument that, you know, Your Honor needs to take a look at these claims even if as is often the case in

1  bankruptcy the claim objection process in court occurs post-

2  confirmation not pre-confirmation.  That is, after all -- I

3  see your smiling, I know it's not something that may thrill

4  you, but it may be what happens here.

5         THE COURT:  Actually, it won't thrill the District

6  Court, I think, is who it won't thrill.

7         MR. ANKER:  I hear you on that as well.  And it

8  may be that it ends up there.

9         Your Honor, I will just end with this and then

10 move to the 3007 issue, it can't be that anyone in this room

11 including people representing valid claimants who don't want

12 to have their clients be diluted for us to put our head in

13 the sands and simply ignore a potential problem.  That isn't

14 the responsible thing for me to do as officer to the court

15 and I know it's not what Your Honor is going to do.

16        On the Rule 3007 point I would just make the basic

17 point we have to be practical here.  We have to deal with the

18 real world.  I hear Ms. Lauria when she says we, BSA, need to

19 get out of bankruptcy by the summer.  That may be right or it

20 may not be right, but I take that point at face value for the

21 moment.  If we are going to be practical here we have to

22 bring on, have relief from those rules and the rules

23 absolutely allow Your Honor to grant that relief in a

24 practical way.

25        Again, I am not asking that we be able to file

omnibus objections, Your Honor, without giving any notice to the claimant simply disallows their claim. They will be able to come into court and put -- you're going to give a due process, but if we going to be practical here we need relief. And as Your Honor knows, in addition to the practical point that that relief is often granted where you have exigent circumstances, the whole Rules Enabling Act starts with the proposition, I think it's really the first section in the statute, that says,

"While courts can make rules, and make federal rules, or local rules, those rules cannot abridge the substantive right."

Here there is a substantive right to object to claims by parties in interest. If you don't give relief, for all intents and purposes, we're not going to be able to object certainly, certainly before confirmation of a plan. Then the scenario where you said it may not thrill the District Court may become a *fait accompli*.

So I would urge the court and I would urge all the parties let's be practical and work for a solution that allows for due process but also allows us to accomplish something that is beneficial.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Schiavoni?

1  MR. SCHIAVONI:  Your Honor, just briefly.  I will

2  tell you, Your Honor, I think this may be among the most

3  important decisions that you may in the entire case.  You

4  heard us in the contested hearing about whether or not the

5  bar date order should be entered.  Your Honor, pointedly made

6  the point to me that this is how Congress drafted the statute

7  and that did we want to go back and amend the statute.  We

8  took what came from that, Your Honor's ruling about how the

9  proofs of claim were to be signed.

10  This is, I think, no matter how one looks at it,

11  having mass torts addressed, you know very complicated

12  individual personal industry claims addressed through 502 is

13  putting a square peg in a round hole.  The statute wasn't

14  really meant for this, but I am not making my appeal to

15  Congress now.

16  What I am saying is that Your Honor has told us,

17  in essence, this is not Congress and we should take the rule

18  as drafted.  The rule as drafted allows these are the

19  protections -- like the bad end of it for us, in some

20  respects was, respectfully, the bar date order what came from

21  that, these are the protections that flow from it.  These are

22  the protections that were built into this statutory scheme

23  that we would get an opportunity to object to the claims and

24  that we would be able to use 2004 to collect basic evidence

25  in order to advance those objections.

1      It cannot be that Congress intended 502 to simply

2   turn all of American jurisprudence on its head and deal --

3   and make all claims submitted in a complicated negligence

4   action into strict liability, make them all deemed presumed

5   allowed, make them everything confidential about them and not

6   allow any challenge or inquiry into them.  If that really was

7   what Congress intended if a license just to print money --

8   and I think when we get to the next motion you will see that

9   there are people that think this and that for profit

10   businesses have jumped into to try to take advantage of this

11   and its created a huge problem.

12      On the specifics of this Mr. Anker has it right.

13   He -- your question earlier about would we use this discovery

14   to extrapolate to disallow the claim and, respectfully, as he

15   said that is not really the issue.  What we were looking for

16   with Hartford and -- look, I have to tell you, on the side,

17   it's not so easy always to get along with Phil, and Jim, and

18   everything, but we worked very hard to reach consensus here

19   because what we were looking for was a responsible

20   conservative careful approach to go forward with how to deal

21   with these claims.

22      What you heard Mr. Ruggeri present, his motion, it

23   presents the best thinking of our two companies about just

24   that.  I think we were entitled to, basically, go ahead with

25   objections as is, but we recognize the type of case this is

1  and we wanted to present the court with something that

2  allowed us to, in good faith, look at the claims harder.  We

3  told you during the bar date argument that the questions,

4  respectfully, weren't adequate in our view to set out all the

5  elements of the claims in fifty states.  You know, we had our

6  say.

7          We are now where we are and this is the vehicle

8  for us.  And we think the process that we have set out that

9  we take this narrow discovery of, you know, one percent of

10  the claimant population and that based on the results of that

11  we, Hartford, Century, and others try to make informed

12  decisions about what we have to make a good faith decision

13  about what objections to advance.

14          In some respects that is what we did in the tort

15  system when the claims were defended.  We -- like we weeded

16  out the good claims from the bad claims. That was what the

17  whole thing was about.  And, you know, having some basic

18  information about the claimants was absolutely essential to

19  that.

20          Our people -- when you go back to our claims

21  people, when I go back to them and tell them that something

22  like 80 percent of the claimants don't show an affiliation

23  with Scouting then I check with the Boy Scouts and I don't

24  get a different kind of number from them, and then in the

25  nature of this type of terrible misconduct to have such large

1  numbers of claimants unable to identify the perpetrators.

2       To be clear, there will be claimants who have very

3  sound reasons not to be able to identify their perpetrator,

4  but what everybody is telling us, including our experience

5  from dealing with the claims, is that by its nature these

6  are, sort of, misconduct of a grooming nature where the

7  perpetrators often times got to know the abused.  To have

8  such large numbers of claimants who are unable to identify

9  them it's an issue.  Its developed huge problems on our end

10  on how to deal with this.

11      The notion that what we have come to you with

12  this, sort of, narrow vehicle to try to take discovery on

13  these to get a handle on what is going on because, Your

14  Honor, you have to understand the situation here.  We are not

15  even -- the proofs of claim in the confidentiality order that

16  is put in place we're not able to go out and speak to the

17  claimants informally.  We are not able to speak to their

18  witnesses informally.  We are not able to speak to anybody,

19  really, about them informally. So there is no way to get to

20  the bottom of this without, in some ways, going forward with

21  some basic discovery.

22      When we were before the court on September 9th on

23  the -- and I think then was when this problem was really,

24  sort of, or the problem we perceive about the proofs of claim

25  was manifesting itself with this explosion of claims. I think

1   when we were before you then on the advertising motion and

2   what was being brought out the debtors' counsel told the

3   court that he,

4           "Shared Century's and the insurers concerns" on

5   how the claims are generated, of course, issues related to

6   the State Court ethics."

7           Then he went onto say that he,

8           "Believed that these issues could be resolved

9   potentially through 2004 discovery."

10          Debtors' counsel, I think that was Mr. Andolina,

11  what he was eluding to then was exactly, exactly what we are

12  here for now; a, sort of, targeted discovery that allows us

13  to try to make, together with Hartford, some informed

14  decisions about the nature of the objections we bring and how

15  extensive they bring.

16          The parallel issue, I would just ask you to -- you

17  know, this is part of the second point, but it goes along the

18  same lines as far as dealing with our request, our motion to

19  modify the local rule which, I have to say, is absolutely --

20  like no matter what you do on the discovery this is

21  absolutely essential to us.  It's vital to the case for us is

22  we would respectfully ask you to look at the Supreme Court

23  case Tennessee Student Assistance Corp., v. Hood, 541 US 440,

24  it's a 2004 case and it addresses Section 2075 of the Code.

25          In that case what the Supreme Court held was that

allowing the bankruptcy rules "to preclude a party from exercising their statutory rights" under the provision of the bankruptcy code "would give the rules an impermissible effect."  In other words, that was a case where the Supreme Court looked at the application of the rules and was dealing with when a court, in essence, had to override the rules in favor of the statute of the code.  And that, we believe, is exactly the situation you have before you.

Normally, to the issue of how to grant relief under the local rules is an issue of, sort of, discretion.  I would suggest to you, Your Honor, in this case it's not discretionary because under the Rules Enabling Act, you heard Mr. Anker refer to, Congress only granted authority to promulgate bankruptcy rules. It did grant that authority, but in doing so, under 28 U.S.C. 278, what Congress did was it mandated that such rules shall not abridge, enlarge, or modify any substantive right.

Here, that is exactly what is at issue because here 502 grants the parties a statutory right to object.  As a practical matter here there was no way the parties can meaningfully exercise that right without relief from what Local Rule 3007(1)(f).  There's just too many claims.  If (indiscernible) to be followed is too little time.  We have no -- we lose the substantive right to object at all if we don't have relief from the local rule.

1          Under those circumstances, under what I believe to

2   be Supreme Court authority, it would be, in essence, an abuse

3   of discretion not to grant us authority to modify the rules

4   to allow us to object.  In effect, be robbed of any ability

5   to object to claims here at all.  That would have the

6   catastrophic effect on our clients, but also on the case in

7   general.  It would really just turn the case into a, sort of,

8   machine to manufacture claims and manufacture pay-outs.

9          There would be -- every (indiscernible) our hands

10  are tied three times from Tuesday to even investigate the

11  claims.  The questions are very limited.  They do not address

12  all the elements in the fifty states.  The manner in which

13  they go out you have seen in some of the declarations that

14  are submitted, not even the questions that were presented are

15  filled out.  We received many proofs of claim that are,

16  basically, mostly blank or contain huge gaps of information

17  in them.

18          So the proofs of claim, like if they're just

19  deemed allowed and they don't give us any information, and

20  then everything is deemed confidential it leads to just an

21  absolute sending this case off the rails.

22          So, Your Honor --

23          THE COURT:  I see those blank proofs of claim, but

24  I have also seen, and a couple of objectors submitted the

25  proofs of claim that are fulsomely filled out.  I think under

almost any standard would have *prima facie* validity.  Now
that doesn't mean that the claim is ultimately allowed.  That
means, though, that it has *prima facie* validity and there
could be an objection, then the claimant will have the burden
of persuasion to show that the claim is valid.

So I have seen both of them in the submissions,
quite frankly.  That is one of the things I am struggling
with in connection with this motion because for some of the
objectors who did submit a claim I look at that claim and
think, okay.

I will tell you this, and I will read the case, I
am not familiar with it; although, I don't see how a rule
could abridge the code, but the -- or change the code, have
the effect of changing the code, but omnibus objections, as a
practitioner, I found them difficult and as a judge I find
them more difficult, quite frankly.  So it depends on what
the omnibus objection is.

Quite frankly, we look at every proof of claim in
my Chambers, every one.  We're looking for whether or not the
claim, I can tell what it is.  It looks *prima* and it gets
*prima facie* validity.  Now I don't know.  Everybody tells me
these claims are different, right.  That is what I keep
hearing, these claims are different.  My proof of claim form
that says basis for claim has, you know, a three inch line to
put your basis of claim, breach of contract, you know,

1  employee claim, wages.  And I look at that and I say, okay,

2  it's an employee who is owed wages; *prima facie* valid, they

3  signed it, it's under oath.

4      It may or may not ultimately be allowed, but that

5  is what I am trying to get a handle on; what are these

6  objections going to do if they are omnibus, are they truly

7  omnibus in the sense that how I would think of it is that --

8  well, some you are saying matter of law.  Matter of law is

9  actually maybe that can be omnibus in some fashion, but

10  particular facts are always an issue with omnibus claims.

11      So I struggle with omnibus claims because we still

12  have to look at each one of them.  We still have to make a

13  determination on each one of them even if people don't

14  respond.  So I am not sure how that works in this case.  I

15  will read your case.  I don't know. I hear the argument. I

16  don't know what to do, quite frankly.  And I will ask others

17  how I am supposed to address this and get their thoughts to

18  consider.

19      I hear what you are saying.  I don't know what to

20  do with it.

21      MR. SCHIAVONI:  Your Honor, all I can say is,

22  first of all, I appreciate you considering it and in my mind

23  it's always a good thing when a judge is open-minded and

24  thinking about the issues.  So I thank you for that.

25      I would ask you to consider on the issue of how a

1 | rule could possible abridge a substantive right.  Here 502

2 | gives us a substantive right to object, but if there is

3 | 95,000 claims and we have more than 150 objections, and the

4 | local rule prevents us from filing more than that number of

5 | objections, we have lost the substantive right to

6 | substantively address the volume of claims we're dealing with

7 | here. I think it's that, sort of, straight-forward under the

8 | practical effect in this particular case.

9 | You know, there are many claims here that, like,

10 | idiosyncratically there's an obvious problem with including

11 | just the ones that are, in fact, completely blank, okay, that

12 | we'd go through 150 all by itself.  So that is one thing I'd

13 | ask you to consider.

14 | The other is as far as how the evidence carries

15 | forward it's that, you know, it's like we're kind of jumping

16 | the gun.  Yes, you can evaluate the omnibus objections when

17 | you get them and deem them one way or the other, but like us

18 | to lose that right without having any ability to inquire

19 | about any of the claims at all.

20 | I mean I'm not sure if the issue here is the court

21 | doesn't think our interrogatories are specific enough.  We

22 | thought by making them as general as they were that it was

23 | actually better to draw out whether there was additional

24 | information.  The pool of deponents we picked was, you know,

25 | intended to allow us to, in some way, explore why these

1 issues are the way they are, why it is that so many of them,

2 you know, are deficient in one way or the other.

3      In the real world, in the tort system world these

4 claims they're not dealt with by someone serving a complaint

5 with little information and then paid on that basis.  Almost

6 all of the people in the real world are subject to some sort

7 of, in this particular kind of tort, sit down either

8 deposition or, in many cases, a kind of under oath private

9 kind of, you know, questioning with counsel present because

10 we're dealing here with claims that are difficult to

11 corroborate, you know.  That type of inquiry -- like

12 virtually all the cases that were settled were settled in

13 that manner.

14      Then just the last point I'd make I hear you that

15 you have looked at some of the proofs of claim and you have

16 made some assessments that it looks like a fair claim or what

17 not, but, Your Honor, it's like each of the fifty states have

18 their own body of case law about -- it's like it's easy to

19 look at these claims and immediately collapse them into what

20 would be liability for the perpetrator so that if there is

21 abuse alleged and the perpetrator was -- you know, against

22 the perpetrator was liability.

23      In many, many states there isn't *respondeat*

24 *superior,* you're not automatically liable for any illegal act

25 done by your employee so that the laws vary in the different

1  states about what needs to be brought out in the particular

2  cases both for liability, but also on the statute of

3  limitations.  It's a wide variance.

4       You could easily look at a (indiscernible) proof

5  of claim and say, well, there it is.  Someone says they are a

6  Boy Scout and they're abused by a perpetrator; end of story.

7  It's like you actually have to have like a handle on what the

8  law is in the fifty states on both liability and the statute

9  of limitations.

10       THE COURT:  Well that is fair enough.  And that is

11  why I said I don't know if the claimant is ultimately

12  allowed.  I am looking at it for have they stated a proof of

13  claim for *prima facie* validity which is nothing to do with

14  whether it's ultimately allowed, but I hear you.

15       MR. SCHIAVONI:  Your Honor, cases where -- in

16  these sexual abuse cases the objections have been pursued in

17  some of the diocesan cases.  They're very different because

18  they're just much smaller, but insurers have filed proofs of

19  -- objections to proofs of claim and there's been back and

20  forth.

21       Frankly, that has been extraordinarily helpful in

22  bringing about resolution of the cases.  You know, I can't

23  reveal, obviously, sort of where the mediation is, but, you

24  know, it's not -- you know, we are at a point where this case

25  is not very different from Imerys as between how much

1  progress has been made between, you know, parties that are

2  being asked to fund and otherwise.

3          Now some basic discovery here it's like we face an

4  enormous problem in trying to resolve this case; just

5  enormous.  The gap is just unbelievable because it's a

6  difference between one group of parties thinking that the

7  entire set of claims are all going to be allowed by them, you

8  know, and that there needs to be some actual adjudication of

9  the claims.

10          Cases where they're not abuse cases, but cases

11  where there has been discovery of the claims themselves, you

12  know, W.R. Grace, famously the Garlock case, USG, and G-I

13  Holdings, In Re Silica Products; we put those cases in our

14  briefs.  All of them involve, you know, discovery that was

15  used to, sort of, narrow the parties on the claims

16  themselves.  I would be the first to say that in those cases

17  there weren't proofs of claim.  They're generally not used in

18  a lot of the mass torts, but here they have been used.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.

21          Okay.  Let me hear from the objectors.  I'll start

22  with the Coalition.

23          MR. GOODMAN:  Good afternoon, Your Honor.  Eric

24  Goodman, Brown Rudnick, counsel for the Coalition of Abused

25  Scouts for Justice.

1          Can you hear me okay?

2          THE COURT:  I can.

3          MR. GOODMAN:  Good.  Your Honor, there is a time

4   and a place for everything in a bankruptcy case.  This is not

5   the time and this is not the place for 96,000 personal injury

6   claims to be liquidated.  It may be that a proceeding is

7   commenced shortly seeking estimation under Section 502(c) of

8   the Bankruptcy Code, and given that these are personal injury

9   claims it may be that the District Court will need to be

10  involved.  We are not there yet at this point in time, but

11  that is a possibility.

12          There are five key points that I want to make in

13  response to Century and Hartford's Rule 2004 motion seeking

14  discovery on 1,400 abuse survivors.

15          The first point, that I don't think anyone has

16  even mentioned today, is that the insurers already have

17  robust data.  Hartford and Century have been the debtors'

18  insurers of choice for decades.  Hartford and Century already

19  know about every reported claim for sexual abuse against the

20  debtors.  They already know about every known abuser in the

21  history of Scouting.  And they also have the same information

22  for other institutions with liabilities for sexual abuse.

23          They are insurance companies.  I will say that

24  again, they are here almost acting as if they are the

25  debtors, they are the insurance companies.  Their job is to

1   assess risk.  If you start with a logical assumption that the

2   debtors have complied with their reporting obligations to

3   their insurers it is evident that Century and Hartford

4   already have substantial information.  They won't share any

5   of it.  It is a closely guarded secret.

6           The question I ask, which is a starting point, is

7   why do parties that may have the most data and the most

8   information get to go out and depose over 100 survivors and

9   take discovery on 1,400 individuals.  How is that

10  proportionate to the needs of these cases.

11          The insurers try to brush this aside, but this is

12  really discovery 101.  The proportionality requirements under

13  Civil Rule 26 are every bit as applicable under Bankruptcy

14  Rule 2004.  Good cause cannot exist if the discovery is

15  unduly burdensome or disproportionate to the needs of the

16  case.  And --

17          THE COURT:  Well let me ask you this, Mr. Goodman,

18  why is that the Coalition's argument?  The Coalition isn't

19  providing the discovery.  So why is the proportionality

20  argument the Coalition's argument?

21          MR. GOODMAN:  Your Honor, I think it really has to

22  do with understanding what process, if employed here, would

23  provide the most benefit at the least cost to the estate.

24  And in the interest of wanting to move these cases forward we

25  are interested in, what I would describe as, meaningful

1  discovery; discovery that would get us some place, that would

2  advance the case forward.

3        THE COURT:  So are you offering something?

4        MR. GOODMAN:  Your Honor, during the meet and

5  confer process we attempted to make multiple offers to the

6  other side.  They were all similarly rejected.  In fact, we

7  were in the midst of discussions when they went and filed

8  their motion. It caught us a bit off guard, in fact, but we

9  were amenable to certain limited depositions being taken as

10  long as they were done on a voluntary basis.  And there were

11  discussions about providing additional information regarding

12  the claim forms.  The insurers did not take us up on that

13  offer and they elected to come to court instead.

14        THE COURT:  Okay.  I am just -- I am a little

15  confused and it may be more in connection with the next

16  motion then this one about the Coalition's role.  And since

17  it is not the subject of discovery what it should be

18  advancing here.

19        MR. GOODMAN:  Fair question, Your Honor.  I mean

20  we do represent the collective interests of over 10,000

21  individual abuse victims before the court based on our 2019

22  disclosures.  So it is in that capacity that I am

23  representing the court today.

24        THE COURT:  How many of those 10,000 are in the

25  1,400 that the insurers want to depose, or the 100, I guess,

1 insurers want to depose, or the 1,400 they want to seek

2 discovery from?  Do you know?

3          MR. GOODMAN:  I don't have that number off hand,

4 Your Honor.  So I can't answer that question.

5          THE COURT:  Okay.

6          MR. GOODMAN:  The point I would make is that if

7 you were to envision a discovery process in normal litigation

8 or even in bankruptcy litigation I think that you would want

9 to first identify which parties have the most meaningful

10 information, which parties have the data, and what is the

11 cost of obtaining that.  And if one side is sitting on a

12 mountain of information that is relevant and could be used to

13 answer a lot of questions in this case you start there.  You

14 don't run out and start deposing 100 individual abuse

15 survivors.

16          Again, you will hear this, I think, again in the

17 future, but there is a lot of information that we want.  I

18 will come back and echo Mr. Ruggeri's statement.  When they

19 did approach us we said we were interested in exchanging

20 information, but we wanted it to be reciprocal.  The

21 insurance companies are not interested in a reciprocal

22 process.  And I think that is not how discovery is supposed

23 to work.

24          Second point, Your Honor, of my five points I

25 would like to make I believe that this is premature.  Putting

1  aside the fact that the parties are supposed to be in

2  mediation the insurers' pleadings, I think, make it fairly

3  clear that this is aimed at plan litigation.  The debtors are

4  revising their plan.  We don't know what it's going to look

5  like yet.

6          You heard Ms. Lauria state at the beginning of our

7  proceeding today that the debtors are looking to get a plan

8  and a disclosure statement on file soon and potentially have

9  that before the court in April.  Right now, sitting here

10 today, we don't know if the debtors are willing to propose a

11 plan that will impact the insurers' rights in any way.  We

12 don't know if the insurers will fund anything.  We don't know

13 if Hartford or Century will even need to fund anything.

14 Every indication is that they will not fund a plan no matter

15 what.

16          I take the world as I find it, Your Honor.  We

17 have here two insurance companies that are intent on throwing

18 up a lot of roadblocks in this case.  When this issue was

19 first presented to us we asked a very simple question; what

20 will this accomplish?  How is this helpful?  How will this

21 advance the cases?  I have been asking that same question for

22 two months and I haven't gotten an answer that makes any

23 sense to me at all.

24          If we ever do get to a specific plan that has a

25 chance of being approved by the majority of survivors, let

1 alone the super majority of survivors necessary for third-

2 party releases, what discovery is appropriate in that context

3 will happen, but we are not there yet.  The debtors are not

4 asking for discovery on victims of sexual abuse.  The

5 official committee of tort claimants has not filed a Rule

6 2004 motion seeking discovery from survivors, neither has the

7 FCR or the UCC.  The debtors are not before the court saying

8 that they need this discovery to formulate a plan of

9 reorganization.

10          How can there be good cause to conduct what is

11 classic plan discovery before there is even a plan.  There is

12 no plan yet.  This is entirely premature.

13          Third point, Your Honor, I believe that the

14 prejudice outweighs --

15          THE COURT:  Well I don't hear -- let me ask you,

16 Mr. Goodman, what is the response to the argument that this

17 isn't necessarily for plan purposes, but for objections to

18 claims?

19          MR. GOODMAN:  Well I think as a threshold matter,

20 Your Honor, the insurance companies, I know that this has

21 been discussed and we will continue to discuss it, are not

22 parties in interest within the bankruptcy code definition.

23 They are not creditors in this case.  They filed about the

24 most bare bone claims imaginable. I don't know that it would

25 be considered *prima facie* valid.  We asked them if they would

admit that they had coverage obligations.  They refused to admit that.

So what we have here are insurance companies that do not fit within the definition of party in interest under 1102(b) and they have not acknowledged, in these proceedings, that they actually do have coverage obligations at this point.  Obviously, we think that they do, but as insurers I don't believe that they would have standing to file a claim objection in this case.

In fact, the Third Circuit has dealt with this issue on multiple occasions in the context of standing to object to the confirmation of a plan.  And if the plan is insurance neutral and does not impact the insurers' rights in any way I believe under Third Circuit precedent they would not have standing to object to plan confirmation.  If they don't have standing to object to plan confirmation how are they in this case filing substantive claim objections.  This isn't something that they could --

THE COURT:  Do you want me to make a decision -- you want me to make a decision now?  How do I make a decision now that the insurance companies don't have standing?

MR. GOODMAN:  I don't know that the court even needs to get to that question today, Your Honor, because the issue before the court is have they presented good cause under Rule 2004 to go forward with this discovery.  I believe

1  that that is actually a very narrow issue, but I was trying

2  to be responsive to the court's question.

3          You know, my answer is do insurers have the

4  ability to go out and launch hundreds of claim objections

5  against tort victims in cases.  I guess my response to that

6  is show me one case where that has happened before.  In fact,

7  they can't even do this in State Court, Your Honor.  This is

8  not something that an insurer could do in a State Court

9  proceeding is come in and conduct themselves in this way.

10          THE COURT:  I suppose the insurers would say that

11  there would be one claim at a time, not 95,000.

12          MR. GOODMAN:  We'll get there when we get there.

13  I guess my point is we're not there yet.

14          THE COURT:  Okay.  So you want me to -- to you

15  this is premature.  You want me to wait until a plan is

16  filed, we will see what it says, and then if the insurers are

17  entitled to discovery it will start in May.  And you think we

18  will confirm a plan by August?

19          MR. GOODMAN:  I think if discovery is taking place

20  in the context of litigation over a plan you would have a

21  contested matter under 9014. If discovery is taking place in

22  the context of an estimation proceeding under 502(c) you'd

23  have a contested matter.  Then we would have a fair fight.

24  We would go after all of the information that they have.  We

25  would serve them with discovery requests.  They would take

1  the discovery that they are seeking.  It would have meaning.

2  It would have consequence, Your Honor.

3        Right now we are just not there yet.  We don't

4  even know what the litigation in this case is or is not going

5  to involve.  I come back to my point that I believe that that

6  is why this is all very premature.

7        THE COURT:  What about the issue -- maybe you will

8  get to it, but go ahead and make your three more points.

9        MR. GOODMAN:  Thank you, Your Honor.  Keeping

10  track.  Two down, three to go.

11        Third point, Your Honor, I believe the prejudice

12  outweighs the value.  Again, we're not talking here about

13  discovery from the debtors.  We are talking about information

14  that -- we're not talking about information that the debtors

15  have already assembled and have produced to the FCR or

16  someone else in the case.  We are talking about 1,400 abuse

17  victims, 100 depositions, and that is probably just the tip

18  of the iceberg.

19        If the insurers had said they want to then launch

20  substantive claim objections completely free of any

21  restrictions set forth in the local rules the magnitude of

22  this would take months and months which I believe is the

23  point.

24        Based on the testimony that we heard from Mr.

25  Martin, both the deposition and today, it's not clear that

1  the information the insurers are seeking will even be

2  meaningful.  If the insurers were serious about conducting a

3  meaningful study here they would have someone with subject

4  matter expertise involved.  That is what the text books that

5  Dr. Martin cites to say, that if you want to do this the

6  right way you have a subject matter expert and a

7  statistician.  We don't have that here, Your Honor.

8          We have Mr. Ruggeri identifying subcategories.

9  This is completely lawyer driven.  They don't have a

10 statistical model yet and the samples that they have proposed

11 appear, on their face, to be gerrymandered in favor of claims

12 that the insurers have already flagged in their system as

13 somehow deficient.

14         They're starting with the claims that they think

15 are bad and they want to take discovery on those claims.

16 This is not a situation where if they just had the data all

17 of our questions would be magically answered.  And, in fact,

18 I don't even know what a party in this case would say if

19 someone showed up on their doorstep and said I'm objecting to

20 your claim based on a statistical sample.  I don't think that

21 gets us anywhere.

22         Again, I don't believe that this is about

23 interposing discovery or extensive litigation that really

24 advances these cases.  Rather, I think there is a clear

25 danger to permitting Rule 2004 to be used in this way.  If

the insurers are successful here this court's decision will
be cited for the proposition that discovery in a mass tort
bankruptcy can begin with insurance companies going after
tort victims before a plan is even proposed.  I cannot locate
a single case or anything close to this that has ever been
proposed or has ever been permitted.

THE COURT:  Well let me ask you -- let me ask you
the context here so far you haven't addressed.  Are you going
to address the context in which we have claims that start at
less than 2,000 prepetition and end up at 95,000 because that
is a context in which we are.  You may have different
explanations or want to suggest a different explanation, but
that is where we are.

MR. GOODMAN:  Well, I guess, a couple points that
I go back to on that point, Your Honor.

The first is if you look at the number of known
abusers set forth in news articles in the Boy Scout system
the number of known abusers, if you consider the number of
victims an abuser will typically have 95,000 is actually not
outside the realm of what you would likely expect here.  We
are talking about a national organization with, I believe,
close to 8 or 9,000 known abusers.  Again, that is just known
abusers, Your Honor.

If you consider the decades, the decades of abuse
in which this, you know, occurred and you also factor in the

number of states where the statute of limitations has opened
up.  I can also, you know, layer into this, I think, changes
in societal views on people disclosing sexual abuse.  If you
put all of this together I don't really believe that 95,000
is outside the realm of possibility.  In fact, I think the
number may actually be significantly higher than that, Your
Honor.

In terms of the, you know, growth in claims filed
its not just Boy Scouts.  Look at Purdue, look at PG&E, look
at the claims that had been filed in most mass tort cases;
they almost all come into bankruptcy with a couple thousand
claims and by the time you're done with a bar date noticing
program and a bar date has been set it forces people to make
decisions and come forward.

So, you know, again the insurers are trying as
hard as they can to paint this picture as if something wrong
has happened.  You know, yes, something wrong happened.
There was sexual abuse on a substantial scale and that is why
we are here today.

Fourth point, Your Honor, I think this court has
actually heard these arguments before.  In Imerys Johnson &
Johnson moved for discovery under Rule 2004.  Johnson &
Johnson was arguably, I'm sure they would dispute this,
obligated to indemnify the debtors.  Given this Johnson &
Johnson argued that the TCC and the FCR would eventually seek

1 to recover from them on the talc claims. Johnson & Johnson

2 claimed that it could be asked to fund a trust for talc

3 claims and that this gave them a key interest at

4 understanding the size of the claim pool and that such issues

5 could arise in the context of a plan. So they demanded

6 discovery under Rule 2004 so they would have adequate time,

7 you know, to process the information.

8 Hartford and Century are making almost the same

9 arguments today. Hartford and Century say that they have

10 coverage obligations for abuse claims. Again, we actually

11 asked them to admit this and they refused. So, technically,

12 Hartford and Century are standing before the court seeking

13 discovery without even admitting that they have coverage

14 obligations.

15 Putting that aside they argue that the TCC, the

16 FCR and the Coalition could ask them to write a check to fund

17 a plan. That is what they say in their motion. They are not

18 saying that they would have to write a check, just that they

19 may be asked to. And they argue that this gives them a keen

20 interest in reducing the size of the claim pool, and this

21 will eventually spill into plan confirmation so they should

22 get discovery under Rule 2004 now.

23 This court denied Johnson & Johnson's Rule 2004

24 motion. So the question I ask is have Century and Hartford

25 made a stronger showing of good cause as Johnson & Johnson

did?  Johnson & Johnson wanted discovery from the debtors.

Hartford and Century want discovery from 1,400 abuse victims.

Johnson & Johnson had co-liability with the debtors as an

indemnitor.  Hartford and Century have co-liability with the

debtors as insurers.

Johnson & Johnson claimed that they may be asked

to fund a plan.  Hartford and Century claimed that they may

be asked to fund a plan.  Johnson & Johnson said that they

need to understand the size of the claim pool of talc claims.

Hartford and Century claimed that they need to understand the

size of the pool of abuse claims.  Imerys was still

formulating a plan.  The Boy Scouts are still formulating a

plan.  Johnson & Johnson already had substantial information

as a co-defendant in litigation with the debtors.  Hartford

and Century already have substantial information as the

insurers for decades and decades.

Johnson & Johnson was trying to confirm that the

debtors had not shared protected communications.  Hartford

and Century are trying to invade the attorney/client

privilege of abuse victims.  Johnson & Johnson was seeking

information that had already been collected and could have

been easily turned over.  Hartford and Century want to go out

collect data from 1,400 survivors, have an economist with no

subject matter expertise at all analyze it which may or may

not amount to anything other than several months of delay in

this case.

I will add, Your Honor, that your ruling in Imerys was obviously correct.

THE COURT:  Obviously.

MR. GOODMAN:  Obviously.

Fifth and last point, Your Honor, we need to focus on what is at stake here.  As I was preparing for this hearing I kept going back to Claimant No. 2432. He has a name and based on the email that the insurers filed he was abused over sixty years ago.  He may be seventy years old today.

Like so many victims, Claimant No. 2432 never sought professional counseling or treatment.  In fact, studies of sexual abuse in America support the proposition that sexual abuse is a grossly underreported crime.  There are many reasons for this failure to disclose, but the predominant one is shame.

We don't know if Claimant No. 2432 felt safe enough to tell his parents.  We do know that he mustered the courage to file a proof of claim without the aid of an attorney.  Then came a call from one of Hartford's attorneys requesting a meet and confer over the detailed interrogatories.  He apparently read them and concluded that since he did not seek professional help that he should withdraw his claim.

From the way the insurers use this email and talk

about the numbers in this case it's almost as if they view
this as some kind of victory.  "Rejoice", one less claim we
may have to pay.  Your Honor, that is not a victory.  That is
sad.  That is just sad.  And it shows, in my view, what the
insurers are trying to do in these cases is not appropriate.

At a minimum, the rules need to be followed here.
After spending years of my life in cases like Takata, PG&E,
and now Boy Scouts I don't understand why some parties seem
to think that when it comes to tort victims the rules can
just be cast aside.

There is no good cause here just like there was no
good cause in Imerys.  We don't have to check our humanity at
the door.  Look at the claims.  Look at the descriptions of
the sexual abuse.  Read objections like the one filed by John
Doe No. 59969.  The key to moving these cases forward is to
not lose sight of what happened.  Look at what happened and
what is at stake. These motions should never have been filed,
never in this court.  They should have tried to work with us
and they chose not to.

I have nothing further, Your Honor, unless you
have questions for me.

THE COURT:  No.  I don't have any questions.

Mr. Stang, your hand has been up, I think, for a
long time.  I'm not sure that I saw a filing by the tort
claimants committee, but I will give you an opportunity to

1  address me if you want to before I go to the individual

2  objectors.

3          MR. STANG:  Thank you, Your Honor.  James Stang

4  for the official tort claimants committee.

5          My hand was up just to let you know that we

6  thought it was the right time that I'd like to say something.

7          THE COURT:  That's fine.

8          MR. STANG:  The tort claimants committee did not

9  file an objection.  The tort claimants committee, of course,

10 does not represent these individual survivors, but we have

11 (indiscernible) overall purposes of this discovery and that

12 it's appropriate.

13         As several of the targets of the discovery, as

14 disclosed by Mr. Ruggeri, responded, had meet and confers.

15 They may not have been timely, but they had their meet and

16 confers, and objections were withdrawn.  People handled their

17 claim discovery as if it was just (indiscernible) discovery.

18         I don't want our silence to be taken as some kind

19 of siding with the carriers.  One should not make that

20 presumption.  What we are -- we're getting back to this

21 actual motion and going back a little bit from the overviews

22 today the discovery request does not ask you to determine

23 that these subgroups are valid subgroups for statistical

24 purposes.  They don't ask you to find that Dr. Martin's 200

25 per category is, in fact, the correct sampling.

1          And if they filed objections, either omnibus or

2     otherwise, and they present some kind of statistical analysis

3     that they think supports their objection every survivor

4     should be able to respond to that without some kind of

5     (indiscernible) being made today if you did approve the Rule

6     2004 exam.  And the TCC, at that point, seeing what the

7     insurers are actually trying to do with this information

8     undoubtedly will be heard or (indiscernible) on whether or

9     not it's appropriate to use the devices to support their

10    objection.

11         So I wanted to try to bring some clarity, at

12    least, to whether Dr. Martin's work is somehow being approved

13    by the court if they were granted the 2004 exam as being

14    something that cannot be questioned down the road.  And I

15    don't think you are saying that.  I don't even think Mr.

16    Ruggeri is saying that.

17         There has been a lot of discussion in cross

18    examination about her qualifications.  I am not sure at this

19    point that is necessary to get into.  If you, in fact, say,

20    hey, I am going to grant this discovery, but I'm not making

21    any finding as to how it is used and the relevance of it at

22    all to an individual claim objection.  If it comes up in an

23    estimation hearing we will take it up then.  Allowing the

24    discovery should not be some kind of blessing that what she's

25    done cannot be revisited or even visited for the first time.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Okay.  We had a response from the Church of Jesus

4  Christ of Latter-day Saints.  Does their counsel have

5  anything to say?

6          MR. GOLDBERG:  Good afternoon, Your Honor.  Adam

7  Goldberg of Latham & Watkins on behalf of the Church of Jesus

8  Christ of Latter-day Saints.  Thank you for the opportunity

9  to be heard this morning.

10          Your Honor, as stated in our statement on the

11  record we do not have a positon on whether or not relief

12  should be granted on the motion.  We would simply rise to

13  emphasize that if discovery is granted it would be relevant

14  to, particularly, all of the mediation parties in this case

15  and we would request that the church, in particular, be

16  granted access to those discovery materials.

17          THE COURT:  Thank you.

18          MR. GOLDBERG:  Thank you, Your Honor.

19          THE COURT:  Bailey Cowan Heckaman?  Mr. Bifferato,

20  do you have anything to add?

21          MR. BIFFERATO:  Your Honor, I apologize.  This is

22  Connor Bifferato.

23          Nothing to add in addition to counsel from Brown

24  Rudnick's comments.

25          Thank you, Your Honor.

1           THE COURT:  Thank you.

2           James Harris Law, PLLC Law Firm.

3           MR. HARRIS:  This is Jim Harris, Your Honor.

4           Nothing to add from the Coalition's objection.

5           THE COURT:  Thank you.

6           There was a joinder by Eisenberg, Rothweiler,

7 Winkler, et cetera, anything to add?  Mr. Hogan?

8           MR. HOGAN:  Good afternoon, Your Honor.  Daniel

9 Hogan of Hogan McDaniel on behalf of Eisenberg, Rothweiler,

10 Winkler, Eisenberg & Jeck, P.C.

11           Your Honor, I have nothing more to add.  And we

12 will rest on the submissions together with the arguments made

13 by co-counsel, Mr. Goodman.

14           Thank you.

15           THE COURT:  Thank you, Mr. Hogan.

16           The Webster Law Firm filed an objection on behalf

17 of Claimant No. 40573.  Did Mr. Webster have anything to add?

18      (No verbal response)

19           THE COURT:  Okay.  I hear nothing.

20           There was an objection filed by Mr. Swenson of

21 Swenson & Shelley.  Does Mr. Swenson have anything to add on

22 behalf of his clients?

23      (No verbal response)

24           THE COURT:  I hear nothing.

25           There was a joinder filed by Conway Legal, LLC.

1   Mr. Conway and Mr. Kraus [phonetic], do either of you have

2   anything to add?

3        (No verbal response)

4             THE COURT:  I hear nothing.

5             Mr. Conway and Ms. Muhlstock filed an objection on

6   behalf of Claimant No. 55101.  Do either of you have anything

7   to add?

8             MS. MUHLSTOCK:  No, Your Honor.  This is Ms.

9   Muhlstock.  We join in Mr. Goodman's arguments and have

10  nothing further.

11            THE COURT:  Thank you.

12            MS. MUHLSTOCK:  Thank you.

13            THE COURT:  Junell & Associates also filed a

14  joinder.  Mr. Cousins or Mr. Thomas?

15            MR. COUSINS:  Good afternoon, Your Honor.  Scott

16  Cousins on behalf of Junell & Associates.

17            We covered our points in our joinder.  And we

18  thank the court for considering our evidence.

19            THE COURT:  Thank you.

20            There was an objection filed by the law firm of

21  Schneider Wallace Cottrell Konecky on behalf of various

22  claimants.

23            MR. HICKS:  Your Honor, Ryan Hicks here from

24  Schneider Wallace.

25            Can you hear me okay?

1          THE COURT:  Yes.

2          MR. HICKS:  If I may, and I apologize for not

3   being on the Zoom. I am Houston and have been without power a

4   couple of days.  I just have a brief couple of things to add.

5          THE COURT:  Yes.  Please go forward.

6          MR. HICKS:  Your Honor, we have three of these

7   1,400 claimants.  We are not part of the Coalition.  We are

8   not a firm that is the subject of the second motion.  We

9   raised this objection separately as these three proofs of

10  claim were, I believe, as the court characterized some of

11  them earlier, fulsomely filled  out, they were signed by the

12  claimants.

13         Earlier counsel stated something along the lines

14  that this discovery is designed to illicit information from

15  people who didn't provide it and differentiate them from

16  those who did.  We provided information regarding the abuser,

17  the relation to Scouting, information about whether anyone

18  was told of the abuse, discussion of prior claims.

19         So, simply, we are objecting on the basis that

20  this is duplicative and that these claims are

21  (indiscernible), and provide the requested information

22  already.

23         THE COURT:  Thank you.

24         I'll get a response to this after I have gone

25  through all of the objections and we see what else there is.

1    The PCVA Claimants filed an objection.  Mr.

2   Clauder or Mr. Bo [phonetic]?

3    MR. STANG:  Your Honor, this is Mr. Stang.  I

4   believe Mr. Amala [phonetic] of that law firm is on.

5    THE COURT:  Mr. Amala.  Thank you.  Anything

6   further to add?

7    MR. RUGGERI:  Your Honor, that objection was

8   withdrawn.  James Ruggeri for Hartford.

9    THE COURT:  Okay.  I've got another objection by

10  Schneider Wallace Cottrell & Konecky.  I am not sure if it's

11  different claims or not, but I will ask again is there anyone

12  from that firm that wishes to address the court?

13   MR. HICKS:  Your Honor, Ryan Hicks from Schneider

14  Wallace.  Nothing to add on that particular joinder.

15   THE COURT:  Thank you.

16   Napoli Shkolnik filed an opposition.

17   MR. BUSTAMANTE:  Your Honor, this is Brett

18  Bustamante from Napoli Shkolnik.

19   The only thing I think with respect to this motion

20  is we'd just like to point out that the insurers used a

21  series of misrepresentations and *ad hominem* attacks

22  specifically on our firm and other firms.

23   In our opposition we took issue with the fact that

24  the insurers accused Mr. Napoli's father of improperly

25  signing claim forms.  In response the insurers, in their

1 reply, state that Mr. Napoli also (indiscernible) insurers

2 for accusing his father of impropriety, but the insurers do

3 not mention Joseph Napoli anywhere in their brief.  So the

4 accusation is hard to understand.

5          In our opposition we not only cite to the very

6 place where they do that, we also provided them with the

7 exact quote.  We just believe this goes beyond mere

8 negligence because in our citation the fact that we gave them

9 a citation -- they are suggesting that they reviewed the

10 documents and nothing turned up.  So they are directly

11 misrepresenting to the court what they wrote in their own

12 papers.  So we believe that it is just really incumbent on

13 the insurers to explain why it's okay to make such

14 misrepresentations to the court.

15          Additionally, they also accuse Paul Napoli of

16 misconduct.  We pointed out in our opposition that the case

17 that they cited to actually exonerated Paul Napoli.  They did

18 not follow-up in their reply.  So I assume that issue is

19 moot.

20          THE COURT:  Thank you.

21          There's an objection filed by Crew Janci.

22          MR. RUGGERI:  Your Honor, James Ruggeri for

23 Hartford.  That objection has been withdrawn.

24          THE COURT:  Thank you.

25          Mr. Kosnoff?

1          MR. WILKS:  Good afternoon, Your Honor.  David

2     Wilks for Tim Kosnoff.

3          We are content, Your Honor, to rest on the

4     arguments that have been made.

5          Thank you.

6          THE COURT:  Thank you, Mr. Wilks.

7          Babin Law filed an objection.

8          MR. PICKENS:  Good afternoon, Your Honor.  Joe

9     Pickens on behalf of Babin Law.

10         We do not have anything additional and support Mr.

11    Goodman's arguments.

12         Thank you.

13         THE COURT:  Thank you.

14         There was an objection filed by Ms. Liakas from

15    Liakas Law on behalf of multiple claimants.

16         (No verbal response)

17         THE COURT:  I do not hear Ms. Liakas.

18         A joinder filed by Marc J. Bern & Partners.

19         MR. SULLIVAN:  Good afternoon, Your Honor.  Bill

20    Sullivan on behalf of Marc J. Bern & Partners.

21         We filed a joinder to the written objection filed

22    by the Coalition and we also join in the arguments presented

23    to Your Honor today by the Coalition, but we don't have

24    anything further to add.

25         THE COURT:  Thank you, Mr. Sullivan.

1          Merson Law Claimant's joinder, they joined the

2    PCVA Claimant's objections.  Does the Ciardi Firm or Mr.

3    Merson have anything to add?

4          MR. GOULDSBURY:  Your Honor, this is Walter

5    Gouldsbury for Ciardi Ciardi & Astin.

6          We have nothing further to add to the arguments

7    that were made today.

8          THE COURT:  Thank you.

9          MR. STANG:  Your Honor, this is Mr. Stang.

10          I would just like to interject that as to the

11    objections that were withdrawn they were withdrawn pursuant

12    to a meet and confer process that included modifications not

13    withdrawn at the discovery requests.  So I didn't want these

14    two law firms that did withdrawn their objections have

15    clients on the TCC. So I have been in regular contact with

16    them, not to say I am not in contact with others.

17          I didn't want you to come away with the impression

18    that there was simply withdraw of the objection as opposed to

19    a result in the meet and confer process that modified both

20    sides' rights.

21          THE COURT:  I took that from Mr. Ruggeri's intro.

22          MR. STANG:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          There's a joinder in the Coalition's objection by

25    Porter & Malouf, P.A.  Ms. Harris or Mr. Porter?

1     (No verbal response)

2          THE COURT:  I hear no one.

3          I think I got an objection last night that went to

4     this motion.  I don't see it off hand.

5          If there is anyone else -- I've gone through all

6     the objections I have.  If there is anyone else who is on

7     either the Zoom cast or the phone who would like to be heard?

8          MR. DURSO:  Your Honor, Carmen Durso.

9          THE COURT:  Mr. Durso, I think yours was the

10    objection I saw, yes.

11         MR. DURSO: Yes, Your Honor.  Its John Doe No.

12    5969.  Mr. Goodman has already referenced that objection, but

13    I do want to make a few additional points if I may.

14         THE COURT:  Yes.

15         MR. DURSO:  The process that the insurers have

16    used here, it seems to me, is a result of the 90,000 number.

17    I just want to say to the court that that should not be a

18    significant consideration even though it's an enormously

19    large number in terms of this kind of case.

20         Counsel referred to the statistics that one sees

21    when you read studies about perpetrators indicating that they

22    have, on average, institutional perpetrators have upwards of

23    100 victims.  It was already mentioned to you the 8 or 9,000

24    of perpetrators that have been identified with regard to the

25    Boy Scouts.  You start multiplying those numbers out you come

1  out with victims far in excess of anything that we're talking

2  about in this particular matter.

3       When I started doing this kind of work over thirty

4  years ago the average victim I was seeing was a male in his

5  mid-40's.  That has consistently come done through the years

6  and part of the reason it's come down is because it's become

7  somehow more acceptable for people to talk about these kinds

8  of things.  So my victims are getting younger and younger all

9  the time.

10       The other thing is that when there is well

11  publicized matter like this particular case it gives

12  permission to males who ordinarily would rather die than tell

13  anybody else that another male has touched them sexually.  It

14  gives them permission to say, yeah, it happened to me too and

15  I need to do something about it.  So it's not remarkable that

16  you've got 90,000 people coming forward in this case.

17       The Boy Scouts are the only institution, really,

18  of any size that you see with treating young men throughout

19  the -- treating young boys throughout the country.  The

20  catholic church have all been segmented because the

21  institutional diocese are independent corporations and no one

22  has ever been successful in making the argument that they

23  should be all dealt with as one national organization or that

24  the Vatican should be involved.  So that is the reason why

25  you don't see larger numbers in other cases that have come

1 | forward.

2 | The idea that the people who come forward are so
3 | much less detailed then you would see in other type of tort
4 | cases also is not remarkable.  You're talking about boys,
5 | young clueless boys who are having what is, arguably, their
6 | first sexual experience at the hands of a trusted individual,
7 | a very confusing thing that they don't know how to deal with.
8 | The male on male part of it makes it clearly something they
9 | can't talk about, can't deal with and getting through to the
10 | point in their life where they can do that, as I have
11 | indicated, is simply just can take them forever.  Some people
12 | go to their graves without ever talking about it.

13 | So I think the court should not allow itself to be
14 | taken in by the idea that because there is a large number of
15 | people and because there is vagueness in letters of a lot of
16 | these people therefore, automatically it must be something
17 | that is fraudulent or, in fact, it's a commonplace to find
18 | people who have difficulty coming up with the kind of detail
19 | that you would have with any other kind of tort claim.

20 | In this particular claim, as has been pointed out,
21 | there is no indicia of any kind that this is a fraudulent
22 | claim.  I haven't seen the other claims. I have seven claims
23 | and I have just one claim of the 1,400.  I can't imagine a
24 | claim that would have more detail about the incident and
25 | documentation then this particular claim.  There are eighteen

1  pages of documentation from the time period when the claim

2  occurred.  There are official records from the Boy Scouts

3  about the perpetrator.  There is correspondence with the Boy

4  Scouts organization.  There is an indication that parents

5  contacted the Boy Scouts and gave them details about what had

6  happened.  There is a letter from the perpetrator indicating

7  to some degree his admission of his conduct.

8         Why a claim like this would end up picked out by

9  that full proof statistical process of being something that

10 indicates there is widespread fraud I can't imagine.  I'm

11 thinking nobody ever read it, Your Honor, frankly.

12        I did talk to counsel for the insurers and I said,

13 you know, if you have read this  you have got to know that

14 the big thing that is driving you right now for this motion,

15 the fraud simply doesn't apply here.  They said, well, you

16 know, statute of limitations.  I have a great deal of

17 difficulty understanding whatever they might be able to say

18 about that statistical process for rooting out fraud, how

19 that could apply to a statute of limitations situation.

20        There are, actually there's more than fifty

21 states, there is additional jurisdictions where there are

22 statute of limitations.  In most of the jurisdictions there

23 are separate statutes of limitations for perpetrators and for

24 non-perpetrators.  Case law has developed with regard to both

25 of those things.

1        There is a case in the First Circuit that just

2 came down after I filed my objection and if the court gives

3 me permission I will send a copy to you.  Judge Lipez, in the

4 First Circuit, wrote a very interesting decision in which he

5 differentiated between a discovery rule as applied to claim

6 against a perpetrator and a discovery rule as applied as to a

7 non-perpetrator.  He says you don't determine in the same way

8 and statutes of limitations can run differently between one

9 or the other.

10        I say this to you because the point I want to make

11 is that I can't imagine what a statistical study can do to

12 show how statute of limitations issues with regard to any one

13 case can be a predictor of what will happen in any other case

14 particularly with regard to the discovery rule.  The

15 discovery rules determinations are fact based.  You cannot

16 say because I picked out a particular case and I showed that

17 the factual basis there indicates to me that this case might

18 be one we can win it tells you nothing about what would

19 happen in another fact based case.

20        Indeed, I reference in my papers that one of the

21 things that our courts have said, which you look at to

22 determine whether or not there a survivor has made an

23 appropriate determination about an appropriate discovery of

24 the harm which he suffered is that the discovery was

25 triggered by what it calls a watershed event.  Now that is

what our courts have said in Massachusetts.  In other states they say very different things.  The state of Washington they look at the mental state of the survivor only.

So there is such a variety of ways in which statutes of limitations can be determined, how they can be applied, that looking at a particular case and saying this gives us some information by which we can figure out what we can do with regard to defeating the claims because of the statute of limitations just doesn't work.

The last thing that they could possibly do has been determined by a statistical determination.  I listened to the testimony of the young woman who was explaining her process.  I thought about asking her questions, but really I know what the answers are going to be.  She clearly has no legal background.  She does not know how many states have discovery rules.  She does not know how the discovery rules work and how they differ from each other, and how one set of facts can be determined.

Now I suppose one of the things that might be asked is well, look, all we really want you to do is to answer a few questions.  The short answer is that that is not really accurate.  What they want to do is to get you to answer a series of questions so that they can then take a deposition and then they can move to dismiss it.  In that process you are going to have to spend a lot of time, money

1  and effort into feeding that.

2       I want to say, respectfully, that I am always

3  willing to engage in that kind of process where opposing

4  counsel has some purpose that will be worthwhile.  The only

5  purpose that would be worthwhile will be to attack my

6  client's particular case and it does not help the court with

7  regard to what happens or should happen in any other case

8  that have statute of limitations issues.

9       THE COURT:  Thank you.

10       Is there anyone else to be heard on this motion?

11       MS. GUMMOW:  Your Honor, this is Susan Gummow.

12       THE COURT:  Ms. Gummow?

13       MS. GUMMOW:  Thank you.  I represent the AIG

14  Company.  We filed a joinder with regard to Century and

15  Hartford's motion.

16       If there is information with regard to invalid or

17  fraudulent claims I think it's important for the debtors to

18  know that, for the court to know that, and for purposes of

19  objecting to claims.

20       With regard to the insurers the policies only pay

21  valid covered claims.  So if there is information regarding

22  invalid or fraudulent claims then that goes to the exposure

23  analysis that is being done by the insurance carriers.  And

24  given that we are currently in the process of mediating these

25  issues I think it's important to have any information with

1 regard to invalid or fraudulent claims sooner rather than

2 later to assist the parties in having beneficial ongoing

3 mediation discussions.

4          That's all I have, Your Honor.

5          THE COURT:  Thank you.

6          I will permit anyone else who has filed a joinder

7 to the insurance companies' position to add any comments they

8 have.

9     (No verbal response)

10          THE COURT:  Okay. I hear no one.

11          Mr. Ruggeri?

12          MR. RUGGERI:  Yes, Your Honor.  Thank you.

13          Well I think we can start off on something that

14 Mr. Goodman and I agree on and that's the standard.  The

15 court agrees on it too because you have written on it.  Have

16 the insurers provided good cause to go forward with

17 discovery.  We have demonstrated that we believe that we

18 have.  We don't dispute the standard.

19          Mr. Goodman accused us of gerrymandering the sub-

20 populations, if you will, because those are the ones that are

21 most likely to draw questionable invalid claims, if you will.

22 Okay.  There are tens of thousands of those.  That is what we

23 are trying to test, Your Honor, is if we draw from those

24 groups are we seeing high percentage of invalid claims

25 filings.  That then would be what one could extrapolate if we

1  did that which would, in turn, enable us to make objections

2  if we feel that appropriate.  And, again, shifting the burden

3  over to the person who is filing the claim.

4          So I think that there is no surprise there and

5  there shouldn't be any surprise there.  That is what we are

6  trying to determine.  One of the things were trying to

7  determine --

8          THE COURT:  Isn't that the question whether the

9  sub-populations that counsel has chosen will give us relevant

10  information with respect to fraud.

11          MR. RUGGERI:  Your Honor, I think -- I wrote it

12  down.  The samples appear gerrymandered for the claims that

13  are defective.  Those words were used by Mr. Goodman.  So I

14  took that as, you know, an indication that he knows why we

15  have identified these sub-populations and articulated those,

16  but I don't deny, Judge, that included in these sub-

17  populations are claims that we believe presumptively are

18  invalid.  That is, sort of, what we are trying to find out

19  through the discovery that we are seeking.

20          So I thought we had joinder on that issue and it

21  would be helpful to the court.  My thought is that's right.

22  That's exactly right.  Your Honor --

23          THE COURT:  How do I know?  How do I know that

24  these six sub-populations correlate to claims that are likely

25  to be fraudulently filed?

1        MR. RUGGERI:  I don't think you know anything more
2   than those are the sub-populations that we designed or
3   requested.  That was the reaction from the Coalition's
4   counsel in response to those sub-populations.  So an
5   indication that those are the sub-populations where one would
6   expect to find problematic claims.  Again, I thought that was
7   helpful that we, sort of, joined that issue.

8        Time and place, trying to go through what Mr.
9   Goodman mentioned, this is the right time and place. I think
10  the court heard Ms. Lauria this morning lay out her schedule,
11  amended plan filed at the end of this month, disclosure
12  statement hearing in April, need to emerge by the end of
13  summer.  This is the time and place for us to take the
14  discovery so, frankly, we get it by May or early June.  We
15  need this information to evaluate the claims for voting
16  purposes and to exercise our right to object to claims as we
17  deem appropriate.

18       Your Honor, Mr. Goodman says we have this
19  information.  We don't have this information.  We don't have
20  anything more about these claims then the proofs of claims
21  that were filed.  We don't have this information.  That is
22  why we are seeking it.  With regard to the historical, the
23  alleged abusers, all we have is information that is publicly
24  available.  We don't have anymore information then he has on
25  those issues, Your Honor.  So it's just wrong to say that.

1      When he says we have turned our back to Hartford

2  and Century turned our backs on these claims that is also

3  wrong.  We have handled these claims in the tort system for

4  decades.  That is what we did before Boy Scouts filed for

5  bankruptcy.  So it is just wrong for him to say that we

6  turned our backs and we're the bad insurance companies who

7  said we're not going to pay claims that are covered by our

8  policy period.  That is not what either one of us has said

9  ever.

10      Standing, Your Honor, I think that the court made

11  it clear that you don't really need to get into the standing

12  issue today.  In fact, Hartford is more than a party in

13  interest.  Were a legitimate creditor.  We actually filed a

14  claim as a creditor based on our indemnity right against Boy

15  Scouts which is partially liquidated.

16      And then in terms of standing, insurers standing,

17  we believe that the lead case is GIT which made it pretty

18  darn clear that when you have a situation where the

19  liabilities that the insurers are going to be asked to cover

20  is increased then there is standing for the insurers to

21  participate in the bankruptcy process.

22      Prejudice, Your Honor, we're asking for 1.5

23  percent of the claimants to give us information that they

24  would have to provide if they were making a claim in the tort

25  system, actually less than that.  But that is what we are

asking from them.  They have elected to participate in this

proceeding and I don't believe just because the bankruptcy

proceeding it immunizes a claimant who has come forward to

participate in this proceeding from participating as we need

that claimant to participate.

Imerys, I don't know that I should tell you about

Imerys, Your Honor, but you, obviously better then I,

understand the differences between this case and Imerys.  And

J&J was demanding debtors to produce all of the materials

that they provided to the TCC and the FCR in the course of

negotiating the plan.  Your Honor ruled that is not something

they were entitled to for a number of reasons including that

wasn't legitimate Rule 2004 discovery.  That was plan

discovery, not 2004 discovery.

We talked about this morning I think that

discovery we're seeking today falls right within the

wheelhouse of 2004 discovery.  There is no adversary

proceeding.  There is no plan.  There is no contested

proceeding.  We're in a situation where we're trying to

examine the liabilities of the debtor.  The most significant

liability of the debtor in this case is sex abuse claims and

that falls within the wheelhouse, we believe, of 2004, Your

Honor.

Thank you for your time, Your Honor.

THE COURT:  Thank you.

1           MR. SCHIAVONI:  Your Honor, if I could just add

2    one point to that.  Mr. Ruggeri (indiscernible).

3           The one point I would just like to add is you

4    asked how could you tell that these requests could lead to

5    something.  I do suggest to you the nature of the topics, the

6    subcategories, you know, it's like one is people who on the

7    proofs of claim have no affiliation with Scouting.

8           Another is that they can't identify the abuser.

9    It's like these are not -- it doesn't require a huge amount

10   of inquiry to see that, you know, these are definitely

11   relevant issues that go right to the heart of what anyone

12   would check in evaluating claims here.  The large numbers

13   drive this.

14           Thank you, Your Honor.

15           THE COURT:  Thank you.

16           I did have, earlier in this case, a subject matter

17   expert testify about the bar date.  I recall that.  And it

18   just strikes me that a subject matter expert who would tell

19   me that, in fact, these categories correlate or don't to

20   fraudulently filed claims or likely to would be helpful.

21           I don't know if I need it.  I am going to think

22   about it, but I'm prompted by any objections that question

23   popped into my mind from the beginning.  That is what I have

24   been listening too and, therefore, of course, asking

25   questions about.  I want to give consideration to the

1 responses that I have received as well as the arguments of

2 the objectors, particularly those who say I filled out your

3 form, it's complete, you have my information.

4           I guess maybe in that instance that claimant it

5 would be good to include in the population because it would

6 tend to show if that category means anything that, in fact,

7 it wasn't a fraudulent claim.

8           So we're going to take a break for lunch.  And I

9 also have a three o'clock which I am going to push back to

10 four, first days in another matter.  So let's -- its 1:49,

11 let's recess till 2:30 and we will take up the next motion.

12           Thank you.  We're in recess.

13      (Recess taken at 1:49 p.m.)

14      (Proceedings resumed at 2:32 p.m.)

15           THE COURT:  Thank you.  We're back on the record.

16           MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott,

17 again, Morris Nichols Arsht & Tunnell, here for the debtors.

18           Your Honor, I think we heard a lot of discussion

19 certainly about number four, a little bit about number three

20 which is also the insurers' motion.  It wasn't clear to me

21 that they have said their piece on item three on the docket,

22 Your Honor, which is the relief from the omnibus claims

23 objection, but if so then we're onto number five which is

24 just the insurers motion to seal certain aspects of the 2004

25 motion we did discuss.

1    THE COURT:  I think we're on, and the insurers can

2  correct me if I'm wrong, but I think we're on four.  We heard

3  three.  And four addresses the relief sought against the law

4  firms.  Am I wrong?

5    MR. ABBOTT:  Let me just let the insurers describe

6  that, Your Honor.  I had thought that is what we had just

7  discussed.

8    MR. RUGGERI:  Your Honor, James Ruggeri for

9  Hartford.

10    You are correct.  Mr. Schiavoni is now going to

11  take the other end and talk about that.

12    THE COURT:  Okay.  Agenda Item 4.

13    Mr. Schiavoni?

14      (Recording goes off record)

15    MR. SCHIAVONI:  Yes, Your Honor.

16    THE COURT:  Okay.  So we're on the motion seeking

17  to depose various counsel.

18    MR. SCHIAVONI:  Should I go forward, Your Honor?

19    THE COURT:  Yes.  My understanding is you are

20  taking the lead on this one.

21    MR. SCHIAVONI:  Yes.  I am, Your Honor.  Thank

22  you.

23    If it pleases the court, Your Honor, I'd like to

24  offer into evidence several declarations.

25    The January 22nd, 2021 declaration of Andrew

1  Kirschenbaum.  Its Docket No. 1975 and the exhibits

2  associates with that.

3           THE COURT:  Okay.  Is there any objection to the

4  entry into evidence of the declaration of Mr. Kirschenbaum?

5       (No verbal response)

6           THE COURT:  I don't hear any.  It's admitted

7  without objection.

8       (Declaration of Andrew Kirschenbaum, received into

9  evidence)

10          MR. SCHIAVONI:  Your Honor, I now offer into

11  evidence the declaration of -- he's my colleague, but I will

12  mispronounce his name, I'm certain, Sergei Zaslavsky dated

13  February 3rd, 2021 at Docket 2030 and the exhibits thereto.

14          THE COURT:  I don't remember that one.  Give that

15  to me again.

16          MR. SCHIAVONI:  That's the declaration, Your

17  Honor, with the tweets, the Kosnoff tweets attached to it.

18          THE COURT:  Okay.  Well I did read that.

19          Let me ask if there is any objection to the entry

20  into evidence of -- give me the name again?

21          MR. SCHIAVONI:  Sergei Zaslavsky.

22          THE COURT:  Mr. Zaslavsky's declaration.

23       (No verbal response)

24          THE COURT:  I hear no one.  That is admitted

25  without objection.

1     (Declaration of Sergei Zaslavsky, received into

2  evidence)

3          MR. SCHIAVONI:  Your Honor, I now turn to the

4  declaration of Chuck Fox.  To be clear this was the

5  declaration that was submitted in reply.  It was -- it's

6  specifically responsive to the filing by Mr. Napoli in his

7  opposition, Docket 2090, Paragraph 35 where he says that he

8  is -- he had certain blank proofs of claim he submitted.  He

9  contends he submitted some of those blank claims as filled in

10 and that there was no further work to be done.  Mr. Fox

11 presents the results of a criminal search on the claimants he

12 reviewed.

13         So we offer that -- Mr. Fox's declaration for that

14 purpose.

15         THE COURT:  I was familiar with everything, but I

16 don't have his declaration in front of me.

17         Is there any objection to Mr. Fox's declaration

18 coming into evidence?

19         MR. BUSTAMANTE:  Your Honor, this is Brett

20 Bustamante on behalf of Napoli.

21         I have not received that declaration.  I am

22 unfamiliar.  So I guess I would object to it.  If the court

23 is willing to put that aside or maybe take it for a later

24 hearing, I would certainly be able to take a look at it.

25         Thank you.

1      THE COURT:  Okay.  Well I am not -- when was it

2 filed?

3      MR. SCHIAVONI:  It was filed with our reply brief.

4      MR. Elias, do you happen to have the docket number

5 for it or one of my colleagues.

6      MR. ELIAS:  This is Brad Elias from O'Melveny.

7      I believe its Docket No. 2174.

8      THE COURT:  Well I am not going to admit it over

9 objections that it hasn't been received.  I haven't seen it.

10      MR. MOXLEY:  Your Honor, Cameron Moxley, Brown

11 Rudnick, on behalf of the Coalition again.

12      This is one of those declarations that I have

13 mentioned at the outset of the hearing today, Judge, that we

14 object to the admission of expert reports into evidence that

15 were filed to the reply for the reasons I stated previously.

16 I'd be happy to state those reasons for the record again,

17 Judge, if you would like.  I just want to note the objection

18 to this declaration on the same grounds.

19      MR. SCHIAVONI:  Your Honor, to be clear, Mr. Fox

20 isn't an expert as such.  All he did was run criminal -- he

21 ran a criminal search on Mr. Napoli's opposition brief.  He

22 states that he, sort of, cured the issue of him not having

23 filed blank proofs of claim by filing subsequent proofs of

24 claim.  Mr. Fox simply ran through the ones that he refiled

25 and ran a criminal search on them.  He found a significant

1 number of people who had been convicted of crimes of honesty,

2 you know, identify theft, forgery, that sort of thing.

3 THE COURT: Okay. I do have this two volumes that

4 was filed February 11th I think.

5 What am I supposed to do with these? People who

6 have been convicted of a crime can't have also been abused as

7 a child?

8 MR. SCHIAVONI: Judge, these aren't ordinary

9 crimes. These are crimes of honesty. You know, as I said,

10 forgery, identity theft, credit card fraud. These are fraud

11 crimes.

12 The suggestion that this -- you know, again, we're

13 in a situation here, Your Honor, where we're not able to

14 speak to the claimant, we're not able to speak to any

15 witnesses. You know, this is what we have, so to speak, to

16 indicate that there are issues about these. This is not an

17 insignificant number among the ones that were subsequently

18 submitted.

19 So you can give it whatever weight in the contexts

20 of this motion you want, but that is the proffer.

21 THE COURT: Is Mr. Fox available for cross?

22 MR. SCHIAVONI: Yes, he is.

23 THE COURT: Okay. Let me hear the objection

24 again, Mr. Moxley?

25 MR. MOXLEY: Yes, Your Honor. And the

1  availability for cross really doesn't really solve the

2  problem.  The problem with filing these declarations at the

3  eleventh hour with a reply is a tactical one that the

4  insurers engaged in more to limit our ability to study the

5  testimony that is provided in the declaration, to be able to

6  actually prepare meaningfully (indiscernible).

7  These people -- I am surprised to hear that he is

8  (indiscernible) for not, you know, his declaration.  It's not

9  appropriate, Judge, for these declarations to be filed on teh

10  fly when they're not actually in response to any declarations

11  that were filed by objectors.  The insurers (indiscernible)

12  and if they had evidence and testimony to support the motion

13  they should have submitted that evidence with the motion.

14  And it's not appropriate to do so (indiscernible).

15  MR. SCHIAVONI:  Your Honor, there is nothing

16  tactical here.  This is filed in response to an assertion,

17  unsworn assertion by Mr. Napoli in his opposition that he

18  had "cured" some of the proofs of claim by refiling them.

19  So, you know, if we're going to --

20  THE COURT:  How does this relate to the refiled

21  claims?  How does it relate to that specifically?

22  MR. SCHIAVONI:  Mr. Fox, ran criminal searches on

23  the collection of, whatever it was, forty, or fifty, or a

24  hundred of these that were refiled to see whether they were

25  like just obvious facial issues with them and he presents

1  these results.

2       MR. BUSTAMANTE:  Your Honor, if I may.  I also, I

3  think, would add relevance to the objection.  Counsel seems

4  to be making the argument that the proofs of claims were --

5  the proofs of claims were cured by amendment.  Whether the

6  particular claimant has a criminal background is irrelevant

7  to how they were amended.  So it's completely irrelevant to

8  that topic.

9       THE COURT:  Thank you.

10       That is what I am trying to figure out, how does

11  it relate to whether or not the firm subsequently filed an

12  amended proof of claim.  You may not like who filed it or may

13  have an issue with the claim as filed or refiled, but how

14  does that respond to the assertion that the claim has been

15  amended?

16       MR. SCHIAVONI:  Your Honor, this isn't an ordinary

17  situation.  The proofs of claim that were filed were blank.

18  They didn't bear signatures.  They bore an s/Mr. Napoli.

19  Okay.  Then later there is -- not all of the blank ones like

20  this for which there is no explanation of how this came about

21  were amended, some subset were and of those, apparently a

22  significant number of them, come up with, you know, not

23  regular crimes so to speak, but like forgery, identity theft,

24  credit card fraud.

25       You know, you can give it what weight you want,

1   but these are the kinds of things in the overall context that

2   raise concerns.

3          THE COURT:  Okay. I understand in the overall

4   context they may raise concerns for you.  I don't understand

5   how it is responsive to whether a proof of claim was amended

6   or not.  I am not going to admit it.  The parties haven't had

7   a real chance to take a look at it and make any response they

8   may have to it.  I am not going to accept it for purposes of

9   this hearing. It's excluded.

10          MR. SCHIAVONI:  Your Honor, I'd next like to offer

11   --

12          THE COURT:  Excuse me, Mr. Schiavoni, can everyone

13   please make sure that they are muted.  I'm hearing background

14   noise.  Thank you.

15          Mr. Schiavoni?

16          MR. SCHIAVONI:  Your Honor, I'd next like to offer

17   the January 22nd, 2021 declaration of Paul Hinton.

18          THE COURT:  Is there any objection to the

19   declaration of Mr. Hinton, signed January 22nd, 2021?

20      (No verbal response)

21          THE COURT:  I hear none.

22          It's admitted.

23      (Hinton Declaration received in evidence)

24          MR. SCHIAVONI:  Okay.  Your Honor, lastly, I'd

25   like to offer the declaration of Erich Speckin, dated

1   January 22, 2021.

2            THE COURT:  Is there any objection to

3   Mr. Speckin's declaration, signed January 22, 2021, coming

4   into evidence?

5            MR. WILKS:  Yes, Your Honor.  This is David Wilks

6   for Timothy Kosnoff and Kosnoff Law.

7            THE COURT:  Mr. Wilks?

8            MR. WILKS:  Thank you.  We filed a motion to

9   strike the insurer's reply brief, which Mr. Speckin's

10  declaration and 20-some exhibits were accompanied.  The move

11  to strike, I think, lays out, Your Honor, the basis for the

12  objection to Mr. Speckin's declaration.

13           It also, Your Honor, is improper opinion

14  testimony.

15           MR. SCHIAVONI:  Your Honor, he's got the wrong

16  declaration, if I could just help him out.  We're not

17  offering the reply declaration.  Now we're offering the

18  moving declaration.

19           MR. WILKS:  Then I think we'll stop talking, Your

20  Honor.  Thank you.

21           THE COURT:  Okay.  Thank you.

22           Any other objection to the Speckin declaration,

23  signed January 22?

24       (No verbal response)

25           THE COURT:  I hear no one.

1          It's admitted, without objection.

2      (Speckin Declaration received in evidence)

3          MR. SCHIAVONI:  Your Honor, will any of these be

4  subject to cross-examination, so that we can make a

5  determination as to whether we should put them on?

6          THE COURT:  Yes.  Does anyone wish to cross-

7  examine Mr. Kirschenbaum?

8      (No verbal response)

9          THE COURT:  I hear no one.

10          Does anyone wish to cross-examine Mr. Zaslavsky?

11      (No verbal response)

12          THE COURT:  I hear no one.

13          Does anyone wish to cross-examine Mr. Hinton?

14      (No verbal response)

15          THE COURT:  I hear no one.

16          Does anyone wish to cross-examine Mr. Speckin?

17          MR. BUSTAMANTE:  Based on Mr. Schiavoni's

18  representation just now, Your Honor, my answer is no.

19          THE COURT:  Okay.  Then I hear no one.

20          MR. SCHIAVONI:  Your Honor, we would just like to

21  make a very brief presentation with Mr. Hinton of his direct,

22  and if there's cross that follows, it's just to acquaint the

23  Court with his declaration.

24          THE COURT:  Okay.  Mr. Hinton?

25          MR. SCHIAVONI:  And my colleague, Mr. Elias, will,

1   at the pleasure of the Court, put him on.  He's got a pro hac

2   pending, Your Honor.  He's appeared in other Delaware courts.

3   He's my colleague.  I vouch for him.

4           THE COURT:  That would be fine.

5           Mr. Hinton, I need to swear you in.  Can you raise

6   your right hand, please.

7       PAUL HINTON, WITNESS FOR THE INSURER, AFFIRMED.

8           THE WITNESS:  I do.

9           THE COURT:  And will you please state your full

10  name and spell your last name for the record.

11          THE WITNESS:  My name is Paul Hinton, H-i-n-t-o-n.

12          THE COURT:  Thank you.

13          Mr. Elias?

14          MR. ELIAS:  Thank you, Your Honor.  Bradley Elias

15  from O'Melveny & Myers.  I intend to show Mr. Hinton a few

16  tables from his declaration.

17          Would it be easier for the Court to share my

18  screen with those or is it better to just have everyone look

19  at their copy of the tables?

20          THE COURT:  I have my copy.

21          MR. ELIAS:  Okay.

22          THE COURT:  If you can share your screen, that's

23  fine.  I don't know how any of that works.

24          MR. ELIAS:  Okay.  Thank you, Your Honor.

25                  DIRECT EXAMINATION

1  BY MR. ELIAS:

2  Q     Mr. Hinton, who is your current employer?

3  A     The Brattle Group.

4  Q     And what is your current position at Brattle?

5  A     I'm a principal.

6  Q     And what type of work do you do as a principal at The

7  Brattle Group?

8  A     I conduct economic analysis and provide testimony in

9  mass-tort cases, in securities litigation, and in finance

10 cases.

11 Q     And how long have you been doing this type of work?

12 A     I've been doing this work for over 20 years and in the

13 mass-tort area, almost exclusively for a period of 10 years.

14 Q     And can you describe for the Court your educational

15 background.

16 A     Yes, I have an undergraduate degree from Oxford

17 University in the United Kingdom in engineering science and a

18 master's degree from Harvard University's Kennedy School of

19 Government and that degree gave me the opportunity to study

20 statistics, economics, and finance.

21 Q     And how many mass-tort cases have you worked on during

22 your career?

23 A     I've worked on over 40 cases, I would estimate.

24 Q     And what about mass-tort cases, how many of those have

25 you worked on?

A    I've conducted claims estimation work that's been
relied on in at least five significant mass-tort
bankruptcies, including Dow Corning, Armstrong, W.R. Grace,
Combustion Engineering, and I can't remember the other ones,
but ...

Q    And have you provided expert testimony before?

A    In the area of mass torts, I provided expert testimony
in the Dow Corning trust matter for ING's insurance
subsidiary in a fee arrangement, which is a U.K.-based
restructuring insurance and runoff.  In a matter called the
Harmon v Atlantic Richfield, in a private trust litigation
for medical monitoring, and in a chemical company indemnity
case, involving Kemira, the chemical company.  Those are the
most prominent ones.

Q    And do you have any professional experience with or
without mass torts, outside of the litigation context?

A    Yes, I have had the opportunity to do public policy
related research and, in particular, published studies that
do empirical analysis of the cost of mass torts and torts and
cost in the United States, and was invited on the basis of
that research, to provide testimony to Congress to the House
Judiciary Committee on two occasions about the impact of U.S.
tort litigation on U.S. competitiveness and jobs.

Q    Now, turning this case, what has been your role?

A    I've been retained by Century Indemnity Company as a

1  claims estimation expert.

2  Q    And have you submitted any, prepared or submitted any

3  declarations in this case?

4  A    Yes, I've submitted two declarations; one on

5  January 22nd and the second on February 11th.

6  Q    I'm going to ask you today only about your first

7  declaration on January 22nd.  Can you please briefly describe

8  the work that's reflected in the declaration.

9        MR. ELIAS:  I don't know if others are hearing the

10  music?

11        THE COURT:  Yes.  Can everyone please check your

12  lines.

13        Operator, can you tell where that's coming from?

14        THE OPERATOR:  Your Honor, I have muted John

15  Thomas' line.  It appears the music was coming from there.

16        THE COURT:  Thank you.  Mr. Elias?

17  BY MR. ELIAS:

18  Q    Mr. Hinton, I'll repeat the question.  I was asking if

19  you could briefly summarize the work that you performed

20  that's reflected in your January 22nd, 2021, declaration.

21  A    Yes, I have been analyzing the claims data for the BSA

22  case that was assembled by Omni and developed certain

23  indicators of claims characteristics, such as their

24  completeness and various other measures that we'll talk

25  about.

1   Q    And just for the record, what is Omni?

2   A    My understanding is that Omni is the claims agent for

3   Boy Scouts of America and so claim forms were submitted to

4   Omni and they processed them to extract the information from

5   them and publish them in a database and made that database

6   available to the parties and to the experts for the parties

7   to (indiscernible) the claims review and analysis.

8   Q    And can you briefly describe how you performed your

9   analysis in this case using the Omni data.

10  A    Yes.  Well, I work with a team at The Brattle Group who

11  work at my direction.  We started with the process of

12  downloading data from the Omni website.  We did that on two

13  occasions, just before each of the declarations I prepared,

14  to make sure we had up-to-date data.  We did some work that's

15  standardized.  Some of the information text yields, there are

16  a lot of text yields that can have typos or misspellings or

17  can just use different syntax, for example, law firms' names.

18  So that had to be standardized.

19       And then we also extracted certain text information

20  from text yields such as key descriptor of the abuse, such as

21  the abuser name and the year of abuse and state of abuse.

22       And, finally, we conducted a random sampling exercise

23  so that we could then manually review a random sample to

24  evaluate the statistical competence level that I could report

25  for the test statistics that I computed in my report to show

1  that they were reliable.

2  Q     Okay.  I'd like to ask you about a few of the specific

3  analyses you did in your report.  I'm going to show you

4  Table 1 in your initial declaration.

5  Can you see that on your screen in front of you, Mr. Hinton?

6  A     I can, thank you.

7  Q     And can you describe the analysis that you've done in

8  Table 1.

9  A     Yes, this table, you'll see lawyers' names in the first

10  column and there are several columns of numbers where I'm

11  reporting the frequency of claims that were signed by

12  particular lawyers.

13  Q     And what was your conclusion after analyzing this data

14  regarding the number of claims signed by attorneys in two

15  weeks prior to the bar date?

16  A     Well, first of all, I identified the lawyers who signed

17  the most claims for the purposes of this table, and I

18  identified lawyers who either filed more than 500 proofs of

19  claim or signed more than 200 on a single day.  And what I

20  discovered is a large number of those claims and attorneys

21  were associated with, the law firms they were associated with

22  and some of them were so admitted with the Abused in Scouting

23  firms, so those are the first firms listed.

24      I see that over 13,000 claims altogether are signed by

25  the top 15 lawyers that are on this table and the lawyers who

1    signed the most claims on a single day signed almost 900

2    claims on a single day and that was Adam Krauss (phonetic).

3    Q     Let's move now to Table 2 in your declaration.  I'll

4    try to make that a little bigger for you.

5          Can you tell us what you did in the analysis depicted

6    on Table 2.

7    A     Yeah, in Table 2, I expanded the list of law firms

8    beyond the list of law firms for the lawyers who signed the

9    (indiscernible) claims to include the other two law firms

10   from the Coalition.  So, this table can now report, I can

11   report on this table, statistics for both, the high-volume

12   signing firms and separately for the Coalition firms, which

13   potentially overlap.

14         And I'm focusing here on indicators that I've developed

15   of claims that have missing key pieces of information of two

16   types; one, information that identifies the claimants and,

17   secondly, information that identifies and describes the

18   nature of the abuse.

19   Q     And just so we're clear, how did you select the firms

20   that were included in this chart in this table?

21   A     Okay.  So, I started with the firms that I identified

22   in my first table, which were identified by starting with the

23   lawyers who signed the largest numbers of claims and then I

24   noted that a large proportion of those claims were attributed

25   to law firms that were in the Coalition.  All but two of the

firms in the Coalition were included in that analysis.  So, I

added the other two firms which were (indiscernible) at the

bottom of Table 2 so that we can now, on this table, report

statistics of the Coalition.

Q     And can you describe for us the types of information

that was missing from the claims that you examined in this

table.

A     Right.  So, there are two categories.  So, in terms of

claimant identification information, I focused on five pieces

of information:  the surname, the zip code, the Social

Security number, you know, five digits, and the date of

birth, month and year.  And if any one of those pieces of

information was not provided, then I would flag that as

missing key claimant information.

Q     And in what respect --

A     It's --

Q     Keep going, Mr. Hinton.  I'm sorry?

A     Yeah, sorry.  I was just going to mention the second

category of missing information on this table is, I described

as the information about the abuse and, specifically, I

identified indicators of the abuse in terms of the when,

where, what, and who associated with the abuse.  And if this

information was not available for each of those categories, I

indicated it in the corresponding column.

Q     And what percentage of the claims that you examined in

1  this table were missing key information?

2  A      Well, if you count claims that were missing any

3  information for any one of these indicators, I found that 65

4  percent of claims from the high-volume signing firms, and 65

5  percent is also the number with missing information from the

6  Coalition firms, and that's shown in the last column at the

7  bottom of the table.

8  Q      So, just to break that out, you mentioned high-volume

9  signers and then the Coalition firms.

10        How many claims overall were these firms responsible

11 for?

12 A      So, the high-volume signing firms were the firms where

13 the attorneys signed the most claims, work at law firms that

14 are responsible for 66,000 claims.

15 Q      Okay.  Let's move to your third table.

16        Can you describe for the Court the analysis depicted in

17 Table 3.

18 A      Yes, in Table 3, I now look at the counts of claims for

19 these same law firms that were filed late, after the bar

20 date, where they represented a multiple, meaning there was

21 more than one claim filed for the same claimant or exhibited

22 certain inconsistent information about the age of the

23 claimant or the location of the alleged abuse.

24 Q      You mentioned the inconsistencies with the age.  How

25 did you make that determination?

1  A     Yes, what we noted is that for some claimants, the

2  dates of the alleged abuse occurred when the claimant was not

3  of scouting age, based on the information provided about that

4  scouting activity.

5  Q     And you also have a column here for never lived in the

6  state of alleged abuse.

7       How did you make that determination?

8  A     Well, we did our best to identify the claimant in a

9  commercially available background check database called

10  National Public Data, where we were able to find information

11  about the claimant about their historical locations of

12  residence. We checked to see if they had ever lived in the

13  state where the alleged abuse occurred. And when we found

14  that they had never lived in that state, we listed that here.

15  Q     Dismissed the address data that you mentioned a moment

16  ago, did that have information for all of the claims that you

17  looked at?

18  A     No, we were only able to identify inconsistencies for

19  the claims where we were able to obtain historical residence

20  information. So, we weren't able to do this for every

21  claimant, so there are a lot of claimants for which we don't

22  know the answer to this question. So, this is potentially an

23  underestimate.

24  Q     So, what percentage of the claims were either missing

25  key information or were late, a multiple claim, or had

1   inconsistencies with regard to age or location?

2   A    Right.  So, combining the results from the previous

3   Table 2 and these results, I report in the last column here

4   that 78 percent of the claims filed by the high-volume

5   signing firms had some sort of deficiency of the types that

6   are listed here.

7         And for the Coalition firms, it's almost the same,

8   77.7, so it rounds to 78 percent, also.

9   Q    Have you been asked for counsel to make any

10  determination as to whether any individual or specific claims

11  were valid?

12  A    No, I haven't been reviewing individual claims.  The

13  whole point of this analysis is to look at proofs of claim,

14  to look at certain indicators or claim characteristics to see

15  whether any are unusual and raise questions about the claims

16  process.

17  Q    And did you look at any other issues associated with

18  the claims?

19  A    I did.  One of the issues I looked at was this question

20  of the frequency with which certain law firms had filed

21  claims that were almost completely blank.

22  Q    So what do you mean by -- how do you define a blank

23  claim?

24  A    Well, a blank claim, I define as essentially lacking

25  all information about alleged abuse.  And there are four

1  sections of the claim form that are focused on capturing that

2  information:  Sections 3, 4, 5, and 6.  And in those

3  sections, there are 120 different fields of information that

4  claimants are asked to provide information on by answering

5  those questions.

6      And I classify a claim as almost completely blank if it

7  only contained two or fewer responses to those 120 questions.

8  Q    And using that methodology, how many blank claims did

9  you find?

10 A    I'm just going to look at the relevant page of my

11 report (indiscernible) memorized it, but I think it's about

12 2500.

13 Q    Okay.  And did those forms come from any specific firms

14 of group of firms?

15 A    Well, it was noteworthy that almost the majority of

16 them came from only three firms, which were the Mark Berman &

17 Partners firm (ph), the Napoli Law Firm, and the Abused in

18 Scouting group.

19 Q    Mr. Hinton, thank you for your time today.

20         MR. ELIAS:  Your Honor, I have no further

21 questions.

22         THE COURT:  Thank you.

23         Does anyone have any cross?

24         MR. ROBBINS:  Yes, Your Honor.  This is Larry

25 Robbins from the firm of Robbins Russell.  I represent the

1  firms of Andrews & Thornton and ASK, LLP, and I wonder if I

2  could just do a brief cross-examination of the witness,

3  please?

4          THE COURT:  Certainly, Mr. Robbins.

5          MR. ROBBINS:  Thank you, Your Honor.

6                       CROSS-EXAMINATION

7  BY MR. ROBBINS:

8  Q    Good afternoon, Mr. Hinton.

9        May I ask you, sir, to turn back to Table 1.  Just so

10 you know what I'm about to do, I'm going to take you through

11 Tables 1, 2, and 3, and I have a couple of questions about

12 each one.

13       So, may I ask you to please put in front of you,

14 Table 1, and tell me when you're there.

15 A    I'm there.

16 Q    All right.  And you have a column in which you gather,

17 in which you report the number of proofs of claim that were

18 signed within two weeks of the bar date; is that correct?

19 A    Yes.

20 Q    And just so we're clear, that column tells us only when

21 the proof of claim was signed, but not anything about when

22 the information contained in the proof of claim was vetted by

23 the signer; is that correct?

24 A    Yeah, that information is just based on the date of

25 signature that's reported in Omni.  It doesn't tell me

1  anything else.

2  Q    So, for example, you would agree with me, Mr. Hinton,

3  that if I were a lawyer submitting one of these claims and I

4  had several rounds of vetting and several rounds of

5  interviews with the claimant and I followed up with the

6  claimants to make sure I was getting as much information as I

7  potentially could so that nobody would impeach the

8  credibility of that claim, and I therefore vetted that claim

9  almost until the bar date was upon us, that would show up,

10  would it not, in your column, indicating when the proofs of

11  claim were signed within the last two weeks, would it not?

12  A    Well, the fact that you had engaged in a lot of vetting

13  prior to that date presumably would show up in some of the

14  indicators that I report, right, in terms of how complete the

15  claims were and whether they were free from inconsistencies

16  as of that date --

17  Q    Yeah, I agree -- I'm sorry, please finish your answer.

18       Are you done?

19  A    I'm finished.

20  Q    All right.  So, let's return to my question.

21       I'm looking at just this column on Table 1 where you

22  list the date of signature and these are the claims that were

23  signed within the two weeks before the bar date, and all I'm

24  asking you is whether the numbers in that column shed any

25  light whatsoever on the extensiveness or timing of the

1  vetting of a given claim by a given law firm, yes or no?

2  A    Well, I think it tells you something about the timing

3  of the vetting, because it wasn't completed until two weeks

4  before the bar date.  But that column is just telling you how

5  many claims were filed at the last minute.  That's all it

6  tells you.

7  Q    Okay.  All right.

8       Let's talk about Table 2.  Table 2, you've gathered

9  what you call "missing information" --

10           THE COURT:  I'm still on this hearing.  I'm just

11  on mute.

12  BY MR. ROBBINS:

13  Q    You gathered missing information for a collection of

14  law firms that you call "high-volume signatories and

15  Coalition law firm members."  I want to ask you about two of

16  those columns.  One of them is missing key claimant ID.

17       Do you see that?

18  A    Yes.

19  Q    And I believe you told us on the direct exam by your

20  counsel that -- well, actually, let me ask you, you tell us,

21  do you not, in paragraph 9 of your declaration on page 4, the

22  things that constitute incomplete information; am I correct?

23  A    Yes.

24  Q    And you also testified, did you not, sir, that if any

25  one of those different categories of information is missing,

1   it goes into the column that you call "missing key claimant

2   ID."

3       Correct or incorrect?

4   A    Yes, the five elements of claimant identification are

5   tested in that column.

6   Q    Yes.  But the point, sir, is if a given proof of claim

7   is missing any of these five, it goes into that column, does

8   it not?

9   A    Yes, it does.

10   Q    So, if a proof of claim is missing, for example, the

11   zip code of the claimant, that shows up in that column of

12   Table 2, does it not?

13   A    Yes.

14   Q    All right.  You also have a column called "missing

15   abuser last name."

16       Correct?

17   A    Yes.

18   Q    And you tell us, do you not, in Footnote 4 on page 4,

19   that you count a given proof of claim as including key

20   information if the last name is identified in the text field

21   of the last name of the abuser, the purported abuser,

22   correct?

23   A    Yes.

24   Q    Which means that if a given claimant, let's say three

25   years after his abuse, if a given survivor can recall only

1  the first name of the scout leader who abused him, that shows

2  up, does it not, in the column called "missing abuser last

3  name."

4      Correct?

5  A    Yes, that's correct.

6  Q    And you don't hold yourself out as any kind of expert

7  in the question whether it is common among survivors of

8  sexual abuse, particularly males, to have forgotten the last

9  name of a scout troop leader.  You don't hold yourself out as

10 that kind of expert, do you?

11 A    No.  Actually, we can just look at those questions by

12 looking across the claims data.  So, I think you're

13 misunderstanding the person's abuse whose data are not to

14 assess the validity of any individual claim; it's to look and

15 see whether particular groups of law firms have unusually

16 high rates of missing information.

17     Whether it's common or not depends, and can be

18 determined, by looking at the other claims.  And so, for

19 example, you can look at claims that were signed by attorneys

20 versus those that were signed by claimants.  So, that would

21 be one way to look at this question to see whether these

22 particular claims look unusual or not, and you don't need to

23 be an expert in sexual abuse to do that analysis.

24 Q    Can we go back to my question, do you fancy yourself an

25 expert on the question whether it is common among abuse

1   survivors to have forgotten the last name of an abuser 30

2   years prior; that's my question.

3        Are you so an expert?

4   A    I'm providing expert testimony that includes

5   information about the frequency of certain pieces of

6   information provided by claimants.  So, you can decide for

7   yourself whether that means I'm an expert of the type that

8   you describe, but I'm representing myself as an expert in

9   claims estimation and analysis, and so I am trying to, in

10  this table, show descriptively, what frequency of these types

11  of deficiencies are in particular groups of claims so the

12  Court can decide whether that warrants asking further

13  questions or not.

14  Q    I see.  So, can I take that as a no to my question, the

15  actual question I asked?

16  A    Well, I'm sorry, I just didn't understand your question

17  fully enough in terms of describing expertise --

18  Q    All right.  Let's move on.  I think I probably made the

19  point.

20       Let's look at Table 3 together.  Tell me when you're

21  there.

22  A    I'm there.

23  Q    And one of your columns is inconsistent age, correct?

24  A    Yes.

25  Q    And to figure out what you mean by inconsistent age,

1  one of the things we should look at is how you define that

2  category in Footnote 13 of you report on page 6; am I

3  correct?

4  A     Yes.

5  Q     And so, if there is a mismatch, for example, between

6  the type of scouting that the claimant purports to have been

7  part of and the age of that particular claimant, that could

8  very well be the kind of inconsistency that would result in

9  showing up in the so-called "inconsistent age" column of

10  Table 3; am I correct?

11  A     I think just to put it simply, you know, all I'm doing

12  is how old were you when the abuse occurred and were you of

13  scouting age, based on the type of scouting activities that

14  you were involved with as a child.

15  Q     Well, let's suppose --

16  A     There are different ages --

17  Q     I'm sorry, go ahead.

18  A     I was just saying, you know, based on, you know, some

19  people were in the Cub Scouts, some people were in the Eagle

20  Scouts and we looked at the information from -- on scouting

21  on the Boy Scouts of America website to determine the age

22  ranges for kids in those different scouting activities, so if

23  you were --

24  Q     I really appreciate that -- sorry, go ahead.

25  A     You know, so I'm just saying --

1  Q     That's exactly what I want to ask you --

2  A     Right.  So, if you were -- if you know that you were

3  abused when you were too old or too young to be a scout, then

4  that raises certain questions.  So, we classified those

5  claims.

6        And that's not to say that some of those claims, if

7  given the opportunity, might be able to clarify that

8  information, but all we're doing here is indicating that that

9  is an inconsistency.  It may be a little bit technical, but

10 it might have useful in this, you know, in the process of

11 identifying proofs of claim where we have additional

12 questions.

13 Q     All right.  Well, let me ask you a concrete example and

14 see, because I appreciate your clarification.  Let me give

15 you this example, Mr. Hinton.

16       Suppose the given survivor fills out a proof of claim

17 and states that he was born in 1952 and that the abuse took

18 place when he was a Boy Scout in 1961 when he was 9 years

19 old.  And he otherwise provides all bells and whistles, every

20 bit of data that you could possibly want, but he calls

21 himself a Boy Scout and not a Cub Scout in 1961 when he was 9

22 years old.

23       My question to you is whether that proof of claim for

24 that claimant, that survivor, would or would not show up in

25 your inconsistent age category, yes or no?

1  A    I think based on Footnote 13, you have to be -- if you

2  were a Boy Scout, you would be age 10 to 18, so that would be

3  an inconsistency, if he -- that particular claimant said they

4  were abused at age 9 as a Boy Scout.

5  Q    So, if -- so, just to be clear, if a claimant is 9

6  years old at the time of the abuse and calls himself in the

7  proof of claim, a Boy Scout and not a Cub Scout, why then, he

8  would show up -- his claim would show up in your column of

9  Table 3 called "inconsistent age."

10     Isn't that true?

11 A    That's right, it's showing up there because it's an

12 inconsistency that deserves a little further investigation.

13     MR. ROBBINS:  All right.  Your Honor, I think I'm

14 through with this witness.  Thank you very much.

15     THE COURT:  Thank you.

16     Any other counsel who wishes to cross-examine?

17     MR. SULLIVAN:  Your Honor, Bill Sullivan.  I have

18 a follow-up question.

19     THE COURT:  Mr. Sullivan?

20              CROSS-EXAMINATION

21 BY MR. SULLIVAN:

22 Q    Mr. Hinton, staying with the inconsistent table, which

23 is Table 3, would it also be correct that if a Boy Scout who

24 resided in Delaware traveled to Maryland for a camp and was

25 abused at that camp, that that would, nonetheless, show up in

1  your inconsistent information table?

2  A      Well, it depends, whether I was able to get background

3  check information that provided the historical residence

4  information.  But if I were able to do that, that would get

5  flagged, but, again, that doesn't say anything about the

6  validity of that particular claim, right.  All it's doing is

7  saying when we look at particular groups of claims together

8  of particular law firms, is there any reason to expect that

9  there were more, going to be more inconsistencies for one law

10  firm than another or for claims brought by and signed by

11  lawyers versus claims signed by claimants.

12      And when you see these differences or statistically

13  significant differences in these indicators, it can look

14  unusual and raises questions, and that's why we're doing

15  this.  We're not doing it to suggest that there's not an

16  explanation in some of these cases or that individual cases

17  might be cured of inconsistencies, but we're looking at them

18  here as groups.

19  Q      But the answer to my question is, if you were able to

20  determine from historical information that the Boy Scout

21  resided in Delaware and he alleges that he was abused at a

22  camp in Maryland, that would show up as an inconsistency in

23  Table 3, correct?

24  A      Yes, that's true.

25  Q      Thank you.

1          THE COURT:  Thank you.

2          Any other counsel with cross?

3          MR. TAYLOR:  Yes, Your Honor.  Joel Taylor with

4    Kagen Caspersen & Bogart on behalf of Slater Slater &

5    Schulman.

6          THE COURT:  Mr. Taylor?

7                    CROSS-EXAMINATION

8    BY MR. TAYLOR:

9    Q    Mr. Hinton, can you turn to Table 2, please.

10   A    Yes.

11   Q    Here, you performed an analysis of claims filed by the

12   columns that are listed on the left-hand column; is that

13   correct?

14   A    Yes.

15   Q    And have you performed -- are there claims that have

16   been filed by firms, other than those that are in the left-

17   hand column?

18   A    Yes.

19   Q    And did you perform an analysis of this kind with

20   respect to the claims filed by those firms?

21   A    I think we computed these metrics for all claims in the

22   database.  We just haven't reported them here because --

23   Q    Because why?

24   A    Because this analysis was motivated by looking for

25   lawyers who signed the highest volume of individual claims.

1  Q     Okay.  And so, let me just -- we'll look at the right-

2  hand column there and there are conclusions there that as to

3  the claims filed by those that you identified in the left-

4  hand column, 65 percent are missing some element of

5  information; is that correct?

6  A     Yes.

7  Q     And do you present anywhere in your analysis, the

8  percentage of the claims filed by other law firms that are

9  missing this information?

10  A     In my second declaration, what I do to make a

11  comparison is compare claims that were filed and signed by

12  attorneys versus those that were signed by claimants, but I

13  do that --

14  Q     I understand that.  That's not my question, right.

15       My question is, did you perform an analysis of the

16  frequency with which there was information missing from

17  claims that are filed by law firms, other than those that are

18  listed in the left-hand column?

19  A     I have done that analysis, it's just not recorded here

20  for the reason that I described.

21  Q     Right.  So, it may well be, and we don't know because

22  you haven't submitted the information, that those claims that

23  were submitted by firms other than those in the left-hand

24  column, in fact, report a higher frequency of missing

25  information; isn't that correct?

A     Well, no, in fact, they have a lower frequency of missing information, because I have done that work and I have looked at that question, and I don't --

Q     But you don't report that in our --

A     It wouldn't be wise to do that.

Q     You don't have that in your report, do you, Mr. Hinton?

A     It's not included in the report because I think 65 percent speaks for itself; that's a pretty high number.

Q     But for all we know, the other firms may have an 85 percent missing information rate; isn't that correct?

A     Well, I think you have access to the Omni data, as well, so I certainly hope you don't know that, because that would be wrong, in fact, (indiscernible) what we think is true.

Q     Am I correct that you have chosen not to share with the Court, the results of your analysis as to the rate of incomplete information contained in claims filed by firms, other than those in the left-hand side; isn't that correct?

A     It's true that those additional numbers for the other firms is not reported here.

Q     Okay.  Now, can we please turn to Table 3.

        The same is true of Table 3, isn't it, Mr. Hinton? Isn't it the case that you have chosen not to report to the Court the frequency with which there is so-called inconsistent information in claims that are filed by law

1  firms, other than those in the left-hand column.

2  A     Well, I just want to -- I don't really agree with the

3  phrasing of the question, because you have articulated that

4  it's something that I've chosen to do.

5       I was charged with a particular scope of work, with

6  regard to this declaration, which was very narrow and related

7  to identifying, as narrowly as possible, which of the law

8  firms that show with the indicators I've developed, unusual

9  frequency of claimant characteristics that warrant further

10  inquiry or raise questions.

11  Q     Well --

12  A     Yeah, I could have added more law firms, but I was

13  asked to just for focus on those law firms that had attorneys

14  who filed the most claims and that was the starting point and

15  so, it was my mandate.  It doesn't like I chose not to give

16  you information that would be useful to the Court.  I was

17  narrowly focused in my inquiry for this particular

18  declaration.

19  Q     Okay.  So, you report that 78.4 percent of the claims

20  filed by the firms in the left-hand column had inconsistent

21  information of some sort, correct?

22  A     That's correct, yes.

23  Q     And you have been mandated to not share with us the

24  rate of inconsistencies that may appear in claims filed by

25  law firms other than those in the left-hand column; isn't

1  that correct?

2  A     I think that's really a mischaracterization of how I

3  was given my mandate.  And I've already told you that

4  actually the rates are actually relatively lower for the

5  other firms and the *pro ses* in general.

6  Q     But you have chosen, or you have been mandated not to

7  share that information with the Court, correct?

8  A     As I said, I was asked to start by looking at the

9  lawyers who signed the most claims and that was the starting

10  point for my analysis.  We then looked at all the claims that

11  were filed by those law firms.

12  Q     Okay.  But based on the information that you have

13  chosen or mandated to share with us, we and the Court, have

14  no way of knowing whether or not those claims filed by those

15  listed, the firms listed in the left-hand column are any more

16  or less likely to have missing elements of information or

17  inconsistent information than those claims filed by firms

18  that are not on that list; isn't that true?

19  A     No, absolutely not.

20        Everybody, all the experts, all the parties have access

21  to the same Omni data.  This declaration was filed almost a

22  month ago.  All the parties have claims analysis experts who

23  are able to access these data and look at them.  So, I can

24  only infer that you have looked at this and you've seen that

25  the numbers aren't actually supportive, and you're not -- you

1  haven't decided to reference that or cross me on that.

2  Q    Okay.  But let me just repeat my question, which is

3  based on the information that you have chosen to give to the

4  Court or that you have been mandated to the Court, there is

5  no way for us to know whether or not the rate of

6  inconsistency or rate of missing information is any higher or

7  lower for the firms listed in the left-hand column than it is

8  for those that you have chosen not to present information

9  for; isn't that correct?

10 A    I disagree with your characterization that there's no

11 way that you can find that information; that's just not true.

12 Q    That was not my question.  My question was, based on

13 the information that you chose or were mandate to furnish,

14 there is no way to know; isn't that correct?

15 A    Well, yes, I guess if you're just referring to the work

16 I've done.

17      My understanding is that all the parties have experts

18 who are doing work and can answer whatever questions they

19 have about the claims data.

20 Q    Okay.  Thank you.

21      Another set of questions related to Tables 2 and 3.  Am

22 I correct that as to both Tables 2 and 3, the analysis that

23 you have performed relates to all claims that were filed by

24 the firms in the left-hand columns and not just those claims

25 that were signed by attorneys?

1  A      Yes, in columns 2 and 3, they include all the claims

2  that were filed as of the date that we downloaded the data

3  from Omni, which was January 4th for the purposes of this

4  table --

5  Q     And so, Tables 2 and 3 contained in your declaration

6  tell us nothing about whether or not the claims that were

7  signed by attorneys are any more or less likely to contain

8  missing information or inconsistent information than those

9  claims that were signed by claimants themselves; isn't that

10 correct?

11 A      I did that analysis in my second declaration.

12 Q     Right.  I'm asking you about your first declaration.

13 The information contained in Tables 2 and 3 tell us nothing

14 about the rate at which there are inconsistencies or missing

15 information contained in those claims that are filed by

16 attorneys, as opposed to those claims filed by someone, other

17 than an attorney; isn't that correct?

18 A      Yeah, these two tables report those numbers together,

19 so you're seeing the average.

20 Q     Right.  So, when you see, for example, in Table 2 that

21 65 percent of the claims are missing information, we don't

22 know if that means 80 percent of the claims filed by non-

23 attorneys are missing that information and only 20 percent of

24 the claims filed by attorneys are missing that information,

25 we don't know, right?

1  A     Well, not by looking at that table, but you can find

2  that answer by looking at my second declaration.

3  Q     Okay.  So, just finalizing on your first declaration,

4  the information contained in there doesn't really give us any

5  insight into whether those claims filed by attorneys are any

6  more or less reliable than those filed by non-attorneys,

7  correct?

8          UNIDENTIFIED:  Your Honor, we would like to offer

9  the second declaration.  He's opened the door for us to offer

10  the second declaration.  We would like to offer it.

11          THE COURT:  I don't think he's opened the door for

12  the second declaration.  I don't know who's speaking.  I

13  don't think counsel did.

14          Overruled.

15  BY MR. TAYLOR:

16  Q     So, can you please answer the question, Mr. Hinton.

17  A     I'm sorry, you had just wanted me to confirm that

18  Tables 2 and 3 don't look at the question of the frequency of

19  missing information or attorney-filed claims versus claimant-

20  filed claims.

21          Yes, that's correct, I don't address that question in

22  the first declaration.

23  Q     Right.  So, it could well be that the attorney-signed

24  claims are more reliable in that they contain fewer

25  inconsistencies and less missing information than those

1  claims that are filed by claimants; isn't that correct?

2  A    Well, no, that's not true.  The opposite is true.

3  Q    Well, that's not contained in your declaration,

4  correct?  You did not do that analysis.

5  A    That's right.  Not in the first declaration, that's

6  correct.

7         MR. TAYLOR:  Okay.  Your Honor, I would like to

8  reserve the opportunity to cross-examine Mr. Hinton with

9  respect to his second declaration if it is moved into

10 evidence, otherwise, I have no other questions for him.

11        THE COURT:  Yes, that's reserved.  It has not been

12 moved into evidence yet.

13        Any other cross-examination?

14        MR. GOODMAN:  Your Honor, this is Eric Goodman.

15        Can you hear me?

16        THE COURT:  Yes, Mr. Goodman?

17        MR. GOODMAN:  Thank you.  I just have four

18 questions for the witness.

19                    CROSS-EXAMINATION

20 BY MR. GOODMAN:

21 Q    And, again, Eric Goodman, counsel for the Coalition for

22 Abused Scouts for Justice.

23        Are you aware that 47 -- sorry, let's try that again --

24 are you aware that 40.7 percent of the claims filed by the

25 law firm Jeff Anderson & Associates, were attorney-signed?

1  A     (No verbal response.)

2          THE COURT:  Okay.  I've lost volume.

3          THE WITNESS:  Oh, I'm sorry, I think I put myself

4  on mute.

5          I don't recall exactly what the fraction was for

6  that particular law firm, I'm sorry.

7  BY MR. GOODMAN:

8  Q     Okay.  But you would agree with me that that law firm

9  does not appear in any of your tables?

10 A     Any of the tables in the first declaration, that's

11 right.

12 Q     Okay.  Another question.

13        Are you aware that the law firm Hurley McKenna & Mertz

14 filed other 4,000 proofs of claim in these cases?

15 A     Again, I looked at -- I summarized all the claims by

16 law firm, but I don't recall -- I don't remember all the

17 numbers for every law firm, so I apologize.

18 Q     Okay.  You would agree with me that the law firm Hurley

19 McKenna & Mertz does not appear in any of the tables in your

20 first declaration?

21 A     That's true.

22        MR. GOODMAN:  No further questions.

23        THE COURT:  Thank you.

24        Any other questions?

25      (No verbal response)

1          THE COURT:  Okay.  Redirect.

2                REDIRECT EXAMINATION

3    BY MR. ELIAS:

4    Q    Mr. Hinton, I just have one or two questions for you.

5         Do you recall earlier you were asked about the

6    designation of claimants as to whether they participated in

7    Boy Scouts, Cub Scouts, or Explorer Scouts, do you recall

8    that line of questioning?

9    A    Yes.

10   Q    And do you know on the claim forms whether claimants

11   are asked to provide that information in a free-form text box

12   or whether they're asked to check the box for the appropriate

13   scouting organization?

14   A    I believe they have the opportunity to provide the

15   information both ways, but that's my recollection.

16   Q    And do you recall seeing checkboxes with the scouting

17   organization names on them?

18   A    Yes, I recall seeing them.

19   Q    So, if a claimant was checking the box for the Boy

20   Scouts, in your analysis, you would assume they were a Boy

21   Scout and not a Cub Scout, given the choice they made when

22   they filled out the form.

23        Do I understand that correctly?

24   A    Yes.

25             MR. ELIAS:  I have nothing further, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          Mr. Hinton, thank you for your testimony.  You're

3   excused.

4          THE WITNESS:  Thank you.

5     (Witness excused)

6          MR. SCHIAVONI:  Your Honor, I think we can go to

7   argument now with the --

8          THE COURT:  Let me ask before we do that if any of

9   the objectors have any evidence that they're going to be

10  presenting?

11     (No verbal response)

12         THE COURT:  Okay.  I hear no one.

13         Argument, Mr. Schiavoni.

14         MR. SCHIAVONI:  Thank you, Your Honor.

15         Rule 9011 applies to proofs of claim.  It embeds

16  in it the proof of claim, the oath that's there to affirm the

17  contents of the proof of claim.  It's an essential part of

18  the, in essence, statutory scheme here for 502.  That 502 may

19  create a presumption of validity if the questions posed in a

20  proof of claim go through all the elements, but if it does,

21  the protections built into the statute include the

22  verification of the contents of the proof of claim.  It's an

23  essential element of that statutory scheme.

24          The cases that have looked at 9011 make that

25  really clear.  And, Your Honor, you know, there's always one

or two cases in every case that, you know, every motion you want to sort of like to refer the Court to, but In re Obasi, which is a Southern District of New York case, Westlaw 6336153 is one of those cases. It's a case that talks about the 9011 requirement, the context of proofs of claim, and, you know, critically it says in compliance with 9011 is particularly important for proofs of claim because a properly filed proof of claim may constitute *prima facie* evidence of validity. And because of that, it's essential that the Court know that there's integrity in the proof of claim process itself. It's a key protection.

We cite in our moving papers, the cases that apply the 9011 requirement and talk about what has to do done and why it's important. We cite in Obasi itself, it makes crystal clear that that's an obligation that when a lawyer signs, right, that when a lawyer signs a proof of claim, that that's a nondelegable obligation, that the person signing, who's giving the oath, has to verify that the oath is correct and has to do it in the context of the actual proof of claim.

The other point we make in our brief in citing cases, In re Rivera, 342 B.R. 435, is that you may not, you cannot comply with 9011 by attaching pre-signed signature pages. This is not the first case where this has happened. Other bankruptcy courts have looked at this and said, you cannot do this.

1     And the reason is sort of clear that if you're

2  pre-signing signature pages and giving them to someone else

3  to attach, you're not complying with the fundamental elements

4  of 9011 which require that you personally vet the contents of

5  the proof of claim.  In re Rivera talks specifically about

6  that, and that decisions we cite some other cases that talk

7  about other instances in the bankruptcy context where people

8  have tried to, basically, either pre-print signature pages or

9  give signature pages to other people.

10         THE COURT:  Let me ask you a question --

11         MR. SCHIAVONI:  Yes?

12         THE COURT:  -- let me ask you a question on

13  Rivera, because I spent a lot of time in Judge Lane's opinion

14  in Obasi, which was in the context of a sanctions motion.

15         What's the context of Rivera?

16         MR. SCHIAVONI:  Rivera deals with certifications

17  of -- it's a certification of compliance.  I forget exactly

18  with what, but it's something that has to be signed.  It's

19  the same context of a lawyer signing.

20         And in this particular case, the signatures have

21  been -- it's like they were pre-done, the certifications, and

22  given to others to attach.

23         THE COURT:  Okay.  Because Judge Lane does not

24  disallow the proofs of claim because of the attorney's

25  impropriety in Obasi, right?

1         MR. SCHIAVONI:  Your Honor, the procedural context

2  of that case was a little complicated.  There was an issue

3  about the trustee being involved and whatnot, as I recall,

4  but definitely, in Obasi, the Court definitely held that you

5  cannot delegate the signing of the proof of claim.  It was --

6         THE COURT:  Yes.

7         MR. SCHIAVONI:  It was a sanctions case.

8         THE COURT:  Uh-huh.

9         MR. SCHIAVONI:  I don't think the exact issue of

10  the proof of claim is even before the Court, and the Court

11  ended up dealing with the sanctions issue in the context of

12  sanctions.  But I don't think the Court ruled anything about

13  the propriety of the proof of claim without the signature

14  attached, without the appropriate signature.

15         THE COURT:  Well, he did note that the defect had

16  been, that the firm had taken steps to remedy the defect and

17  had amended the proof of claim to include the electronic

18  signature of the attorney who actually did the review, as

19  opposed to the attorney who had signed the proof of claim.

20         So, clearly, Obasi is right on point on what your

21  obligations are, with respect to a proof of claim and how to

22  sign it.  So, I do want to hear in your presentation what it

23  is that you want to do with the -- I want to hear the

24  purpose, I want to hear the purpose of the discovery you want

25  from the law firms.

1     MR. SCHIAVONI:  All right.  Your Honor, here's the
2  thing here.  This is not -- we're not asking here to
3  disallow.  This is not a disallowance motion.  We're not
4  seeking that as a remedy now to disallow the claims.  We're
5  also not seeking sanctions in connection with this motion.
6  That's not what the motion is.
7     The motion is -- you know, at the very beginning,
8  I sort of introduced these two motions as sort of the two
9  ends of the pipe --
10     THE COURT:  Uh-huh.
11     MR. SCHIAVONI:  -- you know, one being the kinds
12  of claims that were coming out and the other, the process
13  that generated the claims.  And just one minute of background
14  before I can get into, like, you know, the purpose, but it's
15  like getting the notion of how the claims were prepared, the
16  process of the claims.  502 builds into that some assurance
17  of reliability of the process.
18     And one of the elements of that is having the
19  claims vetted and having someone personally attest to the
20  claim.  There was at least, at a minimum, a sufficient
21  concern in Obasi about the situation that some remedy was
22  done after the fact.
23     Here, it's like where the evidence takes us from
24  here and, critically, the testimony we put forward who
25  reviewed the actual signatures on the proofs of claim, they

don't just show that signatures were pre-signed and given to others. They show, critically, further, that the signatures were given to third parties. They were given to claims aggregators, for-profit shops that do this work, and that the role of interviewing the claimant and vetting the claimant was delegated not to one's associate, but to these claims aggregator firms.

All of the exhibits that are cited, all of the factual assertions cited in our brief about those claims aggregator firms, they've all come in now uncontested. They're all attached to exhibits from Mr. Kirschenbaum's declaration and Sergi's (phonetic) declaration, and they all show, not just a failure of lawyers not just that the signature pages have been passed to others, but they have been passed to third parties who aren't even lawyers.

And, further, it's like we have also put in evidence of indications that the claims are bought and sold. Among that evidence, Your Honor, is a tweet from Mr. Kosnoff himself after this motion was filed, which talks about inventories of claimants being bought and sold. He talks about them being acquired from, quote, TV advertisers. This is direct reference and there was nobody better placed to know how this was done than the man behind it, the man who founded the Coalition. And that concern goes to how -- goes to the process, the process by which these proofs of claim

1  were generated and whether or not they were really vetted.

2           The discovery we've asked for, the purpose of it

3  isn't really to sanction people, per se, or at least,

4  initially, to disallow the claims, but the purpose of it is

5  to identify the breadth and scope to which the claim, like

6  the actual claim process was delegated out to non-lawyers,

7  third parties, in violation of 9011, so that we all, in

8  connection with Obasi, can make an evaluation about the

9  integrity of the proofs of claim as a general matter, the

10  extent to which this was done, and, frankly, to confirm, to

11  be confirmatory about exactly how many it was done in

12  connection with it.

13          The evidence that we've offered, it gets us enough

14  of the way along to show that this sort of thing was done.

15  We walked through in our brief four different examples of

16  collections of these mass-signed declarations that are all

17  supported by the uncontested declaration that's now in

18  evidence of the gentleman that reviewed the actual signature

19  pages, the metadata embedded in those signature pages, and

20  the verification sheets attached to them that show that

21  signature pages were generated and attached to proofs of

22  claim before the proofs of claim, like the signature page

23  was -- one of the examples that's on page -- this shows up in

24  our moving brief on page 10 through 12, is an example that

25  was called out that specifically walked through in the

declarations, where signatures were generated before the

proofs of claim were created and essentially attached after

the fact.

And then the same sets of these proofs of claim,

gets a trace through the metadata and the other electronic

data associated with them to the third-party claims

aggregators who were the ones who were actually submitting

the proofs of claim.

This is a failure in the process.  In is exactly

what those 9011 cases talk about that the process was

supposed to have lawyers vetting the claims and that's all

indications that that's absolutely not what happened here.

But we're not asking -- again, we're not asking for sanctions

on this right now.  We're not asking for anything else,

except we're asking for some very targeted discovery directed

at establishing the full extent to which this happened, so we

can focus on those groups of claims for further question and

study.

And, again, talking about the overall process that

Hartford and Century have tried to come forward here with to

be constructive, to give some sense of where there are issues

with these proofs of claim.  This is one of them.  This is an

effort.  We didn't jump the gun.  We didn't move for

sanctions.  We didn't try to take -- you know, we didn't rush

out and immediately file objections on these.  We'd like a

1  better understanding of the breadth to which this happened.

2         And, Your Honor, just to bring you back to when we

3  all faced -- you know, remember what happened.  The TCC here,

4  which has the fiduciary duty to all the claimants, they

5  signed off on, and a bar date order was entered that required

6  the claimants to actually sign and to use real signatures.

7         It was the Coalition that came in and asked that

8  that be changed.  We had argument on that, and Your Honor

9  decided to grant that motion.

10         But, importantly, I think some of the concerns

11  that we raised then about what might happen, you know, I

12  think Your Honor took some of those things to heart.  And the

13  Court, in connection with that, if you remember, you know,

14  you recognized the risk created by permitting lawyers to sign

15  the proofs of claim, the Court noted, quote, that it was ill-

16  advised for lawyers to sign proofs of claim -- this was at

17  the October 14th, 2020, hearing; it's pages 190 to 12 --

18  lines 12 through 17 -- it's on the docket as 1520.

19         And, you know, obviously the Court is free to --

20  I'm not quoting Your Honor back as if you're authority to

21  yourself; that's not the point.  I want to make a different

22  point here, and that point is, really, that the claimants,

23  the plaintiffs' lawyers here were completely forewarned not

24  to do this.

25         The Court went on to tell them at that hearing on

1   October 14 that it was, quote -- that the Court would be,

2   quote, concerned, closed quote, if, quote, a thousand claims

3   are signed by a particular lawyer.  And Your Honor went on to

4   add that an attorney signing a claim, quote, might have to

5   give a -- to become a fact witness and may be subject to

6   deposition.  That's on page 183, line 9 through 22, of that

7   October 14 deposition.

8             And despite this, this is exactly happened.  This

9   is exactly happened.  And the reason is, if you look at these

10  firms, many of them are fairly small.  It's almost

11  implausible that they could have generated this volume of

12  claims on their own.  It's like, we've submitted to you, and

13  it's in the exhibits that are attached to these declarations,

14  that have quoted in the fact section of the moving brief,

15  from these aggregator firms that, you know, the sections

16  where they talk about in their own marketing that, we will

17  take care of everything for you.  We will run the process.

18  We will submit the claim.  We will speak to the people.  And

19  there's every reason to believe, based on what we've

20  submitted, that that's exactly what happened here and that,

21  in many ways, is how this mass-tort process has changed.

22            You heard someone in the prior argument this

23  morning talk about the three prior cases they have worked on.

24  They were Takata and two other cases that had nothing to do

25  with sexual abuse.  We put in the fact section that it's

1   clear that many of the lawyers that came in to the, you know,

2   and are now part of the Coalition, and, critically, not all

3   of them, to be clear, but many of them were firms that have

4   no connection with sexual abuse cases, have no history in it

5   at all.  That their history, their commonality is that

6   they're filing proofs of claim in one after the other mass-

7   tort bankruptcy.  The only commonality of it is they're mass-

8   tort bankruptcies.  The claims are all being generated out of

9   this, this central, like, these central, you know, claims

10   aggregators.

11         The point here is that without the protections of

12   9011, there's not the same assurance that the claims are

13   valid.  Just like in Obasi, the Court said, look, once they

14   got hold of the facts on that, and, again, it's not -- that

15   case is not really one where they took at issue directly the

16   proof of claim.  They were dealing with the sanction motion.

17   But the Court looked at that and said, Yes, and there was

18   some mention of, yes, it was the follow-up on that.

19         That's what we're, like, what we're trying to do

20   is just that.  This process of you know -- it's like you've

21   seen the evidence in the examples in the moving brief.  It's

22   uncontested.  The targets here of this motion very easily

23   could have put in one-paragraph declarations saying, yes,

24   just like the gentleman did on cross with Mr. Hinton that,

25   like, yes, we thoroughly reviewed these in the months prior

1  to the filing and then we filed them.

2         That's not what they did.  To be clear, that's not

3  what they did.  There's not an affidavit from a single one of

4  them here that in any way contests any of the evidence that

5  is now uncontested in the record which points entirely in a

6  different direction, where when you get into the metadata,

7  you have signature pages coming in and being submitted

8  seconds after each other in series and machines on file that

9  could only be done, the only plausible explanation for this

10  is that it's being done out of an aggregator, submitting

11  large numbers of claims all at once.

12         That's not a good process.  That's not a process

13  that 9011 has in mind.  That's a process that generates

14  claims that are not of the same quality.  That's a process

15  that generates suspect claims.

16         And, yes, you can cross Mr. Hinton about, you

17  know, maybe this or that is driving the high number of

18  disparities, but the disparity on these, on the Coalition

19  claims is very, very significant and there's significant

20  oddities among those claims, including just -- I mean, some

21  of them are almost hard with a straight face, to explain.

22         You know, in example four in our brief for the

23  Paul Napoli firm, and, by the way, the whole thing about,

24  like, mentioning some complaint about mentioning the father

25  instead of the son, it's not in this motion.  If it was a

typo in the other brief, apologies to the Napoli family.  I'm
completely unaware of that, but it's not in this motion,
because we pointed out that Paul Napoli, he allegedly signed
over 500 proofs of claim in the days leading up to the bar
date.  Four hundred of those proofs of claim were essentially
blank, blank with just a similar symbol at the bottom of it.
This is not a sign of a normal process.  There is something
wrong.

        We pointed Your Honor also in the brief, and it's
uncontested to the Junelle (phonetic) firm, which actually
publicly published that they, the firm, was going to, quote,
have their proofs of claim completed and filed without the
claimants, even getting back to them, that they created like
a negative opt-out, that if you wrote them, unless you wrote
them, they would finish your form and file it.

        This is not a reliable process.  It's a process
that causes great -- it's a suspect process.  It's in
violation of 9011, to start with, and it's entirely
legitimate for us to say that the evidence we've offered is
enough to say, please give us, you know, a few depositions of
these folks.

        If Your Honor, you know, thinks 15 is too large a
number, so be it.  You could cut it in half.  You could just
pick the ones who have the most numbers of claims.  But
getting a handle on, and a sense before the Court of how the

claims were actually prepared, it goes right to the -- like, can you rely on the integrity of this process.

And that's really a key issue here, how these claims were prepared.  All of those examples are uncontested. We attach, again, you know, four of the different -- (indiscernible) embedded in the proofs of claim, you know, the verification stuff, information showing that they come in from (indiscernible) Consumer Attorney Marketing, a firm called Archer, a case called case management.  Actually, they tout that they take over your management of your claims.

This is wrong.  It's a classic reason for Rule 2004 discovery, and we cite In re Subpoena Duces Tecum as a 2004 case where the Court actually talked about how the process on which the proofs of claim were being prepared was a legitimate form of question for 2004.

Here, I'd be the first to tell you, Your Honor, this is sort of a unique process.  This is unique.  I will tell you that.

The shadowy role that these claims aggregators have played has not been one that's really been inquired about.  Everyone thought the plaintiffs' firms just made, you know, ran some ads and they, themselves, did the interviews. The notion that this whole process is one that third-party investors, working together with claimants, is running is one that only raises concern about this process, because, look,

1  like, we (indiscernible) one of these firms, one of the

2  funders for this is a Wall Street hedge fund which is known

3  for, you know, distressed investing.

4          You know, I have clients that do -- that are

5  distressed-investing hedge funds.  We all know that they're

6  very, very aggressive, and they know how this process works.

7  Fill out 15 questions, file the form, it's presumptively

8  approved, everything is confidential about it, we're going to

9  make it incredibly hard to attack it.

10          And by the way, it's like Your Honor has seen the

11  retention agreements in connection with the 2019s.  I thought

12  it was important that you saw those and saw how the

13  retentions were set up.  I'm not going to disclose what the

14  fee percentages there were.  I don't have to, because in the

15  UCCs filed by the funders, they tout the fact that they're

16  taking -- in the UCCs, they're in evidence, but, you know,

17  uncontested, as part of this brief -- that they're going to

18  take 40 percent of the claim.  When you add on top of that

19  the coalition's rates, you know, the charges of the

20  Coalition, half the money goes out the door to the people who

21  have generated the claims and own the claims.  It's a process

22  that is problematic.

23          But at the end of the day, the thing that is most

24  convincing here is -- Mr. Stamoulis, could you bring up Mr.

25  Kosnoff's tweet for a second.

1          MR. STAMOULIS:  Your Honor, I'm going to share my

2     screen.  This is Stam Stamoulis.

3          THE COURT:  Okay.

4          MR. SCHIAVONI:  I (indiscernible) before Your

5     Honor --

6          MR. STAMOULIS:  Go ahead.

7          MR. SCHIAVONI:  The screen-sharing is disabled in

8     my -- as my participant's view -- okay.  Well, there we go.

9     I was going to make a joke about how I'm no more

10    sophisticated than Your Honor in using the screen-sharing,

11    but I guess I proved it even better.

12         But the tweet that we're relying upon or that we

13    offer, it's like, I got it, it's a tweet, but it tells it

14    all, because, you know, Mr. Kosnoff talks in there about

15    inventories of claims being bought from TV advertisers.  He

16    talks about how the lawyers handling those claims, he talks

17    about them in derogatory terms, and it's probably unfair, but

18    the gist of it is that they're just moving from one of these

19    cases to another, but they're not professional at handling

20    sexual abuse cases.

21         And I have no doubt that there are lawyers on this

22    phone -- we heard one earlier -- who has spent his career on

23    this sort of work and, if anything, it's people like that

24    gentleman who are, and their clients, who are the ones who

25    are potentially victimized by this, because bringing in this

1   sort of mass numbers of claims, if we're not able to inquire

2   about them and look into it, you know, it does hurt the

3   claimant.  It hurts those claimants with meritorious claims.

4            The integrity of the process is important.  And

5   I've got it.  It's like, you know, Greeks bearing gifts,

6   hearing it coming from me, but it's true, nonetheless, it's a

7   true fact about this, that having the unreliability of the

8   proofs of claim is a real problem.

9            So, Your Honor, I'd ask you, respectfully, to give

10  this some serious thought.  I continue to think that these

11  two motions are, to some extent, the most important motions

12  you'll hear on the case, because if we're just simply, our

13  hands are tied behind our back and, you know, we're

14  blindfolded and our ears are stuffed and we're just told, you

15  know, here's 95,000 claims that were done through an

16  aggregator, mass-tort process system, and no matter what it

17  is, you have to take them all and let the tort claimants

18  generate the values, it's like it becomes an impossibility to

19  deal with the situation.  It becomes one that can only be

20  resolved fundamentally by the Circuit, and it's like one that

21  will just buy tremendous amounts of litigation.

22           Letting us have some ability to, like, get into

23  this -- and this is not, you know, to be clear, like the

24  folks that we have asked for this discovery from, cut the

25  number in half if you think, focus on some of the ones that

1   we offered the most compelling evidence in that group, but
2   these are people at the end of the day that, respectfully,
3   you warned in very clear terms that if you sign, you may be
4   deposed.  And the case law supports that.  We offered those
5   cases, and it makes clear that if you sign, you know -- and
6   that's not something -- like, to honest I've had a couple of
7   clients call me at the last minute and tell me to sign and,
8   you know, I don't like to turn away business, but, you know,
9   I said, I'm not going to do it.

10          I did it once when it was just a bond, you know,
11  it was like I was just attaching a bond, but to submit, you
12  know, after the Court has told you to submit 2,000 claims in
13  your own name or to submit hundreds and hundreds on a given
14  day when the Court has warned you that if you do that, you
15  may be deposed, all notions of proportionality and prejudice,
16  I think genuinely go out the window.  It's like these folks
17  happen to have an obligation to step forward, and in a
18  deposition, they'd be asked, basically, the fundamental
19  questions of, is that really true what you heard before?
20  Were you really vetting these over the last three weeks?  Or,
21  you know, is what's in the metadata the story, that, in fact,
22  you signed this, sent your signature page to Verus, and Verus
23  handled the whole process, just like they tout in their
24  advertisements.

25          And that's something that we don't have,

1  necessarily, the metadata from all of the claims, so we can't

2  build this out, but getting into this process a little bit,

3  we could isolate the broader group here.

4          And, by the way, there's one other element to it.

5  You know, there was a key part of the proof of claim where

6  there was an issue about should we have verifications for the

7  claimant signatures, all right.  And most of the claimant

8  signatures here are electronic; they're not handwritten.  And

9  of the electronic ones, some had verifications, but many

10 don't, because that ended up being something that wasn't

11 required.

12         But the indication that they were using the

13 aggregators and what we have already, it looks like the

14 signatures, many of them were attached by the aggregators and

15 not separately by the claimants.

16         But we need discovery.  We need the ability to get

17 a little discovery on this to really kind of confirm that,

18 and make an issue about, and see whether there's an issue

19 about how many that happened to.  And, again, that's not just

20 important to us, that's important to the claimants at the end

21 of the day, those with meritorious claims.

22         And, yes, you know, the TCC has not opposed this.

23 There are -- by no means is Mr. Stang in any way working with

24 us or Mr. Stang like insurers or anything like that.  I'll be

25 the first to show up at Mr. Stang, you know, valedictorian to

1  give him that, like, he is against insurers and whatnot.

2          But the bottom line is, I think, and, you know,

3  they have not opposed this, because it's not -- it's

4  discovery that isn't anti-claimant; it's discovery that could

5  be beneficial to the claimants with meritorious claims.

6          Thank you, Your Honor.  Sorry I got a little

7  passionate about it.

8          THE COURT:  Okay.  Thank you.

9          It's 4:20 and I need to take the hearing in my

10  other matter, so we're going to do that.  We're going to

11  adjourn until 5:00 and then I'm going to hear the response,

12  the objectors' arguments.  We're not getting to the Rule 2019

13  today.  That's just not going to happen, but I want to close

14  the argument on this particular motion.

15          So, we're adjourned until -- we're in recess until

16  five o'clock.

17      (Recess taken at 4:17 p.m.)

18      (Proceedings resumed at 5:08 p.m.)

19          THE COURT:  Thank you, this is Judge Silverstein.

20          We're back on the record in Boy Scouts.

21          Mr. Schiavoni has finished his argument.

22          Is there any other party in support who wants to

23  speak before I go to the objectors?

24          MR. RUGGERI:  Your Honor, James Ruggeri for

25  Hartford, very briefly, just to make a couple of points, Your

1   Honor.

2          We join in full in Mr. Schiavoni's comments this

3   afternoon.  His motion is well-supported by evidence, and

4   we'd just note, again, that the Coalition or the objectors, I

5   should say, could have offered competing evidence.  They

6   didn't.  The objectors could have cross-examined Mr. Speckin

7   this afternoon about his declaration and all of the

8   irregularities that he found with regard to the signatures on

9   the proof of claim forms.  He didn't.

10         On cross-examination of Mr. Hinton, the only

11  witness they chose to cross, all it really showed is that his

12  claim count would have someone who lived in one state and

13  camped in an adjacent state and those instances, no doubt,

14  are few and far between, but more importantly, that point

15  doesn't do anything to undermine the credibility of his work

16  in this case.  I mean, again, this afternoon, the objectors

17  are going to be left not with evidence, but with argument of

18  counsel.

19         These motions, this motion, as the other one, in

20  our view, they're about integrity and they're important, Your

21  Honor.  And thank you for your time today.

22              THE COURT:  Thank you.

23              Okay.  Let's hear from the objectors.

24              MR. GOODMAN:  Good afternoon, Your Honor.

25              Eric Goodman, Brown Rudnick, counsel for the

1  Coalition of Abused Scouts for Justice.

2        Just two matters before I get into argument on the

3  2004 motion, themselves, or the 2004 motion, directed at

4  attorneys.  The first is we did have some discussions

5  regarding an order, a lineup, if you will, in terms of who

6  wants to talk and when.  I will note, and if the Court will

7  agree with this, we would certainly appreciate it, although,

8  the Court is obviously free to call on anyone she wants and

9  at any time.

10        But after I am done speaking, I would like to turn

11  the virtual podium over to Mr. Robbins, who represents

12  Andrews Thornton and ASK.  And then following Mr. Robbins

13  would be Mr. Taylor, who represents Slater Slater & Schulman.

14  Following Mr. Taylor would be Mr. David Wilks, who represents

15  Mr. Kosnoff, and following Mr. Wilks would be Mr. Hogan, who

16  represents the Eisenberg firm.  There may be others who want

17  to speak after Mr. Hogan, but those are the initial lineup,

18  if you will.

19        The second matter before I get into argument, a

20  matter was brought to my attention at lunch that I wanted to

21  address.  Apparently, the insurers made a representation that

22  there were some 80,000 claims filed in this case that are

23  deficient because the victims did not allege an affiliation

24  with scouting.

25        Apparently, that is factually not true.  There are

1  claims where the survivors did not check the box in

2  Part 3(e)(a) of the claim form, indicating an affiliation

3  with scouting, but, instead, included a detailed narrative,

4  explaining their affiliation with scouting, instead.

5       Since the insurers evidently, have not reviewed

6  all of the claim forms, or at least the vast majority of the

7  claim forms submitted by survivors, they kept asserting that

8  some 80,000 claimants have no affiliation with scouting.

9  Again, we believe that that is factually not true, and I was,

10  specifically, asked to bring that to the Court's attention

11  before beginning argument.

12       So, with those two points --

13       THE COURT:  Okay.  I will -- your lineup is fine,

14  and I would ask everyone to please check your phones.  I'm

15  getting some feedback.  Make sure you're muted.

16       MR. GOODMAN:  Okay.  Thank you, Your Honor.

17       So, there are three key points this time that I

18  would like to make in response to Century and Hartford's Rule

19  2004 motion, seeking discovery on attorneys, Your Honor.  The

20  first is, this is not about the survivors, nor is it about

21  their claims; this is about the law firms.

22       And I thought that Century and Hartford's reply

23  brief was very clear on this point.  According to Century and

24  Hartford, the discovery they're seeking from the law firms

25  is, and I quote, not material, or material, not because the

Plaintiffs' lawyers may have knowledge of the underlying

abuse, but to determine whether they conducted any pre-filing

investigation.

I agree with the insurers' own characterization of

their motion.  The Plaintiffs' lawyers have no personal

knowledge of the underlying abuse.  When they signed the

claim forms, they did not travel back in time and witness

abuse that occurred decades ago.

The attorneys are not fact witnesses, as to the

allegations contained in the proofs of claim.  Seeking

discovery from the law firms is not about the survivors.

This is about the insurers' ongoing war against law firms

that seek to help tort victims and it goes beyond this case.

The insurers are seeking discovery and aid of a

sanctions motion, which itself is improper, but more

importantly, it's not about the survivors or their claims,

and, therefore, it's not about the debtors' liabilities,

which takes this out of Bankruptcy Rule 2004 entirely.

Bankruptcy Rule 2004 has never been used for this

purpose.  In the history of bankruptcy, no court has ever

granted a Rule 2004 motion like this one.  The Obasi case,

which was discussed --

THE COURT:  I'm sorry, in the history of

bankruptcy, no court has ever granted a Rule 2004 motion like

this one?

1    I don't know whether they have or they haven't,

2 but let me ask you a question --

3    MR. GOODMAN:  We haven't located anything close to

4 it, Your Honor.  Obasi involved a Rule 11 motion and

5 Subpoena Duces Tecum involved a nationwide review of claims

6 by mortgage servicers conducted by the United States Trustee.

7    Again, we haven't found, and no case has been

8 cited, where anything like this has been done before.  And

9 the reason, I think, for that is it doesn't fall within the

10 scope of Rule 2004, which is --

11    THE COURT:  Okay.  So, what would be the remedy or

12 what would be the appropriate way to investigate process

13 issues?

14    MR. GOODMAN:  So, I think we would look at

15 Rule 9011, Your Honor, as that deals with the specific issue.

16 And I think the starting point would be that if a party

17 identifies a claim in this case that they believe has not

18 been asserted and doesn't, you know, contain appropriate

19 information, that they could send a letter; in fact, that's

20 what Rule 9011 requires before a party should come before the

21 Court on a motion for sanctions.

22    I think that the Bankruptcy Rules, themselves, set

23 in place a process by which these types of challenges can

24 occur and it's not about free-range discovery under Rule

25 2004, because, again, whether the attorney did his job or not

1   is not something that is related to the validity of the

2   claim, which is, again, what takes you out of Rule 2004

3   entirely.

4           The debtors, again, are not seeking this relief.

5   From our perspective, Century is seeking to use Rule 2004

6   here to further its own personal agenda, and that's not an

7   appropriate use of the bankruptcy statute.

8           Second point, Your Honor, there's no evidence of

9   fraud. I'm going to say that again: There's no evidence of

10   fraud.

11           Let's go through it. One, attorney advertising

12   happened. The debtors, themselves, engaged in a robust

13   nationwide noticing campaign. That's not fraud.

14           A    lot of claims were filed on the eve of a bar

15   date. That happens in every bankruptcy case. That's not

16   fraud.

17           People used electronic signatures. So did the

18   insurers on the pleadings they file in this case. That's not

19   fraud.

20           Lawyers used photocopies of signatures. I'm sure

21   The Center for Disease Control appreciates that. That's not

22   fraud.

23           Duplicate claims were filed; in fact, Hartford

24   apparently filed duplicate claims in this case, and I will

25   say, probably not fraud.

1          Claims have deficiencies; again, not uncommon in

2    mass-tort bankruptcies.

3          If the Court wants to see a truly bare-boned proof

4    of claim, one that lacks almost any description or detail at

5    all, you should look at the claims filed by Hartford or

6    Century.  I still can't figure out how they have claims in

7    these cases, but not fraud.

8          Attorneys signed claim forms.  This is permitted

9    by the Bankruptcy Rules.  This was already litigated, not

10   fraud.

11         Abuse victims have criminal records.  Yes, they

12   do, because they were abused as children.  Also, not fraud.

13         Family members doubt that their sons or siblings

14   were abused.  That's actually fairly consistent with social

15   science and heartbreaking in many ways, but also not fraud.

16         People who have been named as abusers have denied

17   such accusations.  Also, not surprising, also does not prove

18   fraud on behalf of any of the attorneys.

19         There was a, quote, explosion of claims before the

20   bar date.  Yes, we know that.  Look at Purdue.  Look at PG&E.

21   Look at Takata.

22         Attorneys have litigation funding; again, not

23   fraud.

24         Your Honor, the insurers are employing a logical

25   fallacy, known as proof by assertion.  If they repeat a

1  statement enough times, regardless of contradiction or lack

2  of evidence, they're hoping that this Court and others will

3  believe that it is true.  It is called a logical fallacy for

4  a reason, Your Honor.  Simply shouting fraud over and over

5  again does not make it so.

6          Third point, Your Honor.  This motion has not been

7  filed for a proper purpose, and I feel obligated to say that

8  because I am not the attorney that's being personally

9  attacked here.

10          I did not sign any claim forms.  I did not

11  directly represent any abuse victims.  I am counsel for an ad

12  hoc group.  I did not counsel any survivors on how to

13  describe being raped as a teenager on a claim form, but many

14  attorneys who are under attack in this courtroom have.  They

15  have been on those calls.  They have heard the stories and

16  none of them seem remotely surprised by the number of abuse

17  claims filed in these cases.

18          Again, a national organization like the Boy

19  Scouts, decades of known abuse, thousands of known abusers.

20  I checked over the lunch break and the number of known

21  abusers, according to news articles is 7,819, and that's just

22  the ones that are known.  Are the insurers really shocked at

23  how many claims were filed?

24          These lawyers are being targeted, Your Honor.

25  First, I would submit that they're being targeted because

1  they're part of the Coalition.  The insurers understand the

2  collective votes that we represent and it's terrifying to

3  them and they need a way to attack the firms.

4          When Mr. Hinton testified, I asked him a few

5  questions.  I asked him about two law firms; first, Jeff

6  Anderson & Associates.  40.7 percent of the claims his firm

7  filed were attorney-signed.  The second firm was Hurley

8  McKenna & Mertz.  That firm filed 4,065 claims, putting them

9  in the top five overall.  Both firms are completely absent

10  from any of Mr. Hinton's charts.  Both firms represent

11  members of the TCC.

12          I'm not suggesting that Century is working with

13  the TCC.  I just wanted to be clear that this is a job that

14  is targeting firms that are part of the Coalition.

15          The second reason they're being targeted --

16  because they are on the front lines.  Yes.  They signed claim

17  forms for their clients because they believed it was the

18  right thing to do, and we should all wish for that kind of

19  courage and dedication.  If it means that one survivor of

20  sexual abuse gets compensated, it was worth it.

21          And the insurers have the audacity to come before

22  the Court and accuse lawyers of, quote, outright fraud and

23  Rule 11 violations.  Based on what?  Advertising?  Electronic

24  signatures?  Duplicate forms?  A surge in filings before the

25  bar date?

1    Your Honor, this has to stop.  Insurers should not

2 be allowed to threaten State Court counsel when there's no

3 evidence.  This is not how attorneys should be treated.  This

4 is not how anyone should be treated.  There are a number of

5 complex problems that must be solved for survivors to be

6 fairly compensated and for the Boy Scouts to survive.

7    We are trying to be constructive.  Every day I

8 wake up trying to solve the real problems in these cases.

9 Having to spend weeks responding to motions like these when

10 the parties are in mediation, does nothing to advance these

11 cases.  It is incredibly expensive.  When you look at the

12 agenda for today, it is driven entirely by Century and

13 Hartford.  I mean, consider how much time has been spent

14 dealing with their motions and objections.  This is all being

15 driven by insurers, not creditors, that won't even admit that

16 they have coverage obligations.

17    At some point, the gamesmanship needs to stop.

18 It's causing real harm.  Thank you, Your Honor.

19    THE COURT:  So, let me ask you, why did the

20 Coalition feel the need to file something, when they are not

21 the subject of the motion?

22    MR. GOODMAN:  That is a fair point, Your Honor.  I

23 believe that the attorneys that represent State Court counsel

24 are probably going to have a lot more to say on these

25 specific issues.  The reason why the Coalition filed an

objection is, one, because we thought that it was an improper

use of Bankruptcy Rule 2004 and, most importantly, we think

that it is serving as a massive distractions in these cases.

We do not want to see this kind of discovery go forward

because we are trying to find a constructive solution.

THE COURT:  I guess I understand that, but you

also make factual assertions or representations in your

filings, which I assume you have no knowledge of, so I was a

little surprised to see the filing.  This isn't directed at

you.  You don't represent these law firms.  You don't even

represent the underlying claimants.  But you're spending time

and effort on what you think is a distraction from your other

efforts.  That's why I ask.

You don't know.  You do not know what these law

firms did or did not do.  The Coalition don't, right?

MR. GOODMAN:  I will answer your question

directly, and you're correct.  I do not have any personal

knowledge.

THE COURT:  So, how can you tell me what they did

or did not do?

MR. GOODMAN:  I cannot.  I can simply look at the

data that the insurers have given to you, and to me, it's

meaningless.

THE COURT:  That's a different argument.  Okay.

MR. GOODMAN:  With that, I will cede the podium to

1  Mr. Robbins, Your Honor.

2           THE COURT:  Mr. Robbins?

3           MR. ROBBINS:  Thank you, Your Honor.  Again, this

4  is, for the record, this is Larry Robbins for two firms:

5  Andrews & Thornton and ASK, LLP.

6           I want to join in the arguments Mr. Goodman made

7  on behalf of the Coalition as a whole, but, Your Honor, with

8  respect to the two firms that I represent today, the 2004

9  discovery that's requested by the insurers is especially

10 unwarranted, and I say that for four reasons.

11          First, to our knowledge, Rule 2004 discovery has

12 never been used to take discovery from opposing counsel in

13 the very case, itself.  Now, the Court posed a question to my

14 co-counsel a moment ago:  Can you really say that in the

15 entire history of the Bankruptcy Code, there's never been

16 such a motion?

17          If there is, Your Honor, I can't find it, and more

18 importantly, neither have the insurers.  Now, they did tell

19 you on page 27 of their opening brief, they told you -- they

20 included the following sentence, quote, indeed, they said,

21 Rule 2004 has been used to obtain discovery from counsel.

22          With all respect, that truly misdirects the eye,

23 because what they didn't tell you is that in the only two

24 cases they've cited, the discovery was against lawyers from

25 closed cases, not from the opposing counsel in the two cases

1  before the Court.  In the <u>Gawker</u> case, the first one they

2  cite, the only one they cite in text, that was a closed case

3  in which the debtor was taking discovery from a lawyer who

4  had represented a third-party funder; in other words, not --

5  it was Mr. Peter Thiel in the famous <u>Gawker</u> case, who was

6  behind-the-scenes, funding the Plaintiffs' counsel and debtor

7  brought that 2004 motion to get discovery in a closed case.

8          The same is true in the second, and only the

9  second -- they only cite two cases.  It's true in the other

10  case, as well, which is cited in the so-called Bewitt

11  (phonetic) case, cited in Footnote 121 of their opening

12  motion.  In that instance, the discovery was taken from a

13  lawyer who was basically a business partner in the pre-

14  bankruptcy transactions conducted by the debtor.

15          So, to put it squarely, we are unaware of any

16  reported case in which 2004 discovery has been used as the

17  insurers propose to use it here, to take discovery from their

18  actual litigation opponents.  It's never happened and their

19  claim that there are two such instances, which they make at

20  page 27 of their brief is simply untrue.

21          Now, is there a case out there that nobody can

22  find?

23          Obviously, I can't swear to you, Your Honor, that

24  somebody couldn't come up with one, but everybody has had a

25  lot of good reasons to try to find it and nobody has given it

1    to you, and they've given you know good reason to be the

2    first judge to order it against a counsel in the very case

3    itself.

4            Point number two, they told you, Mr. -- counsel

5    for the insurers did, as Mr. Goodman explained in the last

6    sentence of their reply brief, and, actually, in the very

7    first sentence in Mr. Schiavoni's argument today, he made

8    clear that the purpose of the discovery they're seeking, the

9    purpose for this 2004 discovery is to support a potential

10   9011 claim for sanctions.  He said he's not actually seeking

11   sanctions right now, but he's looking for the predicate.  He

12   wants to know, as he put it, what went on, how were the

13   claims prepared, how we they vetted.

14           Under Rule 11, where the case law tells us, it's

15   supposed to be a benchmark for the application of Rule 9011,

16   as well, the advisory committee notes are emphatic.  They

17   state that the Court must, to the extent possible, limit the

18   scope of sanctions proceedings to the record, thus discovery

19   should be conducted only in extraordinary circumstances.

20           It is therefore not surprising that there is no

21   reported 2004 case that we've been able to find in which

22   discovery was permitted for the purpose of predicating these

23   sanctions motions.  We've never seen one.  The other side

24   doesn't cite one.

25           Now, they do cite cases.  To be clear, Your Honor,

they do cite cases in which 2004 has been used for discovery
into the *bona fides* of claims, but they cite not a single
case in which 2004 discovery was used to investigate the *bona*
*fides* of the lawyers, themselves.

We are aware of no such case and the advisory
committee notes to Rule 11 tell us that only in the most
extraordinary circumstance should it be granted, and we've
never seen one, and they've never cited one. So, for that
second reason, this Court oughtn't to be the first to do so.

Now, if you were ever going to be the first to do
so, Your Honor, it ought to be in a case where there's
abundant good cause and that brings me to the third point.
At least with respect to the two firms I represent, there is
nothing remotely close to good cause. The allegations don't
come close to meeting the Millennium standard that this Court
articulated.

Let's be clear about what the insurers say about
Andrews & Thornton and ASK, in particular. I urge the Court
to look closely at Tables 2 and 3, and I don't want to
restate the points that I hope came clear in my cross-
examination of Mr. Hinton, because the data reflected in
Tables 2 and 3 to the Hinton declaration call to mind, Your
Honor, the adage usually attributed to Mark Twain, that,
"There are three kinds of lies: lies, damned lies, and
statistics."

1          This is an example of the third kind of lie.

2     Let's start with Table 2.  Table 2 asked this Court to infer

3     that the proofs of claim filed by A&T and ASK were missing

4     all sorts of important information and, therefore, must have

5     been filed without proper vetting.  That, Your Honor, is an

6     utter canard.

7          Here's what Table 2 actually shows.  For, ASK, it

8     shows that of the 3613 proofs of claim listed, 99.9 percent

9     listed the date of the abuse, 99.1 percent listed the

10    location of the abuse, 99.9 percent listed the nature of the

11    abuse.

12         For A&T, of the 3104 proofs of claim listed, 96

13    percent listed the date, 96 listed the location, 99.9 listed

14    the nature of the abuse.

15         The balance Table 2 is equally misleading, I

16    suggest.  Take the category called "missing key claimant ID."

17    That certainly sounds ominous, but as the Court will recall

18    from my cross-examination of Mr. Hinton, it turns out that

19    all you have to do to get into that column, Your Honor, is to

20    omit the claimant's zip code.  And even under that rather

21    exacting standard, ASK and A&T filed quote, unquote, complete

22    proofs of claim 56 percent of the time.

23         How about the final category on Table 2, "missing

24    abuser's last name."  I asked Mr. Hinton about that and, you

25    know, in all fairness, I didn't expect him to profess any

expertise in this field, but I would suggest to Your Honor
that it is a scarcely surprising that survivors of BSA
predation can now only recall the first names of their
abusers.

Does that, does the failure after all this time,
to remember the last name of their scoutmaster, as well,
remotely suggest that these law firms, the two that I
represent, or for that matter, any of them, have somehow
failed to discharge their ethical duties?  Could that
possibly be a basis for being the first court, to our
knowledge, ever to permit 2004 discovery into the ethical
conduct of lawyers in the very case, itself?

How about Table 3?  Table 3 supposedly shows you
that a significant percentage of high-volume filers made
mistakes in the claims they filed.  Unfortunately, this is
yet another illustration of the Mark Twain principle at work.
For ASK, 99.9 percent of the claims were timely, 90 percent
weren't duplicates, 97 percent of the claimants lived in the
state of the alleged abuse.

For A&T, 87 percent were timely, 90 percent
weren't duplicates, 95 percent lived in the state where the
abuse took place.

But the insurers, like Inspector Javert, are bound
and determined to find some kind of impropriety.  For
example, they pounce on a category called "inconsistent

ages," but as the Court will recall from my cross-examination
of Mr. Hinton this afternoon, it turns out that when you look
at Footnote 13 of the Hinton declaration, inconsistent ages
could simply be when a 9-year-old abuse survivor checks off
"Boy Scout," instead of "Cub Scout" on the form.  And even
then, under that cherry-picked standard, ASK got the ages
right 81 percent of the time, while A&T got it right 61
percent of the time.

   The notion that data this paltry could launch a
Rule 11, a Rule 2004 foray to rummage through opposing
counsel's files is absurd, I respectfully suggest.

   So, what's left over to show good cause in this
case?  What else do they have?

   Well, they say that some firms received funding
from a hedge fund on Wall Street, no less.  I'd suggest that
there are a fair number of big law firms that are represented
on today's call that gets funding from banks, too, for their
operations.  I'd suggest that some of them use marketers, as
well.  I would suggest that some of them use outside vendors
or use contract lawyers.

   This isn't a specialty of Plaintiffs' law firms;
it's endemic to the entire profession.  There's nothing
unique or much less suspect as grounds for launching this
kind of rummaging through files.

   They also say in their reply brief that in the six

weeks between the receipt of the financing and the bar date,
the two firms filed many more claims than they filed in the
six weeks before the financing.  But all that shows, Your
Honor, is a basic fact about human nature.  Busy people tend
to finish things close to the due date.  If anything, this
completely anodyne fact suggests only that the two firms I
represent continue to vet claims up through the bar date and
only then made the filing.

        And I want to actually return to a question you
posed to my co-counsel.  You asked, well, gosh, if this isn't
the right way to do it.  If this isn't an appropriate use of
2004, what actually is the right way to investigate claims
that the process was abused or that lawyers have failed to
discharge their ethical duties?

        And there was an answer to that.  It's an answer
prescribed by the rule itself.  Rule 9011 and Rule 11 tells
us what the process should look like, and it tells us in the
advisory notes that only in extraordinary circumstances shall
that process, shall the existing record be supplemented by
the launching of discovery.  This is not even remotely such
an extraordinary case.

        Finally, the only other piece of so-called good
cause evidence that they have as to my two firms are that the
firms signed numerous claims on a given day.  Again, that's
just beside the point.  The question is not when did these

1  claims get signed?  The question is, did they get vetted?

2        And the fact that they may have been signed on a

3  given day, as the due date, the bar date was fast

4  approaching, sheds absolutely no useful light on when the

5  claims were vetted for their sufficiency and the lawyers'

6  ethical obligations under 9011.  It's completely without

7  probative force, much less the compelling probative force it

8  would have to have to allow, to permit this kind of rummaging

9  through opposing counsel's files.

10        In any event, and this is the last substantive

11  point I want to make before just quickly addressing three or

12  four quick things that Mr. Schiavoni said in his argument,

13  even if there were good cause, even if this weren't an

14  untethered use of Rule 2004, even if it were permissible to

15  rummage through opposing counsel's files in a way that, to my

16  knowledge, is unprecedented in reported cases, even if all of

17  that were true, it would be premature to do it now.

18        Mediation is ongoing, as other counsel had pointed

19  out, and if mediation fails, it's quite likely that the

20  plaintiffs will launch an --

21        Somebody's on the phone.

22        THE COURT:  Somebody has another conversation

23  going.  Please check your phones.

24        MR. ROBBINS:  Thank you, Your Honor.

25        THE COURT:  Mr. Robbins?

1          MR. ROBBINS:  Thank you, Your Honor.

2          And if mediation fails, there's a likelihood that

3   the plaintiffs will seek a 502(c) adversary estimation

4   proceeding.  As this Court pointed out in <u>Millennium</u>, once

5   that happens, 2004 relief is no longer available.

6          Now, in our brief, Your Honor, we explained the

7   large swaths of this requested discovery is burdensome and

8   would infringe on privileges and work product, but because it

9   is so plainly -- Rule 2004 is so plainly unwarranted, as a

10  matter of law, I don't think there's any occasion for this

11  Court to wade into the particulars of the discovery requests

12  because they're simply not entitled to it.

13         I'm going to close with four quick points about

14  things that Mr. Schiavoni said that need correction.  He

15  pointed Your Honor to a series of tweets from Mr. Kosnoff and

16  he said in his argument -- I wrote this down -- quote, it

17  tells it all, end quote.

18         And point of fact, it tells us nothing, because

19  the tweets of one individual lawyer cannot be admitted for

20  the truth of the matter asserted against the other lawyers

21  involved in this case under Rule 801(b)(2).  It simply -- if

22  a party admission is admitted, as this Court well knows, only

23  against the party itself, not against everyone else.  So, it

24  tells us literally nothing about the conduct and *bona fides*

25  of anybody else.

Second, Mr. Schiavoni said that 40 percent of the total funding is going to the funders.  That is untrue.  As even a glance at the relevant documents will reveal, it is simply not true.

A    third point, and, actually, I'm going to close with this, Mr. Schiavoni, at some point, said to the Court, in substance, look, if you don't want to give us everything we want, give us half.  Give us 7 out of 15 or 8 out of 15.

I say this with all respect to opposing counsel, when you are seeking the extraordinary remedy of asking to look through the processes and files kept by your opposing counsel, that is not a moment for such cavalier argument.  What Mr. Schiavoni is asking this Court to do is not only unprecedented, to our knowledge; it is deadly serious.  It is not a joking matter to rummage through opposing counsel's files, and it is not an occasion for saying, well, gosh, if you don't give us 15, give us 7 or 8.

No.  The right answer, Your Honor, is to stick to the plain text of Rule 2004, the advisory committee notes to Rule 11, and not to undercut the nature of the adversary system, itself, along with its attendant privileges and work product protections, and allow a motion, whose evident purpose is to disable that adversary process from finally uncovering the truth.

1      And with that, Your Honor, I yield the floor and

2   thank the Court for its time.

3          THE COURT:  Thank you, Mr. Robbins.

4      Let me ask you a question, and I don't know if

5   this applies to your two firms -- I don't recall -- to the

6   two firms you represent.  Part of the request is to have Rule

7   2004 discovery into Verus Claims Services, Consumer Attorney

8   Marketing Group, Archer Systems, and Stratus Legal.

9          As I said, I don't know if the two firms you

10  represent have a relationship with those entities or not, but

11  I would like your thoughts -- if they are -- I would like

12  your thought with respect to that particular aspect of the

13  request.

14         MR. ROBBINS:  Well, I may not be the right person

15  to answer it, because to my knowledge, we have no such

16  relationship --

17         THE COURT:  Okay.

18         MR. ROBBINS:  -- but since I have the privilege of

19  the lectern for just a moment, I will say that if we had some

20  relationship, which I believe we don't, it would be no more

21  relevant to the question before the Court.

22         Whether a particular law firm uses outside vendors

23  to assist in the marketing process or the advertising process

24  is, it seems to me, a matter of utter irrelevance.  If every

25  law firm representing the insurers in this case -- and let me

1  say, I'm rarely in a case where -- I'm not a mass-tort

2  lawyer.  I'm not a personal injury lawyer.  I don't pretend

3  to know the ins and outs of that profession.  I spend most of

4  my time dealing with law firms that are today, in front of

5  you, representing insurance companies.

6          And I can tell you this, there's not a one of them

7  that doesn't use outside vendors, that doesn't use marketers,

8  that doesn't make some kind of advertising, and the

9  suggestion that somehow these law firms, on behalf of

10 individual claimants and survivors are doing something that

11 is unique or endemic only to the Plaintiffs' side of the

12 caption is a canard.

13          But the short answer to your question is, as far

14 as I know, we have no involvement with those particular

15 entities.

16          THE COURT:  Thank you.

17          MR. ROBBINS:  Thank you, Your Honor.

18          MR. SCHIAVONI:  Your Honor, if I may, their

19 involvement is set out on page 13 of our brief.  There's

20 specifically, the signature pages were sent to Verus.  It's

21 in paragraph 18 of Mr. Speckin's declaration, which is in

22 evidence.

23          THE COURT:  Okay.  Let me hear from Mr. Taylor.

24          MR. TAYLOR:  Good afternoon, Your Honor.

25          Can you hear me okay?  I'm on speakerphone.  I can

1    put you on --

2                THE COURT:  Yes.

3                MR. TAYLOR:  So, I will try to be brief, because I

4    think Mr. Goodman has done a very good job of explaining many

5    of these issues already.

6                I'm counsel to Slater Slater & Schulman and speak

7    only to address whether or not good cause has been shown with

8    respect to that firm, to serve discovery on that firm.

9                There are only three allegations made by insurers

10   with respect to the Slater firm; one, which I think has

11   already been generally addressed, both by Mr. Mr. Goodman and

12   Mr. Robbins, is that there are two attorneys at the Slater

13   firm who signed claim forms, more than 200 claim forms, and,

14   secondly, which was addressed by Mr. Robbins, is that the

15   Slater firm was also a party to this lending agreement that

16   provided litigation financing.  And I think the proper

17   explanations of those two things have already been provided

18   and I won't repeat that.

19               The third factor that the insurers point to is the

20   information contained in the Hinton declaration, which I

21   cross-examined him about, that there are certain claims that

22   were filed that were either incomplete or contained other

23   characteristics that Mr. Hinton suggested may sort of reflect

24   on the reliability of those claims.

25               And that, to me, is really the meat of what it is

1  that is being argued.  The rest of these, you know, sort of

2  accusations of impropriety are sort of atmospheric or window

3  dressing, whether or not the claims that are filed have any

4  kind of demonstrable infirmity in a manner that other claims

5  don't.

6          And that was the purpose of my cross-examination

7  of Mr. Hinton that the two principle sources of information

8  that he's providing is Table 2 and Table 3 of his opening

9  declaration is, you know, in Table 2 where he reaches a

10 conclusion that 65 percent of the claims filed by the firms

11 that are listed have some element of information that's

12 missing, but he doesn't furnish you, doesn't furnish the

13 Court, doesn't furnish us any information as to sort of a

14 control group, right.  He doesn't look at the other firms to

15 figure out the percentage of those claims filed by those

16 firms that have any missing information.

17         So, when he says that 65 percent are missing

18 information it may well be that the claims filed by other

19 firms have 80 percent of those claims are missing information

20 and, in fact, the firms that he is targeting, that the

21 insurers are targeting, have more complete claims than others

22 and they elected not to furnish the Court with that

23 information.

24         The same is true of Table 3, where there is

25 information that they say is -- and I don't know what the

1   purpose of this is -- they call them "indicators of

2   characteristics," which is meaningless to me, but I assume

3   that these categories that they identified are in some manner

4   that they think they reflect a lack of *prima facie* validity

5   of the claims.  And, again, there's no comparison of the

6   claims that are submitted by the firms that they're targeting

7   for discovery to those for claims that are filed by firms if

8   they're not the subject of discovery.  There's no control

9   group, right.

10          So, they say that 78 percent of the claims as a

11   group, 78 percent of the claims have, you know, the

12   inconsistent information or one of these other

13   characteristics, but it may well be that the claims by firms

14   that are not the target of this discovery is of a much higher

15   percentage, right.  It may well be that this group, in fact,

16   has more reliable claims being filed.  So, that's one point.

17          The second point is that none of this information

18   is distinguishing between claims that are filed by attorneys

19   and claims that are being filed by the claimants.  So, these

20   are just aggregate numbers.  So, in the case of Slater, which

21   filed 15,497 claims, there's a conclusion that 74.5 percent

22   of them -- this is in Table 3 -- has one of these

23   characteristics, but we don't know whether or not those

24   characteristics are more prevalent in attorney-signed claims

25   or non attorney-signed claims.  It could very well be that

1  the attorney-signed claims are less likely to have these

2  characteristics than are the non attorney-signed claims.  It

3  may be that the attorney-signed claims, to the extent that

4  these are indicators of the prospective validity of the

5  claims, it may well be that the claims being filed by the

6  attorneys have greater indication of validity.  And we don't

7  know, because they elected not to provide that information to

8  the Court.

9        And, in fact, Mr. Hinton did file a supplemental

10  declaration addressing that issue, trying to identify as to

11  each firm, the probability that a claim is going to missing

12  information or other characteristics that those that are

13  attorney-signed and those that are not attorney-signed, and

14  they chose not to move that into evidence for reasons I don't

15  understand.

16        I do, I certainly do with respect to Slater,

17  because what it shows is, in fact, that it is the percentage

18  of the claims that are being filed by the attorneys are less

19  likely to have these characteristics than those claims that

20  are filed by the -- that are not filed by the attorneys,

21  right.

22        And you can look at this in the supplemental

23  declaration of Mr. Hinton, right.  There are one, two, three,

24  four -- four characteristics --

25        MR. SCHIAVONI:  Your Honor, I'm going to object.

1      To the extent counsel wants to talk about the

2 supplemental declaration, we would like to offer it into

3 evidence.  We're not hiding from it.  We would like it in

4 evidence.

5      So, please, he's opened the door.  We'd ask that

6 it be admitted into evidence or he stop trying to sort of

7 cherry-pick things from it and cite them, you know,

8 improperly.  But we would like it in evidence.

9      THE COURT:  Let's have argument about what's in

10 evidence.

11      MR. TAYLOR:  I would -- I think had they moved it

12 into evidence when Mr. Hinton was available for deposition, I

13 think he'd have a better basis, but they chose not to do so

14 at that point.

15      THE COURT:  Yes, you're correct.  It's not in

16 evidence, so I'm not going to consider it.

17      MR. TAYLOR:  So, am I not to speak to it?

18      THE COURT:  It's not in evidence.

19      MR. TAYLOR:  Well, I will represent to you, if you

20 look at the factors that they say, there's incomplete

21 information or that the information somehow has other

22 characteristics with respect to --

23      MR. SCHIAVONI:  Objection.

24      MR. TAYLOR:  -- with respect to the Slater firm --

25      I hear your objection and I'll speak, and the

1   judge can decide if she wants to hear it or not.

2            With respect to the Slater firm, it is more likely

3   that a claim that's not filed by an attorney has these

4   characteristics than a claim that is filed by a Slater

5   attorney.  And as to those where there is statistical

6   significance, as found by Mr. Hinton, there is not a single

7   one of these characteristics that is more likely to appear in

8   an attorney-signed claim.

9            Those two that have some statistical significance,

10  according to Mr. Hinton, as to both of those, the attorney-

11  signed claims are less likely to have those characteristics

12  than the non attorney-signed claims, right.

13           It is a complete contradiction of the insurers'

14  thesis that somehow these attorney-signed claims are less

15  reliable or some indicator of fraud; in fact, by their very

16  own roster of characteristics, the attorney-signed claims are

17  more likely to be reliable.

18           The only exception to that is what they refer to

19  as incomplete, and incomplete, there are more incomplete

20  attorney-signed claims than there are non attorney-signed

21  claims, which makes a lot of sense for the reasons that

22  Mr. Robbins talked about, is that these are being signed

23  shortly before the bar date, before they have all the

24  information.

25           And if you look at -- and this is the same

1  exercise that Mr. Robbins went through -- if you look -- and

2  this is back to Mr. Hinton's original declaration, right --

3  if you're not interested in hearing anything about the

4  supplemental declaration, because they chose not to move it

5  into evidence -- this is going back to his original

6  declaration, right.

7          MR. SCHIAVONI:  We'd like it in evidence.

8          THE COURT:  Go ahead.

9          MR. TAYLOR:  So, this is something that is

10 certainly in evidence, right, and if you look at the numbers

11 here, it is very similar to what was the case of ASK and of

12 Andrews & Thornton, that the vast, vast majority of these

13 claims contain all of the information, the vast of it.  The

14 only exception to that is the category of "missing abuser

15 last name."  There's 8,668 of those, right.

16          If you remove that, just that one category, only

17 11 percent of the claims that are filed by Slater Slater &

18 Schulman, are missing any information, right.  And for the

19 reasons Mr. Robbins and others have talked about, it is

20 unsurprising that somebody now doesn't remember the name of

21 the scout leader that molested them when they were a child.

22          So, what it comes down to is the entire basis on

23 which the insurers are seeking discovery from the Slater firm

24 is an inflated number of supposedly incomplete claim forms

25 based on the fact that they don't have last names, right.

1  That's the extent of it.

2         Every other indicator that they have of whether or

3  not a claim form is complete or has other characteristics is

4  demonstrable that the attorney, by their own evidence, if the

5  attorney-signed claim forms have fewer of those

6  characteristics.

7         So, that's what I have to say about that.  I think

8  the Mark Twain quote is an appropriate one.  If you actually

9  look at the numbers, you'll see that a case has not been made

10  that the attorney-signed claim forms are in any way less

11  reliable than non attorney-signed claim forms.

12         THE COURT:  Okay.  So, your point is on this

13  Table 2, if I'm understanding it right, is that if you look

14  at these claim forms included information almost all the time

15  of when the abuse occurred, where the abuse occurred, and

16  what abuse occurred?

17         MR. TAYLOR:  Yes.  For example, if there are

18  15,492 claims are filed, only 33 of which were missing

19  information about when the abuse occurred, only 50 of which

20  were missing information about where the abuse occurred, and

21  only 89 of which were missing information about what abuse

22  occurred.  That's pretty extraordinary, right.

23         So, they are trying to inflate the number of

24  supposedly incomplete claim forms by including these two

25  categories.  And Mr. Robbins also talked about missing abuser

last name and missing key claimant information, and it's

particularly that "missing abuser last name" category, which

in the case of Slater, it's 8,668 that don't have a last

name, but that certainly shouldn't be a basis, in and of

itself, as Mr. Robbins said, to rummage through the files of

your adversary law firm, right, because it's natural that

many of these claimants aren't going to know the last name of

the people who abused them, right.  These are 5-year-old

children who were abused by a scout leader who, you know, 20

years later, can't remember the scout leader's last name, if

they ever knew it.

THE COURT:  Okay.  Well, not now, but, Mr.

Schiavoni, when it's your turn, you can tell me why it is

that the missing abuser last name column doesn't dominate how

this chart comes out.

Okay.  Anything further, Mr. Taylor?

MR. TAYLOR:  No, Your Honor.

THE COURT:  Thank you.

Mr. Wilks?

MR. WILKS:  Thank you, Your Honor, and good

evening, everyone.  And I'll join everybody else in thanking

you for so much time today.  Your patience is truly

incredible.  But if it were earlier in the day, you know,

Your Honor, I would have a lot to say, but I know Your Honor

reads all the submissions, you know I've written a lot on

this motion, and I know what time it is.  So I'm going to be just hitting some high points here.

I also don't probably need very much time because it feels like the insurers have kind of gone full circle here when it comes to my client, Tim Kosnoff.

The original motion that they filed was really bare bones when it comes to Mr. Kosnoff.  They talked about the email that we talked about last fall that he had written about some folks in this case.  It should never have gotten public anyway because that was a privileged communication, but that we can kind of take that aside, it doesn't really expose him to 2004 discovery.  Your Honor already held last fall that it doesn't expose him to discovery on the issues before the Court then and this one is really no different, this was even more attenuated.

And then they cite the two statistical points that, gosh, there's an awful lot of attorney-signed proofs of claim and, gosh, there's an awful lot of him close to the bar date.  Well, those two things go together, of course, because the attorneys' signatures are required because this is -- you know, we've heard it before today, this is a deadline that had to be met and an attorney who would blow the deadline for a client like this is an attorney with a problem, a much bigger problem than facing a deposition in a 2004 examination, which is entirely extraordinary.

1    But the irony not lost on me, I don't know if
2 anybody else picked up on it, is that Mr. Schiavoni even
3 wants discovery from Mr. Kosnoff because the tweet that he's
4 kind of showing Your Honor and keeps talking about has
5 nothing whatever to do with Mr. Kosnoff's practices or
6 anybody that he's associated with.  It's -- Mr. Kosnoff is
7 only one man's view of what other nameless, faceless
8 attorneys might be doing in his view, it has nothing to do
9 whatever with --

10    THE COURT:  I don't know that I buy that.  I don't
11 know that I buy that when he's referring in a tweet to his
12 clients, he's talking about a case; I don't know that I
13 believe that the tweet means nothing.  I don't know what I do
14 with it, but I don't know that I believe that it's not in his
15 lawyer capacity and representing his clients when -- I don't
16 have it right in front of me, but I think that's what he
17 talks about.

18    MR. WILKS:  Oh, it's about this case.  Make no
19 mistake, Your Honor, it's about this case, but he's not
20 talking about, hey, guess what, I have a bunch of fraudulent
21 claims.  Guess what, I use hedge funds.  Guess what, I use
22 third party aggregators in marketing firms.  That wasn't
23 self-referential, he was -- those were his own views of what
24 other people, in his view, he suspects might be doing, which
25 sounds an awful lot like what Mr. Schiavoni is talking about.

1  They're both criticizing the same thing.

2         Our submissions are very clear.  We answered the

3  accusations that are set forth in the original motion papers.

4  There's no evidence now supporting or even submitted on any

5  of these new allegations that came in, you know, in the

6  reply, which I don't have to talk about now, I don't think,

7  because Your Honor isn't going to consider the Speckin

8  declaration or anything attached to that.

9         But the fact of the matter is, the record before

10 Your Honor is Mr. Kosnoff is probably the most experienced

11 child sex abuse advocate in the country, although hearing

12 from Carmen Durso today was enlightening too.  I mean, these

13 are two old warhorses in this practice area, no one else

14 holds a candle to either of them.

15        THE COURT:  Do I have any evidence -- do I have

16 any evidence at all about Mr. Kosnoff?  What evidence do I

17 have?

18        MR. WILKS:  Your Honor, first of all, we're not

19 obligated to put forth the evidence.  And it's interesting to

20 hear Mr. Schiavoni talk about that because he suggests we

21 should put in evidence, we should provide the evidence that

22 he is asking for in a 2004 exam.  In order to avoid a 2004

23 exam, we should put in the 2000 -- the information that he's

24 asking for.

25        THE COURT:  That's a different argument, that's a

1 different argument, but you told me I had evidence.  So I

2 want to know what evidence I have.  I don't think I have any

3 evidence in front of me about Mr. Kosnoff or his practice.  I

4 have representations from counsel, but I don't have any

5 evidence.

6 　　　　　　　MR. WILKS:  You're right, Your Honor.  You have my

7 representation, that's exactly right, and I, as an officer of

8 the court, take that very seriously, as everyone else on this

9 call does.  But what you -- well, let's look at the flipside.

10 What evidence do you have that Mr. Kosnoff uses hedge funds?

11 None.  What evidence is there that Mr. Kosnoff uses any of

12 the three third party aggregators that Your Honor named?

13 None, not -- there's no evidence.

14 　　　　　　　THE COURT:  Does he or doesn't he?

15 　　　　　　　MR. WILKS:  He does not, Your Honor, and that's an

16 attorney representation.  He does not use those three -- he

17 doesn't use third party aggregators.

18 　　　　　　　MR. SCHIAVONI:  Objection.  You can't -- that

19 statement can't be made consistent with the duty of candor,

20 it's just not true.

21 　　　　　　　MR. WILKS:  It is true.

22 　　　　　　　THE COURT:  Mr. Schiavoni, this is Mr. Wilks'

23 argument.

24 　　　　　　　MR. WILKS:  Yes.

25 　　　　　　　THE COURT:  Is it aggregator by another name or

1  what is it?  How did he sign so many claims?

2          MR. WILKS:  Well, first of all, as I said, he's a

3  warhorse.  He has been on the New York Times; he's been on

4  the Canadian version of 60 Minutes.  His name is out there

5  and has been for 25 years handling these kinds of cases.

6          He's also associated with other lawyers who have

7  proprietary software and proprietary methods.  I mean, a lot

8  of that is work product, Your Honor.  Nobody has really

9  talked about the work product doctrine today.  I mean, the

10  work product and privilege issues here are rampant.

11          But, you know, for Mr. Schiavoni to get upset and

12  suggest that Mr. -- there's any evidence that Mr. Kosnoff

13  uses those three organizations that Your Honor asked someone

14  else about, there is no evidence at all.  You know why?

15  Because he doesn't.  And he doesn't take hedge fund money.

16  There is absolutely no suggestion that each proof of claim

17  filed with the Kosnoff name on it had attorney consideration

18  involved in the process before they were signed, that's the

19  way it was done and there's not a shred of evidence to the

20  contrary.

21          It's not our burden to come forward and show the

22  insurance companies and everybody else exactly what our

23  methods are.  That's proprietary, it's work product.  In

24  order for that to be required they'd have to come up with

25  something other than plain, bald accusation, which is all

1 this is.  He wrote an email last fall criticizing folks who

2 are taking a different tack in this case, those arguments are

3 going to be hashed out someday in this case, I imagine.  That

4 has nothing whatever to do with what we're talking about

5 today.  He also has the two statistics that are in these

6 charts.  I'm not going to slice through them at all.

7 What's important is, how did he get to where he

8 got to?  Is there any evidence at all (inaudible) proofs of

9 claim that he -- that came through for his claimants, are any

10 of them fraudulent?  Was there ever -- is there any evidence

11 at all that there's no homework done behind it, that there's

12 no attorney work done behind it?  Absolutely none.  There are

13 trained professionals, there are trained nurses, there are

14 forensic nurses, there are professionals, there are lawyers,

15 there's a big team of people all behind each one of these

16 proofs of claim and we lay that out in our papers.

17 So I don't think it's my burden to come forward

18 with that evidence, it's not our burden to put forth a

19 declaration or an affidavit, which is exactly the ultimate

20 relief that the motion seeks.  It's not our obligation to

21 give them what they seek in order to beat the motion.  On the

22 flipside, there is absolutely nothing that suggests that any

23 of the Kosnoff proofs of claim are anything other than bona

24 fide claims that pass muster.

25 I don't have to address all the accusations in Mr.

Speckin's declaration of course.  If there's anything that

Your Honor is particularly, you know, worried about of the

three things that are in the original, I'm happy to discuss

them.  But the motion, Your Honor, is improper, it asks for

extraordinary, extraordinary relief.

In a regular case, if a defense lawyer hired by an

insurance company or anybody else suspects that a complaint

filed and signed, by the way, by an attorney is unworthy of

Rule 11, you don't -- the relief is not to depose that

lawyer.  The relief is to take discovery in the case and let

the case follow its course, unless there are other purposes

here behind the motion.  Is it an attempt to run out the

clock?  Is it an attempt to disturb the debtors' hoped-for

plan confirmation?  I don't know, but if that's the design,

this is probably a decent way to go about it because, if

we're going to go through discovery of lawyers, the

privilege, the work product, the scope questions, we're going

to be back in front of Your Honor quite a lot and I don't

think that's lost on the insurers.

So, unless Your Honor has any questions, I've

talked more than I intended to.  Thanks very much.

THE COURT:  Thank you.

Mr. Hogan?

MR. HOGAN:  Thank you, Your Honor.  Good

afternoon, Daniel Hogan of Hogan McDaniel on behalf of

1  Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.

2          Your Honor, I don't stand to repeat most of what

3  you've heard today because you've heard a lot.  I would and

4  always like to focus on the big picture here, Your Honor, and

5  I really hope that the Court doesn't lose sight of the fact

6  that this case and where this case is, this 2004 discovery is

7  largely premature and specious, at best.  The Eisenberg firm

8  has been subject to discovery as a product of these motions,

9  Your Honor, I'm not sure you're aware of that, but we were

10 served with discovery requests, interrogatories, requests for

11 production and requests for admissions relative to these

12 motions and, as a product of that, we have answered some of

13 the questions that the insurance companies are looking for

14 from these other firms.  And I can tell you unequivocally

15 that Eisenberg has denied each of the allegations that were

16 brought forth in the requests for admissions and these

17 requests for admissions largely mirror the requests that

18 they're looking for in this 2004 motion.  And so it was a

19 little strange for us, honestly, to have to answer discovery

20 about relief that they were requesting in the motion that the

21 discovery was predicated upon.

22          Nevertheless, we responded to the requests for

23 admission, Your Honor, and we denied each of the allegations.

24 Allegations such as whether signatures were photocopied and

25 affixed to claim forms, whether we used -- whether we

submitted claim forms without the claim form having been
completed, whether AIS counsel did not individually
investigate the factual contentions in each claim form,
whether AIS counsel did not individually review each claim
form that bears the signature.

And so from our perspective, Your Honor, this
entire process is somewhat backwards, and it's our
perspective that this discovery is inappropriate,
particularly at this juncture.  The Eisenberg firm had a
significant vetting process that it undertook with regard to
each proof of claim that was filed.  In fact --

MR. SCHIAVONI:  Objection.  There's no evidence in
on this issue.

THE COURT:  It's argument.  Go ahead, Mr. Hogan.

MR. HOGAN:  Thank you, Your Honor.

In fact, there is -- there's a number of proofs of
claims, in excess of 1500 proofs of claims that have been
amended post bar date by the Eisenberg firm to in fact
replace the signatures of the individual lawyers who reviewed
those proofs of claim with the signatures of the claimant,
and I think that speaks to the nature of the vetting and also
to the nature of the bar date and the fact that these claims
were filed at the last moment largely because that's how
deadlines work, Your Honor.

With relation to the tweets, Your Honor, the

1  tweets really are a sideshow.  The tweets were made by Mr.

2  Kosnoff, the tweets weren't made by Abused in Scouting, they

3  weren't re-tweeted by Abused in Scouting, they weren't re-

4  tweeted by the Eisenberg law firm.  They are just merely a

5  sideshow; they're a predicate upon which the insurance

6  companies are seeking to have this Court inject itself into

7  these proofs of claims unnecessarily.

8          And so from our perspective, Your Honor, these

9  motions are inappropriate and should be denied.

10          Do you have any questions for me, Your Honor?

11          THE COURT:  Thank you.

12          Any other objectors?  I think that was the end of

13  the lineup, but I'd like to hear from anyone else.

14          MR. THOMAS:  Your Honor, this is John Thomas from

15  Houston, Texas, representing the Junell & Associates firm.

16          THE COURT:  Mr. Thomas.

17          MR. THOMAS:  Yes, Your Honor.  My apologies for

18  not being on camera today.  In Houston, we're largely without

19  power and all without water, so my apologies.  I will be

20  brief.

21          I want to respond specifically because Counsel

22  addressed Junell & Associates in its comments, and I got the

23  distinct impression that Counsel was trying to suggest that

24  there was some funny busy or fraud going on in the

25  communications with clients regarding opt-outs.  The

1  communication that Counsel was referring to is contained at

2  Exhibit 1 to the Kirschenbaum document contained in their

3  2004 motions.  That communication is one that was done by

4  email and text at the end of a lengthy process to evaluate

5  and file claims on behalf of numerous claimants in this case.

6  And I'll direct the Court's attention -- unfortunately, I

7  can't share my screen, Your Honor, but in that communication,

8  which was sent to clients, paragraph 1 states that "Our

9  firm," which is Junell & Associates, "has a signed contract

10  with you to participate in the BSA litigation and, as your

11  attorneys, we are obligated to act as fiduciaries on your

12  behalf in this matter."

13         It goes on to say that the power-of-contract form

14  with our firm that you signed is an obligation that we take

15  extremely seriously with respect to both professional

16  responsibility and the law, and we aim to make certain that

17  all of our BSA clients meet the November 16th deadline.

18         Your Honor, this communication was done three days

19  before the deadline to clients who had not signed their

20  forms, and it reflected the communication with regard to

21  putting the clients on notice that time was running out and

22  that we can complete the claim form with the information you

23  provided over the phone during your first consultation with

24  us about the litigation.  And we advised clients -- Junell &

25  Associates advised clients that, unless they told us not to,

we were going to go forward and do the job that we were

hired, which is to file a claim.

And, Your Honor, the claim form, which was a

process of negotiation and vetting with the Court, contained

a statement that "I have examined the information in the

Sexual Abuse Survivor proof of claim and have a reasonable

belief that the information is true and correct," and this

Court permitted attorneys to make that representation, if

needed, on behalf of its clients who it provided the

information that was used to fill out this 12-page, multi-

question claim form.

And, Your Honor, I was not at the October 14th

hearing, but I do recall Your Honor making a comment with

regard to why would I believe that the attorneys did not do

their job?  Your Honor, we did not put into the record the

specific discovery that was requested by the insurers in

response to this motion because there is nothing that they

have to suggest that my clients, Junell & Associates, didn't

discharge their duties and their ethical obligations to the

client and to this Court in filing the claim forms that

they've submitted to the Court.

And, Your Honor, I don't have the statistics handy

at this time and can sure provide them, but there are

numerous claim forms that have been submitted post bar date

with the clients' signatures.

1          And so, Your Honor, we do object to the discovery

2     for the reasons stated previously and for the reasons stated

3     in my comments.  I simply wanted to address Counsel's

4     comments because it suggested some kind of funny business or

5     fraud in connection with these claims submitted by Junell &

6     Associates.

7          Thank you.

8          THE COURT:  Very well.

9          MR. SULLIVAN:  Your Honor, I think you said me,

10    but I didn't hear, is that right?

11         THE COURT:  I didn't hear anyone.  Who is

12    speaking?

13         MR. SULLIVAN:  Oh, I'm sorry, Bill Sullivan.

14         THE COURT:  Mr. Sullivan.

15         MR. SULLIVAN:  Your Honor, for the record, Bill

16    Sullivan on behalf of Mark Bern and Partners.

17         Your Honor, from our perspective, the focus on the

18    colloquy that Your Honor had last October is a discussion in

19    the abstract.  At best, it may have been a warning for

20    counsel not to substitute convenience for best practices, but

21    I don't read it to be an invitation to demand discovery if an

22    attorney signs a claim form, which is a permitted practice.

23    And I think we can leave that behind because now we also have

24    the benefit of hindsight.

25         The principal point I'd like to make, Your Honor,

1  is that the broad-brush approach here is not appropriate to

2  meet the for cause standard that applies to the Rule 2004

3  examination that they're requesting.  The insurers' requested

4  discovery doesn't go to all of the claims signed by

5  attorneys, it doesn't go to all of the attorneys who signed

6  claims, it appears and based on the Hinton testimony that

7  it's only directed at attorneys who signed claims at or near

8  the bar date.  And I think that shows that it's really the

9  spike of activity near the bar date that is the insurers'

10 concern, but I don't think that's an unexpected occurrence.

11 It may have been that because the bar date process was

12 extended in this case that people thought it would be

13 otherwise, but human nature is what it is and attorneys

14 respond to deadlines, and they also try to get their clients

15 to do the same.

16          Your Honor, the reality is is that a signature on

17 the proof of claim is the last act before it's filed.  And so

18 whether it's signed by an attorney or not or whether it was

19 filed two days before the bar date or two months before the

20 bar date, none of that is proof of a lack of vetting of the

21 proof of claim.  I think Mr. Robbins' questions of Mr. Hinton

22 brought that out.  And so the discovery that is being sought

23 on a broad basis from a large number of law firms isn't

24 really appropriately targeted and there isn't cause for Your

25 Honor to grant it.

1          Your Honor, I think the parties recognize that

2   Rule 11 applies to proofs of claim; I don't think any party

3   has disputed that.

4          Your Honor, with respect to attorney discovery, we

5   also pointed out that the Shelton rule applies and that, you

6   know, in order to get it, there are three standards that

7   should be met, and that is no other means exist to obtain it,

8   the information that's sought is relevant and not privileged,

9   and the information is crucial to the preparation of the

10  case.  I don't think that standard has been met either.

11         Your Honor, we referred to a Law Journal article

12  by Young and Hefter (ph) from 2014 in our response, but --

13  and I think it echoes your comments about the Obasi case --

14  and that is Rule 11 does -- Rule 9011 does apply to proofs of

15  claim, but the signing of a proof of claim by an attorney

16  does not and should not automatically turn the attorney into

17  a fact witness.

18         And, Your Honor, respectfully, the grounds to

19  obtain this discovery have not been met and we ask that Your

20  Honor overrule the motion.

21              THE COURT:  Thank you.

22              Is there anyone else?

23              MR. HARRIS:  Your Honor, Jim Harris with the James

24  Harris Law Firm.  Can you hear me okay?  Your Honor, can you

25  hear me?

 1          THE COURT:  Yes, I can --

 2          MR. HARRIS:  Okay.

 3          THE COURT:  -- and go ahead.

 4          MR. HARRIS:  All right.  Thank you, Your Honor.

 5          The general points that have been made so far, I

 6   won't go over those again, they've been made and I would join

 7   in them.  I would just say, with respect to each individual

 8   attorney that's been targeted here, I ask the Court to just

 9   make sure that they've met their heavy burden with respect to

10   each attorney.  There's been a general tendency to try to

11   paint everyone with the same brush.  In the case of my law

12   firm, I don't believe that they've met their burden.  They've

13   not shown good cause.

14          It seems that their complaint is with the number

15   of claim forms that were signed by myself and I don't think

16   that's probative, it's just -- it's part of this innuendo

17   that there must be some sort of fraud going on.  And my

18   understanding is the rule allowed attorneys to sign, Your

19   Honor allowed attorneys to sign, and so the number of times

20   that a lawyer did what you said they could do and what the

21   rules say they could do can't be probative.  It's not

22   evidence of fraud; it's just evidence that they're following

23   the rules and they're following your order and doing what you

24   allowed them to do.

25          So I think they need to show something more

1  because they start rummaging through clients' files and

2  privileged materials and, in my case, I don't think they've

3  met that burden.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. PICKENS:  Your Honor, this is Joe Pickens,

7  Taft, Stettinius & Hollister on behalf of Babin Law.

8          I'll be brief.  We agree with and we echo the

9  arguments that were made by Mr. Goodman and Mr. Robbins and

10 the other objectors, I won't rehash those here, and we have

11 nothing more to add.  Thank you.

12         THE COURT:  Thank you.  Anyone else?

13    (No verbal response)

14         THE COURT:  Okay, I hear no one else.  Mr.

15 Schiavoni?

16         MR. BUSTAMANTE:  Your Honor, Brett Bustamante on

17 behalf of Napoli Law.

18         THE COURT:  Yes --

19         MR. BUSTAMANTE:  Can you hear me?

20         THE COURT:  -- Mr. Bustamante.

21         MR. BUSTAMANTE:  Again, we'd like to join in the

22 concerns of our colleagues.  We believe there's no good cause

23 for discovery, specifically from Napoli.  Just a couple of

24 points that I'll try and keep as brief as possible for Your

25 Honor.

1       First, there's been no attempt to meet and confer

2  specifically with me.  I appeared before this Court three

3  times and I'm counsel of record on every case.  So, you know,

4  the fact that they haven't met and conferred with me on the

5  motion kind of shows that it's more about harassing our law

6  firm than it is about actually solving issues in the

7  litigation.

8       And to that point, if they honestly believed there

9  were deficiencies of any kind, why not give us a list of some

10  kind?  Why not tell us what those deficiencies are?

11       Just first to very quickly deal with the

12  conspiracy theory.  Napoli has been lumped in with other law

13  firms.  Obviously, we don't think any of those law firms have

14  done anything wrong either.  But just very quickly, the

15  insurers have not established any evidence that we have any

16  connection to Tim Kosnoff, which we don't, there's no

17  evidence that we coordinated any of our filings or advertised

18  any with other members of the coalition.

19       They also make the claim that we used claim

20  aggregators to file cases and they pushed this point in their

21  reply.  They claimed that they have evidence that -- some

22  type of forensic evidence that we used claim aggregators to

23  actually file claims, and they cite to paragraph 18 and 19 of

24  the Speckin declaration.  If you look at that citation, that

25  simply doesn't refer to Napoli.  So the citation is a

misrepresentation on their part.  And, again, there's just no
outright fraud on behalf of Napoli.

As far as the one other argument I wanted to bring
to the Court's attention, they initially claimed in their
opening motion that we filed 1700 cases and a large amount of
them had no attorney signature and -- or had an attorney's
signature and were largely blank.  This was a direct and very
intentional misrepresentation.  It omitted the fact that
there were amendments made by Napoli.  Our opposition pointed
out that we only have 1300 cases, about 1300 cases, so we
can't possibly have 1700 cases on file, there has to be a
large amount of amendments there.

In their reply, the insurers capitulate to that to
some extent.  They claim that there's 93 amendments that we
did, we claim there are far more.  Just for Your Honor I
could represent that we mark 690 cases to be amended, we
believe that we've amended 391 of them and we have 299 left,
which we intend to do that and we are doing so through even
today.

Regardless, their capitulation shows that there's
essentially no fraud taking place by the Napoli firm.  If
we're able to amend the cases and they now bear an
attorney/client signature, regardless of their number or not,
there simply can't be fraud unless we've made up the names of
the claimants as well and their signatures as well, which I

 1  think would be a very bold claim and I don't think the

 2  insurers have made that claim.

 3          And just to very quickly address -- if Your Honor

 4  has any questions, I don't want to cut you off.  I'm sorry.

 5          To address some of the other arguments, there was

 6  an argument made about fonts, that certain claim forms have

 7  different fonts on the signature page.  Just in dealing with

 8  the clients myself, I know that sending out a proof of claim

 9  and getting it back, they sometimes sign it independently of

10  us filling -- of completing it over the phone with them or

11  they may use a different software program when signing the

12  proof of claim.  So that certainly is no evidence of fraud in

13  itself.

14          There was a point made about sharing contingency

15  fees.  I think that largely got glossed over, but I can

16  assure you our law firm, but certainly any law firm that

17  works with contingency fees is not sharing those contingency

18  fees, it's an illegal practice.

19          And I echo the concerns brought up before about

20  evidence, you know, it's not our burden to show that we are

21  not part of some made-up fraud.

22          And then just finally, Mr. Schiavoni addressed the

23  issue of naming Joseph Napoli, our senior partner's father,

24  in their briefing.  He claims now that it's a typo, but in

25  their papers they again said Mr. Napoli also (indiscernible)

the insurers, they're accusing his father, Joseph Napoli, of
impropriety, but the insurers do not mention Joseph Napoli
anywhere in their brief.  So the accusation is hard to
understand.

Mr. Schiavoni's name is on the signature block of
that briefing.  So, technically, he's the only person who
signed it and violated Rule 9011 so far.

With that, if Your Honor has any questions?

THE COURT:  Thank you.

MR. BUSTAMANTE:  Thank you.

THE COURT:  Anyone else?

MS. LEVICK:  Hi, this is Stephanie Levick on
behalf of D. Miller and Associates.  I just want to echo and
join in all the arguments made by Mr. Goodman and our other
colleagues, which I won't repeat given that it's already
6:30.

I just wanted to add that we don't believe that
the insurers have demonstrated good cause to take discovery,
specifically from our client, D. Miller, and note only that
the insurers' papers make no specific allegations regarding
D. Miller beyond their argument that somehow the volume of
attorney-signed claim forms or forms submitted close to the
bar date are somehow inherently suspicious.

That's all I had.  Thank you.

THE COURT:  Thank you.

1        Anyone else?

2     (No verbal response)

3          THE COURT:  Mr. Schiavoni?

4          MR. SCHIAVONI:  The reason why, Your Honor, I feel

5   a little like Custer going to Little Big Horn by myself, but

6   sometimes, you know, just one man in the wilderness is right

7   and, this one, we're right on; this is not a close call.

8          The arguments you've heard, almost all of them are

9   straw man arguments.  This is not a motion to seek discovery

10  for sanctions.  I don't know how anyone could perceive that

11  somehow that would be in our advantage.  This is a motion to

12  seek discovery in furtherance of what 502 objections should

13  be filed.  We were explicit about it.  The two motions that

14  we filed are both unified, they are both tied to the omnibus

15  objection motion.  We've made that very, very clear.  I

16  understand why there's concern here about sanctions by some

17  of these folks, but that is not what we're seeking discovery

18  about.

19         Two, this is not a motion where we have the

20  obligation to prove fraud, nor is it even really an element

21  of the motion that we have to show fraud or that we are

22  showing fraud, or whatnot.  We've made a specific showing

23  here through the evidence that was uncontested, the exhibits

24  that are in, the forensic document examiner declaration

25  that's in that none of these folks really wanted to talk

1 about, but the illustration of that is almost best made by

2 you heard from Mr. Krause's lawyer -- I forget his name, he's

3 a very eloquent fellow -- but here's what's in the

4 declaration and in the brief, and the brief is all summed up

5 on page 13 and tied to the declarations, but Adam Krause

6 signed -- or his signature is affixed to 890 proofs of claim

7 in one day, overall it's affixed to 2500 proofs of claim.

8 Assuming an eight-hour day, you know, we say this in our

9 papers, he'd have to be affixing it every 32 seconds to get

10 that 890 that day.

11 But what's important about it -- and this is

12 what's been missed in all the arguments you've heard -- is

13 they've all sort of selected out individual pieces and not

14 tied them together, but they're tied together in the moving

15 brief and they're tied together in the declarations, and that

16 is we went a step further. It's not just that 890 proofs of

17 claim went in one day and that carries with it some real

18 oddities about what was happening, they got -- the forensic

19 document examiner got into those individual documents and

20 what he found inside of them was he found that the signature

21 was -- that this affixed signature was pasted as part of a

22 PDF image onto the proofs of claim of over 1900 proofs of

23 claim.

24 What else did he find? And it's in his

25 declaration, you know, paragraph 18, he found that those were

1  all submitted by this firm Verus.

2         What was the other thing that we put in as

3  evidence that ties this together?  We put in -- and it's

4  cited and quoted on page 13 -- we put in in the Kirkland

5  declaration, Exhibits 2 and 3, we put in documents that we

6  got from Verus.  Verus actually couched what they're doing on

7  the Boy Scouts and this is what they say:  "Verus will be

8  handling the complete process of the proofs of claim forms,

9  as well as the actual submission of the claims to the Chapter

10  11 proof of claims submission."  The complete process.  Even

11  when 90 signatures get imaged, they get given to a third

12  party aggregator, they get affixed to 1900 proofs of claim,

13  and they all get submitted.

14         You know, we don't have a videotape of Mr. Krause,

15  what he was doing in the weeks before, but there's enough

16  evidence there to warrant the discovery we've asked for

17  because what it indicates is that these proofs of claim were

18  done exactly what Verus says, that they will be handling the

19  complete process of the proofs of claim.

20         And we heard, we heard Mr. Krause's lawyer get up

21  -- and I'm going to be clear, Mr. Krause's lawyer sounded to

22  me like a very eloquent fellow, I don't know, and I 100

23  percent believe that he believed everything he said because

24  he did condition it saying this isn't his area of practice,

25  okay?  But he actually got up and said we don't use Verus,

despite the fact that that's the evidence, that's the

evidence here.  There's not an affidavit from Krause denying

this, there's no -- none of the evidence submitted on it was

contested.  Mr. Kosnoff, the linkup is the same.

You don't even have to take Mr. Speckin's reply

declaration, who was replying just to the submission that Mr.

Kosnoff made.  In Mr. Kosnoff's own opposition papers he

says, well, like somehow if we weren't -- we weren't using --

and this is in his surreply -- we weren't using these other

aggregators, we somehow used reciprocity.  Well, if you try

to go on the website for reciprocity, it's an aggregator.

It's owned by Mr. Van Arsdale.  I think he refers to that

actually in his reply paper.

And, okay, we didn't put on the reply declaration

of Mr. Speckin because -- like all the hoot and hollering

about somehow that's -- you know, it would be ambushing the

poor Mr. Kosnoff, but my goodness, we'd have to be ostriches

with our heads in the sand not to know that what's in there

is actually evidence that Mr. Kosnoff is using reciprocity to

submit his claims and that's -- which is something he's

admitted himself, and they're the ones -- it's a call center,

it's a call center, it's not a marketing firm, they're the

ones who actually spoke to the people.  How do we know that?

Mr. Kosnoff is a solo practitioner, how on earth could he

generate these numbers?  And we can go through each one of

these.

To hear Mr. Napoli get up and now Mr. Napoli is suggesting maybe sanctions are appropriate against me. To be clear, in this motion, in the motion about the claimants' signatures, we do not refer to his father. Apparently, in the motion that Mr. Ruggeri argued, it may be they have the name wrong, in which case -- and I acknowledge my name is on that, in which case I acknowledge it's a typo and it shouldn't have been there. Okay? So no insult intended to Mr. Napoli's father. But the reality is what matches, the Napoli firm submitted hundreds of claims that were blank that just had S slashes on them.

You can't fathom how any of this is even close to consistent with what the statutory scheme envisioned with regard to the importance of having a lawyer vet the claims. You know, not somebody who the week before was working at a pizza delivery company and for 15 bucks an hour is on the call center phone, filling out proofs of claim and maybe getting a bonus to submit them for it. It's like, no, an actual member of the bar actually sitting down with people and making sure that the claims were -- are in fact should be submitted.

And that gets to another point. I want to answer Your Honor's question about the Hinton declaration. It gets to what is really off the rails about this kind of case.

1  Your Honor, you easily could miss the big picture by sort of

2  focusing on is the proof of claim, are the 15 questions

3  perfectly filled out?  This type of mass tort is very

4  different from some of these other latent injury one, at

5  least like in the asbestos or some of these others, talc, but

6  fundamentally the claims turn on some very objective

7  evidence.  You've heard some of it in Imerys.  Do you have

8  ovarian cancer?  Do you have lung cancer?  Do you have

9  another cancer?  At the end of day there's to be debate about

10 like what proof they've done on that, but there's some tie-

11 down on what the proof is.  These kind of claims are very

12 different.

13        You did hear from a gentleman who I give great

14 credit to from Massachusetts who said he's got attached to

15 his declaration, it's in his proof of claim, 15 or 20 pages

16 of exhibits.  I have not seen a single proof of claim like

17 that.  I'm happy to sit down with him and his proof of claim

18 and try to resolve that with Mr. Ruggeri, but that, my

19 goodness, is the absolute oddity here.  It's like here all

20 you've got to do is answer the 15 questions.  And the

21 suggestion that perfectly filling out the 15 questions leads

22 to like, okay, pay $2 million is absolutely not how any of

23 these claims are normally handled in any way because the

24 credibility of the claimant and the collaboration that one

25 can get through a sworn exchange with the claimant is

1  absolutely critical to verifying the claims.  To simply hand

2  them out and say, did you fill in the questions perfectly,

3  you know, it's like that's -- that doesn't get there.  It's

4  like that's almost as much of the problem as anything else.

5          So the notion that they're perfectly filled out --

6          THE COURT:  How does that relate to what you're

7  looking for here?  You're really arguing then that there

8  needs to be a different focus -- and I haven't even seen a

9  focus yet -- on who a trustee might be, what the trust

10  distribution procedures might look like, what will be

11  acceptable documentation to support a claim, isn't that

12  really what you're getting to with this?

13          MR. SCHIAVONI:  So, admittedly, Judge, you are

14  sort of reaching forward -- and maybe I am a little bit too,

15  because you will hear argument from us about that at some

16  point perhaps because that is an issue, that's a problem

17  here, okay?  But to suggest that the purpose of today -- and

18  I want to come back to answering a Hinton question and also

19  like dealing directly with how this would be helpful, this

20  discovery -- it's like to suggest that like, well, like maybe

21  if they're perfectly filled out, everything is, you know,

22  copacetic, it's not really the case.  That's not really the

23  situation because think what we have, think what we have.  We

24  have a non-member of the bar hired by a for-profit company

25  called Verus saying we will be handling the complete process,

the complete process.  Okay?  It's like they could be trained

to perfectly, you know, fill out the form, but it's like we

need to know that to know how to -- how to -- in essence,

where there are problems here and where there aren't.

The discovery we've sought, it is specific.  It's

like we would like to speak to -- and some of these folks

like Mr. Krause who submitted hundreds and hundreds of claims

on a given day and who are linked to what appear to be just

giving it to Verus and we would like the subpoena to Verus to

show how -- what was the process here that generated these

things.  Because I think 9011 and I think the statutory

system, like the scheme was intended that, as members of the

bar, we're kind of bound by ethics rules and procedures about

how we would go about preparing a proof of claim and how we

would vet someone when they come in the door, not even go

into someone who's a for-profit entity.  It's like it's a

totally different, Wild West entity.  It's like we ought to

know what proofs of claim come out of there and the process

for -- and if we're all wrong about it, so be it, but letting

us have some discovery on this when there's this kind of

evidence, it's like I think this is the kind of thing that

actually really would concern the circuit if they see 96,000

claims coming down valued at millions of dollars, every one

of them, it's like it's a process off the rails to not let us

even look under the hood and see what is going on with these

1  folks.

2         And, again, you know, I picked Krause out.  I

3  could go on through each one of these.  I'd ask you to look

4  at the Speckin declaration.  And, yes, the proof is sort of

5  different for each one of them and for some it's not as

6  complete as the others, but it's there and it's linked

7  together about how these entities were involved and how they

8  were generating claims.  And the importance of it, yes, is

9  9011 was a substantive protection.

10         And the discovery we want, it's not to sanction

11  people, that's not the point.  The point is what is the scope

12  and extent of this?  And where were these claims emanating

13  from and what commonality could we then draw from them, so we

14  could make some assessment about what to deal with the proofs

15  of claim objections as a general matter and how to deal with

16  the claims.  And that's a very valid point in using 2004.

17         I disagree about the case law and somehow this is

18  the first time ever that 2004 has been used to look at the

19  process of proofs of claim being produced.  But you know

20  what?  If they want to say it's the first time, tell me

21  another case, another case in this district where somebody

22  submitted 890 proofs of claim, they signed them, and then

23  their signature turned out to be affixed to a PDF coming from

24  a third party entity.  It's like there's a first time for

25  everything and this might be it, if that's really the view,

1  but it's like that -- you know, that is really a process

2  that's off the rails and it's something that merits some

3  targeted discovery.

4         And, you know, what we've asked for here is not --

5  you know, it's not really that much.  Okay?  And the notion

6  that, you know, these folks saying, oh, yeah, it's like, you

7  know, we didn't do anything, they're not really 100-percent

8  upfront about the evidence that's out there.  There's a

9  reason why they didn't put declarations in, they can't.  It's

10  like a lot of what we've heard is utterly inconsistent with

11  what's actually happened.

12        And, you know, I'd just like to wrap up on two

13  points.  Your Honor, I went back and I looked at the Riviera

14  case -- I don't know if I've pronounced it right -- Rivera

15  case -- and it's worth a read what the court there said about

16  the use of, you know, pre-signed certifications in that case

17  and they were used, they were being attached to stay motions.

18  And what the Riviera court that this District of New Jersey

19  talks about is that, quote, "no reasonable attorney would

20  consider" -- and then a, you know, bracket -- "forms with

21  pre-signed signatures to be certifications, nor would any

22  reasonable lawyer engage in the practice of using un-signed

23  signature forms."

24        The case goes on and on about the judge talking

25  about the practice is in violation of 9011 because writings

were presented for, you know, an improper purpose. They had
the court believe that they were certifications. Moreover,
the threshold factual contention in each one of these
submissions was that the signatory read and signed is flatly
untrue. That's the situation here.

But we're not seeking this discovery to sanction
these people. Okay? You know, it's sort of a distraction to
what's really important to us and that is how big a problem
is this. Because, yes, we thought and I think the Court
thought when it was getting the signatures on it that it was
getting someone verifying that they read this and they
thought about it before they submitted it. It's one of the
reasons, by the way, in the tort system that we ended up in
the filing with 275 claims because the lawyers had to make
actual, real decisions before they took on claims. They
weren't having a third party just saying, well, you know, for
every one of these we will fill out, we're going to sell it
to you for X dollar amount and you're going to be able to
then turn around and turn it for another dollar amount. It's
a totally different process.

But, you know, Judge, a point I'll end on is the
one other quote from the hearing, you know, on October 14th
that you told the parties -- and, again, you're obviously
free to rule any way you want about this, I'm not quoting you
-- I'm not quoting back to you -- but what you warned the

1 parties was, quote, "Think long and hard before you sign a

2 proof of claim form because you may become a witness."

3      These folks were definitely, like they were

4 warned, but they -- you know, they went ahead and did it

5 anyway. Asking Mr. Krause to sit for a deposition to

6 explain, you know, what happened here is just -- it would be

7 very productive and it would not lead to a huge distraction.

8      Thank you, Your Honor.

9      THE COURT: Thank you. Okay.

10      MR. SCHIAVONI: Oh, I did -- if you want to hear

11 about Hinton, I'm sorry to miss that, but I'm happy to answer

12 that question. Hold on, let me just --

13      THE COURT: You did answer the question. If I

14 eliminate the abuser last name column from Table 2, does it

15 look that bad?

16      MR. SCHIAVONI: Okay. So, Judge, first of all, if

17 you set aside the missing abuser last name, there's still

18 tens of thousands of proofs of claim among the 66,000 that

19 were submitted by these high-volume-signing firms with other

20 infirmities that are flagged by Mr. Hinton in Tables 2 and 3.

21 So just simply sort of putting that aside, it doesn't really

22 -- it's like there's still a very significant issue with the

23 other things made in Tables 2 and 3.

24      The other point is that like I've got it that some

25 victims may not remember their abuser's name, we're not

1 saying otherwise. It's like that easily -- that could

2 happen. Okay? But what we're saying is to have almost 60

3 percent of the proofs of claim in this kind of case missing

4 that kind of information, it is noteworthy, it is something,

5 it is noteworthy and it does go into the analysis here.

6 　　　　　THE COURT: Doesn't it matter if the rest of the

7 proof of claim form is very specific? It has a troop number,

8 it has a date, it has -- so that you could figure it out by

9 the first name?

10 　　　　　MR. SCHIAVONI: Again, Judge, in any one case

11 that's -- I hear you, I completely hear that, you know, but

12 in this large -- it's the overall percentage of it in the

13 context of this kind of matter. Okay? Where there's -- like

14 the allegation is long-term grooming, et cetera.

15 　　　　　And, look, I already can hear it, so, you know,

16 the objectors need not put on an argument about it. I can

17 tell you they'll say, oh, well, there's a million

18 psychologists who could explain it away in any one case, and

19 that may be the case, but the overall number is significant,

20 60 percent.

21 　　　　　THE COURT: Okay. This is the flipside, these

22 deficiencies are the flipside of what you just postulated

23 that you could hire a whole bunch of people who know how to

24 fill out the form perfectly even though there are no valid

25 claims. So this is sort of the flipside of that. Either

1  they fill it out perfectly or there are deficiencies.

2         MR. SCHIAVONI:  Judge, that's -- look, I hear you

3  on that and actually (indiscernible) and I have sort of

4  looked at both.  It's like one set of ones to look at were

5  almost the ones that -- and, by the way, like I think they

6  were the ones, some of the ones that HUD pulled, they were

7  the ones, they were absolutely perfect, and that's -- they

8  drew a lot of -- a lot of those turned out to be problematic

9  for reasons -- for reasons that we will put on at some point,

10  but they pulled a small sample of those and, yeah, it's like

11  it was the oddity of sort of the perfect submission.

12         THE COURT:  They're too good, they're too good --

13         MR. SCHIAVONI:  Too good.

14         THE COURT:  -- they can't be right.

15         MR. SCHIAVONI:  But, Judge, here's the thing.

16  We're not here today to prove fraud.  I have -- and to be

17  100-percent clear, we haven't accused anybody of fraud.

18  Hartford and Century have tried to be careful, cautious;

19  we've tried to come up with a process that gives us a good

20  faith basis to look at this.  Okay?

21         And no one has -- look, I will be the first to say

22  that I think it was wrong for -- it's wrong to the extent a

23  lawyer photocopied a signature and attached it, I don't take

24  it you've just excused that, but it's -- but we haven't

25  accused any claimant of fraud, we haven't accused any lawyer

1  of fraud at this point.  We're looking to try to identify and

2  get a handle on these claims and this is -- what we've come

3  up with is a legitimate, good faith effort to try to do that

4  and, you know, without objecting to every single claim, it's

5  a good faith effort to try to address the issue.

6            THE COURT:  Thank you.

7            Okay, it's 7 o'clock.  I don't know what else is

8  on the agenda.  I don't recall, other than the Rule 2019

9  motion, which we're not going to get to tonight.  Is there

10 anything else that I have to address tonight?

11            MR. ABBOTT:  Your Honor, it's Derek Abbott.  There

12 were a handful of sealing motions, as well as a motion

13 requesting the ability to file a surreply, but the 2019 is

14 the only thing -- and there's a motion to strike by Mr.

15 Kosnoff, but I would suggest, Your Honor, that the 2019 is

16 the only other thing of real substance or import tonight that

17 remain on the agenda.

18            THE COURT:  Okay.  We'll find a time for that -- I

19 don't know when that will be, but we'll find a time for that

20 and I'll take these matters under advisement.

21            Thank you.

22            COUNSEL:  Thank you, Your Honor.

23            THE COURT:  Thanks for the day, guys, and I will

24 be -- and we're adjourned.

25            COUNSEL:  Thank you, Your Honor.

1          (Proceedings adjourned at 6:59 p.m.)

2

3

4                          CERTIFICATE

5

6          I certify that the foregoing is a correct transcript

7    from the electronic sound recording of the proceedings in the

8    above-entitled matter.

9
     /s/Mary Zajaczkowski              February 19, 2021
10   Mary Zajaczkowski, CET**D-531

11
     /s/William J. Garling             February 19, 2021
12   William J. Garling, CE/T 543

13
     /s/ Tracey Williams               February 19, 2021
14
     Tracey Williams, CET-914
15

16

17

18

19

20

21

22

23

24

25

```
 1                UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
 2
                                     .   Chapter 11
 3   IN RE:                          .
                                     .   Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA and       .
     DELAWARE BSA, LLC,              .
 5                                   .
                                     .
 6   _____Debtors._____        .
     BOY SCOUTS OF AMERICA,          .   Adv. Pro. No. 20-50527
 7                                   .
                     Plaintiff,      .
 8                                   .
          v.                         .   Courtroom No. 2
 9                                   .   824 Market Street
     A.A., et al.,                   .   Wilmington, Delaware 19801
10                                   .
                     Defendants.     .   March 17, 2021
11   . . . . . . . . . . . . . . . . .   9:00 A.M.

12            TRANSCRIPT OF TELEPHONIC OMNIBUS HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
13                 UNITED STATES BANKRUPTCY JUDGE

14   APPEARANCES:

15   For the Debtor:         Derek C. Abbott, Esquire
                             Andrew R. Remming, Esquire
16                           Eric W. Moats, Esquire
                             Paige N. Topper, Esquire
17                           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                             1201 North Market Street, 16th Floor
18                           Wilmington, Delaware 19899

19                           - and -

20
                             Jessica C. Lauria, Esquire
21                           WHITE & CASE LLP
                             1221 Avenue of the Americas
22                           New York, New York 10020

23

24   Audio Operator:        Brandon J. McCarthy

25
```

**A0272**

1  Transcription Company:    Reliable
                            1007 N. Orange Street
2                           Wilmington, Delaware 19801
                            (302)654-8080
3                           Email:  gmatthews@reliable-co.com

4  Proceedings recorded by electronic sound recording; transcript
5  produced by transcription service.

6

7  TELEPHONIC APPEARANCES (Continued):

8  For the Debtors:         Michael C. Andolina, Esquire
                            Matthew E. Linder, Esquire
9                           Laura E. Baccash, Esquire
                            Blair M. Warner, Esquire
10                          WHITE & CASE LLP
                            111 South Wacker Drive
11                          Chicago, Illinois 60606

12 For Century Indemnity:   Tancred Schiavoni, Esquire
                            Brad Elias, Esquire
13                          O'MELVENY
                            7 Times Square
14                          New York, New York 10036

15
   For Tort Claimants:      James Stang, Esquire
16                          PACHULSKI STANG ZIEHL JONES LLP
                            919 North Market Street, 17th Floor
17                          Wilmington, Delaware 19801

18 For Hartford Financial:  Philip Anker, Esquire
                            WILMERHALE
19                          250 Greenwich Street
                            New York, New York 10007
20

21 For Andrews Thornton:    Lawrence Robbins, Esquire
                            ROBBINS RUSSELL ENGLERT ORSECK
22                            UNTEREINER SAUBER LLP
                            2000 K Street NW, 4th Floor
23                          Washington, DC 20006

24

25

```
1   TELEPHONIC APPEARANCES (Continued):

2   For the Ad Hoc           Richard Mason, Esquire
    Committee of Local       Joseph Celentino, Esquire
3   Councils:                WACHTELL, LIPTON, ROSEN & KATZ
                             51 West 52nd Street
4                            New York, New York 10019

5
    For the Committee of     Rachel Ringer, Esquire
6   Unsecured Creditors:     KRAMER LEVIN NAFTALIS& FRANKEL LLP
                             1177 Avenue of the Americas
7                            New York, New York 10036

8   For the FCR:             Edwin Harron, Esquire
                             YOUNG CONAWAY STARGATT & TAYLOR LLP
9                            1000 N West Street
                             Wilmington, Delaware 19801
10
    For the U.S. Trustee:    David Buchbinder, Esquire
11                           UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
12                           844 King Street, Suite 2207
                             Lockbox 35
13                           Wilmington, Delaware 19801

14
    For the Coalition of     David Molton, Esquire
15  Abused Scouts for        BROWN RUDNICK LLP
    Justice:                 7 Times Square
16                           New York, New York 10036

17
    For Abuse Survivors:     Michael Pfau, Esquire
18                           PFAU COCHRAN VERTETIS AMALA
                             403 Columbia Street, Suite 500
19                           Seattle, Washington 98104

20                           - and -

21                           David Klauder, Esquire
                             BIELLI & KLAUDER, LLC
22                           1204 North King Street
                             Wilmington, Delaware 19801
23

24

25
```

**A0274**

MATTERS GOING FORWARD:

2. Debtors' Second Omnibus (Substantive) Objection to Certain (I) Cross-Debtor Duplicate Claims, (II) Substantive Duplicate Claims, (III) No Liability Claim, (IV) Misclassified Claims, and (V) Reduce and Allow Claims (Non-Abuse Claims) (D.I. 2020, Filed 2/3/21)

**Schedule 1: Supplemental Revisions Needed**

**Schedule 2: Supplemental Revisions Needed**

**Schedule 3: Objection Sustained**

**Schedule 4: Objection Sustained**

**Schedule 5: Objection Sustained**

MATTERS GOING FORWARD AS A STATUS CONFERENCE:

6. Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 2293, Filed 3/1/21)

7. [SEALED] Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections (D.I. 1971, Filed 1/22/21)

8. [SEALED] Insurers' Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claims (D.I. 1974, Filed 1/22/21)

ADVERSARY PROCEEDING:

*Boy Scouts of America v. AA, et al.; Adv. Pro. No. 20-50527 (LSS)*

1. The BSA's Motion to Extend Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 (D.I. 144, filed 2/22/21)

**Ruling: Approved/Order Entered**

1    (Proceedings commenced at 9:09 a.m.)

2         THE COURT:  Good morning.  This is Judge

3    Silverstein.  We're here in the Boy Scouts of America case;

4    Case No. 20-50527.

5         Let me remind everyone to make sure your computers

6    are muted when you are not addressing the court.

7         I will turn it over to Mr. Abbott.

8      (No verbal response)

9         THE COURT:  Can parties hear me?

10         UNIDENTIFIED SPEAKER:  Yes, Your Honor.

11         THE COURT:  Okay.  Thank you.

12         Mr. Abbott?

13         MR. ABBOTT:  Thank you.  Derek Abbott here of

14    Morris Nichols on behalf of the debtors, Your Honor.

15         We have a modestly long agenda today so we will try

16    to get through it quickly, Your Honor.

17         In accordance with the second amended agenda that

18    was filed -- and I want to make sure that Your Honor has it.

19         THE COURT:  I do.

20         MR. ABBOTT:  Thank you, Your Honor.

21         Item one, orders have been entered.  We are good

22    there.

23         Number two, Your Honor, is, I believe, the second

24    omnibus claims objection.  There were certifications filed,

25    but we understand the court may have some questions about the

1   matters raised in that objection.

2            So we're at the court's pleasure.  I believe Mr.

3   Linder will be responding to the court on these issues.  So we

4   are happy to respond as appropriate.

5            THE COURT:  Okay.

6            MR. LINDER:  Good morning, Your Honor.  Matt Linder

7   of White & Case.

8            Can you hear me okay?

9            THE COURT:  Yes.

10           MR. LINDER:  As Mr. Abbott mentioned, the second

11  omnibus substantive claims objection it relates to

12  approximately sixty non-abuse claims.  In particular, we are

13  seeking to expunge certain duplicate claims and no liability

14  claims to reclassify certain claims that were inappropriately

15  asserted as having priority under the bankruptcy code, and to

16  reduce and allow certain claims in revised amounts.

17           Your Honor, we had a few informal comments that we

18  received from counterparties to fund the claimants.  We were

19  able to resolve those without any further filings.  Those were

20  noted in the certification of counsel filed at Docket No.

21  2315.  We did not receive any formal responses, but we're

22  happy to address your questions.

23           THE COURT:  Okay.  Thank you.

24           Yes.  I have reviewed the second omnibus objection

25  and -- I'm sorry, I'm getting feedback.  Am I the only one?

1    MS. BATTS:  Your Honor, this is Cacia.  I will go

2  ahead and contact Rob and let him know that you are --

3    THE COURT:  Thank you.

4    MS. BATTS:  You're welcome.

5    THE COURT:  The -- we've reviewed the objections

6  and I have questions with respect to Schedule 1, Schedule 2,

7  and Schedule 3 generally.

8    With respect to Schedule 1 it labels these cross-

9  debtor duplicate claims and by definition if they're cross-

10  debtor they're not duplicative.  Okay.  These persons or

11  entities have asserted a claim against two different debtors,

12  often on the same day.  So it's clear they intended to assert

13  claims against two different debtors.  So they're not

14  duplicative.  So why should I disallow them as duplicative?

15    MR. LINDER:  I'm happy to address that, Your Honor.

16  Delaware BSA is the other debtor in this case, and Delaware

17  BSA is a non-operating company that is not party to other

18  contracts, it's not entered into any guarantees other than

19  being a co-obligor on Boy Scouts of America's prepetition

20  funded indebtedness.

21    Certain of the claims, for example, certain

22  liability, rather, under the Boy Scouts restoration plan which

23  is a prepetition retirement plan.  For example, Delaware BSA

24  has no connection to that plan.  So your comments are well

25  taken in that they are not duplicates asserted at two

1  different debtors.  The basis for our objection was that

2  Delaware admits they have no liability on account of these

3  claims.

4        THE COURT:  But that wasn't the basis of your

5  objection.  The basis of your objection is that they're

6  duplicative.

7        MR. LINDER:  We'd be happy, Your Honor, to go back

8  and clarify the objection.  It's really a no liability basis

9  for the objection.  We can substantiate that with a

10 supplemental declaration if you would like.

11       THE COURT:  Okay.  You need to do that and you need

12 to serve that on the claimants.  Then we will take this up

13 again at another hearing.

14       I have similar questions on Schedule 2.

15 Substantive duplicate claims. Some of them appear to be claims

16 against different debtors.  Some of the claims appear to have

17 been purchased, perhaps.  But I don't know if -- I'm not sure

18 that I know the basis of objecting to these claims.  They are

19 not purely duplicative.  In fact, they are different on their

20 face.

21       MR. LINDER:  I think generally, Your Honor, we --

22 rather than being able to address these in a non-substantive

23 fashion on the basis that they're true duplicates and that

24 they are exact matches you are correct, for example, there are

25 a couple of vendor claims that has been filed, on one part, by

A0279

1  the actual counterparties and contract, and on one hand, as we

2  noted, by a third-party who may have purchased the claims.

3          We're happy to go back and take a look.  And to the

4  extent that it's not clear in the objection that we filed

5  we're happy to revise it to further substantiate the

6  objections.

7          THE COURT:  Okay.  I think you need to do that and

8  also address, as with the first schedule, the claims that are

9  against different debtors.

10          MR. LINDER:  Understood, Your Honor.

11          THE COURT:  With respect to Schedule 3 I was

12  generally okay with that except I have a question with respect

13  to two of the claims where the reason for disallowance, among

14  other things, is that the debtors do not believe these two

15  invoices are valid.  What does that mean?  You think they made

16  them up?

17          MR. LINDER:  Your Honor, we did take a look in

18  preparation for this hearing.  What that means is that we --

19  the debtors searched its files, its accounts, payable systems,

20  its records, and although it provided services to that

21  counterparty, the invoice that is asserted as to the debtors

22  and the future claim there is no record of those services ever

23  having been provided.

24          THE COURT:  Okay.  So that is a substantive

25  objection that we have no liability for this because we didn't

1  get the services.  Okay.  That one is close enough.  I will

2  accept that.

3          I did not have any questions on Schedules 4 or 5.

4  So I will sustain the objection as to Schedules 3, 4 and 5.

5          Mr. Linder, you will supplement with respect to

6  Schedules 1 and 2.

7          MR. LINDER:  Thank you, Your Honor.  We will

8  bifurcate the order and we will submit the claims under

9  certification of counsel that you are sustaining the

10  objections and then we will do as you requested with respect

11  to the balance of the claims.

12          Thank you very much.

13          THE COURT:  Thank you.

14          MR. ABBOTT:  Thank you, Your Honor.

15          Items three through five on the agenda are the 2019

16  matters that the court previously heard and indicated that it

17  would not be addressing today.

18          So that moves us along to number six on the agenda,

19  Your Honor which is the debtors' plan as to which the court

20  requested a status conference.  I am going to cede the podium

21  to Ms. Lauria who will address the court on that.  I believe

22  there are some others who also, obviously, want to be heard on

23  that issue.

24          Maybe, perhaps, if the court has specific questions

25  that they'd like us to address we can prime the pump so to

1   speak.

2           THE COURT:  Well, I do.  I want to take five

3   minutes because I am getting significant feedback in the

4   courtroom and see if we can get this cleared up.  So let's

5   take five minutes.

6           MR. ABBOTT:  Thank you.

7       (Recess taken at 9:20 a.m.)

8       (Proceedings resumed at 9:33 a.m.)

9           THE COURT:  Okay.  May apologies.  Hopefully we

10  have this fixed.

11          Can you all hear me?

12      (No verbal response)

13          THE COURT:  Okay.

14          MR. ABBOTT:  Yes, Your Honor.

15          THE COURT:  Okay.  Thank you.

16          Let's start with the status conference.  I had

17  requested a status conference to have a discussion about

18  whether there's a realistic timeframe for confirmation or what

19  the realistic timeframe is for confirmation given where we

20  currently are.

21          Debtors have filed a plan.  I have reviewed it.  I

22  noted that the debtors inserted a confirmation date of July

23  26th which was not vetted with Chambers.  And I don't know --

24  and that date, by the way, is not available, but the question

25  I really have is where are we.  I wanted to know whether the

1   debtors were planning estimation procedures, when I can expect

2   TDP's; all of the things one would expect a Judge would have

3   questions about when asked for confirmation dates and when

4   there is currently a disclosure statement hearing scheduled

5   next month.

6           I have seen the flurry of paper.  I have read the

7   flurry of paper.  And I would like to have some discussion.

8   If we were in the courtroom I might have it in Chambers, but

9   we're not.  So we are going to have it on the docket.

10          Ms. Lauria?

11          MR. LAURIA:  Thank you, Your Honor.  Again, for the

12  record, Jessica Lauria, White & Case, on behalf of the Boy

13  Scouts of America.

14          Why don't I start, Your Honor, with where we're at

15  and then turn to the importance of the debtors' timeline, and

16  in particular a summer 2021 confirmation timeline.

17          I am sure Your Honor saw that in addition to the

18  plan and disclosure statement, and solicitation procedures

19  motion we also filed, on behalf of the mediators, the first

20  mediator's report.  I think the fact that they used the term

21  first was no accident.  That was intentional.  And it suggests

22  that there are additional mediator reports to come.

23          In fact, if I could, I want to quote the tail-end

24  of that mediator report which says,

25          "The mediators are confident that the mediation

1  will foster additional constructive discussions between and

2  among the debtors and other mediation parties.  Accordingly,

3  the mediators do not consider the mediation to be closed."

4          That was a mere two weeks ago.  And we agree with

5  the mediators.  In fact, we have had mediation sessions since

6  that mediator report was filed.  And we have also had

7  mediation -- we have a group mediation session scheduled for

8  the end of the month.

9          Now we are, Your Honor, keenly aware that we are

10 not there yet.  We also saw the flurry of pleadings, plan

11 response pleadings, that have been filed to date both by

12 survivor constituencies as well as the insurers.  And like, I

13 think, the sentiments that were expressed in those filings the

14 debtors are also frustrated that we're not there yet.

15         I will say, Your Honor, that we're particularly

16 frustrated that because of the impact of COVID we have been

17 unable to have in-person face to face mediation sessions.

18 It's frustrating, I know, just even from a courtroom

19 experience.  Well that has been extremely frustrating from a

20 mediation experience.  And that has made our bankruptcy

21 mediation, which as you will recall kicked off in the middle

22 of COVID, extraordinarily challenging.  And I don't think that

23 is putting it mildly.

24         We didn't file a responsive pleading to those

25 pleadings.  I am not here today to air our grievances with

1 other mediation parties and what has happened in the

2 mediation.  I think suffice it to say the debtors are

3 committed to continuing to work with the mediation parties.

4 We're working with the mediation -- excuse me, with the

5 mediators on global resolution.

6 　　　　　As I mentioned, we have sessions scheduled

7 regularly, literally daily, and we believe this is going to

8 culminate in group mediation sessions at the end of March,

9 early April.

10 　　　　　As you will hear about later today in the hearing

11 we now have consensus around an extension of the preliminary

12 injunction.  That gives us the breathing spell, we think, to

13 continue the mediation.  Your Honor, we know we have a lot of

14 wood to chop.  I don't think it's the entire forest, as some

15 people in this case would have you believe, but we know we

16 have a lot of wood to chop.  We have got a process to resolve

17 that and we need -- from the debtors' perspective we need to

18 let that process play out.

19 　　　　　In terms of timing I'm going to start with

20 confirmation timing because I know that is where you started.

21 Our apologies, Your Honor, for putting the date in the

22 documents.  From our perspective it is important that we

23 maintain an emergence by the end of summer 2021 for a lot of

24 reasons.  We kick-off recruiting, in earnest, in the fall.

25 　　　　　The debtors need to put this bankruptcy matter

behind them.  We have talked in the past about liquidity

concerns, financial concerns with the bankruptcy case.

Suffice it to say, the case has cost the debtors tens of

millions of dollars, upwards of $100 million.  With the

litigious environment that we are finding ourselves, the case

is running around $10 million a month from an estate cost

perspective.

If this litigation, between, frankly, the

plaintiffs on the one hand and the insurers on the others with

the debtors stuck in the middle, continues to escalate that

number is only going to go up.  And we think that that is just

entirely inappropriate for a non-profit debtor whose revenue

is generated by donations, and children attending, you know,

youth serving camps.  We just don't think that is appropriate

for the size of this case or the nature of this debtor.  So we

are trying to cabin-in those costs also on the timeline.  That

is why we are looking at a summer emergence.

We would like that hearing to be fully consensual.

We have got the mediation set-up, we think, to do that.  We

recognize it probably won't and we will probably need multiple

days of Your Honor's time.  That doesn't mean we won't have

consensus with some parties, but it may be that there are

parties, even as we get to the end of the summer, that aren't

entirely happy with where we have ended up.  We will see when

we get there.

1          In terms of Your Honor specifically asked about

2    estimation.  We understand that last night the TCC, the FCR

3    and, I believe it was joined by the coalition as well, filed a

4    motion to estimate claims.  That is scheduled to be heard, I

5    believe, at the April 15th hearing.

6          As Your Honor noted, that April 15th hearing is

7    currently scheduled as our disclosure statement hearing.  I

8    think given the fact that we have mediation later this month,

9    late this month, into early April holding that date is going

10   to be very difficult for a disclosure statement hearing.  We

11   fully acknowledge that, but we want to stay within the overall

12   timeline.

13         So if the date needs to move for the disclosure

14   statement we understand that, but we would ask that it not be

15   moved by much because I think we've got momentum in the

16   mediation right now.  We think we should continue to take

17   advantage of that and see where we are at the end of these

18   sessions that are at the end of the month.

19         THE COURT:  Okay.

20         MR. MASON:  Your Honor, Richard Mason for the ad

21   hoc committee.  I'd be happy to speak for the ad hoc committee

22   if -- I apologize, I didn't mean to interject on Ms. Lauria, I

23   Ms. Lauria is done for the moment.

24         MS. LAURIA:  I am unless Your Honor has any further

25   questions for me.

1        THE COURT:  Not right now.

2        Mr. Mason?

3        MR. MASON:  Yes.  Thank you, Your Honor.  Good

4   morning.  Again, Richard Mason of Wachtell, Lipton, Rosen &

5   Katz for the ad hoc committee of local councils.

6        Just as a very brief reminder, Your Honor, the ad

7   hoc committee consists of eight local councils drawn from

8   across the country.  We are all volunteers as (indiscernible)

9   chair and my firm is pleased to represent the committee *pro*

10  *bono*.  We reflect a variety of the 253 local councils that

11  deliver the scouting product on the grounds, Your Honor, to

12  over a million youth today.

13        The ad hoc committee, importantly, for purposes of

14  the mediation, consists of councils with higher numbers of

15  claims against them and those with lower numbers, councils in

16  plaintiff friendly states with open windows, and those in

17  states where the statute of limitations has long since expired

18  and is very unlikely to be revived, frankly, including because

19  of state and constitutional provisions, and councils with

20  relatively higher net worth, and those towards the lower end

21  of the financial scale.

22        Despite that variety, Your Honor, we have a common

23  goal to achieve, if we can, a solution that compensates

24  victims of abuse claims and preserves scouting for the young

25  men and women it serves.  We are a mediation party, the ad hoc

A0288

1  committee is, and we believe that we have been engaged

2  productively with other mediation parties including the BSA,

3  the coalition and others.

4          Recently we have worked very well with the TCC and

5  the coalition on the proposed extension of the preliminary

6  injunction.  That is a matter that you will hear from my

7  colleague, Mr. Celentino, and others later in the agenda.

8          Your Honor, to be clear, no individual council is a

9  mediation party.  Over the past year the ad hoc committee has

10 been engaged intensively with local councils both to keep them

11 informed about the BSA bankruptcy and particularly recently to

12 see, frankly, what the art of the possible is with regard to

13 local councils aggregate contribution to a global settlement.

14         Now because the numbers are covered by the

15 mediation confidentiality, Your Honor, I am not intending to

16 discuss on the record the amount that we think we can circle

17 from the local councils based on our own analysis and

18 thousands of hours, frankly, we spent with them.  But I just

19 want Your Honor to know that the local councils are fully

20 engaged through the ad hoc committee's efforts to achieve a

21 resolution on a timely basis.

22         I would agree with Ms. Lauria's comments about the

23 need for speed in the matter to achieve a resolution of one as

24 soon as possible and, frankly, we all look forward to the

25 continuing mediation that, from our perspective, has and

1  should be intensifying.

2       I do want to say a brief word, Your Honor, about

3  the TCC's status report if I might.  Frankly, I read it very

4  briefly last night, much like a disclosure statement objection

5  which is for another day.  I guess possibly not next month,

6  but hopefully soon thereafter.  But there is one point that I

7  would like to address that I think is relevant for today and,

8  you know, in mediation.

9       The TCC says that based on its analysis of local

10 council properties, I think all of which have been appraised

11 at this point, the local councils can contribute to

12 "multiples" of the $300 million number that the BSA has

13 identified in the plan that it filed as the local council

14 aggregate settlement contribution.

15      Now we have done our own analysis and we disagree

16 vehemently with the TCC's view of that potential.  We think

17 that the appraisals do not properly account for deed

18 restrictions and conservation easements and other limitations

19 on local council properties across the country.  We have other

20 issues, frankly, with the appraisals.

21      We also think that these types of disputes are

22 exactly why we have mediation with three very able mediators

23 appointed by Your Honor so that we can discuss the issues and

24 avoid litigating them if we can.  So we would invite the TCC

25 to share their analysis with us in mediation.  And if we can

A0290

1   find common ground that is fantastic, like we did on the

2   preliminary injunction extension.  And if we don't, at least

3   we will have tried our hardest.  I'm sure they will as well

4   and we will know where we disagree and we can proceed from

5   there.

6           I do just want to mention that the TCC said in its

7   status report that it had reached out to certain individual

8   local councils to discuss the TCC's view about their

9   properties based on the appraisals.  The local councils to

10  whom Mr. Stang reached out to discuss these matters are not

11  mediation parties.  I believe almost all of them have

12  responded, and to the extent that they have they have asked

13  the TCC to work with the ad hoc committee which I would just

14  reiterate we are fully prepared to do.

15          So thank you, Your Honor.  That is all I have for

16  the moment.

17          THE COURT:  Thank you.

18          Let me hear from the tort claimants committee.

19          MR. STANG:  James Stang, Pachulski Stang Ziehl &

20  Jones, for the tort claimants committee.

21          First, Your Honor, we want a consensual resolution

22  of this case.  Survivors and -- well, the (indiscernible)

23  committee has been accused more than once in conversation with

24  other parties that (indiscernible) and the local councils.

25  That simply is not true.  I (indiscernible) the tort claimants

committee is not concerned about whether the Boy Scouts

(indiscernible) exists post-confirmation.  Their concern is a

reasonable compensation (indiscernible).  If the Boy Scouts

cannot continue to (indiscernible) post-confirmation so be it.

Our goal is to protect our constituencies and get them

compensation.  Our goal is always not the liquidation

(indiscernible) for the local councils.

The issue that Ms. Lauria described was -- we were

informed of that on Monday in a phone call with counsel.  We

have not received a single notification from the mediators

that that mediation has been since scheduled.  No one has

asked the tort claimants committee if they were

(indiscernible).  No one has discussed with us whether it was

safe to travel to Miami for mediation.

I have (indiscernible) creditors committee.  I

don't know if he's willing to -- he lives in South Florida,

whether he is willing to travel to White & Case's offices.  I

am not available to White & Case's.  I have several previous

(indiscernible) conditions that can be at home.  I have

vaccinated and I have asked counsel what precautions they were

taking to ensure that it was safe to go their offices.  They

said they have (indiscernible) protocol.

So COVID issues aside the fact that we have not

even consulted (indiscernible) about any availability to go to

-- it sounds like counsel hopes that their case

1  (indiscernible).  I think it is just (indiscernible) of what

2  is going on in the mediation process generally.

3         So Mr. Mason's comments about the councils, I

4  think, is a further illustration of where we are.  I don't

5  have to have a settlement (indiscernible) in the context of

6  mediation.  We have analysis of five local councils

7  (indiscernible), their assets, their cash, their investments,

8  their camp utilization, their camp values, the reviewed deed

9  restrictions on thousands of properties.

10        We reached out to the local councils because they

11  are in breach.  There is no invitations to date that we have

12  to have with them about the value of those (indiscernible)

13  which is a huge issue in talking to the parties that are

14  liable.  So we decided to cut through that.

15        The first counsel said we're not interested in

16  talking to you about talking to the local councils.  One of

17  them hasn't even responded to our inquiry.  The debtors said

18  that (indiscernible) not to you individually, but we will talk

19  to you through the local councils.  Two of those local

20  councils are actually members of the ad hoc committee.  So I

21  don't understand what (indiscernible) talk to us through the

22  committee, through the ad hoc committee.

23        Frankly, we'd be willing to talk to all 253

24  (indiscernible) but the information we got was confidential

25  and (indiscernible) unless they all agreed.  So we have been

1    invited to talk to the ad hoc committee, which we intend to

2    do. Mr. Mason doesn't know that (indiscernible), but it is

3    our intention to do that.

4         That committee has no authority over any of the

5    other local councils. Mr. Mason has repeatedly said that the

6    committee cannot bind them. I don't know what communications

7    are going to go forward from that meeting to the rest of the

8    constituents of the ad hoc committee.

9         So the fact that they're not mediation parties,

10    Silicon Valley, Garden State, Grand Canyon, these are local

11    councils, Your Honor, doesn't mean they flock to us. We are

12    trying to keep our constituents informed of what is going on.

13    We have had three, what I call, (indiscernible) available to

14    all survivors. We have had (indiscernible). We have

15    (indiscernible) a couple of thousands of people that

16    downloaded the recordings of those webinars. We have had town

17    halls (indiscernible) who represent survivors.

18         So they're useful, informing them as to what is

19    going on. Honestly, I have heard, I don't know the

20    (indiscernible), coming onto those town hall meetings to

21    listen as to what is going on. So this notion that somehow

22    there's all this communication going on between us and the

23    local councils. Obviously, we're not (indiscernible) of the

24    mediations at the moment with the BSA. We have had lots of

25    conversations. As you can tell from our (indiscernible)

1  progress to where it should be.

2          Issues that we have with plan and disclosure

3  statements or webinar statements (indiscernible) we have too

4  many things to do today (indiscernible).  In a sense

5  (indiscernible) was right, it was kind of a preview of the

6  disclosure statement objection.  It also works with some other

7  issues that have not (indiscernible).  The estimation matter

8  Mr. Patton talked about it.  (Indiscernible) demonstrates how

9  much (indiscernible) and whether (indiscernible) disclosure

10  depends on a lot of the work that the BSA and local councils

11  do.

12          At the end of the day local councils and chartered

13  organizations, (indiscernible) of all liabilities.  I

14  understand the actions with the insurers, the settlements.  I

15  understand there needs to (indiscernible) for them to continue

16  (indiscernible).  The lack of information that is in the

17  disclosure statement that will be provided to the creditors I

18  think there has to be a real change in attitude by councils as

19  to what assets are in the disclosure (indiscernible), what the

20  alternatives are so that they can look at (indiscernible).

21          Your Honor, we will continue working towards a

22  global resolution, but we have a lot of work to do.  We are

23  committed to doing it, but we have got to have partners.

24  Telling us that we have to be in Miami without asking us

25  (indiscernible), who's coming, (indiscernible).

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Let me from the unsecured creditors committee.

4          MR. RINGER:  Good morning, Your Honor.  Rachel

5     Ringer from Kramer Levin on behalf of the creditors committee.

6          Your Honor -- as Your Honor saw from the first

7     mediators report we were able to achieve a resolution for the

8     treatment of our constituency which is embodied in the version

9     of the plan that was filed in early March with the caveat

10    that, you know, given the timing as reflected in that plan and

11    disclosure statement those documents, themselves, we are still

12    in the process of reviewing.

13         In terms of the schedules I generally agree with

14    the comments laid out by Ms. Lauria.  From the committee's

15    perspective, and I think as recognized by, effectively, all

16    the parties in the case, you know, our constituency is small

17    by comparison with the exception of really (indiscernible) for

18    pension claims that are resolved through the plan, and the

19    claims held by our constituency, as I think was referenced in

20    the TCC status report, is not the claims that precipitates the

21    bankruptcy filing.

22         With that in mind we did work very hard with the

23    debtor and with JP Morgan to negotiate a deal for constituency

24    that not only addressed our claims, but allow the organization

25    to take what we view is a critical first step for

1  confirmation.  We do recognize that there are, you know, still

2  a lot of wood to chop.  We are happy to and look forward to

3  continuing to work with the debtors to try and achieve greater

4  consensus around the plan.

5          Key to our agreements and key to the settlements

6  that we reached with the debtor is the continued viability of

7  the organization.  That is important not only for the members

8  of our committee and the members of our constituency, many of

9  whom are going to continue doing business with the

10  organization post-bankruptcy, but also because, as Your Honor

11  has heard a little bit about in prior hearings, the assumption

12  of the pension and the avoiding the items that would trigger a

13  potentially very large claim is important for preserving

14  recoveries to, you know, non-general unsecured creditors and

15  preserving recoveries for all other constituencies in the

16  case.

17          You know, we've always believed our constituency

18  could be an important and constructive building block and we

19  are happy to have reached an agreement but also recognize that

20  we, along with debtors and other parties in the case, still

21  have work to do before confirmation.

22          THE COURT:  Thank you.

23          Let me hear from the FCR.

24          MR. HARRON:  Good morning, Your Honor.  This is Ed

25  Harron for the FCR.

**A0297**

1          Can you hear me okay?

2          THE COURT:  I can.

3          MR. HARRON:  If I may, Your Honor, I'd like to

4  address two things, the plan and the estimation motion that we

5  filed yesterday with the TCC and the coalition.

6          Your Honor, we talked about this in other mass tort

7  cases but its generally the case that a mass tort bankruptcy

8  only concludes when you have some level of consensus between

9  the company and the claimants.  And Imerys is an example of

10  that where we have a consensual plan.

11          Unfortunately, Your Honor, the plan that's on file

12  does not reflect any sort of consensus, and I think it's plain

13  from the TCC's response that it will be a subject of claimant

14  opposition.

15          And, just to be clear, at this moment, I know that

16  we're not (indiscernible), but at this moment the FCR does not

17  support that plan.  And to be frank, Your Honor, we think it

18  ignores the elephant in the room.

19          You know, this case is unique in many ways.  But

20  among the unique facts here is the existence of about 84,000

21  claims that were filed as of the bar date.  And Your Honor has

22  heard in prior hearings that the compensability of those

23  claims, the value of those claims, it will be highly contested

24  by among others, but at least we know the (indiscernible) of

25  issues.

**A0298**

1       But those same considerations which claims are

2   compensable and how much are they worth and that feeds into

3   all the confirmation price areas.  That informs claimants on

4   the votes that form the criteria and values in the TDP.

5       It's necessary for the court to conduct the best

6   interest analysis to compare to the cover available to tort

7   claimants against -- the tort survivors, pardon me -- against,

8   for example, what the commercial claimants are receiving.

9       Also, this case puts at issue third-party releases

10  to the local councils, to the charter organizations, to

11  insurers.  And, of course, the fundamental consideration of

12  the court when evaluating third-party releases is how the

13  consideration compare to the liability.

14      So, to make a long story short, Your Honor, we

15  think the plan is putting the cart before the horse.  And

16  we've discussed with the debtor what we believe to be a more

17  appropriate strategy.  And we discussed this with them before

18  we filed the motion.  But we think the way to advance this

19  case is for a court to determine the magnitude of the

20  liability to the abused claimants. And we're attempting to

21  address that issue via the estimation motion.

22      And Ms. Lauria mentioned that the estimation motion

23  would be up for consideration on the April 15th hearing.

24  That's not our intention, Your Honor.  In fact, we wanted to

25  bring the motion to your attention today.  Mr. Brady set up a

A0299

1  chambers this morning, so we have an opportunity to discuss it

2  with you but later this afternoon we plan to file a motion to

3  withdraw the (indiscernible).

4         We believe (indiscernible) 157 -- pardon me 28

5  U.S.C. 157(b)(2)(b), the liquidation of personal injury claims

6  is beyond this court's core jurisdiction.  And because it's

7  our intention, at least, in part, to use the estimation motion

8  of the basis to potentially fix distributions to claimants,

9  again, it falls squarely within 157(b)(2)(b) which said not

10 matters which are among the court's core jurisdiction.

11        So we collectively -- we spent a lot of time

12 consideration which court was best situated to resolve the

13 estimation.  And it's our view, particularly in light of

14 157(b)(2)(b), primarily in light of that statute.  We believe

15 the District Court is probably the appropriate place to

16 litigate the estimation issues.

17        THE COURT:  How does that fit into a timetable that

18 the BSA believes is necessary to make sure we have a

19 continuing Boy Scouts?

20        MR. HARRON:  Well, I don't want to speak out of

21 school, but BSA says it does not fit into their timetable.  We

22 have -- the motion has an expedited schedule and they'll

23 proceed -- we intend to proceed quickly but when we get over

24 to District Court, you know, it will be subject to the court's

25 availability.

1              THE COURT:  Correct.

2              MR. HARRON:  But the BSA timetable we think

3    erroneously assumes that confirmation in the near term is an

4    option.  We don't accept that premise.  We don't think -- we

5    think the current plan is a road to nowhere.  And it may be

6    the case of (indiscernible) BSA funds prosecuting that plan.

7    Maybe that's not in the best interest of the estate.

8              THE COURT:  It may be.  I don't know.  I'm

9    surprised that anyone thinks that the plan that was filed is

10   the plan that's going to be confirmed.

11             So I think you've all been in this game long enough

12   to know that's not the case.  So what my concern is, though,

13   and I don't know what, you know, you file your motion, of

14   course.  I don't know what the District Court will think about

15   the argument you're making with respect to who can determine

16   it.

17             And what concerns me more, quite frankly, is a

18   timeframe with the District Court that has on its plate and

19   coming up with hopefully the relaxation of -- well not

20   hopefully, the relaxation, with possibilities of return to

21   criminal trials, a docket that it has to prioritize.  So that

22   is a concern I have.

23             But parties, of course, are free to file whatever

24   motions they think are appropriate and legally required. But I

25   have that concern of the backlog of criminal docket that --

1  it's my understanding the District Court will need to

2  prioritize.

3          But, you know, I read the motion and I've seen

4  what's been filed, as I said, the flurry of filings.  The

5  parties are free to take the positions they want to take.  I'm

6  not sure if they can take them back at some point.

7          MR. HARRON:  Your Honor, I just want to clarify a

8  few points.

9          One, we seem to be committed to mediation.  And we

10 don't see the estimation path and the mediation path as

11 regionally exclusive.  So it's our hope that the estimation

12 process will bring the parties closer together, rather than

13 further apart.

14         And with the plan and the timing, we do share the

15 concerns about timing.  Certainly, my client has no interest

16 in harming a long-term process of the Boy Scouts.  But it's

17 our view that, as Your Honor noted, the plan that's on file

18 will not be the plan that's confirmed.

19         But when we play it out, we think that any plan

20 that's going to be confirmed ultimately will require an

21 estimation of some sort.  And so, it's our view, that we can

22 proceed with the estimation now and perhaps use that as an

23 opportunity to bring the parties together.  And once that

24 litigation is completed or near completed, then we can move

25 more promptly to a plan process.

1          THE COURT:  Okay.  Thank you.

2          MR. HARRON:  Thank you, Your Honor.

3          MR. MOULTON:  David Moulton.  May I speak for the

4    coalition?

5          THE COURT:  Yes.

6          MR. MOLTON:  Good morning, Judge.  It's David

7    Molton of Brown Rudnick for the Coalition of Abused Scouts for

8    Justice.

9          I want to say a few words.  I'm going to try to be

10   as concise as I can, Your Honor.  I know that a lot of folks

11   have already spoken about things that I was going to say.

12         I know that folks have talked about a lot of wood

13   to chop.  I think that that's a fair statement, but probably

14   an understatement.  I think that that's a forest to chop and I

15   know Mr. Stang has talked about the local council issue and

16   the official tort claimants' issues and efforts in connection

17   with local council.

18         I think also, Judge, one of the, as alluded to

19   earlier, one of the elephants in this room, as Your Honor has

20   seen from the history of this case and our involvement in it,

21   is the insurers.  And what they're going to do, what they're

22   going to bring to this plan.

23         So I think we can't respoke it.  Just looking at

24   the Boy Scout proposal and local council's proposal, but also

25   the issue of the insurers.  And I want to address, go right to

1  the heart of what you said about estimation, Judge.  Because

2  what you have in the estimation motion, the two fiduciaries

3  for the survivors, plus the ad hoc committee.

4        The coalition that as Your Honor knows represents a

5  significant amount of those survivors for collective purposes

6  in this bankruptcy case joined together, all of those parties

7  are working extremely hard in the mediation.  I don't think

8  anybody on this in-conference in your courtroom will say that

9  that's not the case.

10       We've all extended hours of good faith efforts

11  working with the debtors, working with the local council,

12  engaging as appropriate and necessary.  And to the extent we

13  can with the insurers through the mediators in order to move

14  this case.

15       At the present time, Judge, the timetable suggested

16  by the estimation is very aggressive. We did that in light of

17  exactly what the debtors concern was and in light of the

18  suggestion and what I knew the question from Your Honor would

19  be.

20       Your Honor said you read it.  We appreciate that,

21  Judge.  Paragraph eleven is the proposed case management

22  ordered.  We narrowed that, that's 111 days' timetable for all

23  of this to get done.  You know assuming that the order is

24  granted and estimation is granted in mid-April, that puts us,

25  you know, within fair game of concluding if that timetable is

1 accepted and abided by.

2     And I know that other folks are going to have their

3 say on that timetable and surely the court hearing this will

4 have its say on that.  But it puts us not beyond or

5 substantially beyond the timetable that Ms. Lauria mentioned.

6 So we tried very hard to do that.

7     Number two, Judge, and I know it's been talked

8 about earlier in earlier hearings in mass tort bankruptcies

9 estimation often is teed up and often it results in incenting

10 and facilitating the mediation and consent, not the opposite.

11     I refer Your Honor to PGE that I know Your Honor

12 heard from before from some of my colleagues where an

13 estimation was teed up in front of the district judge and soon

14 there afterwards, you had a deal between the debtors and the

15 prior victims on value and the amount that would be paid to

16 them in the plan.

17     Just across the hall, the physical hall, at one

18 period of time, an incest, Your Honor, I think it was -- well

19 it's going to be a year and a half, almost two years ago, the

20 debtor teed up an estimation process very early in the

21 program.  And what happened is under the mediation auspices of

22 Judge Carey, mediation happened with that regime be proposed

23 by the debtor which mediation went to a consensual plan.

24     So it's important to understand that from the

25 survivor constituency's perspective, in light of -- and I

1 don't want to get into mediation discussions. That's not

2 appropriate.  I'm not even going to allude were they

3 successful, non-successful progress or non-progress.  But,

4 clearly, the survivor constituencies in light of everything

5 that Your Honor had seen in this case so it's important and

6 necessary to tee this up at this point in time for the reasons

7 that Mr. Harron described.

8 I will say, Your Honor, that you know the coalition

9 agrees with the TCC and the FCR that the plan itself is

10 unconfirmable and will not be voted.  There will be -- I can't

11 say no survivor, but there will be overwhelming survivor

12 opposition and vote no to the plan.

13 There's a lot of issues that I know Mr. Stang stood

14 and raised that 2388 that was filed yesterday, I think it's

15 fair to say that the coalition doesn't have to repeat them or

16 join in them.

17 Just some of the things that weren't said in there,

18 you know, number one, we have great concerns under the present

19 plan.  First of all, it purports to be insurance neutral but

20 yet it gives the insurers enhanced rights such as the ability

21 to avoid direct claim litigation where that litigation is

22 allowed in various states.

23 Further, Judge, in terms of the millennium factors

24 because non-debtor releases here as stated by Ms. Boelter from

25 day one, Ms. Boelter, Ms. Lauria, and Mr. Andolina are

absolutely essential to Boy Scouts' surviving, if it's going
to emerge from Chapter 11 and survive.

A key issue in evaluating whether one of the
Millennium, Master Mortgage, Metromedia, whatever you want to
call the case law that gives the court the criteria for
evaluating non-debtor releases.  Whether the claim effected by
the releases are going to be paid in full.  Clearly, the
issues there are the value of the claims which is we're
dealing with now with the tee up of the estimation, but also
the value of the insurance assets.

I think it's important to note that no matter what
the argument is of the contribution of the local council to
the debtors, I think it's undisputed among everybody in this
virtual courtroom today, Your Honor, that those assets even if
to the maximum requested by the survivor constituencies, the
hard assets, you know, will not be even -- will be de minimis
in terms of satisfying (indiscernible).

So really what is the value of the insurance
assets.  And we're really concerned, Judge, that a key issue
is what are the obligations of those companies with respect to
the proposal made by the debtors in terms of transferring
insurance rights under the insurance neutral plan to a trust
and one of those issues is, I think, is previewed, I believe,
in prior hearings whether the insurers can state that all they
owe is the amount that was actually paid into the trust,

meaning by the Boy Scouts, or whether their coverage
obligation is coextensive with the actual value of the claim.

Those are all issues that we believe need to be
addressed, one way or other in this case before a plan can be
confirmed. And in that way will give you, Your Honor, the
ability to make the _Millennium_ decision to evaluate those
criteria based on actual disclosure and ascertain ability of
the value of the claim and what is being transferred to the
trust to satisfy those claims.

So, Your Honor, I think, what we've asked the
debtor's counsel nicely and sometimes not so nicely is put off
the hearings next month. There's no reason for all the
parties in this room, the talented lawyers in your courtroom
to be expending time and resources objecting to a plan that as
Your Honor knows won't be the plan that's confirmed and
clearly has substantial disqualifications to confirmability
now, let alone deficiencies and disclosure.

Instead of spending that time and telling us as Ms.
Lauria just did, well we think we may have to adjust the
schedule, but you know we want to hold it until when? Until
everybody files their objection and the debtor replies and
further money is spent on a wasted effort that we all know and
then to a plan that cannot be confirmed?

No, let's put a hiatus on that, Your Honor, and to
use that money to allow Boy Scouts that saves money from the

1   Boy Scouts' estate to be channeled, so to say, into more

2   productive activities over the next month.  Let's get the

3   estimation motion teed up and decided. And, again, there's a

4   case management procedure proposed therein that we think works

5   and addresses all the issues, Your Honor, that have been

6   previewed to Your Honor before regarding this case and the

7   claim.

8          Get it teed up and continue with Judge Carey and

9   Crofton and Tim Gallagher's efforts to bring parties to some

10  common ground.  We're fully behind that, Your Honor.  The

11  coalition has been since day one.  And I'd ask Your Honor, you

12  know, to consider those points in terms of next step.

13         MS. LAURIA:  Your Honor, this is Jessica Lauria.

14  May I just briefly respond to the time line point?  Because I

15  think that was, in fact, the purpose of the status conference.

16         MR. BUCHBINDER:  Excuse me.  This is Dave

17  Buchbinder.  May I be heard briefly on behalf of the U.S.

18  Trustee, Your Honor?

19         THE COURT:  I'd like to hear from all the parties

20  who want to speak.  And then, certainly, Ms. Lauria, I will

21  come back to you.

22         MS. LAURIA:  Thank you, Your Honor.

23         THE COURT:  Mr. Buchbinder.

24         MR. BUCHBINDER:  Thank you, Your Honor.  David

25  Buchbinder on behalf of the United States Trustee.

1         I'd like the Court and the parties to be aware that

2 the U.S. Trustee has provided the debtor with numerous

3 comments regarding the plan, the disclosure statement, and the

4 solicitation procedures motion was also fraught with numerous

5 concerns.  And we do share many of the concerns echoed, not

6 only by the Court, in your initial comments, Your Honor, but

7 in earlier comments, as outlined by the status report filed by

8 the tort claimants committee.  And I would just like the Court

9 to know that at this point in time.

10        Also, as a human being here, it seems that there

11 are two things that are undisputed.  Before this case can go

12 to consensus, we need to know the size of two pots, the size

13 of the claimant pot and the size -- from whatever sources they

14 come from -- of the pot that's available to pay compensation.

15 And what I've heard here this morning, as a human being, is a

16 lot of excuses and reasons why we can't do that now, we can't

17 do this for this reason or that reason.

18        And after acknowledging that these are the two

19 issues, that's where whatever little agreement exists breaks

20 down.  It's incumbent on the parties to roll up their sleeves

21 and sit down and deal with this seriously and realistically

22 because that's what's going to answer the questions, including

23 getting consensus to this case and minimizing, as opposed to

24 exponentially increasing the administrative expenses.  Thank

25 you, Your Honor.

1          THE COURT:  Thank you.

2          MR. ANKER:  Your Honor, this is Mr. Anker.  May I

3 be heard?

4          THE COURT:  Yes, Mr. Anker.

5          MR. ANKER:  Yes, Your Honor.  For the record,

6 Philip Anker from Wilmer, Cutler, Pickering, Hale & Dorr, for

7 Hartford, the Hartford Insurers.

8          Your Honor, I certainly want to echo what Mr.

9 Buchbinder just said, that we all need to roll up our sleeves,

10 and we all need to avoid unnecessary administrative expenses.

11 And Ms. Lauria talked about those expenses.

12          Your Honor may not end up deciding whether there

13 will be an estimation motion in the first instance; it may be

14 the District Court.  But that -- since people have started to

15 politic and try to poison the well, let me briefly respond.  I

16 think Your Honor's instinct that this is a bad aide and an

17 idea that is simply going to lead to more administrative

18 expense is right.

19          Among other things, let's just start with two basic

20 propositions, which are:  One, does the motion have merit?

21 And two, can Your Honor decide it?  Your Honor, under 157,

22 cannot liquidate for distribution purposes an unliquidated

23 personal injury claim.  The most significant part of the

24 motion that has been in front of you that was filed is

25 Footnote 3.  Footnote 3 reads, quote:

1        "Estimation of aggregate liability will not

2  determine the liquidating amount of any particular individual

3  claim.  The plan contemplated that the movants will likely

4  provide that such individual amounts will be determined

5  through trust distribution procedures, the TDP, or through

6  release of actions in the tort system through adjudication, as

7  permitted by the TDP."

8        That means, first, Your Honor can resolve the

9  motion; and second, the motion is directly contrary to 502(c),

10  the Bankruptcy Code provision on estimation, which says -- if

11  I can call it up quickly and I apologize, Your Honor:

12        "There shall be estimated, for purpose of allowance

13  under this section, any contingent or unliquidated claim" --

14  singular -- "the fixing or liquidation of which, as the case

15  may be, would unduly delay the administration of the case."

16        Yes, there are procedures for valuing that are done

17  in connection with a plan; for valuing assets of an estate and

18  liabilities of an estate.  But what is being proposed here

19  with respect to estimation flies in the face of the words of

20  the statute.  And the proposition that Your Honor can't

21  consider it flies in the face of the words of the

22  jurisdictional statute 28 U.S.C. 157.  We will make those

23  arguments.

24        But this -- let's ask the real question, what is

25  going on and why it's going on.  What's going on -- and Mr.

1 Moulton, with all due respect -- and I've known him for a long

2 time -- is being -- and he smiles, and I think he acknowledges

3 that I know him -- is cute, is being cute.  What really is

4 being sought here is some sort of adjudication by someone of

5 aggregate liability, so that, then, when it comes to coverage

6 litigation, someone can say, ah hah, that's already been

7 determined.

8          If we want insurance neutrality here, I agree with

9 Mr. Moulton, the current plan is not insurance-neutral.  It

10 denies carriers rights, doesn't grant them rights.  One of our

11 rights is to defend every claim in the tort system, if we want

12 to; and, if not, if not, that is a breach of the policy, and

13 it provides for defense to coverage.  If there's going to be

14 insurance-neutrality here, there needs to be language that

15 either honors our rights or gives us all defenses to coverage

16 that that creates and doesn't have anything that this Court

17 does or the District Court does affect that ultimate coverage

18 decision.

19          Having said all of that, I want to come back to and

20 actually echo something that Your Honor said and Ms. Lauria

21 said.  This case has led to enormous expense and a lack of

22 consensus.  There is an ongoing mediation.  I am not going to

23 breach the mediation privilege, either.  But I think Ms.

24 Lauria would attest that our client has been constructive and

25 helpful, and we are trying to see if we can get to something

that ultimately makes sense, given the extraordinary -- and I

know Mr. Moulton likes to stay away from this.  But going from

275 filed claims in the tort system to 86,000 is staggering

and tells you something is -- I'm trying to remember what the

Shakespeare expression was, something is amiss in Denmark, or

whatever that expression was.

Something doesn't smell right, and that has to be

dealt with, but this estimation process is not the way to do

it.  It simply is inconsistent with the Code and with the

jurisdictional statute.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. ROBBINS:  Your Honor, I wonder if I could --

this is Larry Robbins.  Our firm is litigation counsel to the

coalition in connection with the estimation.

I had thought that all we were appropriately

supposed to do today was to call the fact of the estimation

motion to the Court's attention.  Mr. Anker has just given

what I assume is the first half of his oral argument on the

merits.  I don't propose to engage on it.  But I also don't

want the moment to pass with the suggestion that we believe

that that substantive opposition has any merit.  We don't.

And when Mr. Anker and his co-counsel put those

arguments in writing, in due course -- which is how motions

are supposed to be handled -- we will respond.  And we are

confident that whatever court resolves the threshold question

1  of whether there should be an estimation will conclude that

2  it's appropriate and that the time line that we proposed is

3  fully consistent with the debtors' goal of getting a plan

4  confirmed in a timely manner.

5            Unless the Court is asking for argument on the

6  merits today, I'm going to stop here because I don't think an

7  oral argument of the sort Mr. Anker just gave is warranted.

8            THE COURT:  Thank you, Mr. Robbins.

9            Anyone else before I go back to mister -- to Ms.

10 Lauria?

11           MR. MOULTON:  Judge, it's Mr. Moulton again.  I

12 just want to tell Mr. Anker that the last time I was called

13 "cute" was in high school, so thank you.

14           MS. LAURIA:  Thank you, Your Honor.  And I think

15 we're getting --

16           MR. SCHIAVONI:  (Indiscernible) I'm sorry, I had

17 mute on.  Your Honor, this is Tanc Schiavoni for Century.  May

18 I be heard for just a moment before Ms. Lauria?

19           THE COURT:  What hearing would be complete if I

20 didn't hear from you?

21           MR. SCHIAVONI:  I -- and Your Honor, what I'm going

22 to say is really -- I really want to talk about estimation,

23 but I'm not going to.  Okay?  I just want to say something

24 very brief, that I think will be noteworthy, and that is:

25           I have had many disagreements with Ms. Lauria.  I

1  don't necessarily agree with a lot of the things in the plan.

2  But I think you should give her some more time and a chance.

3  We're willing to work with her, and I think she can be very

4  creative.  So I would give her a little bit more string to run

5  out here, and that's me saying positive things about Ms.

6  Lauria and the Boy Scouts.  So let me end on that note and

7  thank you for hearing me.

8         THE COURT:  Thank you.

9         Anyone else?

10     (No verbal response)

11        THE COURT:  Ms. Lauria.

12        MS. LAURIA:  Thank you, Your Honor.  Jessica

13 Lauria, White & Case, on behalf of Boy Scouts of America.

14        While Mr. Schiavoni deprived me of the joke I was

15 going to make about my boxing helmet, as you can see, with my

16 big puffy earphones today, because that was an unusual

17 occurrence.  But I do wear these things for a reason.  And as

18 you can see, we're a little bit stuck in between our plaintiff

19 colleagues -- who we agree with all of the remarks that were

20 made, it is our desire to equitably compensate victims -- and

21 our insurers.

22        But without delving into the merits of the plan or

23 the estimation, I do think we need to return to the time line

24 because that, I think, is where you started, Your Honor.

25        On the estimation, we share Your Honor's concern

about the District Court's calendar and the time line that the
District Court would be able to accommodate. But even if this
were in front of Your Honor, I should note that the hundred-
and-eleven-day time line that was proposed in the estimation
conveniently expires right at the debtors' statutory
exclusivity period.

And as I read the motion, it suggested that the
bankruptcy cases should hold tight while the estimation work
proceeds -- with that hearing at some point in mid-August,
again, when our statutory exclusivity expires -- so that,
apparently, the other parties can deprive the debtors of their
time in Chapter 11 and their attempts to reach a consensual
deal. We don't think that's appropriate and we don't think
that should guide the Court today in determining what our time
line is for confirmation.

As I said, Your Honor, and just to put a finer
point on it, accrued professional fees through the end of
February are upwards of $100 million. By the time we get to
August, we're estimating they'll be around $150 million.
That's just -- that's not right for a nonprofit case. And we
are trying to reign that in with the mediation process.

With respect to Mr. Moulton's point on moving the
disclosure statement hearing, Your Honor, we understand that
if we need to move that to accommodate parties, but as I said
earlier, only by a bit. We are getting to the point in this

1  case -- and certainly, I think we will be there by the end of

2  April, that we're going to need the Court to start calling

3  balls and strikes on disputed issues.  And those disputed

4  issues go beyond 2004 requests and 2019 motions.  We have

5  pretty serious issues that we'll need to bring before the

6  Court at the appropriate time on an appropriate briefing

7  schedule.  So, in our view, pushing the disclosure statement

8  hearing off indefinitely or to a date past the 111 days or

9  well into the future is just not right for this particular

10  case.

11         So, again, if the Court is inclined to move that

12  date, we would say only move it by a very little bit because

13  we do believe we need to come in front of the Court,

14  potentially in the near term -- let's see how the mediation

15  goes through the month of March -- to call some balls and

16  strikes for us.

17         THE COURT:  When you say "a little bit," what are

18  you thinking?

19         MS. LAURIA:  You know, I would say two weeks, two

20  to four weeks.  I know we have an omnibus mid-May, I think

21  it's May 15th, if I'm not mistaken, or thereabouts.

22    (Pause in proceedings)

23         THE COURT:  May 19th.

24         Well, thank you for all of the input.  As I said, I

25  have read what's been filed, the flurry of papers noted, the

1  adversary proceeding that's been filed, obviously the

2  estimation motion.  Sometimes I think I am not the audience

3  for some of these filings because I can read a mediator's

4  report and understand exactly what it meant.  But the -- and I

5  -- so if parties perceive that their filings are helpful for

6  some reason, of course you can file what you want.  But again,

7  I don't always think I'm the intended audience.

8          The concern I have with going forward with the

9  disclosure statement at this point is because I don't see some

10  very necessary information and documents, quite frankly, that

11  I would want to see at a disclosure statement, including the

12  TDPs.  Those who are involved in Imerys with me know that I

13  did not send out that disclosure statement until we had TDPs.

14  They can be negotiated or they can not be negotiated.  But

15  there's -- but I think -- and think this plan has that gap in

16  it, where parties don't know what, in fact, the treatment is

17  going to be.

18          So, for very practical reasons, I think it's

19  difficult, perhaps, to go forward with that hearing in mid-

20  April.  On the other hand, I hesitate to move it because

21  deadlines usually focus people and things get achieved.  What

22  I think, here, perhaps can focus people are the mediation

23  sessions that are to take place later this month.

24          And whether attending in person or attending via

25  Zoom, I expect everybody to be there, who the mediators

1  request be there.  I don't want to hear that someone decided

2  it was inconvenient or they couldn't show.  We're $100 million

3  into fees in this case, I think that is a staggering number,

4  and progress needs to be made.  Victims need to be compensated

5  appropriately and the Boy Scouts' mission needs to continue.

6  And that's evident from -- everyone that I see here has voiced

7  that view.

8          And I will say that some of the letters that I've

9  received from individual -- individuals who are abuse

10 survivors, or who say they are abuse survivors -- and they get

11 docketed -- also share that view, which I find quite

12 heartening and somewhat amazing sometimes; that those

13 survivors, some of them, are still involved in scouts, their

14 kids are involved in scouts, and they see a role for scouts

15 going forward.  Boy Scouts, I should be specific.

16         So I think that goal needs to be paramount, and I

17 think it affects the mediation.  It affects the timing of

18 disclosure statement and confirmation.  It affects how much

19 this is going to cost.  And quite frankly, every dollar to

20 professional fees is a dollar that comes out of some

21 creditor's pocket.

22         So I'm going to move the disclosure statement

23 hearing to April 29th and 30th.  And I will look for any

24 further mediation reports that the mediators find appropriate

25 to file after further mediation sessions.  And we'll have a

1 further status report or hearing on April 12th.

2         MR. ABBOTT:  Your Honor, Derek Abbott for the

3 debtors.  I assume we can just work with chambers to tighten

4 up specific timing for that and get notice --

5         THE COURT:  Yeah, I'm looking in the afternoon.

6 And if that doesn't work for parties, generally, we can do it

7 on the 13th.  My thought is to try to get in a status before

8 objections are due to disclosure statement, recognizing that

9 some people may still have to work on it notwithstanding, but

10 people seem to have a jump on it.  And I want it sufficiently

11 after the sessions with the mediator, so that discussions can

12 continue, as they often do after the mediation, and we can see

13 if -- what kind of consensus, if any, is reached on overall

14 issues or discrete issues.  But I'm generally available the

15 afternoon of the 12th and 13th, and I don't have a preference,

16 but that's my thinking.

17         MR. ABBOTT:  (Indiscernible)

18         THE COURT:  Thank you.

19         MR. BUCHBINDER:  Your Honor, Dave Buchbinder for

20 the record.

21         I take it that the objection deadlines will be

22 extended accordingly?

23         THE COURT:  Yes, they need to be extended

24 accordingly.

25         MR. BUCHBINDER:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Okay.  What's next?

3          MR. ABBOTT:  Yes.  Your Honor, the next matters on

4   the agenda are related, Items 7 and 8.  I believe the Court

5   requested status on the 2004 motion filed by the insurers.

6   I'm suspecting the Court may have questions.  But I'll cede

7   the podium, obviously, to the insurers' counsel.

8          THE COURT:  Okay.  Well, here's my thoughts.  I had

9   been working on ruling on these motions when the flurry of

10  paper came in.  And quite frankly, I had waited to see what

11  the plan was going to look like before I ruled on these

12  motions.  And now I think we've somewhat eclipsed them, in

13  that, if this estimation motion goes forward, then I see no

14  reason why that discovery shouldn't go forward as part of that

15  process.  I may not be the person who is presiding over that

16  process or making that decision.

17          But I considered this, the requested discovery --

18  and I should qualify that by saying that certain of the

19  discovery could go forward, was my thinking -- would be or

20  could be relevant to estimation and could be relevant to the

21  TDPs, more so than objections to claims because, at least

22  under this plan, as filed, the survivor proofs of claim are

23  expunged from the docket.  I'm not making a comment on whether

24  or not that's appropriate, but that's what this plan says with

25  respect to those proofs of claim form -- forms and said that

1  those claims will be -- I forget exact language, but the

2  claims will be resolved exclusively in accordance with the

3  TDPs, which we've already discussed that we don't have yet.

4       So my inclination was to permit certain of the

5  discovery to go forward, but I think it needs to be racked

6  into where we are now. So I'm going to hold off, again, and

7  let's see where it goes. But I think certain of this

8  discovery is appropriate. And quite frankly, I see in the

9  estimation motion the movants wanting to do similar, if not

10 the same type of discovery, which they opposed -- well, the

11 coalition opposed two weeks ago, so I think it needs to be

12 racked into that. So I'm not going to rule separately on it

13 at this point.

14      MR. MOULTON: Judge, can I add one point, just for

15 clarification, if Your Honor lets me?

16      THE COURT: Mr. Moulton.

17      MR. MOULTON: Yeah. I don't think we oppose,

18 Judge. I think we opposed the 2004 process, which was a

19 unilateral process, I think, at the hearing. We suggested

20 that we were willing to engage in a reciprocal process or come

21 to an agreement as to a process.

22      And I do note, Your Honor -- and Your Honor is

23 correct that that sort of process that was suggested by the

24 first motion, which would -- what I call the "claims motion,"

25 that I think Your Honor is probably referring to --

1          THE COURT:  Uh-huh.

2          MR. MOULTON:  -- is, in fact, covered by 11(d) of

3  the estimation, but it endeavors a cooperative, collaborative

4  regime.  And if that -- a cooperative and reciprocal regime.

5  And if that regime is unable to be agreed to, then the

6  presiding court will decide it.

7          So I do want to say I don't think -- I don't

8  necessarily think it's an accurate characterization that we

9  were opposed to it.  I think the survivors have their claims.

10 I think our estimation motion with the TCC and the FCR shows

11 that we believe in our claims.  It's interesting, I know,

12 again, referring to my friend Mr. Anker's "cute" reference,

13 but it's almost too cute by half that the very issue that

14 we've been hearing since day one of our emergence in this

15 case, now we put it on, teed it up.  Apparently, they're not

16 in favor of it, so that's an interesting thing.

17         But the estimation process and the proposed

18 discovery regime in it does cover that.  And it would be my

19 suggestion, Judge, that that be left to the Judge who's

20 administering that to work within -- with the parties and come

21 up with a doable plan and regime.  That would be my only

22 point, Your Honor.

23         Otherwise, you know, clearly, with respect to the

24 second motion, what I call the "attorney discovery motion," we

25 just stand on our -- you know, I'm not going to repeat what

1    was said at length a month ago.  And the claims -- I note Your

2    Honor's points on claims objection, which we still stand on

3    our arguments.  Thank you, Judge.

4               MR. SCHIAVONI:  Your Honor, Tanc Schiavoni for

5    Century.

6               We do have -- it could have been lost in the

7    motion, but we do have the request for relief under 3007-1(f).

8    And I'm not -- and Your Honor will obviously rule whenever you

9    choose to.  But I just would ask that -- you know, I think a

10   ruling on that could be decoupled from the other issues.  If

11   you some -- if you decided you want to deal with this -- the

12   discovery collectively, you know, I defer to the Court's

13   decisions about how to administer matters.  But 3007 is a sort

14   of separate issue, and it is sort of tied to solicitation

15   here, about whether -- you know, what claims should vote, what

16   claims should not.

17              We put before the Court specific uncontested

18   evidence of proofs of claim bearing signatures, the same

19   signature for multiple different names of claimants and other

20   such things that are very problematic.  We look forward to the

21   U.S. Trustee weighing in on these issues, as they examine the

22   evidence.  But we think the 3007 relief is a separate issue

23   that we'd ask Your Honor to take into consideration and

24   consider ruling on.  Thank you, Your Honor.

25              THE COURT:  Thank you.

1          My thought was that I was going to consider the

2    Rule 3007 issue after I saw what discovery yielded.  But I'll

3    make a decision on that when I see whether or not I'm going to

4    be handling the estimation motion and -- because I think I

5    need to see what's happening there.  I may decide -- if I'm

6    not handling it, so that I cannot coordinate all of this, then

7    I may rule separately on the Rule 3007 request.

8          I do think, to some extent, all of these issues are

9    intertwined.  And the estimation, for example, the discovery

10   you want with respect to the -- or from the attorneys, the

11   individual attorneys and the aggregaters may be appropriate

12   discovery in the estimation motion context.  And so I'm -- but

13   since I may not be handling that, I'm not going to rule on it

14   for now.  And I will consider whether I rule on the 3007

15   separately, once I know whether or not I'm handling the

16   estimation motion.

17          MR. SCHIAVONI:  Your Honor, we -- if you recall, we

18   took an appeal on the bar date order that's before Judge

19   Andrews.

20          THE COURT:  Ah.

21          MR. SCHIAVONI:  One of the issues there was -- so I

22   just -- so, if you remember that, one of the issues there was

23   sort of how the form questions -- the adequacy of the

24   questions, what would happen.  It's a -- you know, it's as if

25   a prophet wrote that email -- that brief.  It foretells what

1  might go wrong.  And I'm not -- no -- and Your Honor, I mean

2  no criticism, obviously, to the Court.  It's like, you know, I

3  think we were all faced, at that time, not -- you know, with

4  some novel issues.

5        But Judge Andrews does have before him an appeal

6  that asks him to -- that, because of -- you know, the

7  substance of the appeal is the claim shouldn't be granted

8  presumptive validity.  Okay?  So that is before him.

9        Now just one thing to close on:  It's still before

10 him.  I'm not sure how many months have gone by.  But you

11 know, perhaps -- Mr. Moulton would be very happy if like he

12 gets to the estimation after he gets out that appeal for six

13 months.  Okay?

14        THE COURT:  Well, my --

15        MR. SCHIAVONI:  I mean --

16        THE COURT:  My guess is --

17        MR. SCHIAVONI:  -- it's like -- it's illustrative

18 of the case --

19        THE COURT:  My guess is, if the District Court

20 takes this, you're going to be in front of Judge Andrews, so

21 you'll be able to address him on multiple issues.  I could be

22 wrong, but that's generally how it happens.  So -- and I --

23 has he had argument on that yet?

24        MR. SCHIAVONI:  No, Your Honor, he hasn't.

25        THE COURT:  Okay.  Well, I will consider this.  I -

1   - as I said, I was going to sequence it a little differently,

2   but I will rethink whether I need to -- how I should sequence

3   it, once I know what I'm handling and what I'm not handling

4   and we see --

5            MR. SCHIAVONI:  Thank you, Your Honor.

6            THE COURT:  I'd like to see if the mediation

7   results in something that could somehow meet this issue, as

8   well, or address this issue, as well.  So we'll see.  Okay.

9   Thank you, everyone.

10           What is next?

11           MR. ABBOTT:  Thank you, Your Honor.

12           The next item on the agenda is the debtors' motion

13  for preliminary injunction.  I believe that matter has been

14  resolved, but I'll cede the mic to Mr. Andolina, Your Honor,

15  who will (indiscernible)

16           THE COURT:  Mr. Andolina.

17           MR. ANDOLINA:  Good morning, Your Honor.  Michael

18  Andolina, White & Case, on behalf of the Boy Scouts of

19  America.

20           Yes, Your Honor.  As Ms. Lauria previewed and Mr.

21  Abbott just stated, some continued good news and momentum to

22  report.  Your Honor, we filed a motion to extend the

23  preliminary injunction on February 19th.  Prior to the

24  objection deadline on that motion, we engaged in extensive

25  mediated negotiations with the UCC, the TCC, the coalition,

1 the FCR, and the ad hoc committee of local councils. And Your

2 Honor, the parties were able to finalize a stipulation and

3 proposed order that was filed at Docket 151.

4          That stipulation was served on all parties in the

5 adversary on March 8th. There were no objections by any

6 plaintiff to either our motion or to that stipulation. As

7 Your Honor is aware, Century had filed a limited objection to

8 the stipulation. We greatly appreciate the conversations we

9 had over the last several days, in particular with Mr.

10 Schiavoni, Mr. Lucas, and Mr. Celentino, assisted by Mediator

11 Tim Gallagher. And we were able to resolve Century's limited

12 objection.

13          Your Honor, we provided a blackline version of the

14 proposed order to the Court. I don't know if Your Honor has

15 had an opportunity to review that. We can -- I can either

16 read the language or we can submit that to Your Honor, you

17 know, through a filing. But all the parties to the

18 stipulation -- the TCC, the UCC, the insurers and the ad hoc -

19 - have signed off on that additional language to the proposed

20 order. And we would ask that the Court enter the order and

21 stipulation as soon as the Court has an opportunity to review

22 that proposed language.

23          THE COURT: It was just handed to me. Let me see.

24 Okay. It looks fine.

25          Does anyone else wish to be heard?

1          MR. STANG:  Your Honor, this is Mr. Stang.  I'd

2     like to make a comment, please.

3          THE COURT:  Yes.

4          MR. STANG:  Your Honor, while it's good news --

5     good that we're not having a preliminary injunction trial

6     today, the real good news will be if (indiscernible) satisfied

7     the conditions for the extension of their preliminary

8     injunction.  And this (indiscernible) this an agreement

9     between the TCC and the (indiscernible) and the counsels have

10    been told (indiscernible) eligible for the extension of the

11    injunction, this is what you have to do (indiscernible)

12    production of documents.

13         And we've talked about (indiscernible) before, they

14    are critically important to our survivors, to our

15    (indiscernible) organizations (indiscernible) liable for the

16    abuse they suffered and may be channeled parties or

17    participating parties under the proposed plan.  So we keep our

18    fingers crossed.

19         We've been through this (indiscernible) before,

20    local counsel producing information.  And (indiscernible) they

21    have -- they did supply information (indiscernible)

22    disclosures, but there was a response.  So we're hoping that,

23    through (indiscernible) the debtor (indiscernible) can

24    (indiscernible) counsel to make those searches (indiscernible)

25    rosters under the conditions specified in the stipulation.

A0330

1    Your Honor, Mr. Pfau, who represents abuse

2  survivors, filed a joinder to the (indiscernible) response, I

3  should say, to the preliminary injunction (indiscernible) like

4  to make a comment to the Court.

5    THE COURT:  Okay.

6    MR. PFAU:  Your Honor, this is Michael Pfau.  Can

7  you hear me clearly?

8    THE COURT:  I can hear you, yes.

9    MR. PFAU:  Okay.  My apologies.  I'm traveling, so

10  I had to appear via iPhone.  But if you can hear me and see

11  me, great.

12    I filed a joinder -- I represent a number of abuse

13  survivors across the country, and I filed a joinder and am

14  appearing in conjunction with David Klauder, a Delaware

15  bankruptcy attorney.  We filed that joinder, we thought it was

16  important because we wanted to raise an issue with you that we

17  think is critically important.  We styled our joinder a

18  cautious joinder, not an enthusiastic joinder, and it's

19  cautious because we have been seeking the troop rosters for a

20  long time.  Don't need to get into that now because we have

21  agreement, or at least agreement on a protocol that will allow

22  us to obtain those rosters.

23    The rosters may not be as important for the

24  bankruptcy lawyers and bankruptcy professionals, but they are

25  of critical importance to those of us who are representing

A0331

survivors in this case. And you know, why are the rosters so important? The rosters allow the survivors to identify the local council in the sponsoring organization. Not many, but some of my clients have not been able to identify the sponsoring organization that sponsored the troop when they were children.

I have been told that there are tens of thousands of claimants who have not identified a sponsoring organization. Now this is important because the injunction does not toll the statute of limitations for the lawyers that are practicing in State Court, and it doesn't allow for discovery.

And the reason I wanted to speak, Your Honor, on my client's behalf, and I think on behalf of many of the tort lawyers representing abuse survivors was a timing issue. There are three states who have passed limbo legislation, New Jersey, New York, and North Carolina, where those windows are going to be closing this year. We need to be able to identify, in order to preserve the statute of limitations, those sponsoring organizations, and we need the troop rosters.

I'm glad we've reached a point where we have a protocol in place to obtain that discovery. But we thought it was important, Your Honor, to raise this issue. It's of critical important to us, to put it on your radar. Hopefully, we'll not be back asking for any relief in this regard. But

A0332

1  we thought it was important to join, important to state our

2  piece, and like I said, put this on your radar.  So thank you.

3          THE COURT:  Thank you.

4          Is there anyone else who wishes to be heard?

5          MR. CELENTINO:  Your Honor, this is Joe Celentino

6  of Wachtell, Lipton, Rosen & Katz, for the ad hoc committee.

7  May I be heard?

8          THE COURT:  Yes.  Can I remind everyone else,

9  please mute your microphones?  Thank you.

10          Mr. Celentino.

11          MR. CELENTINO:  Good morning.  I'll be brief, Your

12  Honor.

13          As you have no doubt just heard, this -- we support

14  the preliminary injunction stipulation that Your Honor is

15  being asked to enter, and we hope that you will.  As you can

16  tell from the comments that were made just now, the injunction

17  stipulation is a compromise, and it's a compromise that we

18  support because it's one that will let the parties focus on

19  mediation, which, as Your Honor heard this morning, is

20  critical, given where we are in the case right now.  It is

21  critical that we can get to a global resolution in the short

22  time frame that we have here.

23          We believe this stipulation will help move these

24  cases forward to a positive conclusion, which is in everyone

25  interests -- everyone's interests here.  And we hope that Your

1  Honor will enter the stipulation this morning.  And we will

2  continue, the ad hoc committee will continue to work to move

3  these places -- these cases to a global resolution.  Thank

4  you, Your Honor.

5          THE COURT:  Thank you.

6          Anyone else?

7      (No verbal response)

8          THE COURT:  Okay.  Well, I have reviewed the

9  revised form of order and I will enter it as consensual and

10 recognize that it is a compromise that the parties who

11 negotiated it have reached.  I do not have any plaintiff in

12 the underlying litigation in front of me objecting to any

13 further extension of the preliminary injunction, and so I will

14 grant it.  I will address whatever subsequently occurs with

15 respect to the compromise, as and when it's brought in front

16 of me.  So that will be signed.

17         MR. ABBOTT:  Thank you, Your Honor.

18         THE COURT:  Anything further?

19         MR. ABBOTT:  Thank you, Your Honor.  Your Honor,

20 Derek Abbott again for -- on behalf of the debtors.  No, that

21 completes the agenda.  We appreciate the Court's time and

22 guidance today.

23         THE COURT:  Thank you.  And I encourage everyone to

24 make good use of the mediators and the mediation session that

25 was coming up.  If I were channeling Judge Fitzgerald -- who

1  many of you have been in front of on mass tort cases -- I

2  would say bring your toothbrushes and be prepared to come to a

3  resolution.  We're adjourned.

4          UNIDENTIFIED:  Happy St. Patrick's Day, everyone.

5          UNIDENTIFIED:  Thanks, David.  Nice hat.

6          UNIDENTIFIED:  Thank you, everybody.  Thank you,

7  Judge.

8          UNIDENTIFIED:  Thank you, Your Honor.

9      (Proceedings concluded at 11:05 a.m.)

10

11

12

13

14                  CERTIFICATE

15

16      I certify that the foregoing is a correct transcript

17  from the electronic sound recording of the proceedings in the

18  above-entitled matter.

19  /s/Mary Zajaczkowski            March 17, 2021

20  Mary Zajaczkowski, CET**D-531

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                                    |   |                              |
|------------------------------------|---|------------------------------|
|                                    | . | Chapter 11                   |
| IN RE:                             | . |                              |
|                                    | . | Case No. 20-10343(LSS)       |
| BOY SCOUTS OF AMERICA AND          | . |                              |
| DELAWARE BSA, LLC,                 | . |                              |
|                                    | . | 824 Market Street            |
|                                    | . | Wilmington, Delaware 19801   |
|                  Debtors.          | . |                              |
| . . . . . . . . . . . . . . . . .  |   | Monday, April 12, 2021       |

TRANSCRIPT OF VIDEO HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:   (On the Record)

| | |
|---|---|
| For the Debtors: | Jessica Lauria, Esq. |
| | WHITE & CASE, LLP |
| | |
| For the Ad Hoc Committee | |
| of Local Councils: | Richard Mason, Esq. |
| | WACHTELL, LIPTON, ROSEN & KATZ |
| | |
| For the Tort Claimants | |
| Committee: | James Stang, Esq. |
| | John Lucas, Esq. |
| | PACHULSKI, STANG, ZIEHL & JONES |
| | |
| For The Hartford: | Phillip Anker, Esq. |
| | WILMER, CUTLER, PICKERING, HALE |
| |  & DORR |
| | |
| | James Ruggeri, Esq. |
| | SHIPMAN & GOODWIN |

(Appearances Continued)

| | |
|---|---|
| Audio Operator: | Electronically Recorded |
| | by Brandon J. McCarthy, ECRO |
| | |
| Transcription Company: | Reliable |
| | 1007 N. Orange Street |
| | Wilmington, Delaware 19801 |
| | (302)654-8080 |
| | Email:  gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**A0336**

APPEARANCES VIA ZOOM:  (On the Record - Continued)

For the Coalition of
Abused Scouts:                David Molton, Esq.
                              BROWN RUDNICK, LLP

For Century Indemnity
Company:                      Tancred Schiavoni, Esq.
                              O'MELVENY & MYERS, LLP

INDEX

Page

STATUS BY MS. LAURIA                        4

COMMENTS BY MR. STANG                      15

COMMENTS BY MR. MASON                      17

COMMENTS BY MR. ANKER                      19

COMMENTS BY MR. MOLTON                     22

COMMENTS BY MR. SCHIAVONI                  25

SCHEDULING                                 33

A0338

1          (Proceedings commence at 3:04 p.m.)

2          THE COURT:  Okay.  Good afternoon.  This is Judge

3     Silverstein.  We're here in the Boy Scouts of America case,

4     Case Number 20-10343, for a status conference.

5          And I will turn it over to Ms. Lauria --

6          UNIDENTIFIED:  (Indiscernible)

7          THE COURT:  -- and ask all others to please make

8     sure you're muted.

9          MS. LAURIA:  Thank you, Your Honor.  Jessica

10    Lauria, White & Case, for the debtors.

11         Your Honor, with -- in connection with today's

12    status conference, the debtors wanted to address three issues

13    with the Court:

14         First, we wanted to talk through at a very high

15    level where we're at on the mediation and the plan and

16    disclosure statement.

17         Next, we wanted to alert the Court to a motion that

18    the debtors expect to file on Thursday.

19         And then, finally, we wanted to address the time

20    line and, in particular, the time line for the disclosure

21    statement hearing.

22         So, if I could I'm going start with sort of where

23    we're at, again, very high level, not getting into any

24    mediation confidences, with respect to the mediation and talk

25    a little bit about the plan and disclosure statement.

1    Following our last hearing, which I think was March

2    17th, the mediators conducted both virtual mediation and

3    optional, in-person mediation March 30th through April 1st.

4    We did make progress during those sessions.  But as the Court

5    can probably guess due to the lack of a mediation statement,

6    we did not reach a resolution as a result of those sessions.

7    We did, however, have great momentum coming out of

8    those sessions.  And certain of the parties have kept at the

9    mediation, literally with daily mediation sessions, including

10   on the most recent holidays and weekends, since the virtual

11   in-person sessions concluded on April 1.

12   As we always do at these status conferences, we, of

13   course, want to thank the mediators and all of the mediation

14   parties for their efforts.  We specifically want to thank the

15   attorneys representing coalition members for their efforts,

16   they've been working around the clock, as well as the FCR and

17   certain of our insurers.  We appreciate their commitment and,

18   really, everyone's commitment to trying to get this

19   bankruptcy case to a place where we can confirm a plan of

20   reorganization.

21   While we still have very strong momentum, we

22   recognize that there are some parties that we don't have that

23   momentum with that aren't happen with where the mediation

24   stands today.  Candidly, the debtors aren't happy with where

25   the mediation stands today.  We wanted to come before the

**A0340**

1  Court today and announce a global resolute -- excuse me --

2  resolution of the cases.  We're simply not there yet.  But

3  that's not to say, Your Honor, that we've reached an impasse;

4  we haven't.  In our view, we haven't reached an impasse with

5  any of the mediation parties.  We are still negotiating on

6  multiple fronts and we intend to continue to negotiate on all

7  of those fronts.

8         But as I said at the last hearing, we're coming

9  very close to a time where we will call upon Your Honor to

10 start calling balls and strikes when it comes to the

11 disclosure statement and plan.  I think -- and you've seen

12 this in the pleadings before -- if you polled the parties in

13 the case, I think we would agree on one thing, and that is

14 there are some issues that will have to be litigated in

15 connection with the plan.

16        We believe, Your Honor, that the best forum for

17 those issues and the best procedural posture to resolve the

18 open issues through litigation is through plan confirmation

19 in front of this Bankruptcy Court, we think that's the most

20 efficient process for all of the parties.  That has the

21 ability to, not only equitably compensate a few survivors,

22 but also preserve our mission.

23        To that end, Your Honor, unless the stars align

24 tonight and we reach some sort of meaningful resolution with

25 one or more parties this evening, the debtors intend to file

A0341

tomorrow an amended plan, an amended disclosure statement,
trust distribution procedures, and a trust agreement.  I want
to outline very briefly the structure that we're
contemplating for that plan, in light of where we are in the
mediation and the bankruptcy cases, more generally, just to
provide context for what, not only you, but all of the
parties that are present here today will see in that filing.

In short, the plan that we intend to file tomorrow
has been designed to continue the momentum that we have in
the mediation and with other negotiations, to facilitate a
global resolution of these cases, while addressing concerns
that we have heard from the TCC and others, and while
addressing the BSA's timing needs.

In short, Your Honor, what we are going to file
tomorrow is what I can best describe as a "toggle plan."  The
sort of default or the Plan A version of that is a global
resolution plan, very similar to what we have filed in the
past.  It provides for local council releases, in exchange
for substantial contribution.  It would provide for releases
of chartered organizations that have claims exposure that
contribute voluntarily to a trust.  It would provide, just
like the plan today provides a framework for insurance
settlements.

This global resolution plan would have an added
feature, and that's an estimation of the debtors' abuse

1     liability.  You've heard a lot about estimation over the last

2     several weeks, as have we.  We've heard the parties loud and

3     clear.  We believe there should be an estimation in

4     connection with confirmation.  We think the settlements that

5     we are hopeful you will see in the global resolution

6     component of the plan, we think, in the Court's consideration

7     of those settlements, the Court would benefit from an

8     estimation.  We think all parties, candidly, will benefit

9     from an estimation in that world, so we are going to propose

10    one.

11         We think this global resolution plan -- what I kind

12    of refer to in discussions on our side as the "Plan A plus,

13    plus, plus" -- is the absolute best plan for BSA.  We think

14    it's the best plan for the survivors, we think it provides

15    them with a structured and centralized means to receive

16    timely compensation and equitable compensation.  We think

17    it's far preferable to what they would face in the tort

18    system.  And we also think it continues the mission for BSA

19    and the local councils.  But that's the global resolution

20    side of the plan.

21         As I mentioned, the plan does contain a toggle

22    feature, so a BSA toggle feature.  If the abuse claimants do

23    not vote in sufficient numbers to accept that global

24    resolution plan and Your Honor is, therefore, reluctant to

25    confirm that global resolution plan, the plan of

1    reorganization would drop the global resolution component.

2    And again, that's the component that requires the plaintiffs'

3    support with the nondebtor releases, including the insurance

4    settlements. We would drop the global resolution component

5    and we would proceed with a BSA only toggle, a BSA only plan,

6    where BSA could still emerge from bankruptcy.

7          We would save millions of dollars of professional

8    fees. We would avoid what we think would be wasteful and

9    destructive bankruptcy-related litigation. We would maintain

10   our time line. So those are the positives of the BSA toggle.

11         The negatives are it's sub-optimal in our view,

12   worse than sub-optimal for the victims. We would -- in that

13   world, we wouldn't have the local council contributions, we

14   wouldn't have chartered organization contributions. We

15   wouldn't have a centralized forum to liquidate and provide

16   timely compensation to creditors. We would have certainly

17   complications with our insurance, due to the shared insurance

18   features of BSA's insurance program, with the local counsels

19   not being part of the plan. It would be difficult to

20   contribute certainly the policies to the trust or anything

21   that infringes upon their rights.

22         But that is a sub-optimal plan that's confirmable.

23   We think it's very close to what the TCC was actually

24   suggesting in their pleadings. We hope that the abuse

25   victims vote in favor of the global resolution plan, and we

**A0344**

1   hope other parties come to that table.  But if not, we have a

2   confirmable plan that will get BSA out of bankruptcy.

3           I should note that the UCC/JPMorgan settlement that

4   was reached in connection with the mediation would be a

5   feature that is present in both plans.  Both plans would

6   provide for that feature.  So that's where we're at with the

7   plan and the mediation.

8           I can turn to estimation, et cetera, if that would

9   be helpful, Your Honor, and then go to time line.  And I'm

10  sure there may be others that wish to be heard, and I'm happy

11  to answer, of course, any questions.

12          So the next piece.  At our last hearing, I believe

13  it was counsel for the FCR mentioned that the TCC, FCR, and

14  coalition would be filing a motion to withdraw the reference,

15  as well as an estimation motion, and they did, in fact, file

16  those motions.  They are scheduled for an objection deadline

17  of the 15th, which I believe is this Thursday.  The debtors

18  will be objecting to both of those motions, both the

19  withdrawal of the reference, as well as the estimation

20  motion.

21          As I just explained, in our view, the best forum

22  and the best procedural posture for resolution of the

23  litigated issues, including estimation in this case, is you,

24  Your Honor.  It's also in connection with the plan of

25  reorganization itself.  And I understand you're not ruling on

1    either of these matters now.  I just want to give you a heads

2    up of where the debtor is coming out.

3         In our view, if we're in the world of that global

4    resolution that I just described, the District Court will

5    likely need to affirm Your Honor's ruling in any event, which

6    would be premised upon an estimation of the abuse liability.

7    If we are flipped into the world of the BSA toggle plan, we

8    don't think District Court involvement is necessary,

9    including with respect to the estimation.  So we don't think

10   it's necessary to go before the District Court with respect

11   to that estimation.

12        We appreciate the insurers' 2004 motion.  We

13   appreciate the efforts of the TCC, FCR, and coalition to come

14   up with a protocol for estimation.  But we are going to file

15   a confirmation discovery motion that includes the estimation

16   component, we're going to file that also on Thursday, the

17   15th.  As I mentioned, that will apply to plan confirmation.

18   It's going to be very similar, I'm sure, Your Honor, to what

19   you've seen in numerous other cases and concerning, you know

20   litigated confirmation matters.  We will have a protocol

21   that's baked in with respect to the estimation that is

22   designed to get the debtor out of bankruptcy on the time line

23   that we've been discussing.

24        The good news is, on discovery, Your Honor, we're

25   not starting from scratch.  I think you probably know we've

provided a lot of information to the creditor parties. But
we do recognize that, in the context of a contested
confirmation hearing and a contested estimation proceeding,
people are going to need more, and we need a framework to
provide them what they need to work through that process. So
we'll be filing that motion, like I said, on the 15th,
together with the objections to the other two motions.

It's probably -- that's probably a good segue to
the timing discussion. You know, at the risk of sounding
like a broken record at the last several hearings, the
overall time line is still critically important to the BSA,
for all of the reasons that we talked about before. The fee
burn in the case is extraordinary. We believe that every,
you know, additional month takes money out of the trust. The
bankruptcy, I think, jeopardizes the BSA's mission, so we
need to get this out of bankruptcy.

So we've got two matters that I think are coming up
in relatively short order. We've got the disclosure
statement, which currently is scheduled for April 29th. And
I'll come back to the timing of that because I think we
understand and have heard from various parties that they
would like a little more time on that. And then we have this
discovery protocol motion that I just mentioned.

Since we do have time with the Court on April 29th
right now, we would ask that we still reserve a few of those

hours to get things started on the discovery protocol and the

estimation protocol. We think sooner, rather than later, is

best for that. We want to avoid having parties file before

the Court additional 2004 motions and the like. We think we

need a centralized mechanism to deal with the discovery

motions. So we would like to take advantage of the Court's

time on April 29th.

With respect to the disclosure statement, a couple

of things on that. One, I know the Court is aware of what

I'm about to say, but I do feel compelled to address a theme

that we've seen in some of the pleadings, which is this

notion that, due to lack of support principally from the

plaintiff classes, the Court shouldn't hear the disclosure

statement or permit the plan to be launched for solicitation.

I think it goes without saying there isn't a Bankruptcy Code

or Bankruptcy Rule requirement that creditors commit in

advance to the support of a plan. We think it's essential,

particularly with the amended plan that I just described,

that we put that out as soon as possible.

Century did file a motion requesting that the April

29th date be adjourned. While we are -- we disagree with

Century's position on 3017(a) and the notion that we couldn't

file an amended disclosure statement during the twenty-eight-

day period provided for in that rule -- and I should note the

disclosure statement that was filed on March 1st, while it

1   didn't contain TDPs and a trust agreement, it was very

2   robust.  It contained a liquidation analysis, as well as the

3   debtors' five-year business plan.

4        But we're sympathetic to Century's view and the

5   views of others.  We understand that the parties may need

6   some additional time to review the filings for tomorrow.  Our

7   next omnibus is scheduled for May 19th.  We would ask that we

8   not go beyond that May 19th date.  We don't think there's any

9   reason to.  Even if you were to adopt Century's reading of

10  Rule 3017(a), that 28 days, assuming we file the documents

11  tomorrow, expires around, I think it's May 11th.  So we can

12  certainly go earlier than that.  But we also know that your

13  docket is extremely full, Your Honor, and so understand if

14  there isn't other available time.

15       So that's where we're at on the three topics,

16  including the time line.  I'm happy to answer any questions,

17  Your Honor, if you have any with respect to those remarks or

18  other matters.

19       THE COURT:  No, I don't have any questions.

20       Let me hear from others who would like to be heard.

21  Mister --

22       MR. MASON:  Your Honor, may I -- oh, sorry.  I

23  didn't mean to interrupt anyone.

24       MR. STANG:  Your Honor, the committee would like to

25  be heard briefly.

1       MR. MASON:  And after the committee, Your Honor,

2  the ad hoc committee of local councils, please.

3       THE COURT:  Thank you.

4       Mr. Stang.

5       UNIDENTIFIED:  (Indiscernible)

6       MR. STANG:  Thank you, Your Honor.

7       I can't comment too much on what Ms. Lauria -- I'm

8  sorry -- on what Ms. Lauria said about this new plan.  We'll

9  see it and we'll review it.

10      Her Toggle B, at least the way she described it,

11  sounds like what we were referencing in our objection to

12  exclusivity, but we'll see.

13      But I would -- I don't want to turn this into a

14  complaint session about what happened in Miami.  But I do

15  want to point out that the committee has been left out of any

16  discussions since Miami.  At Miami, we asked for permission

17  to address -- because that's what you have to do, you have to

18  ask for permission -- to address all parties-in-interest, but

19  BSA in particular, about claims models.  That request was

20  never responded to by the mediators, except we were told on

21  the last day of the mediation that we were excused because

22  apparently nobody wanted to talk to us.

23      And so, if there is a plan to be filed tomorrow

24  that has a claims matrix in it with values, no one has talked

25  to us about those values, other than a presentation by the

debtor as to its claims model, which we asked for an ability

to respond to in the mediation forum, and we were ignored.

So I don't know what this thing is going to look like.  But

if the debtors' MO continues, it's going to be that the

committee is not a party that it thinks is particularly

relevant to the formulation of its Toggle B plan, or, for

that matter, maybe its Toggle A plan, and it's unfortunate.

But we have not withdrawn from the mediation.  We

attended the days that we were told we were wanted there.  We

had some discussions with some of the mediation parties, but

obviously not all of the ones we wanted to.  And we will

continue to participate in an effort to reach a consensual

plan.

We are having discussions with the debtor regarding

our restricted asset adversary proceeding, and it would be

great if we could reach a resolution on the BSA contribution

around that negotiation.  So I don't want the Court to think

that we have withdrawn from the process.  We have not.  We

want to be engaged with the debtor, we are engaged with the

coalition, we are a joint party in the estimation motion.

But the debtor is being very careful about who it's talking

to and who it's not talking to.  And on certain material

issues, they're not talking to us.  So we look forward to

seeing what they file, Your Honor.

THE COURT:  Thank you.

1          Mr. Mason.

2          MR. MASON:  Thank you, Your Honor.  Can you hear

3     me?  I just want to make sure the computer is working.

4          THE COURT:  Yes.

5          MR. MASON:  Thank you, Your Honor.  Again, Richard

6     Mason, Wachtell, Lipton, Rosen & Katz for the ad hoc

7     committee of local councils.

8          And Your Honor, just as a brief reminder, the ad

9     hoc committee consists of eight local councils, drawn from

10    across the country.  The members of the ad hoc committee are

11    all volunteers, and my firm is representing the committee pro

12    bono.

13         Prior to the petition date, Your Honor, the BSA

14    asked that I form the ad hoc committee, so that local

15    councils could have an active voice in these proceedings, and

16    we have been very active, Your Honor, both in court and

17    outside.  Outside of court, in particular, we have spent

18    thousands of hours, volunteer hours, amongst ourselves and

19    with the over 250 local councils to try to determine the art

20    of the possible in meeting the twin goals of the BSA case;

21    that is, compensating victims and maintaining the scouting

22    mission.

23         Now, for a global resolution to be achieved, Your

24    Honor, in our view, that means literally thousands of

25    volunteers across the country have to agree.  But we

understand that the principal focus of the mediators and the mediation parties over the last several weeks has been, as it should be in our view, I'll just say "elsewhere," without saying too much.

When it comes time, Your Honor, to negotiate and finalize the local council contribution, we believe it is essential that the ad hoc committee be involved, much more involved than we have recently been asked to be, if a global resolution is to be achieved, certainly within the time frame that Ms. Lauria has laid out.

And for our piece, Your Honor, I'll just say the following:  Based on our work and our extensive interaction with our fellow local councils -- far more interaction, I think, candidly, than other parties have had -- we believe that local councils, in the aggregate, can make and are prepared to make a substantial contribution of cash, property, and insurance rights to resolve the BSA case.  But the amount and other terms, in our view, need to be realistic, in light of all of the circumstances.

So, Your Honor, I just want to say for the Court and everyone our sleeves are rolled up and we're ready to work with the other mediation parties, if they're willing, particularly if we have a bit more time before the disclosure statement hearing to achieve a realistic global solution involving the local councils.  We're here and we hope the

1  other parties are, as well.  Thank you.

2          THE COURT:  Thank you.

3          Mr. Anker.

4          MR. ANKER:  Good afternoon, Your Honor.  Can you

5  hear me okay and the other parties?

6          THE COURT:  Yes.

7          MR. ANKER:  Thank you.

8          Your Honor, let me start out by not complaining

9  about the debtor freezing us out and refusing to negotiate.

10  There have been extensive negotiations.  And I appreciate Ms.

11  Lauria's comment that she appreciates the efforts by, in

12  addition to the coalition and the FCR, several of the

13  insurers.

14          I'm not going to take personal credit, I didn't go

15  to Miami in person, though I did participate by Zoom.  But my

16  colleague Mr. Ruggeri, who is on the line, as well as the

17  head of litigation for Hartford, went down in person and met

18  with the debtor and others.  I think it is fair to say there

19  is progress.  But it's also fair to say there isn't a deal.

20  And I'm not going to comment further and violate any

21  mediation privilege.  But I did want to say people are trying

22  and I'm not here to complain about that process.

23          What I do want to comment briefly about is

24  estimation.  We, too, will be filing an objection come this

25  Thursday, both to the withdrawal of the reference and the

pending current estimation motion.  That motion -- and I

don't know if Your Honor has read it yet -- is rather

remarkable.  What it seeks -- and this is the motion filed by

the FCR, the coalition, and the TCC -- is not an estimation

of any claim in particular for the purpose of allowance under

Section 502, but an estimation of the debtors' aggregate

liability by calendar year, and the policies are by calendar.

This is an obvious effort to try to get an order

out of Your Honor, or the District Court, if not Your Honor,

that the plaintiffs can then parade later in coverage for it

and say ah hah, the aggregate liability by policy year.  So

the Hartford policy years are X, Y, and Z; the Century policy

years are A, B, and C.  We know what the aggregate liability

is, that's been liquidated.  And this isn't the first time

this has been tried in an effort to use Bankruptcy Court

orders that plainly are not liquidations, plainly not

allowance of claims, not for any bankruptcy purpose, for --

but for coverage purposes.

I will say, Your Honor, I haven't seen the debtors'

motion, so I can't say today whether we will object to it or

not.  But if it is an attempt to do something similar, to

strong arm the carriers and deny them their rights to have an

actual adjudication in accordance with their policies of what

claims are valid and not and what liability they have, and

misuse Your Honor's own orders, A, we're not going to let

1   Your Honor be confused about what's being attempted; and, B,

2   we will certainly object to that and protect our rights.

3        I hope that isn't going to -- what is being

4   attempted by the debtor.  It is plainly what is being

5   attempted by the FCR, the coalition, and the TCC.  And we

6   will respond to that both in an objection we will be filing

7   before Your Honor this Thursday to the estimation motion, and

8   an objection to the motion to withdraw the reference to the

9   District Court.  I just wanted to alert you to that.

10        I'll also say one other thing.  To the extent

11  there's been estimation proceedings in mass tort cases, not

12  allowance, the real estimation -- so, for example, for

13  purposes of deciding whether the treatment, for example, of -

14  - whether enough was being contributed by the debtors, so

15  they could treat all claimants as unimpaired.  That was the

16  issue in Garlock.  In similar cases, you have estimation

17  proceedings that went on a year, literally a year or longer.

18        I appreciate, from Ms. Lauria's standpoint, why

19  that is impossible here.  And I'm going to accept that

20  representation at face value.  I certainly take at face value

21  that $100 million in professional fees in a case of a not-

22  for-profit like the Boy Scouts is not viable, and another 100

23  million will be even less viable.

24        And so, if there is an attempt to really get an

25  estimation that is an any way, shape, or form binding or

1    probative, even, for future coverage litigation, we will,

2    regretfully, have to become an obstacle in that because

3    that's not consistent with due process and not consistent

4    with our rights as -- our clients' rights as carriers.  I

5    don't want to do that.  I don't want to do -- say I'm not

6    going to do it lightly because we, too, would like to see

7    this debtor emerge from bankruptcy and reorganize

8    (indiscernible) our clients' rights.

9           And so we'll oppose the existing motion, which is

10   plainly an effort to do that.  And as to what the debtors

11   ultimately file, we will review it in good faith and,

12   hopefully, we won't have to take a similar position.  Thank

13   you, Your Honor.

14              THE COURT:  Thank you.

15              MR. MOLTON:  Your Honor, may I go next?

16              THE COURT:  Who was that?

17              MR. MOLTON:  Your Honor, may I -- it's Mr. Molton,

18   Your Honor, for the coalition.

19              THE COURT:  Yes.  Mr. Molton.

20              MR. MOLTON:  Thank you.

21           First, I want to respond to my friend Mr. Anker.  I

22   had my -- I thought today was April 12th and not May 19th.

23   May 19th is the date for argument on the estimation motion.

24   My friend Mr. Anker has used this opportunity to give us a

25   preview of his argument.  Be advised, Your Honor, I'm not

1    going to do the same.  We're going to just put on the record

2    that we disagree with much of what Mr. Anker, if not all of

3    what he said.

4           And the time will come when we'll put in front of

5    you, Your Honor, the issues as to estimation, none of which

6    are remarkable, none of which will take the time Mr. Anker

7    said, and all of which will move this case to a successful

8    conclusion, we believe, from the coalition, into 2020, along

9    the lines of what the debtor had articulated as their time

10   line.

11          So, in any event, we'll reserve our rights.  And

12   I'm not going to hold Mr. Anker to deduct from his time on

13   the 19th of May, the units he used now, I'll let him do it

14   again, if Your Honor -- if your -- you know, I will not be

15   asking that of Your Honor.

16          In any event, Judge, I do want to say a few things

17   about what Ms. Lauria said because I think there were some

18   points that we should be cognizant of, is that parties are

19   working hard with the debtor and other mediation parties, in

20   the context of a mediated resolution of what is a very, very

21   complicated case, a challenging case, as Your Honor knows.

22          Yes, it's true that no agreements were reached at

23   Miami, that we can report to you today.  But the parties are

24   talking, phone lines are open, calls are being responded to.

25   And even as late as within the last hour, Your Honor, the

1    coalition has been hard at work in dealing with mediation

2    issues with respect to the parties, you know, the mediation

3    parties.  And we look forward to putting rubber to road, so

4    to say, on that, and seeing if they can bear fruit.

5         I don't want to go any further than that.  But

6    nobody should take away from this status conference that

7    Miami happened, and then it was over.  No, Miami was a

8    beginning that set -- you know, that the parties were able to

9    understand each other's positions.  And it has served for a

10   basis for continual discussions and serious, serious

11   negotiation.

12        I do want to say, Judge, that the coalition had its

13   mediation delegation on the ground in Miami, meeting with

14   various mediation parties that were there, you know,

15   including the debtor and insurers.  And we had folks on, you

16   know, digital, as well, participating.  It was a challenging

17   endeavor to do this in the way that it was done.  But I

18   think, all in all, looking back at it, it was successful in

19   allowing the parties to articulate their positions,

20   understand each other's positions, and set the groundwork for

21   further discussions.

22        So, in any event, Your Honor, that's what I would

23   like to say.  And if Your Honor has no more questions, I'll

24   leave it at that.

25        THE COURT:  Thank you.

1       Who would -- who else would like to be heard?

2           MR. SCHIAVONI:  Century, Your Honor.

3           THE COURT:  Yes.

4           MR. SCHIAVONI:  If you --

5           THE COURT:  Before that, please, everyone check

6   your audio to make sure you're muted.  I'm getting some

7   background.

8           Mr. Schiavoni.

9           MR. SCHIAVONI:  Thank you, Your Honor.  Tanc

10  Schiavoni for Century Indemnity.

11          Your Honor, I flew to Miami, I was there the whole

12  week.  I stayed a few days to -- I basically traveled on a

13  safer route back.  My client was available.  The actual

14  reality on the ground was that Century was excluded from all

15  meetings with -- between the Boy Scouts and the coalition,

16  save for an opening meeting.  That's true with respect to, I

17  believe, essentially all of the other insurers, except for

18  Hartford.  There were meetings throughout the session between

19  Hartford and the Boy Scouts and the coalition.  But by and

20  large, the other insurers -- or not "by and large."  The

21  other insurers were -- had one discussion or two with one of

22  the mediators, but were not -- were excluded from all of the

23  discussions between the Boy Scouts and the coalition.

24          We are hopeful that things will go in a positive

25  direction here, and we still are -- you know, hold out an

**A0360**

olive branch to engage.  But you know, to be clear here, you know, what had happened is the debtor is engaging with an ad hoc committee that isn't bound by fiduciary duties, which has made multiple threats, as we set out in the 2019 motions we filed.  These are very challenging discussions, what's gone on here.

We're very concerned that we face an enormous moral hazard in how this case reaches a landing.  In essence, we are, at this point, almost completely in the dark as to what the debtor is doing.  I mean, what I just heard from Ms. Lauria is all complete news to us.  I had no idea that this is where they are.  It may be a positive; it may be a negative.  Anything new, in my mind, is potentially a positive.  I'm looking at the glass half full.  You know, we've gotten -- we've written them saying -- you know, giving them our phone number to call us.  We're, you know, anxious to work with them over the next couple of days.

But the bottom line here is that we face a genuine enormous moral hazard, which we're very familiar with how that went down in Imerys.  We do think -- we're not seeking delay for the purpose of delay.  But under 3017, we ought to have the basic 28 days to, you know, examine the disclosure statement and engage on it.  And that's -- you know, our substantive rights in that regard shouldn't be trampled because of the spending.

1    There has been enormous spending here.  But Your

2    Honor, the spending is being talked about as if it's almost

3    like an act of God, you know, a drought that's occurred or

4    something that no one has had any control over.  The debtor

5    is in significant control over this spending.  There has not

6    been open-ended litigation in this case.  It is true that

7    Century has brought several motions, but they've been

8    brought, not against the debtor or the TCC; they've been

9    brought against the coalition, which is not an estate

10   professional and doesn't bill the estate.  The T -- honestly,

11   both the TCC and the debtor really sat aside on those

12   motions, so we can't be blamed for this spending.  The

13   spending has largely occurred in the context of essentially

14   no contested litigation going on.

15   The debtor has huge control over this.  We've urged

16   them to do things like enhance the budgets they have.  We've

17   urged them to do things like the U.S. Trustee, Mr. Vara, has

18   put in place in another abuse case in the last several weeks,

19   in the District of New Jersey, he's imposed a case-ending

20   holdback instead of 20 percent, so that the estate

21   professionals are -- have a holdback until the end of case.

22   We continue to think that actually would be a very productive

23   suggestion here, and encouraging everyone to really focus on

24   getting the case done.  But yes, I got it, that even that

25   suggestion coming from me sounds like, you know, a Trojan

1    Horse, Greeks bearing gifts, et cetera.  But it's,

2    nonetheless, a good idea.

3         But the main point here is our substantive rights

4    to deal with this disclosure statement should not be trampled

5    because of the spending, which we have no control over,

6    frankly, at all.  This is a huge -- it's like this case poses

7    tremendous threats to these -- you know, my client is a

8    runoff, it has limited assets.  You know, you've seen the

9    papers that have been put in.  It's like they're

10   (indiscernible) it's like we need our rights under 3017.

11   That's the second point I'd like to make.

12        The third point, Your Honor, is we do have two

13   motions before you.  And I just want to just explain to you

14   why they actually are important to be decided.  The 2019

15   motion, it's a supplemental motion that -- look, I'm the

16   first to say that I think, when we brought the 2019 motions

17   before Your Honor, you might have been wondering what is this

18   all about, is this a waste of time.  But I think as you've

19   seen how the case has evolved, how the negotiations are

20   taking place and how the subgroups have evolved, identifying

21   the subgroups and whether we really have a controlling vote

22   is actually very important.  And what's been driving them is

23   very, very important to resolving this case.  And we think

24   your rulings on the 2019, so far, have been helpful.

25        What we have on the supplemental motion we have

before you on 2019, it deals with a very fundamental problem
we have. The coalition, the biggest block of votes within
the coalition is by an entity calling itself "AIS," Abused in
Scouting. It's sort of -- we've previously argued this to
you. It's sort of presenting itself as a conglomerate
organization when it's really sort of three firms working
together.

But we have one of the -- one of the co-lawyers who
co-share those claimants is regularly publishing statements
about liquidating the Boy Scouts. We've included some of
those statements in the 2019 that he publishes on the web.
And they go out to like a list of other plaintiffs' lawyers
and other claimants. Meanwhile, you know, the negotiations
for the coalition are being led at the very same time by his
co-counsel, who shares the same exact clients, who is
purporting to run the negotiations in the -- in Miami and
elsewhere. Okay?

It's important for all the parties to know does the
coalition, in fact, have a majority vote. You know, is AIS
acting as one entity, or is there an issue here because the
two -- you know, is this some sort of negotiating ploy,
having one co-counsel say he's liquidating the Boy Scouts,
and the other saying he's negotiating to a resolution, or is
there a genuine conflict between the two counsel? That 2019
motion is important for that reason. It goes to who the

1    parties are dealing with and whether they think there

2    actually could be a deal with them.

3          But we would ask you to consider looking at those

4    motions.  I don't think Your Honor needs to schedule further

5    argument on them, or at least we'd be prepared to waive

6    argument, if it (indiscernible) decision.

7          The other motions before Your Honor are Century's

8    2004 motions that go to how the claims were generated.  And I

9    got it, but there's a huge temptation to sort of put this off

10   and put off decision on it until somehow discovery comes

11   along.  But you can see what's happening.  It's like there's

12   a proposal now that like we should wait for all discovery

13   until right at the end, right before confirmation, and even

14   defer this discussion until after estimation.

15        The fact of the matter is the 2004 discovery is

16   threshold discovery that was supposed to put us in a position

17   to file omnibus objections before solicitation.  So deferring

18   -- if there's a rush to move this forward, I would just

19   suggest that that rush mandates or -- maybe that's too harsh

20   of a word, I apologize -- it, you know, encourages,

21   incentivizes a ruling on the 2004 motion sooner, rather than

22   later.

23        And we do think those motions are extremely

24   meritorious.  We don't think solicitation can go forward when

25   there's hundreds of proofs of claim that they're, you know,

1   basically, you know, forged signatures, we've submitted, and

2   other like very serious problems about them.  So we would ask

3   that that motion not be held up as part of some package on

4   estimation, but that it be dealt with, you know, as soon as

5   Your Honor can issue a decision on it.

6        And just last, Your Honor, I don't -- I'm not

7   intending to get into arguments about estimations.  But you

8   know, to be clear, this is sort of being marshaled as some

9   sort of weapon.  If you were to -- if you were to grant an

10  estimation motion, you will be the first judge in the United

11  States of America to estimate sexual abuse claims.  The only

12  other judge that's looked at this, it's the only other

13  citation in the TCC's brief, when you read the decision, was

14  horrified at the notion of the complex and bizarre issues it

15  would get involved in.

16       The other thing about it that no one has even

17  mentioned is that this is an estimation motion, not just of

18  the Boy Scouts liability, it's an estimation of nondebtor

19  liability.  In other words, they're going to ask -- are

20  asking that you estimate the liability of the local councils

21  and of the sponsoring organizations.  To be clear, there's

22  over 5,000 sponsoring organizations and 253 local council

23  entities.

24       We don't think, as a matter of law, the estimation

25  procedures ever could be used to estimate nondebtor

**A0366**

1    liabilities, and we think it's dead on arrival for that

2    reason, all by itself.  But we also don't think it's actually

3    possible to estimate, you know, by putting on some

4    statistician, the different liabilities based on 5,000

5    different sponsoring organizations, all with their own kind

6    of unique and peculiar facts involving each of those

7    institutions.

8           And the same goes true with (indiscernible) local

9    councils.  Obviously, that kind of discovery would take

10   months, it would be -- it is -- I -- you know, in just the

11   most concise word possible, this estimation is an appeal

12   magnet.  It will -- it's like, you know, to the extent there

13   were efforts to do this for an entirely different reason, in

14   W.R. Grace, in Owens Corning, it generated so many different

15   appeal issues.  It was like an appellate lawyer's dream.

16   This will be a disaster to go this route (indiscernible) so,

17   Your Honor, we think that's a reason -- the only reason I

18   bring that up is the 2004 and the 2019 discovery rulings

19   shouldn't wait for that to happen.  It should go forward now.

20          And again, to just sum up on a happy note, it's

21   like, you know, we're prepared to engage if anybody reaches

22   out to us.  But right now, quite bizarrely, I'm with Mr.

23   Stang, and both of us are in the dark on sort of where the

24   debtor is, Your Honor.  So thank you.  Thank you very much

25   for listening.

1          THE COURT:  Thank you.

2          Is there anyone else who would like to be heard?

3     (No verbal response)

4          THE COURT:  Okay.  Well, I've received a request to

5     push the disclosure statement hearing, and it makes sense

6     because the debtors are going to be making new filings.  So

7     we're going to let the debtor make the new filings, and we'll

8     all see what they are.  And we will move the disclosure

9     statement hearing to May 19th.  And we'll move the objection

10    to the disclosure statement hearing accordingly, objections

11    to the disclosure statement.

12         MR. SCHIAVONI:  And Your Honor, does that include

13    the solicitation procedures, too?  I think they're part of

14    the same motion, so --

15         THE COURT:  Yes, that's going to include --

16         MR. SCHIAVONI:  -- they both --

17         THE COURT:  -- anything related to the disclosure

18    statement and solicitation procedures.  And that should give

19    people plenty of time to take a look at what the debtor is

20    going to file on Thursday.

21         MR. LUCAS:  Your Honor --

22         THE COURT:  And we'll --

23         MR. LUCAS:  -- this is John Lucas.

24         THE COURT:  We'll go from there.

25         Mr. Lucas.

1          MR. LUCAS:  Yeah, I'm sorry, Your Honor.  I'm just

2     not clear when the objection deadline is now.  Can maybe Ms.

3     Lauria or somebody clarify that for us?

4          THE COURT:  What do we usually --

5          MS. LAURIA:  This is Jessica --

6          THE COURT:  -- do with --

7          MS. LAURIA:  -- Lauria.

8          THE COURT:  Yeah.

9          MS. LAURIA:  Yeah.  I apologize, Your Honor.  I

10    don't know the current time line in front of me, and I can't

11    recall if that objection deadline was scheduled 7 or 14 days

12    in advance of the hearing.  We would, as Your Honor just

13    suggested, utilize the exact same timing that is currently in

14    place, whether it's 7 or 14 days, and notice it out

15    accordingly.

16         THE COURT:  Yes.  It will get re-noticed.

17         MR. LUCAS:  (Indiscernible) thank you.

18         UNIDENTIFIED:  (Indiscernible)

19         THE COURT:  I'm hearing somebody's discussion.

20       (Pause)

21         THE COURT:  Okay.  What is left, if anything, for

22    Thursday?

23         MS. LAURIA:  Your Honor, the hearing this Thursday

24    is the hearing with respect to the debtors' exclusivity

25    motion.  One objection has been filed, which was the

**A0369**

1    objection of the TCC.  Obviously, they have not seen the

2    documentation that we just described, so I'm sure they're

3    unable to represent if they're going to continue with that

4    objection.  But we would be prepared to go forward with that

5    on Thursday.

6              THE COURT:  Okay.  Okay.  Well, I appreciate the

7    status.  I appreciate all parties' efforts to continue

8    discussions.  I'm hearing that some parties were more

9    involved than other parties with respect to the mediation, or

10   at least -- and some parties feel they weren't fully utilized

11   at the mediation.

12             I would, of course, encourage all parties to talk

13   to all other parties, to see what can be resolved.  But I'm

14   heartened to hear that the parties -- some of the mediation

15   parties are still having discussions post the March mediation

16   down in Miami.  And I would expect that those communications

17   would continue.  Any momentum that was generated by the

18   mediation is welcome, and I would hope that that momentum

19   could continue and could broaden to include parties who feel

20   they were not fully utilized during the mediation.

21             Anything else?

22             MS. LAURIA:  Not from your -- the debtor, Your

23   Honor.  Thank you for your time today.

24             THE COURT:  Okay.  Thank you, everyone.  We're

25   adjourned.

**A0370**

1          COUNSEL:  Thank you, Your Honor.  Thank you, Your

2     Honor.

3          (Proceedings concluded at 3:55 p.m.)

4                         *****

1    <u>CERTIFICATION</u>

2         I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____    April 12, 2021

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable

**A0372**